# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| )<br>)<br>IN RE SEALED )<br>SEARCH WARRANT )<br>)<br>) | CASE NO. 1:26-MI-12 |

## JOURNALIST JUSTIN GLAWE'S MOTION TO INTERVENE AND TO UNSEAL COURT RECORDS WITH MEMORANDUM OF LAW IN SUPPORT

Journalist Justin Glawe hereby moves to intervene in this matter and to unseal and obtain access to court records related to a search warrant executed on January 28, 2026, at the Fulton County Election Hub and Operation Center. Specifically, Mr. Glawe seeks an order unsealing the warrant, the warrant application, any supporting affidavits, the return, and any other judicial records related to the warrant, including motions to seal, the docket in the original search warrant case number (Case No. 1:26-MC-0177), and the docket in this case (together, the "Search Warrant Materials").[1]

---

[1] Mr. Glawe notes that this motion has been filed under seal only because that procedure is required where, as here, the entire docket is under seal. He does not believe there is good cause to seal this motion, given that it only discusses publicly available information, and it should be unsealed alongside the Search Warrant Materials.

# I. INTRODUCTION

On January 28, 2026, the U.S. Department of Justice took the extraordinary action of searching a county election office in execution of a search warrant issued by this Court. The search warrant targeted material including records from and related to the 2020 election results in Fulton County, which had been held in the custody of the Fulton County Superior Court. These particular election results have withstood numerous recounts and lawsuits—none of which produced evidence that cast doubt on the results of the 2020 election, let alone come anywhere close to warranting a reversal in outcome. As of this writing, Fulton County has made public the warrant in its possession, but the affidavit purporting to justify probable cause for a criminal violation in connection with Fulton County's 2020 election results remains sealed, along with every other judicial record related to the warrant. The public is therefore left with no means to evaluate or understand the federal government's basis for taking such an extraordinary action, which on its face risks endangering the constitutional mandate of the states to conduct free and fair elections. *See* U.S. Const., art. I, § 4, cl. 1.

The search and seizure of Fulton County's election records has already been the subject of countless news reports nationwide. That coverage includes stories by Mr. Glawe—an independent journalist who has written for national and international publications including The Guardian, The New York Times, the

Washington Post, Rolling Stone, and Esquire. He now seeks access to the Search Warrant Materials that will tell the full story of how and why the search warrant that resulted in the seizure of Fulton County's election records was issued. Mr. Glawe has standing to intervene here and seek access to those records in furtherance of the long-established common law and First Amendment right of access to judicial records in criminal proceedings. Because the government cannot overcome the significant presumption in favor of access, the Search Warrant Materials should be unsealed.

## II.     BACKGROUND

### A.     President Trump's Ongoing Efforts to Question the Results of the 2020 Election

The results of the 2020 presidential election in Georgia, including those from Fulton County, have been repeatedly analyzed—recounted, audited, scrutinized in numerous lawsuits in state and federal court. And while vote tallies have shifted slightly (as is typical in vote recounts and audits[2]), no legal proceeding

---

[2] Deb Otis and Bryan Huang, *An Analysis of Statewide Election Recounts, 2000-2023*, FairVote (Oct. 28, 2024), https://fairvote.org/report/election-recounts-2024/ ("Statewide recounts resulted in an average margin shift of 551 votes between the frontrunners, representing 0.03% of the vote," they "typically widen the gap between the top two candidates instead of decreasing it," and out of the 6,929 statewide general elections between 2000 and 2023, recounts have resulted in only 3 reversals—i.e., one out of every 2,310 statewide elections; each of those three reversals occurred in elections where the initial margin was less than 0.06% of all votes cast for the top two candidates).

or analysis of the election returns has called into question the outcome of the 2020 election.[3]

Nevertheless, President Trump has continued to question the results of the 2020 election, with a particular fixation on Fulton County, Georgia. In December, the Department of Justice filed a civil lawsuit against Fulton County Clerk of Superior Court Ché Alexander, seeking absentee ballot signature envelopes, digital files, and other records from the 2020 election in purported violations of two provisions of the Civil Rights Act of 1960: 52 U.S.C. §§ 20701 and 20703. *See generally* Dkt. 1 (Compl.), *United States v. Ché Alexander*, No. 1:25-cv-07084-

---

[3] *See, e.g.*, Kate Brumback, *Georgia again certifies election results showing Biden won*, AP News (Dec. 7, 2020), https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a; Mark Niesse and David Wickert, *Conspiracy v. reality: 2020 election fraud claims persist, but most are debunked*, AJC Politics (Oct. 30, 2024), https://www.ajc.com/politics/5-georgia-fraud-claims-from-the-2020-election-separating-fact-from-fiction/VWFCVFL55VEEVEPZ5Q62COV4R4/; Rosalind S. Helderman and Elise Viebeck, *'The Last Wall': How Dozens of Judges Across the Political Spectrum Rejected Trump's Efforts to Overturn the Election*, Washington Post (Dec. 12, 2020), https://www.washingtonpost.com/politics/judges-trump-election-lawsuits/2020/12/12/e3a57224-3a72-11eb-98c4-25dc9f4987e8_story.html; *Major Pending Election Cases*, Election Law at Ohio State, https://electioncases.osu.edu/case-tracker/?sortby=filing_date_desc&keywords=&status=all&state=all&topic=25; *see also Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*, Georgia Secretary of State (Nov. 19, 2020), https://sos.ga.gov/news/historic-first-statewide-audit-paper-ballots-upholds-result-presidential-race; *Secretary Raffensperger Announces Completion of Voting Machine Audit Using Forensic Techniques: No Sign of Foul Play*, Georgia Secretary of State (Nov. 17, 2020), https://sos.ga.gov/news/secretary-raffensperger-announces-completion-voting-machine-audit-using-forensic-techniques-no.

TWT (N.D. Ga. Dec. 11, 2025). On January 5, 2026, Ms. Alexander moved to dismiss this complaint, arguing that the requested records have nothing to do with either of these statutory provisions, which respectively address retention of certain election documents and establish parameters under which the Department of Justice can investigate discriminatory voter registration practices. *See generally* Dkt. 18 (Mot. to Dismiss), No. 1:25-cv-07084-TWT (N.D. Ga. Jan. 5, 2026). Ms. Alexander further explained that the requested records remain under seal in her custody, pursuant to state court order, and if the Department of Justice could identify a legitimate basis for access to the requested 2020 election materials, then it should seek an order from the Fulton County Superior Court to unseal those materials.[4] *Id.* at 3.

Since Ms. Alexander's motion to dismiss, President Trump has escalated his rhetoric about the 2020 election, making dozens of statements on Truth Social and

---

[4] The Georgia State Election Board ("SEB") has also sought these same records from the Fulton County Board of Registrations and Elections. On December 19, 2025, the Fulton County Superior Court denied a motion to quash a subpoena from the Chair of the Fulton County Board of Registration and Elections Sherri Allen, which sought to quash a subpoena (and later sought declaratory and injunctive relief) from the State Election Board seeking many of the same records from the 2020 election. *See generally* Dec. 19, 2025 Order Denying Quashal, No. 24CV014632 (Fulton Cty. Super. Ct. Dec. 19, 2025). The order, however, "require[d] the SEB to pay for what it wants," *id.* at 4, and Fulton County estimated it will cost nearly $400,000 to comply with the subpoena. David Wickert, *Judge keeps alive subpoenas of Fulton County's 2020 election records*, AJC (Dec. 29, 2025), https://www.ajc.com/politics/2025/12/judge-keeps-alive-subpoenas-of-fulton-countys-2020-ballots/.

in public appearances pushing unsubstantiated allegations of fraud in the 2020 election, including calls for criminal prosecution.[5]

### B. The Execution of the Search Warrant

On January 28, 2026, the FBI conducted a search of the Fulton County election office, in execution of a search warrant issued by this Court (the "Search Warrant").[6] The FBI seized more than 650 boxes of documents and other materials, packed them into rented box trucks, and took them to the FBI's Central Records Complex in Virginia.[7] In one of many unusual facts related to this search warrant, Director of National Intelligence Tulsi Gabbard was present for the FBI's search and seizure; it has also been reported that she arranged a call between President Trump and frontline FBI agents the next day, wherein he questioned agents

---

[5] *See, e.g.*, *Davos 2026: Special Address by Donald J. Trump, President of the United States*, World Economic Forum (Jan. 21, 2026), https://www.weforum.org/stories/2026/01/davos-2026-special-address-donald-trump-president-united-states-america/ ("[The war in Ukraine] wouldn't have started if the 2020 US presidential election weren't rigged. It was a rigged election. Everybody now knows that. They found out. People will soon be prosecuted for what they did.").

[6] Although the Search Warrant itself remains technically under seal, it has been widely published, and Ms. Alexander filed a copy of it in the DOJ's pending civil lawsuit seeking the same documents. *See* Dkt. 22-1, *United States v. Ché Alexander*, No. 1:25-cv-07084-TWT (N.D. Ga. Jan. 29, 2026).

[7] Hannah Rabinowitz, Evan Perez, Tierney Sneed, Jason Morris, and Shawn Nottingham, *FBI searches Fulton County elections office as it investigates alleged voter fraud*, CNN (Jan. 28, 2026), https://www.cnn.com/2026/01/28/politics/fulton-county-election-office-fbi-warrant.

directly about the search and their findings.[8]

Following the search, President Trump dialed up his rhetoric even further, using his ongoing, unsubstantiated claims of "corruption" in Fulton County as a justification to call for Republicans to "nationalize" elections.[9]

## C.    The Substance of the Search Warrant

The Search Warrant authorized the seizure of all physical ballots, tabulator tapes, ballot images, and voter rolls from the 2020 general election, and authorized the seizure or copying of electronic storage media and electronically stored information in order to locate evidence, fruits, and instrumentalities described in the warrant. *See* Search Warrant at Attachment B. It does not name any individual subjects or targets of the investigation. *See generally id.*

The Search Warrant lists two election statutes as the potential criminal violations justifying the warrant: 52 U.S.C. § 20701 and 52 U.S.C. § 20511. *Id.* at 1. As previously noted, 52 U.S.C. § 20701 was enacted as part of the Civil Rights Act of 1960 and requires election officers to preserve all voter registration records

---

[8] *See, e.g.*, Luke Barr, Rachel Scott, and Beatrice Peterson, *Tulsi Gabbard arranged Trump call with FBI agents after Georgia election raid: Sources*, ABC News (Feb. 2, 2026), https://abcnews.go.com/US/dni-director-arranged-fbi-agents-searched-georgia-election/story?id=129794862.

[9] Erica L. Green, Michael Gold, and Robert Jimison, *Trump Repeats Call to 'Nationalize' Elections, as White House Walks It Back*, New York Times (Feb. 3, 2026), https://www.nytimes.com/2026/02/03/us/politics/trump-save-act-elections.html.

and records of any "other act requisite to voting" for 22 months after any federal election. *See* 52 U.S.C. § 20701. 52 U.S.C. § 20511 is part of the National Voter Registration Act of 1993, and it criminalizes threats and coercion in the voting process, as well as fraud in the voter registration process and the tabulation of ballots known to be fraudulent, carrying a maximum five-year prison term. *See* 52 U.S.C. § 20511.

As of this filing, the affidavit purporting to justify the federal government's unprecedented search and seizure of local election records remains sealed in its entirety, alongside every other judicial record related to the warrant. Although Fulton County reported on February 4, 2026, that it filed its own motion seeking to unseal the probable cause affidavit, that motion too was apparently also filed under seal and has not been released by Fulton County or otherwise made publicly available.[10]

The press and the public have been left in the dark as to what exactly the federal government's basis was for a search that appears to be an end-run around the civil discovery process in pending litigation, premised on alleged criminal violations that are almost certainly time-barred, as to election results that have been

---

[10] Kate Brumback and Nicholas Riccardi, *Legal fight escalates over Georgia voting records as Trump says he wants to 'take over' elections*, AP News (Feb. 4, 2026), https://apnews.com/article/fbi-georgia-elections-fulton-county-2020-ballots-532b6daf318c79c471cd7f145c9f2215.

repeatedly confirmed through a variety of recounts, audits, and review by the state and federal officials and courts, premised entirely on the personal animus of the loser of the 2020 presidential election.[11] The public has a right to fully understand the basis of the federal government's actions, particularly given the concerning potential implications for the ability of Fulton County and the State of Georgia to regulate their own elections.

### D. Mr. Glawe's Coverage of Georgia Elections and the FBI's Search and Seizure of Election Records

Mr. Glawe is a writer and independent journalist. He publishes American Doom, a newsletter in which he chronicles stories of unrest and upheaval in America. After starting his journalism career at the *Peoria Journal Star* and the *Bemidji Pioneer*, he has been a freelancing since 2013. He covered the protests in Ferguson, Missouri, following the shooting death of Michael Brown and then spent two years chronicling stories of police shootings. He then moved to Texas and spent several years covering immigration and border issues, often reporting from Juarez and El Paso. His work has been published in outlets such as The Guardian, The New York Times, Rolling Stone, the Washington Post, Zeteo, Esquire, and The Bulwark, among others.

He is currently based in Savannah and writes for a national audience on a

---

[11] *See supra* n.2.

range of topics relating to Georgia, such as the immigration raid at the Hyundai plant in Bryan County, Georgia and legal battles over Gullah-Geechee property.[12] Specific to this case, Mr. Glawe has covered Georgia's elections and conspiracy theories about the 2020 election.[13] In recent days, he has covered the search of the Fulton County elections office that resulted from the search warrant issued in this case.[14] He intends to continue covering this case, and to do so thoroughly, he needs access to the documents he is seeking to unseal here.

## III.    STANDARD OF REVIEW

Under both the common law and the First Amendment, court proceedings and court records are presumptively open and accessible to members of the public and press. *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1310-11

---

[12] Justin Glawe, *Republican Candidate Takes Credit for Trump Immigration Raid at Hyundai Plant*, Rolling Stone (Sept. 5, 2025), https://www.rollingstone.com/politics/politics-features/trump-branum-republican-hyundai-georgia-immigration-raid-1235422245; Justin Glaw, *Inside a controversial auction of Gullah-Geechee homes: 'This land needs to be protected,'* The Guardian (Nov. 3, 2023), https://www.theguardian.com/us-news/2023/nov/03/gullah-geechee-auction-land-real-estate-south-carolina.

[13] Justin Glawe, *Potential 2024 'Chaos': Election Deniers Refusing to Certify Results*, Rolling Stone (March 17, 2024), https://www.rollingstone.com/politics/politics-features/election-deniers-refuse-certify-chaos-2024-1234988747/; Justin Glawe*, Republican promoters of election fraud falsehoods approve ballot hand-counts*, The Guardian (July 28, 2023), https://www.theguardian.com/us-news/2023/jul/28/georgia-republican-election-hand-count-ballot/.

[14] Justin Glawe and Asawin Suebsaeng, *Trump's Plot to Rig the Midterms Has Kicked Off in Georgia*, Zeteo (Jan. 31, 2026), https://zeteo.com/p/trump-georgia-elections-office-2026-midterms.

(11th Cir. 2001) (discussing both rights). Mr. Glawe seeks access to the records in this action under both the common law and First Amendment rights of access.

## A.     The Common Law Right of Access

"The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Chi. Tribune Co.*, 263 F.3d at 1311 (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564-74 (1980)). "Beyond establishing a general presumption that criminal and civil actions should be conducted publicly, the common-law right of access includes the right to inspect and copy public records and documents." *Id.* (citing *Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 597 (1978)).

"The common law right of access may be overcome by a showing of good cause, which requires balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential." *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1246 (11th Cir. 2007) (brackets in original; quoting *Chi. Tribune*, 263 F.3d at 1309).

## B.     The First Amendment Right of Access

"The media and general public's First Amendment right of access to criminal trial proceedings has been firmly established since the Supreme Court's opinion in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555[] (1980)." *Chi.*

*Tribune Co.*, 263 F.3d at 1310. "For a court to exclude the press and public from a criminal proceeding, 'it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.'" *Id.* (quoting *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 607); *see also United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1030 (11th Cir. 2005) (holding that a district court's sealing of court records "violate[d] First Amendment standards" and noting that overcoming the First Amendment presumption of openness requires showing "'an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" (quoting *Press-Enter. Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 510 (1984)).[15] Indeed, "the circumstances under which the press and public can be barred from a criminal trial are limited; the

---

[15]    The U.S. Court of Appeals for the Eleventh Circuit has not addressed whether there is a First Amendment right of access to search warrant affidavits, and there is a circuit split on that question. *See, e.g.*, *In re Four Search Warrants*, 945 F. Supp. 1563, 1566-67 (N.D. Ga. 1996) (discussing circuit split). District courts in this Circuit have applied that presumption to search warrant affidavits and similar judicial records. *See, e.g., United States v. Shenberg*, 791 F. Supp. 292, 293 (S.D. Fla. 1991) (recognizing a "limited First Amendment right of access to . . . judicial documents," including search warrants and probable cause affidavits).

Though it would be correct to conclude that the First Amendment right of access extends to search warrant affidavits, the Court need not resolve that question because "the analyses under the common law and the First Amendment are materially the same," and the common law right of access compels disclosure of the court records at issue here. *See In re Sealed Search Warrant*, 622 F. Supp. 3d 1257, 1260-61 (S.D. Fla. 2022).

State's justification in denying access must be a weighty one." *Globe Newspaper Co.*, 457 U.S. at 606; *see also In re Search of Office Suites for World & Islam Studies Enter.*, 925 F. Supp. 738, 742 (M.D. Fla. 1996) (that the "compelling interest standard has been applied in both civil and criminal cases in this circuit" "suggests an equally strong or stronger right of access to the records in criminal proceedings.").

## IV.   ARGUMENT

### A.   Mr. Glawe has standing to intervene in this matter.

Mr. Glawe has standing to intervene here for the purpose of obtaining access to court records. "[B]ecause it is the rights of the public, an absent third party, that are at stake, any member of the public has standing to view documents in the court file . . . and to move the court to unseal the court file in the event the record has been improperly sealed." *Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992) (reversing denial of motion to intervene and vacating order sealing court records). Furthermore, the Eleventh Circuit has repeatedly "upheld the press's standing to seek access in suits to which it is not a party." *Newman v. Graddick*, 696 F.2d 796, 800 (11th Cir. 1983) (collecting cases); *see also United States v. Valenti*, 987 F.2d 708, 711 (11th Cir. 1993); *In re Petition of Tribune Co. v. United States*, 784 F.2d 1518, 1521 (11th Cir. 1986).

As an independent journalist, Mr. Glawe unquestionably has standing to intervene for the purpose of seeking access to sealed court records. For years, Mr. Glawe has published news stories about Georgia elections, including the 2020 election, and President Trump's efforts to undermine the legitimacy of that election. This case is a continuation of that story, one that Mr. Glawe has written about in recent days and intends to cover in the future. Under longstanding Eleventh Circuit precedent, he has standing to intervene in this matter for the purpose of seeking access to the records covered by his motion to unseal, filed contemporaneously herewith.

**B.      The Search Warrant Materials should be unsealed.**

**1.      Court records are presumptively open to the public.**

"The public's right of access to judicial records is a fundamental element of the rule of law." *In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders*, 964 F.3d 1121, 1123 (D.C. Cir. 2020). "We must begin our discussion by recognizing the presumptive common law right to inspect and copy judicial records." *United States v. Rosenthal*, 763 F.2d 1291, 1292-93 (11th Cir. 1995); *Bennett v. United States*, No. 12-61499-civ, 2013 U.S. Dist. LEXIS 102771, at *16 (S.D. Fla. July 23, 2013) ("this common-law right creates a strong presumption of access"); *see also Leopold*, 964 F.3d at 1127 (there is a "strong presumption in

favor of public access to judicial proceedings," including judicial records (citation modified)).

The Eleventh Circuit has held generally that this strong presumption in favor of public access applies to all documents filed with the courts, including "pleadings, docket entries, orders, affidavits or depositions." *See In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987) (the public "enjoy[s] the right of access to 'pleadings, docket entries, orders, affidavits or depositions duly filed'" (quoting *Wilson v. Am. Motors Corp.*, 759 F.2d 1568, 1569 (11th Cir. 1985)). The presumption thus extends to the documents at issue here, which were all filed with the clerk of court and formed the basis of the magistrate judge's decision to issue a search warrant. *See In re Four Search Warrants*, 945 F. Supp. at 1566-67 (applying common-law right of access to search warrant materials related to 1996 Centennial Olympic Park bombing). That conclusion is bolstered by the fact that the common law right of access has always been strongest in criminal cases and therefore should apply with full force to documents reflecting the Executive Branch's exercise of the power to search and seize, including pre-indictment affidavits in support of search warrants and related materials. *See, e.g.*, *United States v. Sealed Search Warrants*, 868 F.3d 385, 390 (5th Cir. 2017) (the common law right of access "can extend to an individual seeking to access pre-indictment search warrant materials," including, in that case, supporting

affidavits); *United States v. Bus. of the Custer Battlefield Museum & Store*, 658 F.3d 1188, 1193 (9th Cir. 2011) (holding that "[a]ffidavits in support of seizure or search warrants . . . clearly fall within the definition of judicial documents" (citation modified)); *In re Application of Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990) (recognizing that a search warrant application is "a public document subject to a common law right of access"); *Balt. Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989) (holding that "affidavits for search warrants are judicial records").[16] "Search warrants and associated documents go to the heart of the judicial function" and so "[t]he common law presumption of access to [a] search warrant and related materials sought by applicant is thus entitled to great weight." *In re Search Warrant*, No. 16-mc-00464 (PKC), 2016 U.S. Dist. LEXIS 178313, at *10 (S.D.N.Y. Dec. 19, 2016).

"While the presumption in favor of the common law right of access must always be kept in mind, the trial court may properly balance this right against

---

[16] The presumption also extends to documents associated with a search warrant application, including the docket itself. *Valenti*, 987 F.2d at 715 (holding that a sealed docketing system "is an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings" because it "can effectively preclude the public and the press from seeking to exercise their constitutional right of access"); *Leopold*, 964 F.3d at 1129 (a docket "memorializes" a court case—i.e., "a matter of legal significance," "provid[ing] a kind of index to judicial proceedings and documents, facilitating public access to the underlying documents[; i]t would make little sense to provide public access to court documents but not to the indices that record them and thus make them accessible" (citation modified)).

important competing interests." *Rosenthal*, 763 F.2d at 1294; *see also Under Seal v. Under Seal*, 326 F.3d 479, 486 (4th Cir. 2003) (presumption of public access to search warrant applications and affidavits is one that "can only be overcome by a significant countervailing interest"). "[S]eizure warrant affidavits cannot remain under seal unless the countervailing factors provide the most compelling of reasons to deny access." *United States v. All Funds on Deposit at Wells Fargo Bank*, 643 F. Supp. 2d 577, 583-84 (S.D.N.Y. 2009) (citation modified).

The government bears the burden of demonstrating that it can overcome this strong presumption in order to keep the Search Warrant Materials sealed. *See, e.g.*, *In re Sealed Search Warrant*, 622 F. Supp. 3d at 1260 ("The Government concedes that it bears the burden of justifying why the Affidavit should remain sealed." (citing *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997)); *In re Four Search Warrants*, 945 F. Supp. at 1568 ("The Government has advanced a number of reasons for keeping the search warrant affidavits sealed[.]").

### 2. The government cannot carry its burden to overcome the strong presumption of access.

There are numerous factors for this Court to consider in determining whether the government has carried its burden of overcoming the presumption of access, including:

- "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage," *Newman*, 696 F.2d at 803 (citing *Nixon*, 435 U.S. at 596-603 & n.11);

- "whether access is likely to promote public understanding of historically significant events," *id.*;

- "whether the press has already been permitted substantial access to the contents of the records," *id.*;

- "whether allowing access would impair court functions or harm legitimate privacy interests," *Romero*, 480 F.3d at 1246;

- "the degree of and likelihood of injury if made public," *id.*;

- "the reliability of the information," *id.*;

- "whether there will be an opportunity to respond to the information," *id.*;

- "the availability of a less onerous alternative to sealing the documents," *id.*

Applying these factors to this case shows they weigh strongly in favor of unsealing the Search Warrant Materials.

### i.    Mr. Glawe seeks these records for the legitimate purpose of promoting public understanding of historically significant events.

Even in an ordinary case, "[p]ublic access to warrant materials serves as a check on the judiciary because the public can ensure that judges are not merely serving as a rubber stamp for the policy." *In re N.Y. Times Co.*, 585 F. Supp. 2d 83, 90 (D.D.C. 2008); *see also Doe v. Pub. Citizen*, 749 F.3d 246, 271 (4th Cir. 2014) (interest in access to judicial records "is at its apex when the government is a party"). Here, the case for transparency is more urgent still, because "the greater the public interest in the litigation's subject matter, the greater the showing

necessary to overcome the presumption of access." *June Med. Servs., LLC v. Phillips*, 22 F.4th 512, 520 (5th Cir. 2022) (citation modified); *see also In re Motion to Intervene & Unseal Search Warrant Records*, No. 8:25-mc-00539-TJS, 2025 LX 360688, at *5 (D. Md. Sep. 12, 2025) (unsealing portions of search warrant affidavit and noting that "[t]he circumstances in this case involve a matter of significant public concern, making the presumption in favor of public access especially strong").

This search and seizure implicates public interests that strike at the heart of our democratic governance. As a professional journalist for various well-established news outlets, Mr. Glawe seeks these records for the purpose of furthering and promoting public understanding of historically significant events, including the veracity of any claims that Fulton County's administration of the 2020 presidential election was in some way tainted by potential criminal activity. Critically, serious questions have been publicly raised about whether the federal government was appropriately forthcoming in the affidavit as to the existence of probable cause for any potential criminal liability, given that the applicable statute of limitations appears to be a barrier to criminal prosecution under the two criminal statutes cited in the Search Warrant, 52 U.S.C. § 20701 and 52 U.S.C. § 20511.[17]

---

[17] Unless otherwise specified, the statute of limitations for federal crimes is five years. *See* 18 U.S.C. § 3282.

Another question is whether the government was forthcoming with this Court that it has previously—and thus far unsuccessfully—sought these same records through the civil justice system. A reasonable member of the public may well view the government's actions in seeking a search warrant to be an attempt to circumvent the civil discovery process. Publicly releasing the affidavit and other Search Warrant Materials would potentially address that concern, as well as others arising from the federal government's long-standing efforts to obtain voting records from Fulton County.

"People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572. Understanding the factual basis upon which the government underwent this unprecedented search and seizure, and upon which the government appears potentially poised to take extraordinary action to "nationalize" our elections is not just a legitimate purpose, but a necessary one— promoting transparency and public understanding of these historically significant events that are rapidly unfolding, with potentially serious and lasting consequences for the very foundation of our democracy.

ii.   **The public does not have access to any Search Warrant Materials other than the Search Warrant, and release of the Search Warrant Materials will not impair court functions or harm legitimate privacy interests.**

Whether the press has already been permitted substantial access to the contents of the records is a relevant factor to consider. Here, that factor cuts in favor of access. The Search Warrant has been published (presumably by Fulton County, as it remains sealed from public access in the Court's e-filing system). That document raises more questions than answers. This is not a case where there is a viable alternative source for the same information or where the requested information has largely already been released—the sealed Search Warrant Materials are the only source of information on the factual basis for this unprecedented search and seizure.

The release of the Search Warrant Materials also will not impair court functions. Rather, "the federal rules, when read in conjunction with the common law, suggest that the filing of the warrant with the magistrate may be the point at which access is intended." *In re Search of Office Suites for World & Islam Studies Enter.*, 925 F. Supp. at 741 ("Rule 41(g), Fed. R. Crim. P. envisions that once the search warrant is returned, it is part of the public file.").

Nor is there a countervailing legitimate privacy interest where there does not appear to be any protected personal information (like medical records) at issue; no subject of criminal inquiry is identified in the Search Warrant other than Fulton

County writ large; and Fulton County itself has now filed under seal its own motion to unseal the affidavit submitted in support of the Search Warrant, reflecting its own desire that the information be made public.

In sum, there is not good cause—and certainly no compelling interest—that outweighs the factors in favor of access or that can overcome the presumption of access to the Search Warrant Materials in this case.

> ### iii. The degree of and likelihood of injury if made public, the reliability of the information, and whether there will be an opportunity to respond to the information all likewise weigh in favor of access.

These final factors also do not serve to overcome the government's burden. The degree of and likelihood of injury if the Search Warrant Materials were made public does not weigh in favor of maintaining secrecy. Here, the property at issue in the Search Warrant has already been seized in its entirety. There can be no concern that evidence might be squandered prior to the Search Warrant's execution. *See Balt. Sun Co.*, 886 F.2d at 64 ("Frequently—probably most frequently—the warrant papers including supporting affidavits are open for inspection by the press and public . . . after the warrant has been executed."). Furthermore, as previously explained, it is highly unlikely that there could be a viable criminal charge resulting from the 2020 election under either of the criminal statutes cited in the Search Warrant is questionable, given the applicable statute of

limitations and the numerous analyses confirming Fulton County's 2020 election results.

While the release of information that is the basis of an ongoing criminal investigation generally weighs against access, that factor does not carry its usual weight in the government's favor where, as here, the government appears unlikely to have a viable theory of criminal liability and where Fulton County itself—the custodian of the material seized—has moved for unsealing the affidavit. For example, in *In re Four Search Warrants*, the court found that the government's interest in protecting an ongoing investigation into the Centennial Olympic Park bombing would not be compromised by the release of historical information pertaining to a known former suspect who did not oppose the release of the information in the affidavits. 945 F. Supp. at 1568. Like the Olympic bombing, President Trump's attempts to undermine the 2020 election are of great public and historical importance, and releasing information that Fulton County itself seeks to make public will not negatively impact the government's investigation.

**3. Even if the government demonstrates a need to seal certain information, the Court must pursue the less onerous option of releasing the Search Warrant Materials with limited, narrow redactions.**

Even where the government's interests justify some degree of sealing, "the judicial officer must consider alternatives to sealing the documents" in their entirety, which "ordinarily involve[] disclosing some of the documents or giving

access to a redacted version." *Balt. Sun Co.*, 886 F.2d at 66. District courts in this circuit have long recognized and utilized this less onerous alternative of unsealing similar pre-indictment warrant materials with limited, court-approved redactions. *See, e.g.*, *In re Four Search Warrants*, 945 F. Supp. at 1566-67 (granting in part media petitioners' motion to unseal affidavits and providing specific direction to the government about redacting the affidavits for unsealing); *In re Warrant*, 622 F. Supp. 3d at 1260-61 (rejecting government's argument that good cause or a compelling interest justified keeping the entire affidavit sealed when unsealing a redacted copy of the affidavit was a more narrowly tailored and less onerous option).

At a minimum, the government cannot justify wholesale secrecy here, where this search and seizure has serious and widespread consequences for government transparency, election integrity, and the public writ large.

## V.    CONCLUSION

"Public confidence in our judicial system cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view." *United States v. Sealed Search Warrants*, 868 F.3d 385, 395 (5th Cir. 2017) (citation modified). To vindicate that bedrock public interest in the integrity of the judicial process, Mr. Glawe respectfully urges that he be

permitted to intervene in this matter and that the Search Warrant Materials promptly be unsealed.

Respectfully submitted, this 6th day of February, 2026.

*/s/ Meredith C. Kincaid*
**CROSS KINCAID BASKAM LLC**
Meredith C. Kincaid
Georgia Bar No. 148549
315 W. Ponce de Leon Ave., Ste 715
Decatur, Georgia 30030
(404) 948-3022
meredith@crosskincaid.com

*/s/ Sarah Brewerton-Palmer*
Sarah Brewerton-Palmer
Georgia Bar No. 589898
Erin Morrissey Victoria
Georgia Bar No. 285342
Alan Long
Georgia Bar No. 367326
**CAPLAN COBB LLC**
75 14th Street NE, Suite 2700
Atlanta, Georgia 30309
(404) 596-5600
spalmer@caplancobb.com
evictoria@caplancobb.com
along@caplancobb.com

*Counsel for Justin Glawe*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this pleading complies with the Local Rules of this Court, including Local Rules 5.1.C and 7.1.D (N.D. Ga.) in that it is double-spaced and composed in 14-point Times New Roman font.

This 6th day of February 2026.

*/s/ Meredith C. Kincaid*
Meredith C. Kincaid
Georgia Bar No. 148549

*Counsel for Justin Glawe*