## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ROBERT L. "ROBB" PITTS, CHAIRMAN, FULTON COUNTY BOARD OF COMMISSIONERS; FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS; and FULTON COUNTY, GEORGIA,<br><br>          Petitioners,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>          Respondent. | Civil Action No.<br>1:26-CV-00809-JPB |

## PETITIONERS' AMENDED MOTION FOR RETURN OF PROPERTY PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 41(G)

Pursuant to the Court's Order (Doc. 26), Petitioners Robert Pitts, the Chairman of the Fulton County Board of Commissioners, the Fulton Board of Registration and Elections (FBRE), and Fulton County, submit this amended Fed. R. Crim. P. 41(g) motion for the return of improperly seized property and assert the following:

## INTRODUCTION

On January 28, 2026, the U.S. Department of Justice obtained a search warrant unprecedented in American history to seize the original—and only—copy of Fulton County's 2020 election records. Now unsealed, the Affidavit (Doc. 22-2) confirms that the warrant is equally unprecedented in its theory of probable cause, subjecting

Petitioners to an improper and unjustified seizure of their property in violation of the Fourth Amendment. The seizure, which callously disregarded Petitioners' constitutional rights, requires immediate equitable relief from this Court—namely, an order directing Respondent to return the original copy of the seized election records and other relief described below. *See* Fed. R. Crim. P. 41(g).

First, the Fourth Amendment demands "probable cause"—not "possible cause." The Affidavit fails that constitutional requirement. Despite years of investigations of the 2020 election, the Affidavit does not identify facts that establish probable cause that **anyone** committed a crime. Instead, FBI Special Agent Evans (the "Affiant") all but admits that the seizure will yield evidence of a crime **only if** certain hypotheticals are true. *See, e.g.*, Aff. ¶ 10 ("**If** these deficiencies were the result of intentional action, **it would be** a violation of federal law[.]"); ¶ 85 ("**If** these deficiencies were the result of intentional action, the election records . . . are evidence of violations[.]"). Unsupported by probable cause and dependent on unsubstantiated hypotheticals, Respondent's seizure violated the Fourth Amendment.

Second, instead of alleging probable cause to believe a crime has been committed, the Affidavit does nothing more than describe the types of human errors that its own sources confirm occur in almost every election—without any intentional wrongdoing whatsoever. Mislabeling an expected margin of error as "deficiencies"

or "defects" cannot establish probable cause, let alone for a seizure of this magnitude.

Third, the Affidavit omits numerous material facts—including from the very reports and publicly-disclosed investigations that the Affiant cites—that confirm the alleged conduct was previously investigated and found to be unintentional. Moreover, the Affidavit not only fails to allege that any particular witness is reliable or credible; it omits discrediting information about those witnesses that was obviously available to the Affiant. These omissions are serious. The *ex parte* warrant process would be rendered a nullity if the government were permitted to hide material and probative facts that refute probable cause from a magistrate judge and nevertheless retain the fruits of its misconduct.

Fourth, even if the Affidavit established probable cause, the seizure of original election materials would be unreasonable and in callous disregard of the Fourth Amendment because (1) the statutes of limitation have lapsed on the only crimes under investigation; (2) the warrant violates Georgia's state sovereignty by effectively enjoining a pending state court proceeding and preventing Georgia from performing its constitutionally-mandated role in administering its elections; and (3) the Respondent improperly used the criminal warrant process to circumvent a pending civil lawsuit in which **it** requested the same records.

Finally, Petitioners satisfy the other considerations for equitable relief under Federal Rule of Procedure 41(g) and are entitled to relief, including (1) the return of the original records and any copies to Petitioners and (2) a verification of precisely what was taken and how it was handled via a detailed chain-of-custody documentation.

## BACKGROUND

On January 28, 2026, Respondent requested a warrant seeking the seizure of virtually every scrap of paper that Petitioners possessed relating to the 2020 election in Fulton County. In support of the warrant, the Affiant identified two crimes purportedly under investigation: a misdemeanor relating to election records retention, 52 § U.S.C. 20701, and a felony statute criminalizing efforts to "deprive" or "defraud" residents of a fair election. 52 U.S.C. § 20511. Aff. ¶¶ 7–8. Both have a five-year statute of limitations, which has expired.

Section 20701, the records retention statute, makes it a misdemeanor for an "officer of election" to "willfully" fail to preserve "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" for twenty-two months after an election. 52 U.S.C. § 20701. The statute does not expressly reference ballot images or tabulator tapes. Section 205011 makes it a felony "to deprive or defraud the residents of a State of a fair and impartially conducted election process by . . . the

4

procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held[.]" 52 U.S.C. § 20511(2)(A), (B).

In support of the warrant, the Affiant said that there were "many allegations of electoral impropriety relating to the voting process and ballot counting in Fulton County." Aff. ¶ 6. He stated that some allegations of "impropriety" have been "disproven" (without identifying which ones), and he wrongly asserted that "some have been substantiated, including through admissions by Fulton County." *Id*.

The Affiant went on to identify five so-called "deficiencies" or "defects" with the November 3, 2020 election and tabulation of the votes thereof. *See* Aff. ¶¶ 9a–9e (emphasis added and footnotes omitted):

    a. The tabulator machines used by Fulton County are designed to create and save a scanned image of each ballot. Fulton County has admitted that it does not have **scanned images** of all the 528,777 ballots counted during the Original Count or the 527,925 ballots counted during the Recount.

    b. Fulton County has confirmed that during the Recount of votes, some ballots were scanned multiple times. Ballot images made available in response to public record requests show ballots with **unique markings duplicated** within the ballot images.

    c. During the Risk Limiting Audit, auditors counting the votes by hand reported vote tallies for batches inconsistent with the actual votes within the batch. The State's Performance Review Board reported that Secretary of State investigators confirmed **inaccurate batch tallies** from the Risk Limiting Audit.

    d. Auditors assisting in the Risk Limiting Audit reported counting purported **absentee ballots** that had never been creased or folded, as would be required for the ballot to be mailed to the voter and for the ballot to be returned in the sealed envelope requiring the voter's signature for authentication.

e. On the day of the deadline to report the Recount results, Fulton County reported recount totaling 511,343 ballots, **17,434 ballots** fewer than original [*sic*] counted. The following day, Fulton County then reported a total of 527,925 ballots counted.

Rather than elaborate on the above-five allegations, the Affidavit compiles a smattering of over a dozen witness statements under the headings "Missing Ballot Images," "Duplicated Ballots," "Tabulator Tapes," and "Pristine Ballots," and "Seven Hills Strategies Report." Aff. ¶¶ 12–82. And rather than explain why any of this constitutes probable cause to believe a crime has been committed, the Affiant speculates that "[i]f these deficiencies were . . . intentional," then the election records "are evidence" of the crimes described above. *Id.* ¶ 85.

## ARGUMENT

### I. Petitioners Have a Substantial Interest in Obtaining a Return of Their Seized Property.

"A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return . . . in the district where the property was seized." Fed. R. Crim. P. 41(g). Here, Petitioners satisfy all four factors for relief, including (1) whether Respondent displayed a callous disregard for the constitutional rights of the movant, and whether the movant (2) has an individual interest in and need for the property he wants returned, (3) would be irreparably injured by denying return of the property, and (4) has no adequate remedy at law for

the redress of his grievance. *Richey v. Smith*, 515 F.2d 1239, 1243–44 (5th Cir. 1975).

Petitioners have an overriding interest in restored custody of the original seized election records. The Fourth Amendment's restraint on unreasonable seizures protects, among other things, Petitioners' possessory interest in the seized records. *Cf. Soldal v. Cook Cnty., Ill*, 506 U.S. 56, 65 (1992) (holding that the Fourth Amendment protects against unreasonable seizures of property even where no privacy or liberty interest is implicated).[1] As a threshold matter, there can be no dispute that Petitioners, including Fulton County, are constitutionally authorized to possess and own property.[2] And, under Georgia law, Petitioners have a possessory interest in the original election records for numerous reasons, including ongoing

---

[1] The County also has a privacy interest in its records. "It is long settled that the Fourth Amendment's protection of 'papers' covers business records," *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 483 (S.D.N.Y. 2019), and a county's election records are, at a minimum, entitled to equal protection.

[2] O.C.G.A. §§ 36-9-1 to 36-9-11 ("County Property Generally"), 36-9-2 ("The county governing authority shall have the control of **all property belonging** to the county[.]") (emphasis added); 36-5-22.1(a)(1) ("The governing authority of each county has original and exclusive jurisdiction over . . . [t]he directing and controlling of **all the property of the county**, according to law, as the governing authority deems expedient[.]") (emphasis added). The Georgia Constitution expressly delegates counties the authority to regulate "its **property**, affairs, and local government[.]" Ga. Const. art. IX, § 2, § I (emphasis added); *Krieger v. Walton Cnty. Bd. of Comm'rs*, 269 Ga. 678, 680 (1998) ("The general laws of this state grant the governing authority of each county exclusive jurisdiction to control all county property[.]").

pending litigation.[3] *See, e.g.*, *Allen v. State of Georgia*, 24CV014632 (Fulton Cnty. Super. Ct. Dec. 22, 2025). As explained below, Respondent's seizure grossly disregarded Petitioners' constitutional rights.

## II. The Allegations on the Face of the Affidavit Fall Woefully Short of Probable Cause.

In seizing Petitioners' property by relying on a warrant that was entirely devoid of probable cause, Respondent callously disregarded Petitioners' rights under the Fourth Amendment. This flagrant constitutional violation compels immediate equitable relief from this Court—namely, an order requiring Respondent to return Fulton County's original election records, as well as any copies.

### A. The Affidavit Fails to Allege Intentional Misconduct and Relies on "What Ifs" That Do Not Establish Probable Cause.

Although the Affidavit asserts that the FBI is conducting a "criminal investigation into whether any of the [alleged election] improprieties were intentional acts," Aff. ¶ 6, the Affidavit does not identify a single piece of evidence from the FBI's investigation establishing probable cause to believe that anyone **intentionally**, let alone willfully, violated either statute. Instead of relying on the Affiant's personal knowledge, it lists a smorgasbord of witness speculation, beliefs, and theories to identify certain categories of "deficiencies or defects." But the Affidavit cannot bootstrap speculative hearsay into probable cause. Even if every

---

[3] *See, e.g.*, O.C.G.A. §§ 21-2-73; 21-2-390; 21-2-500.

paragraph of the Affidavit were true, it fails to establish a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Foster*, 2024 WL 249324, at *2–3 (N.D. Ga. Jan. 22, 2024) (Boulee, J.) (citation omitted). "[M]ere suspicion is not enough." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992).

The Affidavit puts forth no facts that support the Affiant's conclusory assertion that there is "probable cause" that "unknown persons" violated either 52 § U.S.C. 20701 or § 20511. Both require "willful[]" violations of the law. 52 §§ U.S.C. 20701, 20511. The Affiant does not allege facts that establish a fair or **any** probability that an "unknown person" violated either statute, let alone "willfully." *See* Eleventh Circuit Pattern Instructions, B9.1A ("Knowingly, Willfully – General") ("The word 'willfully' means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law."). The Affiant is fails to allege that any person intentionally did **anything**, and instead twice raises a hypothetical (*i.e.*, "if" some undefined "intentional action," caused the alleged issues, then it would be a crime) to support his conclusory probable cause assertion.[4]

---

[4] *See, e.g.*, Aff. ¶ 10 ("**If these deficiencies were** the result of intentional action, **it would be** a violation of federal law[.]"); ¶ 85 ("**If these deficiencies were** the result of intentional action, the election records . . . are evidence of violations[.]").

It is woefully deficient for an affiant to say **if** I develop additional evidence at **some later point in time**, the seized property would potentially be evidence of a crime. Probable cause requires more: a reasonable likelihood that a crime did, in fact, occur. *See United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). Thus, a warrant application "must show that probable cause **exists at the time the warrant issues**." *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000) (emphasis added); *see Sgro v. United States*, 287 U.S. 206, 211 (1932). Respondent failed to do so, and no authority supports its "possible cause" theory of search warrants.

### B. The Affidavit Tacitly Acknowledges That the Supposed Irregularities It Identifies Are Immaterial.

Though the Affidavit's allegations are difficult to track, the supposed election irregularities it identifies can be sorted into five buckets. Each bucket is comprised of ill-informed witnesses' speculative assertions that, even if true, concern records of no consequence to the outcome of the election. Moreover, as the Affidavit itself concedes, those speculative assertions are contradicted by the accounts of other, more knowledgeable witnesses.

Despite the haze generated by the Affidavit's zigzagging accounts about ballot images and tabulators, the core truth in this case is revealed by "Witness 6," one of the Affidavit's only witnesses who had a firsthand role in the 2020 election: "the ballots are what mattered." Aff. ¶ 48. And critically, as the Affidavit admits, "[d]uring the Fulton County Risk Limiting Audit, which was a hand count, Wit[ness]

10

6 believes that all ballots were accounted for." *Id.* ¶ 49. None of the speculative allegations about other, immaterial records supports probable cause.

## Missing Digital Ballot Images

Without explaining what a "ballot image" is or its significance, or establishing that missing ballot images are evidence of a criminal offense, the Affidavit says that Witness 1 did "research and analysis on elections" and "[a]s part of that analysis . . . reviewed images of the released absentee voter ballot images." Aff. ¶ 13. Though "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report" for assessing probable cause, *Illinois v. Gates*, 462 U.S. 213, 230 (1983), Witness 1 is a chemical engineer with no formal role in the 2020 election and no identified knowledge or expertise regarding election matters. The Affidavit states that Witness 1 apparently "discovered that the number of ballot images from the Recount did not reconcile with the number of ballots cast," though the Affidavit doesn't say how he made that determination. Aff. ¶ 13. Based on his "analysis," he filed a complaint with Georgia State Elections Board (SEB) in July 2022 that said there were "17,582 missing ballot images from the reported results on the Georgia Secretary of State website." *Id.* ¶ 14. The Affidavit says that the SEB investigated that complaint, and without identifying any fact-finding by the SEB, it indicates that there was a "reprimand to Fulton County" and a contemplated

MOU between the Georgia Secretary of State (SoS), the SEB, and Fulton County that allowed a monitor for the 2024 election cycle. *Id.* ¶ 16.

The Affidavit says that Witness 2, a Republican-appointed member of the SEB who was an obstetrician by training, joined the SEB in 2022, and prior to 2021 "had not worked an election." Aff. ¶ 17. Once on the SEB, she investigated Witness 1's complaint and asked the SoS for ballot images from the 2020 election. *Id.* ¶ 18. She got access to the ballot images but does not know whether she reviewed images "from election night or from the recount." *Id.* ¶ 19. While reviewing the images, she saw a "note," and although she does not have a copy, she remembers it said, "Vince must have miscounted. Only 15,464 ballot images. Short of 17,774 by 2,310." *Id.* The Affidavit identifies no other allegation regarding this "note," who Vince is, or how this allegation impacted the election.

Despite her lack of training and having "no prior expertise in reviewing [Secure Hash Algorithm (SHA)] files prior to joining [the SEB]," Aff. ¶ 20, Witness 2 "noticed several things" about the ballot images, including that the SHA files "were missing." *Id*. And despite her lack of expertise, she opined that every ballot image, or TIF file, should produce a corresponding SHA file. *Id*. Based on that, she speculated that the missing files were a "red flag" that someone had "manipulated the data" **after** the election. *Id.* ¶ 21 (noting that Witness 2 "observed at least one file with date modified of January 11, 2024, along with others modified prior[.]").

Witness 3, the current House-appointed member of the SEB, "confirmed" there were missing ballot images, but her information about the 2020 election is "not first-hand." Aff. ¶ 23. Without any basis identified in the Affidavit, she asserted that to "remedy" a missing ballot image, one needs "a hand recount of the physical ballots, images, and votes cast." *Id.* ¶ 24.

Notably, Witness 4, the Director of Elections for the SoS in 2020, "was not aware" of any discrepancy between ballot images and physical ballots. Aff. ¶ 25. He said that the images **"are just duplicates"** and that it would be more concerning if there was a "discrepanc[y] between physical ballots and voter count"—the concern "is less about the images." *Id.* ¶ 26 (emphasis added). Moreover, he identified a possible explanation for missing images: "they were stored on a memory card and it was not uploaded correctly or became corrupt." *Id.* ¶ 27. *See Sherouse v. Ratchner*, 573 F.3d 1055, 1062 (10th Cir. 2009) ("Where an officer observes inherently innocuous behavior that has plausible innocent explanations, it takes more than speculation or mere possibility to give rise to probable cause[.]").

Lastly, the Affidavit says that in a civil action in this District, the FBRE "admitted" that it had not "preserved the majority of the ballot images from in-person voting for the November 3, 2020, Original Count." Aff. ¶ 28. In 2020, however, preservation of ballot images was not required by Georgia law. Nor do ballot images seem to be covered documents under 52 U.S.C. § 20701, as they are not records

relating to an "act requisite to voting" in an election. As Witness 4 explained, ballot images "are just duplicates"—their creation is not necessary to casting a vote. The Affidavit fails to establish (1) that ballot images were willfully destroyed or altered, and (2) that if they were destroyed, it would be evidence of any criminal violation.

### **Duplicated Ballots**

Likewise, the Affidavit's "Duplicated Ballots" theory articulates nothing close to probable cause. It is entirely predicated on a data analysis by someone (Witness 5) who says he reviewed a batch of data (quantity unknown) downloaded online from something called "ZebraDuck" (with no allegation of who or what "ZebraDuck" is, let alone whether it is reliable). Aff. ¶ 29. Witness 5 says he got the data "second hand," *i.e.*, from an unidentified person who acquired the data somewhere else and apparently posted it on "ZebraDuck." Though Witness 5 "believed" the "ZebraDuck" data was "from an Open Records Request from Fulton County," he "was not positive" and the Affidavit cites no basis for his belief. *Id.*

Witness 5 told the Affiant that he analyzed this "ZebraDuck" data and determined there were missing ballot images from Fulton County. From this, he concluded (though the Affidavit does not explain how) that duplicated ballots were "included" in "the original count and recount." Aff. ¶ 33. Even assuming Witness 5 worked with an accurate dataset (which the Affidavit does even assert), nothing corroborates his statements. Moreover, Witness 5 even qualifies his own

speculation: "what he observed **could** be intentional," but "not partisan," since the purported error added votes for Donald Trump. *Id.* ¶ 35 (emphasis added).

Notably, the Affidavit concedes that a former SoS investigator looked at the supposed issue raised by Witness 5 and concluded that it "was not intentional." *Id.* ¶ 36. Likewise, the Affidavit admits that the Director of the FBRE concluded that this purported issue, if it happened, was "due to human error." *Id.* ¶ 38.

### Pristine (Absentee) Ballots

The Affidavit next implies that there was potential misconduct involving so-called "Pristine Ballots," without alleging that any specific crime occurred. *See* Aff. ¶¶ 52–75. This theory of misconduct involves "absentee ballots," which must be returned by "mail" or "drop box," says the Affiant. *Id.* ¶ 52. Accordingly, they "must be folded to fit into the envelope." *See id.* A "pristine ballot," on the other hand, "has no indication it has been folded." *See id.*

Based on a hodge-podge of selective statements from Witnesses 1, 3, 8, 9, and 11, the Affidavit implies something was amiss related to absentee ballots. Witness 8, a poll worker, says she got one "batch of [110] ballots" but that those ballots "looked different." *Id.* ¶ 58. She says 107 were "unfolded" and "labeled as absentee ballots," even though they were "too clean to be absentee ballots, in her opinion." *Id.* Witness 8 claimed that 60 ballots from a senior center "should have been folded . . . but were not." *Id.* ¶ 58. Witness 1 complained to the SEB that "extra ballots were

introduced during the count of absentee ballots." Aff. ¶ 53. Notably, the Affidavit entirely omits the SEB's findings related to the complaint and fails to disclose the outcome of any other investigation on this issue. *See* Section III, *infra* (discussing material omissions). Witness 3 did not allege misconduct here but opined that "there is no reason to have a pristine ballot with no folds," and acknowledged being "unsure if provisional ballots get folded or not." *See* Aff. ¶ 53. Witness 9 saw two women from FBRE "re-voting ballots," and the FBRE director said that "they were having to re-vote the ballot because the original ballot was not being accepted by the machine." *See id.* ¶ 62. And Witness 11, a poll worker, said that while she was doing "Logic and Accuracy" testing she saw "individuals printing random ballots," that there were "stacks of paper to use as test ballots that were unsecured," and that certain ballots, that she "belie[ves]" were "actual voted ballots . . . were removed from machines and unattended for a period of time before they were gathered in ballot cases." *See id.* ¶¶ 70–73.

Juxtaposed with those confusing snippets are two statements by election officials that refute any suggestion establishing probable cause that a crime was committed. First, Witness 6, an Investigator for the SoS since 2009, said that he "did not know how a person could possibly inject fraudulent absentee ballots into the absentee ballot process." Aff. ¶¶ 68, 74. Witness 6 explained that "there were not extra ballots sitting around," and any attempt to "sneak in" ballots would be evident

by a discrepancy between the number of ballots and the number of people who voted. *Id.* ¶ 69. To that end, the Affiant concedes that the SoS also counted Fulton County's ballots, and that count matched Fulton County's. *Id.* ¶ 75. Witness 4, the SoS's 2020 Election Director, further explained the difficulties of any attempt to tamper with ballots, and although it was technically "possible" to change a vote **if** someone got ahold of a blank ballot, he did not think it was technically feasible. *Id.* ¶ 64. In other words, none of the Witness's statements come close to overcoming Witness 4's and 6's reliable statements about the improbability of any crime having occurred.

## **Missing Ballots During the Recount**

Without providing any context or analysis, the Affidavit states that "[o]n the day of the deadline to report the Recount results, Fulton County reported a recount totaling 511,343 ballots, 17,434 ballots fewer than original [*sic*] counted. The following day, Fulton County then reported a total of 527,925 ballots counted." Aff. ¶ 9e. The Affiant does not explain where he got these figures, or where Fulton County allegedly "reported" them. And though the Affidavit describes this supposed issue as a "deficiency or defect," there is no further discussion of it anywhere else in the Affidavit. The Affidavit relies on 11 witnesses to support various propositions throughout, but it does not provide a statement from a single witness who so much as speculates about any alleged infirmity involving the recount's sequence of events or certified outcome.

17

## Tabulator Tapes

The Affidavit unsuccessfully tries to reframe unsigned tabulator tapes as evidence of a crime, but the Affidavit's own allegations state otherwise. Witness 6, an investigator for the SoS since 2009 who "received and investigated multiple complaints regarding the 2020 election," explained tabulator tapes are specific to a particular ballot scan, and that ballots are scanned using a different machine during recounts. Aff. ¶ 48. Thus, a recount generates new tabulator tapes, and, in any event, "the ballots are what matter[.]" *Id.* Witness 6 said that "all ballots were accounted for" during the Risk Limiting Audit. *Id.* ¶ 49. Although Georgia Rules and Regulations require tabulator tapes be signed by the poll manager and two witnesses, Secretary of State Brad Raffensperger stated that the improper signatures on some Fulton County tabulator tapes were "an administrative oversight." *Id.* ¶ 51.

Despite these official findings, the Affidavit relied on the statements of Witness 3, who admits that she lacks any first-hand knowledge of the 2020 election. Aff. ¶¶ 23, 41. Her uncorroborated claim is that tabulator tape is the "holy grail" for a final ballot count. *Id.* The Affidavit also relies on Clay Parikh, who believes that some tabulator tapes were missing and that others showed evidence of "an **opportunity** for the tabulation to be tampered with." *Id.* ¶¶ 45–46 (emphasis added). Parikh speculates that "someone . . . manipulated" tabulator time reports because "the poll closing time and report printed times on several closing tabulator tapes

were close enough in time." *Id.* ¶ 45. And for an unexplained reason, Parikh believed this showed "memory cards were moved from the original tabulator and put in another tabulator to print out the closing tabulator tapes." *Id.* The Affidavit does not attempt to connect the dots between Parikh's various theories or allege that any of his theories, if true, would establish probable cause that someone committed a crime.

In sum, the Affidavit fails to explain the significance or impact of any alleged "irregularity," fails to allege any intentional cause of the purported irregularities, recites speculative allegations by witnesses without establishing those individuals' credibility or basis for knowledge, and even provides multiple exculpatory statements ascribing any perceived irregularity to uninformed witnesses or normal human error. These factors, considered together, thwart the Affidavit's assertion of probable cause. There is no basis, let alone a substantial basis, for this Court to find probable cause that a crime occurred.

## III. The Affidavit Recklessly Omits Material Facts That Undercut Any Argument for Probable Cause.

Even if the four corners of the Affidavit somehow established probable cause, this seizure would be unconstitutional because the Affiant intentionally or recklessly omitted material facts. A warrant violates the Fourth Amendment where the affidavit supporting the warrant contains "deliberate falsity or . . . reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Here, the Affiant failed to

19

include facts—including from the very sources he cited—that shut the door on even the faintest possibility of probable cause.

Under *Franks*, if an affidavit supporting a warrant contains a material falsity, made either intentionally or with reckless disregard for the truth, the warrant "must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. 156.[5] That same rule "applies to information omitted from warrant affidavits." *Madiwale v. Savaiko*, 117 F.3d 1321, 1326 (11th Cir. 1997). Though "neither negligent mistakes nor immaterial omissions implicate *Franks*," *Goldstein*, 989 F.3d at 1197, "[a] party need not show by direct evidence that the affiant makes an omission recklessly." *Id.* at 1326. Rather, "when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980).

At a minimum, the Affiant's recklessness may be inferred from his false statement about Fulton County's "admissions," as well as material omissions about the well-documented, innocuous explanations for the occurrences he portrays as

---

[5] If a defendant makes a substantial preliminary showing that a material omission was deliberately false or made with reckless disregard for the truth, a hearing is required. *United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021). Given the Rule 41(g) motion, Petitioners are already entitled to hearing, and the Court has appropriately set one. But even outside of the 41(g), Petitioners' substantial preliminary showing under *Franks* would entitle them to a hearing.

unresolved and potentially nefarious, as well as the biases of those upon whom he relies.

### False Statement About Fulton County's "Admissions"

The Affidavit's feeble effort at establishing probable cause opens with a broad mischaracterization about the 2020 election. In his "Introduction," the Affiant states, "many allegations of electoral impropriety relating to the voting process and ballot counting in Fulton County . . . some of those allegations have been substantiated, including through admissions by Fulton County." Aff. ¶ 6. That is not the case.

Fulton County has never admitted to any impropriety regarding the 2020 election. Although the County has acknowledged (and since rectified) causes of innocent errors or inefficiencies, it has consistently rejected the notion that any errors resulted from impropriety. The Affiant's statement to the contrary is false, and it casts a cloud of unsubstantiated criminal intent over the allegations that follow.

### Pristine Ballots

First, in depicting the mere existence "pristine ballots" as inexplicable and potentially nefarious, the Affiant omitted the fact that "pristine" absentee ballots are an typical and benign byproduct of overseas and military voting. *See* Ex. A, Declaration of Ryan Macias ¶ 23. Moreover, the Affiant failed to disclose that the Secretary of State thoroughly investigated the very concerns about "pristine ballots" that the Affidavit cites and found them to be wholly unsubstantiated. *Id.* ¶¶ 19–20.

The Affidavit relies on one witness's recollection that she saw 107 ballots that "were labeled as absentee ballots but they were too clean to be absentee ballots," *Id.* ¶ 58, and another witness's view that "there is no reason to have a pristine absentee ballot." *Id.* ¶ 53. According to the Affidavit, "an absentee ballot must be folded to fit into the envelope." Aff. ¶ 52.

But the Affiant omitted the material information that tabulating military and overseas votes regularly results in "pristine ballots." The explanation is simple and well known. *See* Macias Decl. ¶¶ 19–20. Military and overseas voters typically receive ballots electronically and print them on normal paper, not ballot stock. *Id.* ¶ 23. Because elections machines cannot scan normal paper, those ballots must be transcribed by election workers onto an absentee ballot printed on ballot stock. *Id.* That ballot stock is typically not folded and would thus appear to be "pristine." *Id.* Yet the Affidavit recklessly omits this innocuous, commonsense explanation.

Even more troubling, the Affidavit fails to disclose that the SoS investigated complaints related to "pristine ballots" and found them "wholly without support." *See* Macias Decl. ¶ 20. The Affiant makes no mention of the official SoS report concluding that "[a]fter interviewing all identified witnesses and reviewing identified batches of ballots, investigators could not substantiate the allegations of

'pristine' ballots being counted during the risk-limiting audit." Macias Decl. ¶ 18; SoS Report of Investigation Case No. SEB2020-203 ("4/24/23 Report") at 16.[6]

### **Missing Ballots During the Recount**

Further, the Affidavit puts forth a flagrantly misleading narrative of the timing of the Recount in Fulton County, falsely implying that the County manipulated its ballot count by uploading votes that arrived out of thin air after the official recount ended. According to the affidavit, "[o]n the day of the deadline to report the Recount results, Fulton County reported a recount totaling 511,343 ballots, 17,434 ballots fewer than original[sic] counted. The following day, Fulton County then reported a total of 527, 925 ballots counted." Aff. ¶ 9e.

This account badly distorts the true sequence of events by omitting the benign explanation provided by the Secretary of State's investigative report. *See* Macias Decl. ¶ 29; SoS Report of Investigation Case No. SEB2023-025 ("4/9/24 Report").[7] As that report explains, the original deadline for the Recount was December 2, 2020, but Fulton County was unable to finish scanning all of its ballots by that date due to a scanner programming error. *See* Macias Decl. ¶ 29; 4/9/24 Report at 6. The

---

[6] Notably, the 4/24/23 Report addresses what appear to be almost the exact issues raised by the "pristine ballots" witnesses. Because the Affiant spoke to a SoS investigator about those same issues, *see* Aff. ¶¶ 68–69, 74–75, the omission of that critical finding is presumably recklessness or intentional.

[7] Here, it is inconceivable that Affiant was unaware of the 4/9/24 Report, which references the same ballot counts addressed by SoS investigators. There is no explanation for the omission but the Affiant's recklessness or misconduct.

affidavit misleadingly claims that Fulton County "reported" a total of 511,343 ballots on the day of the deadline. Aff. ¶ 9e. In truth, that number represents the running internal tally of ballots scanned by December 2, 2020—a date on which it was understood that thousands of ballots had not yet been counted. [8] Fulton County did not "report" 511,343 ballots or any results to the Secretary of State "on the day of the deadline." *See* 4/9/24 Report. Again here, the Affiant inexplicably omitted an exonerating section of the Secretary of State's report. *See* Macias Decl. ¶¶ 28–30.

### Tabulator Tapes

The Affidavit also contains an extended discussion of tabulator tapes but misleadingly omits the SoS's conclusion that tabulator tapes have no relevance to official vote counts. Aff. ¶ 39–51. As the 4/9/24 Report explains, "[i]t is important to note the purpose of the tapes. . . . They serve as a paper back-up to the memory cards that store the ballot tabulation and are not part of the process by which official results are reported . . . . They are merely additional documentation of the ballots cast on the precinct scanner." 4/9/24 Report at 8. The "assumption that because tabulator tapes have not been produced then the paper ballots themselves are unaccounted for is simply incorrect." *Id.* at 9. The affidavit omits this information

---

[8] The Affidavit appears to mistakenly use the number 511,343 instead of the actual number, 511,543. *See* Macias Decl. ¶ 29.

and instead includes Witness 3's erroneous and uncorroborated claim that tabulator tape is the "holy grail" for a final ballot count. Aff. ¶ 41.

## Omission of Material Facts About Witnesses' Biases

In addition to omitting material facts that rule out any nefarious explanations for the supposed "deficiencies or defects" in the 2020 election, the Affiant failed to disclose the overwhelming biases and credibility issues plaguing the witnesses upon whom he relies. Given that a source's reliability is "highly relevant" in determining whether probable cause exists, *see Gates*, 462 U.S. at 230, the affiant's failure to reveal these biases was both reckless and material.

Incredibly, the Affidavit omits critical information about the basis of Affiant's entire investigation. The Affidavit admits that the entire "criminal investigation originated from a referral sent by Kurt Olsen," Aff. ¶ 6, but it conceals the fact that multiple courts have sanctioned Olsen for his unsubstantiated, speculative claims about elections. *See, e.g.*, *Lake v. Hobbs*, 643 F. Supp. 3d 989, 1008 (D. Ariz. 2022) (imposing sanctions on plaintiffs' counsel, including Olsen, where plaintiffs "made false, misleading, and unsupported factual assertions" in their pleadings); *aff'd sub nom. Lake v. Gates*, 130 F.4th 1064 (9th Cir. 2025); *id.* ("Plaintiffs' counsel acted at least recklessly in unreasonably and vexatiously multiplying the proceedings by seeking a preliminary injunction based on Plaintiffs' frivolous claims"); *Lake v. Hobbs*, No. CV-23-0046-PR (Ariz. May 4, 2023) ("Because Lake's attorney has

made false factual statements to the Court, we conclude that the extraordinary remedy of a sanction under [Arizona Rule of Civil Appellate Procedure] 25 is appropriate"). Olsen was also disciplined by the Arizona State Bar for that same misconduct. *See In the Matter of Kurt Olsen*, No. PDJ 2024-9004 (Decision and Order of Presiding Disciplinary Judge Oct. 17, 2024) ("Mr. Olsen violated duties owed to the legal system and to the profession.").

Further, the Affidavit relies upon representations made by "Witness 7," whom the *Atlanta Journal Constitution* has identified as Kevin Moncla.[9] But the Affidavit fails to disclose that Mr. Moncla was reportedly referred to the FBI in 2023 for sending threatening emails to members of the SEB and an aide to Secretary of State Brad Raffensperger.[10] Nor does the affidavit reveal that it relies on witnesses who, among other things, participated in Kari Lake's failed efforts to contest the 2022 gubernatorial election in Arizona, and reportedly run a Telegram channel devoted to election conspiracies.[11] This is hardly a collection of unbiased or credible experts.

**IV.    Even if the Warrant Were Supported by Probable Clause, its Manner of Execution and Callous Disregard of State Sovereignty and Numerous Judicial Proceedings Was Grossly Unreasonable.**

---

[9]  https://www.ajc.com/sp/annotated-the-fbis-affidavit-in-support-of-fulton-county-search/

[10]    https://www.ajc.com/politics/georgia-officials-ask-fbi-to-investigate-emails-from-pro-trump-election-skeptic/UPYEMVQ4D5DZNJL4WAQYABNP7Q/

[11]    https://www.theguardian.com/us-news/2024/apr/18/fulton-county-telegram-election-conspiracy-bridget-thorne.

The existence of probable cause and Respondent's acquisition of a warrant does not inherently justify the seizure of election records—the reasonableness inquiry remains. "Probable cause for a warrant is not necessarily enough. After all, the Fourth Amendment requires searches and seizures to be 'reasonable.'" *See United States v. Martin*, 399 F.3d 879, 881 (7th Cir. 2005). A seizure "may be 'unreasonable' even if likely to produce evidence of a crime." *Winston v. Lee*, 470 U.S. 753, 759 (1985). The seizure at issue here was unreasonable for two additional reasons beyond the lack of probable cause: (1) the statute of limitations for both alleged offenses has lapsed, and (2) the seizure was executed to thwart pending judicial proceedings and Georgia's constitutionally delegated elections authority.

### A. The Seizure Was Unreasonable Because Any Alleged Offense Was Beyond the Statute of Limitations.

In addition to the absence of probable cause, this seizure was unreasonable because the statutes of limitations for the two potential offenses the Affidavit cites, 52 U.S.C. §§ 20701 and 20511, have expired. Thus, there appears no "apprehension or conviction" available for Respondent to justify a warrant for the sole purpose of search and seizure. *See Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) ("[I]n the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction."). Though the expiration of the relevant statute of limitations does not necessarily negate probable cause, *see Pickens v. Hollowell*, 59 F.3d 1203, 1207

27

(11th Cir. 1995), the staleness of an investigation may also "affect reasonableness . . . . An arrest might be thought unreasonable after the statute of limitations for the offense has lapsed." *Martin*, 399 F.3d at 881.

The Fourth Amendment's reasonableness requirement obligates courts—even where there is probable cause—to "focus on the extent of the intrusion on respondent's privacy interests and on the [government's] need for the evidence." *Winston*, 470 U.S. at 763. Here, given that the relevant statutes of limitations have lapsed, and that numerous investigations into these same allegations have uncovered no wrongdoing, Respondent lacked any legitimate interest in executing a seizure.

Section 20511, which is subject to a five-year statute of limitations,[12] makes it a crime to "deprive or defraud" a state's residents of a fair election process, including through "the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent." 52 U.S.C. 20501(2)(B). The Affidavit concerns solely the 2020 presidential election, which was certified on January 6, 2021. Thus, any conduct that implicated this statute by "depriv[ing] or defraud[ing]" Georgia residents of a fair and impartial 2020 election necessarily occurred prior to January 6, 2021—no votes were "procure[d], cas[t], or

---

[12] Because Section 20511 does not contain its own statute of limitations, the general five-year statute of limitations for noncapital offenses found in 18 U.S.C. § 3282(a) applies.

tabulat[ed]" in the 2020 election after that date. Yet the Affidavit was submitted on January 28, 2026, three weeks after the relevant statute of limitations lapsed.

The statute of limitations has likewise lapsed for any potential Section 20701 offense outlined by the Affidavit. Section 20701 requires the retention of certain election records for a period of 22 months after an election. Though it has not yet been five years and 22 months since the certification of the 2020 election, every potential incident (with the exception of one witness statement about conduct that might have occurred in 2024, well beyond the 22-month window) outlined in the Affidavit occurred more than five years before the Affidavit was submitted. The last relevant events concern a recount that ended in December 2020.

### B. The Seizure Was Unreasonable Because It Effectively Enjoined a State Judicial Proceeding and Trampled on Georgia's Constitutional Responsibility to Administer Its Own Elections.

Because this seizure effectively enjoined an ongoing state judicial proceeding, the issuance of the warrant was also unreasonable under the principles of comity and state sovereignty that animate the *Younger* abstention doctrine. In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court established that federal courts should abstain from exercising jurisdiction to consider matters related to ongoing state criminal proceedings. "The policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

*Younger* abstention is called for where the exercise of federal jurisdiction would intrude into civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013). This case squarely implicates that interest, as the issuance of the federal warrant effectively prevented Georgia from pursuing its own investigation into the 2020 election, as well as enforcing a court order related to that investigation.

By exercising federal jurisdiction in issuing the search warrant, the federal magistrate judge blocked the state of Georgia from effectuating an existing court order. On December 19, 2025, Superior Court Judge Robert McBurney ordered the Fulton County BRE to provide the Georgia State Elections Board (SEB) with ballots and other materials from the 2020 general election upon payment of production costs and scheduled an evidentiary hearing on those costs. *Allen v. State of Ga.*, Civ. A. No. 24CV014632 (Ga. Super. Ct., Fulton Cnty. Dec. 19, 2025). But because of the federal magistrate's issuance of this search warrant, the superior court was forced to enter a stay. As the court explained, "[i]nstead of taking the time to make copies, the [FBI] took the originals, leaving the County without the very ballots the SEB was attempting to review. This Court thus can no longer set measured and thoughtful parameters governing the handling and copying of these materials. We are all left to

30

hope that the Bureau and the Department of Justice handle the ballots and related records with the care required to preserve and protect their integrity.").[13]

Not only does the federal government's seizure functionally enjoin the state proceeding and prevent the state court from effectuating an existing order; it does so in a case that concerns the state's constitutionally-mandated role in administering its own elections. The Electors Clause, Art. II, § 1, cl. 2, "authorize[s] States to conduct and regulate . . . Presidential elections." *Trump v. Anderson*, 601 U.S. 100, 112 (2024). Georgia has implemented its constitutional right to oversee elections through a comprehensive statutory scheme that vests custody, sealing, and retention of election records in state and county officials. O.C.G.A. §§ 21-2-70, 21-2-73, 21-2-500. Georgia has also enacted specific provisions governing investigation of fraud or any irregularities with respect to elections. O.C.G.A. §§ 21-2-73, 21-2-390. At the time the Warrant was executed, the ballots were under seal in accordance with state law.

When Respondent obtained the Warrant and seized the original copies of ballots, it did so in callous disregard of Georgia's constitutional rights, powers and

---

[13] To be sure, "a federal court generally may not choose to 'abstain' from exercising its jurisdiction in a criminal prosecution." *United States v. Long*, 324 F.3d 475, 477 (7th Cir. 2003). But there is no criminal prosecution at present. No one has been indicted, there is no person of interest, and there may be no grand jury out. Criminal prosecutions take precedence over state civil proceedings, among other reasons the Speedy Trial Act. But this is an untimely federal investigation into state law matters.

responsibilities under the Electors Clause and the Tenth Amendment as implemented through the State's election laws. Respondent's seizure and removal of election records, where they were to remain under mandate of Georgia law, prevents the FBRE from carrying out its duties under Georgia law "to guarantee the secrecy of the ballot" and to ensure that ballots and other election records are held under seal by the Clerk. O.C.G.A. §§ 21-2-70(13), 21-2-500(a).

Nothing in 52 U.S.C. § 20701, on which the Warrant relies, permits Respondent to disregard the State's rights. To the extent Congress has authority to pre-empt state legislative choices with respect to elections or election records, such pre-emption must be narrowly construed to extend "no farther" than what Congress expressly provides. *Arizona v. Inter Tribal Council of AZ*, 570 U.S. 1, 8-9 (2013). And Congress has not authorized seizure of original ballots. Rather, in 52 U.S.C. § 20703, Congress permitted only "inspection, reproduction, and copying" of certain records "**at the principal office of such custodian** by the Attorney General or his representative." (emphasis added). Moreover, Congress created a specific procedure for compelling such copies or inspection in 52 U.S.C. § 20705—relief the Department of Justice was already seeking through a separate civil proceeding prior to seeking the warrant. *See* Complaint, *United States v. Alexander*, No. 1:25-cv-07084 (N.D. Ga. Dec. 11, 2025).

Respondent has improperly used a federal statute designed to "secure a more effective protection of the right to vote" into a vehicle for displacement of state election processes in violation of congressional intent and basic principles of federalism. *See State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). As Judge Rosenbaum recently noted, 52 U.S.C. § 20701 and similar provisions "focus on civil-rights violations," not "voter fraud," and there is otherwise no statutory authority that gives "the President or DOJ power to intervene in Georgia's elections." *Georgia v. Clark*, 119 F.4th 1304, 1315 (11th Cir. 2024) (Rosenbaum, J., concurring). The Justice Manual recognizes this limitation:

> The Department has long recognized that the States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts. The Department has a limited role in these processes and should generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification.

*Id.* (quoting U.S. Dep't of Just., Just. Manual § 9-85.300 (2022)).

DOJ's seizure of ballots infringes upon Petitioners' sovereign interests in safeguarding election integrity, maintaining accurate records, and reassuring voters that their ballots will not be manipulated or misused. In addition to improperly enjoining an ongoing state judicial proceeding and preventing a state court from

effectuating its own order, this infringement constitutes callous disregard for Georgia's constitutional rights to sovereignty over its elections.

## V. Petitioners Satisfy the Remaining Requirements for Relief Under Rule 41(g).

As detailed above, Respondent's callous disregard of Petitioners' constitutional rights, and Petitioners' substantial interest in the seized records justify this Court's exercise of equitable jurisdiction to order Respondent to return the seized property at issue.[14] *See* Sections I–II, *supra*. For the sake of completeness, Petitioners note that the remaining *Richey* factors also weigh in favor of granting Petitioners' requested relief. *See Richey*, 515 F.2d at 1243–44 ("Other factors to be considered are . . . whether the plaintiff would be irreparably injured by denial of the return of the property; and whether the plaintiff has an adequate remedy at law for the redress of his grievance.") (footnotes omitted).

As Petitioners have shown, Respondents' ongoing retention of the election records will continue to irreparably harm Petitioner. As a direct result of Respondent's actions, Petitioners are now unable to comply with Georgia statutes and court orders, which has already impacted pending litigation. *See Allen v. State*

---

[14] Even if Rule 41 were inapplicable, the Court still has authority to fashion equitable relief. *United States v. Castro*, 883 F.2d 1018, 1020 (11th Cir. 1989) (Where Rule 41 motion mot appropriate, the "Court is not without the power to fashion a remedy under its inherent equitable authority. Rule 41(e) . . . is a crystallization of a principle of equity jurisdiction. That equity jurisdiction exists as to situations not specifically covered by the Rule.") (citations omitted).

*of Georgia*, 24CV014632 (Fulton Cnty. Super. Ct. Feb. 9, 2026) (Order Staying Case). Moreover, Respondent's continued seizure renders Petitioners unable to respond to verify the chain of custody of the election returns. That function is crucial as Petitioners continue to defend against baseless theories about election fraud, and the continued degradation of records is an irreparable harm.

Additionally, Petitioners lack any other remedy at law for redress of Respondent's unlawful seizure. In fact, Rule 41 relief is necessary to secure Respondent's compliance with constitutional procedures. *See Richey*, 515 F. 2d 1244 n.11 ("Where, as here, the records have merely been seized and there is no pending criminal action, the deterrent policies underlying the exclusionary rule may not be as significant as the interest of the court in securing compliance with constitutional procedures by law enforcement agents."). Accordingly, Petitioners also satisfy the final *Richey* factor. For this reason and those given above, this Court should grant Petitioners equitable relief under Rule 41(g).

## **CONCLUSION**

For the reasons stated herein, Petitioners request that the Court (1) order Respondent to return all original seized materials; (2) order Respondent to return any copies of the seized materials; and (3) order Respondent to verify precisely what was taken and copied via detailed chain-of-custody documentation; and (4) order any other relief the Court deems appropriate.

Respectfully submitted, this 17th day of February, 2026.

/s/ Y. Soo Jo

Y. Soo Jo
Georgia Bar No. 385817
OFFICE OF THE FULTON
COUNTY ATTORNEY
141 Pryor St. SW, Suite 4038
Atlanta, Georgia 30309
Tel.: (404) 612-0246
soo.jo@fultoncountyga.gov

/s/ Kamal Ghali

Kamal Ghali
Georgia Bar No. 805055
Michael C. Duffey
Georgia Bar No. 710738
CHAIKEN GHALI LLP
One Atlantic Center
1201 W. Peachtree St. NW, Suite 2300
Atlanta, Georgia 30309
Tel.: (404) 795-5005
kghali@chaikenghali.com
mduffey@chaikenghali.com

/s/ Abbe David Lowell

Abbe David Lowell*
John Bolen*
LOWELL & ASSOCIATES, PLLC
1250 H Street NW
Washington, D.C. 20005
Tel.: (202)-964-6110
alowellpublicoutreach@
lowellandassociates.com
jbolen@lowellandassociates.com

/s/ Stephen Jonas

Stephen Jonas*
Norman Eisen*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE
Suite 1580, Washington, D.C. 20003
Tel.: (202) 594-9958
steve@democracydefenders.org
norman@democracydefenders.org

*Counsel for Petitioners Robert L. Pitts, Chairman, Fulton County Board of Commissioners, Fulton County Board of Registration and Elections, and Fulton County, Georgia*

*Admitted pro hac vice*

36

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record.

This 17th day of February, 2026.

*/s/ Michael C. Duffey*
Michael C. Duffey