## DECLARATION OF RYAN MACIAS

I, Ryan Macias, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**My Background and Review**

1. I am over 18 years of age.

2. I am an election technology and security expert. I have over 20 years of experience working on election administration. I have worked on thousands of elections and spent over ten years leading the election technology division in the California Secretary of State's Office, where it was my responsibility to work with and test the accuracy, security, and reliability of prior and (while at the United States Election Assistance Commission (EAC)) subsequent versions of the voting machines used in Fulton County in 2020. I was the project manager for the federal testing and certification of the voting system used in Fulton County in 2020, Dominion Democracy Suite version 5.5A Voting System at the EAC, and where I later served as the Acting Director of the Voting System Program. In 2020, I was in Fulton County in an advisory role to provide subject matter expertise to the Fulton County Election Registration and Elections Department, where I observed pre-election and post-election operations, including the Risk Limiting Audit (i.e., the hand count) as well as the Recount. My experience includes compliance with federal

and state laws and regulations, including Title 52 U.S.C. §§ 20511 (Criminal Penalties) and 20701 (Retention and Preservation of Records of Elections).

3. My current Curriculum Vitae is Exhibit 1 to this Declaration.

4. I base this Declaration on my experience, my observations while in Fulton County during the November 2020 pre- and post-election operations, and on my review of all five of the reports of reviews and investigations conducted of the very same allegations set forth in the Affidavit: (1) March 4, 2022 Fulton County Data Review, Report of Investigation conducted by Secretary of State Investigations Division, Case No. SEB2021-181 (hereinafter "3/4/22 Report") (Ex. 2); (2) April 24, 2023 Fulton County – Tabulation and Audit Issues, Report of Investigation conducted by Secretary of State Investigations Division, Case No. SEB2020-203 (hereinafter "4/24/23 Report") (Ex. 3); (3) the April 9, 2024 Fulton County Tabulator Results 2020, Report of Investigation conducted by Secretary of State Investigations Division, Case No. SEB2023-025 (hereinafter "4/9/24 Report") (Ex. 4); (4) January 13, 2023 Performance Review Board Report of Fulton County Elections (hereinafter "PRB Report") (Ex. 5); and (5) January 12, 2021 Seven Hills Strategies State Election Board Report (hereinafter "SHS Report") (Ex. 6). I also reviewed the identified relevant pages of the transcript of the May 7, 2024, hearing of the State Election Board (Ex. 7) and the March 16, 2022, hearing held by the Office of the

Secretary of State (Ex. 8). All of these materials have been publicly available for some time.

**The Search Warrant and Affidavit**

5.   On January 28, 2026, Federal Bureau of Investigation ("FBI") Special Agent Hugh Raymond Evans submitted, under seal, an affidavit ("Affidavit" or "Af.") purporting to set forth facts sufficient to establish probable cause for the issuance of a search warrant. The facts concerned alleged impropriety in the administration of the 2020 presidential election in Fulton County, Georgia. Based on this Affidavit, the Department of Justice ("DOJ") obtained a search warrant ("Warrant") to search and seize materials dating back to the 2020 presidential election in Fulton County.

6.   The Affidavit asserts that there were five "deficiencies or defects with the November 3, 2020, election and tabulation of the votes thereof." Af. at ¶ 9. The Affidavit concludes that "[i]f these deficiencies were the result of intentional action, it would be a violation of" Title 52 U.S.C. §§ 20511 (Criminal Penalties) and 20701 (Retention and Preservation of Records of Elections). *See* Af. at ¶¶ 10 and 85.

7.   In all five areas identified by Special Agent Evans' Affidavit, there are a multitude of false or misleading statements and omissions. In fact, there are, as set forth below, over a dozen omissions of critical parts of the reports and related materials that I identified in paragraph 4 above. This is in addition to the absence of any recognition that much of what the Affidavit references as concerning are widely

known as benign and common election practices. As noted there, all of those materials are publicly available and could have been referenced by Special Agent Evans. Even when Special Agent Evans cites to one of these sources, he repeatedly omits crucial facts and findings inconsistent with his characterizations. Once the statements and omissions in the Affidavit are corrected and based on my experience administering elections in accordance with the statutes cited in the Affidavit, the Affidavit loses any basis in reality.

**November 2020 Election Voting and Counts**

8.  The following information about the voting processes in Fulton County for the November 2020 election is useful as background. In November 2020, Georgia voters could cast their votes in one of three ways; Advance Voting or Early Voting (i.e., casting a ballot in-person prior to election day), in-person on election day, or no-excuse Absentee. For voters casting their ballots through Advance Voting, a voter had the option of voting at any Advance Voting location in the county. To vote in-person on election day, a voter had to vote at their assigned precinct although Georgia law at the time allowed voters who went to the wrong precinct to cast a provisional ballot for any election contests at that precinct for which they were eligible to cast a vote. Absentee voters (excluding those military and overseas voters subject to the Uniformed and Overseas Citizens Absentee Voting Act who had different options under that Act) received their ballots, including the ballot, in an

inner secrecy envelope, and an outer oath envelope via postal mail to the address requested by the voter in their absentee ballot request or to the address on file. Absentee voters could return their voted absentee ballots by mail, by hand-delivery to their county registrar or absentee ballot clerk, or by using an official county drop box (relatives including but not limited to a parent, spouse, child, or other household member could mail or personally deliver the voter's absentee ballot).

9.  Fulton County conducted three counts of votes during the November 2020 election: the original Count; a Risk Limiting Audit, where county election officials oversaw the hand counting of 100% of the ballots to detect if there was sufficient evidence to show that the outcome of the presidential election was correct (completed from  November 11 to November 19, 2020);[1] and a Recount requested by then-President Trump (completed on December 7, 2020).

**Five "Deficiencies" or "Defects" Identified in the Affidavit**

10.Against that backdrop, I now move to the five areas of supposed deficiencies or defects identified in the Affidavit. As the following explanation will show, none of the facts Special Agent Evans relates show any conduct or anomalies that fall outside the normal and accepted range of election administration.

---

[1] Secretary of State Risk-Limiting Audit Report Georgia Presidential Contest, November 2020 https://sos.ga.gov/sites/default/files/2022-02/11.19_.20_risk_limiting_audit_report_memo_1.pdf

*"Missing Ballot Images"*

11. The Affidavit states: "The tabulator machines used by Fulton County are designed to create and save a scanned image of each ballot. Fulton County has admitted that it does not have scanned images of all the 528,777 ballots counted during the Original Count or the 527,925 ballots counted during the Recount." Af. at ¶ 9(a).

12. While the Affidavit does note that this issue was raised as part of Case No. SEB2023-025, an investigation conducted by the Georgia Secretary of State's Investigations Division and detailed in the 4/9/24 Report, and was presented during a May 7, 2024, hearing of the State Election Board, it fails to disclose, as shown below, statements from both of these sources that directly undermine the assertion that missing ballot images support a finding of probable cause that a crime has been committed.

13. The Affidavit also neglects information related to ballot images which would have further undermined any suggestion that missing ballot images supported an allegation of the commission of a federal crime.

14. Both sets of omissions are described below.

    a. The Affidavit outlines the history of the complaint related to "missing ballot images," that was brought to the State Election Board and investigated by the Secretary of State's Office. Af. at ¶¶ 12-28. It goes on to detail a series

of observations and suppositions made by Complainants to the Election Board and individuals who reviewed the matter. It does not include the substantive results of the Office's investigation of the claim regarding "missing" ballot images.

b.   As an initial matter, the Affidavit does not disclose that the preservation of ballot images was *not* required by Georgia law in 2020. As a Georgia investigator told the State Election Board during the hearing on May 7, 2024, "… the preservation of ballot images was not required in 2020. It was not until the passage of [Georgia] Senate Bill 202 in 2021 that ballot images were deemed public records subject to public inspection under the Georgia open records" (at 156). Thus, Fulton County election workers or others may not have thought it necessary to maintain the ballot images under law.

c.   Additionally, the 4/9/24 Report expressly dealt with the claim identified in the Affidavit—that *all* ballot images must have been scanned successfully for ballots to be accepted and processed. What the Affidavit identifies is not applicable here. The Report noted that this process "only applies to counties whose central scanners and servers are housed at the same location," which did not include Fulton County. The Report concluded: "Therefore, it is important to note that ballots can be scanned and tabulated without capturing ballot images."

d.  In my opinion, the absence of some scanned ballot images is common in elections. The scanning of a ballot occurs when it is automatically captured locally by the insertion of a paper ballot into the voting machine and saved on a memory device. The ballot image is one of three elements that are captured electronically on a memory device when a ballot is scanned: (1) the cast-vote record; (2) an image of the ballot; and (3) audit log entries.

e.  The cast-vote record is the electronic record of which candidate the voter cast their vote for, which is created when the scanner extracts an electronic record of the vote from the paper ballot that was scanned. The cast-vote record includes only the contests themselves and the candidates the voter selected.  It is the electronic cast-vote record that is used to tabulate the official results for the election.

f.  The ballot image is just that; an electronic image (i.e., picture), of the paper ballot captured when the ballot is fed into the scanning machine.

g.  An audit log contains a larger data set: it captures the history of the submission of that ballot. That includes information such as when the ballot was submitted, when the cast-vote record was generated, whether the ballot was accepted or not (i.e., if there is an exception such as a ballot jam, misread, or overvote).

h.  Once these three elements from every eligible ballot cast in person are stored on the memory device, the next step in the election administration process is aggregation of the votes, which occurs after the polls close on election day. This occurs automatically on each voting machine when the polls close and the closing tape for a given machine is printed. It then occurs countywide by aggregating all the memory devices together along with all centrally counted votes.

i.  Only the cast-vote record is mandatory to transfer for aggregation purposes because only the cast-vote record is used for the official vote count (or recount). The saving of the ballot image and audit log from the memory devices are optional.

j.  It is typical for the initial results on election night to capture only the cast-vote records since that is all that is required for the aggregation and reporting of results. Further, the ballot images and audit logs are much larger files and thus exporting them, along with the cast-vote records increases the time to extract the data from each memory card and slows down the time it takes to aggregate and report results on election night. Therefore, it is common practice that when aggregating election night results, only the cast-vote record is exported from the memory device—and not necessarily the ballot images or audit log, as well. As the 4/9/24 Report found, Fulton County was under no

obligation to store or transmit the ballot images as part of this process. The Affidavit contains none of this critical information.

k. These explanations about the storing of ballot images have been publicly available for some time. During the May 7, 2024, State Election Board hearing, an investigator explained to the State Election Board how the process followed by Fulton County election workers meant that some ballot images were not necessarily captured:

> This process required county workers to first download the results onto a form of removable media. They then had to upload the results from the media into the RTR [Results Tally Reporting System] workstation at a second location. During the upload process, the RTR provides the users three options which to choose. The user can select the box for load results file, load ballot images, load log file, or choose all three. If the load result file is the only option selected, which was a required option, then no ballot images would be uploaded into the RTR. Therefore, it is important to note that ballots can be scanned and tabulated without capturing ballot images.[2]

The Affidavit fails to disclose this important statement.

---

[2] SEB Meeting Transcript, May 7, 2024, p. 155.

l.  This same explanation is also offered in the 4/9/24 Report, which emphasizes that election workers "had to follow a different process to import election results" and, as a result, "it is important to note that ballots can be scanned and tabulated *without* capturing ballot images."[3] (emphasis in original). The Affidavit does not disclose this statement.

m. The failure to include any of these facts causes the Affidavit to provide a misleading impression of Fulton County's practices with respect to ballot images.

n.  Beyond these omitted facts, while the Affidavit briefly summarizes statements about the minimal importance of the ballot images, Af. ¶¶ 26-27, it ignores the important testimony of Charlene McGowan, general counsel to Georgia's Secretary of State, during the May 7, 2024, hearing that ballot images play no role in the tabulation of election results.  She emphasized that Fulton County counted the physical ballots three times, retained them, and the paper ballots are the "most important document[s]." Ms. McGowan explained (at 133-134):

> We know there are not missing votes because we have the
>
> paper ballots that document those votes for this election. The

---

[3] April 9, 2024, Investigative Report, p. 8.

paper is the record of the vote.[4] It is the most important document and it is what is used to tabulate the vote and to tabulate the results. So as long as we have that paper ballot, we have the paper trail that accurately records the voter's choices…

But it's important to note that they [the ballot images, batch loaded reports and tabulator tapes] play no role in the actual tabulation of results in an election. Again, those results are determined by the paper ballots which we have for 2020.

### *"Ballots Scanned Multiple Times."*

15. The Affidavit states: "Fulton County has confirmed that during the Recount of votes, some ballots were scanned multiple times. Ballot images made available in response to public record requests show ballots with unique markings duplicated within the ballot images." Af. at ¶ 9(b).

16. The Affidavit omits crucial facts and findings from the publicly available record, including that investigators exhaustively investigated the claim and found that multiple scans of some ballots did "not affect the accuracy of the results." 4/9/24 Report.

---

[4] Pursuant to O.C.G.A. 21-2-379.23(d), "The paper ballot marked and printed by the electronic ballot marker shall constitute the official ballot and shall be used for, and govern the result in, any recount conducted pursuant to Code Section 21-2-495 and any audit conducted pursuant Code Section 21-2-498."

a. As explained above, the only essential element needed for the tabulation of election results are the cast-vote records. Ballot images have no bearing on the count; only the cast-vote record is counted. Nothing in the Affidavit indicates any material mistakes in the cast-vote records.

b. If cast-vote records had been duplicated, and those records had been confirmed by ballot images, that could potentially reflect error. But that is not what investigators found to have transpired here. Instead, the Affidavit merely states that some ballots were scanned multiple times.

c. In my experience, scanning ballots multiple times is common in elections and there are a number of benign explanations for that phenomenon, including paper jams, a misreading of a ballot, or the misloading of a batch of ballots. The PRB Report attributed the issue of double scanned ballots to likely include the following contributing factors: "poor batch management and storage practices…a time crunch created by the failure to utilize the early scanning period, and significantly heavier usage of central scanners due to the massive increase in absentee ballots resulting from the COVID-19 pandemic and a corresponding increase in paper jams." PRB Report at 9. The Affidavit does not disclose the PRB's conclusion about the likely causes of duplicate ballot scans, which is thoroughly inconsistent with the Affidavit's suggestion

13

of "an intentional tabulation of ballots in a false matter" in order to "make the recount numbers match." Af. at ¶ 35.

d.  Special Agent Evans also does not mention that this issue was raised as part of Case No. SEB2023-025, summarized in the 4/9/24 Report and presented during the May 7, 2024, hearing of the State Election Board and does not cite the investigative findings. Investigators found that the duplicate images did not mean that ballots had been counted twice. Instead, the Report concluded: "These investigative findings do not affect the accuracy of the results of the 2020 General Election in Fulton County, which were confirmed as accurate by both the RLA and the Recount." 4/9/24 Report at 10. The Affidavit does not disclose this definitive conclusion.

e.  During the May 7, 2024, hearing, one investigator explained that they continued to look into the matter following their initial inquiry and found that duplicate images did not translate into duplicate vote totals.[5] This testimony does not appear in the Affidavit.

_____

[5] "Following the submission of the initial ROI, or report on investigation, the investigation division conducted further inquiry with technical experts and learned if an error occurs while images are moved over to the results tally reporting system for processing, it will require that the particular batch with the error to be rescanned. When those images are rescanned, the second scan creates a new batch with the same previously scanned images. At this point there are repeated images as a batch [sic] was required to be rescanned. However, only the batch that is published and validated is included in the results. As a result of this, there are instances where a county may have repeated images without the repeated images

f. The transcript of the May 7, 2024, hearing also contains the following

exchange between John Fervier, the chair of the State Election Board at the

time, and Charlene McGowan, the general counsel in the Secretary of State's

Office:

> Fervier: "Let me ask a question. You made a comment you didn't
>
> know whether they [duplicate images of ballots] were included,
>
> but you just told me that you had three different counts that came
>
> up substantially – one of them was a hand recount. So if there
>
> were duplicate ballots, it would've shown in the hand recount
>
> along with the other two; correct?"
>
> McGowan: "I think that's a reasonable assumption. Also because
>
> the results of the recount were actually lower, somewhat lower,
>
> marginally lower than the originally certified results. So if you
>
> had 3,000 ballots that were counted twice, you would expect the
>
> results to be larger by that amount." [6]

This exchange was not cited in Special Agent Evans's Affidavit. It is a

material omission because it confirms that whether or not there were

duplicate ballot images, there were not duplicate vote counts.

---

being included in the tabulated results." SEB Meeting Transcript, May 7, 2024,
pp. 160-161.
[6] SEB Meeting Transcript, May 7, 2024, p. 193-4.

g. The investigation's findings related to duplicated ballot images—findings which were publicly available in both the 4/9/24 report and the May 7, 2024, hearing transcript—belie the notion of impropriety suggested in Special Agent Evans's Affidavit.

### *Risk Limiting Audit*

17.The Affidavit alleges: "During the Risk Limiting Audit, auditors counting the votes by hand reported vote tallies for batches inconsistent with the actual votes within the batch. The State's Performance Review Board reported that Secretary of State investigators confirmed inaccurate batch tallies from the Risk Limiting Audit." Af. at ¶ 9(c).

18. Again, the Affidavit omits numerous facts and statements supporting the conclusion of investigators that there was no evidence of criminal behavior as it relates to vote tallies during Risk Limiting Audits.

a. As a threshold matter, the Affidavit fails to mention that Risk Limiting Audits have no bearing on the outcome or determination of the election. Only two types of counts can impact the outcome of the election in Georgia: the original Count and the Recount, both of which are conducted by machine.

b. A Risk Limiting Audit is a hand count for the purpose of determining whether there is confidence in the original official count. After conducting the Risk Limiting Audit for the 2020 presidential election, both Fulton County

and the State of Georgia determined they had confidence in the initial count of the vote.[7] However, under Georgia law, the results of the 2020 presidential election were close enough that a candidate was entitled to request a recount— which is what then-President Trump did. The Recount confirmed the outcome from the original Count and Risk Limiting Audit.  4/9/24 Report at 4.

c.  In my experience and as is widely recognized by experts in the field, hand counts are almost always less reliable than machine counts. The Affidavit acknowledged only that: "During a standard Risk Limiting Audit only a small sample of ballots are counted to verify the results, but in the 2020 election all ballots were audited due to the closeness of the race." Af. at ¶ 50. It failed to disclose the critical conclusion from the PRB: "Independent audit experts confirmed to Secretary of State Investigators that some amount of human error is expected in large hand-counts and that the types of errors seen in the Fulton County audit are the typical types of errors that are seen in hand tabulations." PRB Report at 8.

d.  The Affidavit also fails to disclose critical portions of the 3/4/22 Report, which emphasized that the Risk Limiting Audit was not expected to produce a "precise count."  The 3/4/22 Report at 5 states: "A precise count of over 5

_____

[7] Secretary of State Risk-Limiting Audit Report Georgia Presidential Contest, November 2020 https://sos.ga.gov/sites/default/files/2022-02/11.19_.20_risk_limiting_audit_report_memo_1.pdf

million ballots by human beings in 159 jurisdictions is impossible. Humans counting will always produce errors. In Georgia, the difference was only 0.1053% in the number of votes cast and 0.0099% in the margin. These differences are well within the expected variances in a computer count vs. a hand count and further support the overall conclusion of the hand audit—that the initial reported result in the presidential contest in Georgia was correct." That statement does not appear in the Affidavit.

e.  It is generally recognized that the mistakes inherent in hand counts are precisely why Risk Limiting Audits are not official vote counts. Many studies reflect the fact that hand counts entail human error, and that conclusions about the accuracy of machine counts should not be drawn from hand counts.[8]

f.  Furthermore, as reflected in the 3/4/22 Report, officials within the Secretary of State's Office provided benign explanations for discrepancies

---

[8] *See*, e.g., States United, *The Reality of Full Hand Counts: A Guide for Election Officials* (Feb. 6, 2024), https://statesunited.org/resources/hand-counts/; CalTech/MIT Voting Technology Project, USING RECOUNTS TO MEASURE THE ACCURACY OF VOTE TABULATIONS (January 2004), https://dspace.mit.edu/bitstream/handle/1721.1/96548/vtp_wp11.pdf; Mohave County Elections Department, 2024 BALLOT HAND TALLY (Jul. 20, 2023), https://statesunited.org/wp-content/uploads/2024/01/Mohave-County-Hand-Count-Report_s.pdf; Brett Forrest, *Nye County ballot hand-count won't make Thursday deadline*, Las Vegas CW (Nov. 16, 2022), .

found within the Risk Limiting Audit. The Secretary of State Elections Division Director, Blake Evans, said that claims based on alleged issues with Risk Limiting audits were based on "flawed" "logic." It "assum[es] that the batch names from the RLA data always match batch names from EMS [the Election Management System that tabulates results]. They are two separate systems. The naming conventions are not necessarily the same always… The purpose of the risk limiting audit is not to get a precise count, but to confirm the winner of the election, which it did." *Id* at 3. Again, this information was not disclosed in the Affidavit.

g. Special Agent Evans also does not quote from or otherwise cite the transcript of the State Election Board's meeting on March 16, 2022. The Secretary of State's Investigations Division presented the results of its investigation into Case No. SEB 2021-181. For example, Deputy Chief Investigator James Callaway explained that there "was no evidence" of "criminal behavior":

> We conducted an investigation using two of our investigators with our office. We reviewed the findings of the complaints and there was thirty-six issues and there was numerous examples of human error while inputting data into the Arlo open source software system. But there was no evidence discovered to suggest criminal behavior. I believe the

errors were due to batch sheet being entered twice under different headings.[9]

h. Additionally, Ryan Germany, general counsel in the Secretary of State's Office explained that any inaccuracies were due to human error expected in the Risk Limiting Audit process:

>And so I think what we – we found a few things kind of is what I'm getting at. One, that time crunch, of course, contributed to that Fulton County did not have – and Voting Works was working with every county. In other counties they had time to go back and do a – you know, essentially proofread their data entry and catch mistakes. Data entry mistakes happen. Whenever we've got humans entering data, we're going to have data entry mistakes. In a hand count, there's going to be human error, not just in the count but also in the data entry.

>So Voting Works put out a couple of things that I think are relevant for you guys. One, that these are the type of data entry issues that they see in an audit. At Fulton County, the level was higher because of the time crunch. They didn't have time to do that kind of quality assurance check that a lot of counties do.

---

[9] Exhibit 8 at 47.

But then, three, that the – nothing that they are seeing here changes the overall conclusion in their minds of the audit, which is to confirm the result. The audit is not meant to get the exact same count. In fact, that would not be expected. It's going to be – the whole point is to confirm, though, the – the winner won and that they've – and Voting Works saw nothing here that would change that conclusion, the – of the audit in their minds.[10]

The Affidavit also contains an extended discussion of tabulator tapes. Af. ¶¶ 39-51. But tabulator tapes have no relevance to official vote counts, a fact which the Affidavit fails to disclose but which can be found in the 4/9/24 Report at 8: "It is important to note the purpose of the tapes. The tapes are produced by the precinct scanners after the polls have closed. They serve as a paper back-up to the memory cards that store the ballot tabulation and are not part of the process by which official results are reported by counties to the Secretary of State. They are merely additional documentation of the ballots cast on the precinct scanner." The "assumption that because tabulator tapes have not been produced then the paper ballots themselves are unaccounted for is simply incorrect." 4/9/24 Report at 9.

---

[10] Exhibit 8 at 60-61.

*"Pristine Ballots"*

19.The Affidavit states that "Auditors assisting in the Risk Limiting Audit reported counting purported absentee ballots that had never been creased or folded, as would be required for the ballot to be mailed to the voter and for the ballot to be returned in the sealed envelope requiring the voter's signature for authentication." Af. at ¶ 9(d).

20. The Affidavit fails to disclose that the Secretary of State investigators found these claims to be wholly without support. The Affidavit also fails to note that "pristine ballots" are a common and benign aspect of all elections.

  a.  The 4/24/23 Report concluded with respect to the first complaint related to "pristine ballots" that "the allegations in [the complainant's] affidavit were unsubstantiated" (at 11) and with respect to the second, similar complaint, that "[a]fter interviewing all identified witnesses and reviewing identified batches of ballots, investigators could not substantiate the allegations of 'pristine' ballots being counted during the risk-limiting audit." (at 16).  The Affidavit failed to disclose these conclusions.

  b. The Affidavit cites the Jan. 12, 2021, SHS Report, written by an independent election monitor, Af. at ¶¶ 76-82 but does not disclose language from the Report that directly undermines suspicion of intentional or criminal wrongdoing. The Affidavit omits the following passage: "At no time did I

ever observe any conduct by Fulton County election officials that involved dishonesty, fraud, or intentional malfeasance. During my weeks of monitoring, I witnessed neither 'ballot stuffing' nor 'double-counting' nor any other fraudulent conduct that would undermine the validity, fairness, and accuracy of the results published and certified by Fulton County." SHS Report at 1.

21. Absentee ballots that are not folded or creased (i.e., "pristine ballots") are a typical part of the elections process. The Affidavit fails to include crucial information explaining the purpose and prevalence of "pristine ballots."

22. Ballots that do not have any creases or folds are identified in the affidavit as "pristine." The term "pristine ballots" is not an election term, and any reference herein to a "pristine ballot" is due to the use of the term in the Affidavit. There are multiple ways an absentee ballot would be flat and not contain folds or creases.

23. Most military and overseas voters receive their ballots electronically, either through e-mail or an electronic portal. Those voters can mark their ballots in two ways: either by printing out the ballot and hand marking it; or marking it on the computer and then printing it. Either way, those individuals are printing their ballots on normal paper, not ballot stock that can be scanned by the voting tabulator. Therefore, once those military and overseas voters' ballots are received by the elections office, they must be transcribed onto a paper ballot that can be scanned. In

most cases, elections officials will duplicate the ballot on to a ballot similar to an absentee ballot printed on ballot stock (i.e., opposed to a ballot printed off a voting machine similar to in-person voting) and immediately scanned into the voting tabulator. These ballots would be "pristine ballots" because they are never folded or creased before being scanned.

24. Additionally, absentee ballots that are damaged can also be transferred on to "pristine ballots." For example, in 2020 during the COVID-19 pandemic, Fulton County instituted a new process for receiving, sorting, and opening the envelopes containing an absentee ballot due to the increased volume of absentee voting. Elections officials would first scan the envelope, sort it (i.e., by precinct or district), and to capture an image of the signature so it can be verified by a human; once the signature was verified and it was determined that the voter was eligible, an election worker would place the envelope through a machine that sliced open the envelope so that the ballot could be removed. On some occasions, if the envelope was not properly placed or stacked on the machine, the slicer would cut through the ballot itself. When that occurred, the ballot could not be fed into the scanner. Those votes would be transferred on to a "pristine ballot" that could be properly scanned.

25. In-person votes can also end up on ballots that were not folded or creased (i.e., "pristine ballots"), but that would likely be a small subset of the "pristine ballots." For in-person voting, voters mark their choices and review and confirm

them on a touch screen voting device. The machine then prints out a paper reflecting what was shown on the review screen: all the contests, and the names of candidates selected, or where no selections were made (i.e., undervotes).  The voter then inserts the printed paper record into voting tabulator.

26. Although rare, a small number of printed paper ballots from in-person voting can get damaged. For example, when the printed paper is handled and rehandled ink could be smudged such that the ballot could become defective, or the ballot could be inadvertently torn or otherwise become unable to be scanned. If that happens, the choices would then be transcribed onto a "pristine ballot" using the same process as absentee ballots that need to be duplicated.

27. None of this important context about the use of "pristine ballots" appears in the Affidavit.

### Recount Results

28. The Affidavit states that "On the day of the deadline to report the Recount results, Fulton County reported a recount totaling 511,343 ballots, 17,434 ballots fewer than original [*sic*] counted. The following day, Fulton County then reported a total of 527,925 ballots counted." Af. at ¶ 9(e).

29. There is no further discussion of this allegation anywhere in the Affidavit. Special Agent Evans does not explain where he got these figures from, or where Fulton County allegedly "reported" them. The Secretary of State's 4/9/24 Report

provides a full explanation that there was no wrongdoing whatsoever. The Affidavit contains none of the explanation.

a. The Secretary of State investigated this precise complaint about the increase from 511,543 (I believe the Affidavit erroneously uses the number 511,343) to 527,925. Investigators concluded that the 511,543 number came from a Batches Loaded Report ("BLR"), a feature of the Dominion Election Management System ("EMS") that assists counties "with the tracking and reconciling of batches and number of ballots scanned." A BLR "is [] a running document meaning it is one document in which the totals will constantly change when updated and each update overrides the previous total amount." A BLR is not used to report election results to the Secretary of State. 4/9/24 Report at 6.

b. During the May 7, 2024, hearing, an investigator explained that "a county is not mandated or required to use the" BLR "feature," nor is the BLR feature "used to report election results to the Secretary of State's Office." The investigator explained: "Rather it's a mechanism that exists to any counties for the tracking and reconciling of batches and number of ballots scanned" (at 149).

c. The 511,543 number comes from the first BLR for the Recount as of December 2, 2020, the original deadline for the Recount. 4/9/24 Report at 6-

26

10. That was not the official tally of the vote. Investigators found that Fulton County did not report any results on the day of the original deadline. Fulton County first started reporting the official vote tally the following day, December 3, 2020.

   d.  Official vote tallies, whether during the original Count or the Recount, are uploaded by each county into the Results Tally Reporting System ("RTR") which is then transmitted to and received by the Secretary of State. During the Recount, Fulton County performed three uploads of official results to the RTR, two on December 3 and one on December 4. The last one showed 527,925 ballots cast. *Id.* at 6.

   e.  The 4/9/24 Report stated (at 10): "[T]he investigation revealed Respondent reported its Recount results late due to a count discrepancy caused by a scanner programming error. As a result, Respondent did not submit official results until December 3, 2020, which was after the December 2, 2020 deadline. Lastly, the document the Complainants relied upon to suggest the Respondent submitted official results on December 2, 2020, was a Batches Loaded Report; however, counties are not required to use those forms and the BLR is not used to report official results. Respondents acknowledged BLR's were used in discussions about the discrepancy but only used as a reference in determining what the totals were and should have been, and in determining

the cause of the discrepancy. There is no record of the Respondent submitting official results to the SOS on December 2, 2020."

    f.  As an investigator working for the Secretary of State's office explained during the May 7, 2024, hearing: "There is no record of the respondents submitting official results to the Secretary of State's Office on December 2, 2020."[11]  Instead, Fulton County was working to resolve a discrepancy in its ballot count and missed the deadline.[12] The investigator reiterated: "As a result, the respondent [Fulton County] did not submit official results until December 3, 2020, which was after the December 2, 2020, deadline."

30. None of this information explaining that the 511,543 number was from an unreported internal report of results as of December 2 and the 527,925 number was the official reporting result as of December 4 appears in the Affidavit. These facts refute any implication that the Recount reporting figures in the BLR provide evidence of improper conduct.

**Conclusion**

31. As an expert in the field, I conclude based on my experience and a thorough review of the full public record that each of the many individual omissions and misstatements in the Affidavit, not to mention all of them taken together, reflect

---

[11] SEB Meeting Transcript, May 7, 2024, p. 152
[12] *Id.*

gross mischaracterizations of the facts of how elections work and are directly at odds with the findings and conclusions of all of the prior investigations of the November 2020 election in Fulton County.  Once the statements and omissions in the Affidavit are corrected and based on my experience administering elections, the Affidavit does not have a substantial basis in reality.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in the City of Dallas, Texas on February 17, 2026.

Ryan Macias

# EXHIBIT 1

# Ryan Macias

## RSM Election Solutions LLC

(E) Ryan@RSMElectionSolutions.com (P) 805.345.9050

## Professional Profile

Advising, strategizing, and developing policy for 19+ years with a proven record of significant, successful contributions in election administration, election infrastructure, technology, security, and standards development for thousands of election officials within the U.S. and abroad.

## Experience

**RSM Election Solutions LLC– Election Technology & Cybersecurity Consultant/Owner: (05/2019 – Present)**

Develop methodologies and strategies for evaluating critical products, assets, and appliances used to secure critical infrastructure, with emphasis on election infrastructure technologies.

Assess the needs of United States (U.S.) and international government entities, particularly election authorities, in procuring and implementing cybersecurity infrastructure projects.

Provide expert research, analyses, and recommendations on U.S. funding of international government entities, such as U.S. Agency for International Development (USAID) funded projects for securing democratic institutions around the world.

Audit the resiliency and cybersecurity of major critical infrastructure projects to identify risk, estimate the impact, and assess the value added.

Advise election officials on process, procedures, rules, and regulations to address changes in election technology infrastructure and election administration.

Testify, provide oral testimony, written declarations, and consultation on election technology and security litigations and hearings in state and federal courts.

**University of Minnesota Humphrey School of Public Affairs – Adjunct Staff: (12/2005-Present)**

Development of course content, curriculum, and syllabus for the Elections Security course.

Teach the Election Security course with an emphasis on cybersecurity in elections.

Collaborate with other adjunct staff to ensure complimentary and consistent Election Security course content.

**Lafayette Group Inc.– Subject Matter Expert (SME), Election Security: (05/2019 – 02/2025)**

Strategize, advise, and provide stakeholder engagement to the Election Security Resilience (ESR) subdivision at Cybersecurity and Infrastructure Security Agency (CISA).

Lead SME for election technology and security, including cybersecurity of election technologies, incident response of election infrastructure breaches, disclosure of vulnerabilities, and identification of best practices for mitigative measures to the election infrastructure.

Developed 100s of products and trained 10,000+ election infrastructure stakeholders in 44 states on election security, including cyber hygiene best practices, phishing, ransomware, reducing operation risk by using secure practices, and mitigating risks of insider threat.

**U.S. EAC– Acting Director, Testing & Certification (03/2019 – 05/2019)**

Managed the development of publications and training on election technology and cybersecurity.

Served as the U.S. Election Assistance Commission (EAC) lead on critical infrastructure issues.

Lead to the Technical Guidelines Development Committee (TGDC) a federal advisory committee encompassing experts in the field of security, accessibility, standards development that advise on the development of HAVA compliant election technology principles, guidelines, and standards.

Collaborated with state and local election officials implementing new legislation, rules, regulations, and standards for election infrastructure.

Developed strategies and methodologies for balancing security with accessibility in election technology in compliance with the Help America Vote Act (HAVA) 2002.

**U.S. EAC– Sr. Election Technology Program Specialist (05/2016 – 03/2019)**

Engineered a new strategic approach for federal certification of voting systems, restructuring internal policies, processes, and procedures - focusing on the auditing and conformance to international standards for security, quality assurance, and configuration management.

Transformed the scope of voting system standards to implement a functional process-based model providing adaptability across multiple election technologies.

Project Manager for federal voting system certification - analyzing voting systems to determine conformance with federal standards, policies, and procedures.

Developed nationally recognized publications and training on the best practices for securing, procuring, and implementing election technology; many of which have been referenced in technical or policy related publications.

Implemented a risk-based approach to analyze and identify current threats and challenges in election technology, particularly regarding cybersecurity and information operations.

**California Secretary of State– Sr. Election Technology Analyst (08/2006 – 05/2016)**

Collaborated with legislators, election officials, and special interest groups to develop legislation, regulations, and policies for election systems including the California Voters Choice Act, California Voting System Standards, and remote accessible vote by mail systems legislation and standards.

Advise the Secretary of State and Executive Staff on the certification and implementation of election technologies, such as voting systems and remote accessible vote by mail technologies to ensure that all voters have an opportunity to vote privately and independently.

## Professional Organizations & Committees

Member - AI + Elections Clinic Advisory Council, ASU Mechanics of Democracy Lab (MODL)

Board Member – California Voter Foundation

Member – National Task Force on Election Crises

Member - GCA Cybersecurity Toolkit for Elections Advisory Group

Program Committee Member – E-Vote-ID: International Conference for Electronic Voting

Steering Committee Member for the Center for Internet Security (CIS) Rapid Architecture-Based Election Technology Verification (RABET-V)

Former State of California appointee to the U.S. EAC's Standards Board

## Education & Professional Certifications

Bachelor of Science, Business Administration (Finance) – California State University, Sacramento

Certified Election/Registration Administrator (CERA)

Lead Auditor - ISO 9001 & ISO 17025

Certified as a Protected Critical Infrastructure Information (PCII) Authorized User

## Projects & Publications

- CO-AUTHOR of Trust and electoral technologies throughout the election cycle: Comparing the USA, Netherlands, Poland, and Kenya: Published in the eJournal of eDemocracy and Open Government (JeDEM) Volume 16 Number 3 (2024): Special Issue e-Vote Conference

- EXPERT WITNESS on behalf of the Secretary of the Commonwealth of Pennsylvania: Fulton County, Pennsylvania, et al., v. Secretary of the Commonwealth in the Commonwealth Court of Pennsylvania, Case #277 MD 2021 No. 3 MAP 2022 as identified in the MEMORANDUM OPINION BY PRESIDENT JUDGE COHN JUBELIRER

- EXPERT WITNESS on behalf of the Secretary of the Commonwealth of Pennsylvania: No. 3 MAP 2022 Appeal from the Order of the Commonwealth Court at No. 277 MD 2021 dated January 14, 2022, in the Supreme Court of Pennsylvania Middle District, Case # J-46-2022 as identified in the OPINION by Justice Wecht

- EXPERT WITNESS on behalf of Arizona Secretary of State Katie Hobbs: Jeanne Kentch, et al., v. Kris Mayes, et al., in the Superior Court of Arizona, Mohave County, Case #CV-2022-01468

- EXPERT WITNESS TESTIMONY on behalf of Arizona Secretary of State Katie Hobbs: Kari Lake v. Katies Hobbs, et al., in the Superior Court of Arizona, Maricopa County, Case #CV 2022-095403

- DECLARATION on behalf El Paso County: Timothy J. Kirkwood and Paul T. Prentice v. Board of County Commissioners, El Paso County, et. al. in the District Court of Colorado, Case #2022CV

- EXPERT WITNESS TESTIMONY on behalf of the Secretary of the Commonwealth of Pennsylvania: Fulton County, Pennsylvania, et al., v. Secretary of the Commonwealth in the Commonwealth Court of Pennsylvania, Case #277 MD 2021 as identified in REPORT CONTAINING PROPOSED FINDINGS OF FACT AND RECOMMENDATIONS CONCERNING THE SECRETARY OF THE COMMONWEALTH'S APPLICATION FOR AN ORDER HOLDING THE COUNTY OF FULTON, ET AL, IN CONTEMPT AND IMPOSING SANCTIONS

- AFFIDAVIT (second) on behalf of the Secretary of the Commonwealth of Pennsylvania: Fulton County, Pennsylvania, et al., v. Secretary of the Commonwealth in the Commonwealth Court of Pennsylvania, Case #277 MD 2021.

- EXPERT WITNESS TESTIMONY on behalf of Arizona Secretary of State Katie Hobbs: Kari Lake, et al. v. Katie Hobbs, et al., in the United States District Court for the District of Arizona, Case #2:22-cv-00677

- AFFIDAVIT on behalf of the Secretary of the Commonwealth of Pennsylvania: Fulton County, Pennsylvania, et al., v. Secretary of the Commonwealth in the Commonwealth Court of Pennsylvania, Case #277 MD 2021.

- DECLARATION on behalf of Secretary of State's Motion to Intervene: Arizona Democratic Party and Steve Gallardo v. Karen Fann et al., Superior Court of the State of Arizona for the County of Maricopa County, Case #CV-2021-006646.

- Rebuttal Report to the Allied Security Operation Group (ASOG) Antrim Michigan Forensics Report.

- Election Security Risk in Focus: Ransomware – Trained hundreds of election administrators on the cybersecurity risks and mitigative measures related to ransomware in the election infrastructure.

- MEMORANDUM in Opposition re13 MOTION for Preliminary Injunction: Harley et al v. Kosinski et al, United States District Court in the Eastern District of New York, Case #1:20-cv-04664.
- MEMORANDUM in Opposition re26 MOTION for Preliminary Injunction: Taliaferro et al v. North Carolina State Board of Elections et al, United States District Court for the Eastern District of North Carolina Western Division, Case #5:20-cv-00411.
- Election Security Risk Profile Tool – Collaborator on the methodology for a simple, non-technical tool that provides mitigations for the non-cybersecurity professionals to understand.
- Co-Author of the Harvard Belfer Center Defending Digital Democracy Project (D3P) *State and Local Election Cybersecurity Playbook* and *The Elections Battle Staff Playbook*.
- Trainer and scenario builder for the D3P State and Local Election Official Tabletop Exercise and Battle Staff Bootcamp.
- Contributor to CIS *A Handbook Election Infrastructure Security* and *Election Technology Procurement Guide*.
- Lead on EAC Voluntary Voting System Guidelines v. 2.0 focusing on providing technologies that are both secure and accessible.
- Created the 17-Functions process model that defined the Scope of the VVSG 2.0 so that non-traditional election technologies could be tested to the same standards as traditional voting systems.

# EXHIBIT 2



# INVESTIGATIONS DIVISION

# REPORT OF INVESTIGATION

CASE NAME:            Fulton County Data Review

CASE NUMBER:         SEB2021-181

INVESTIGATOR:        Paul Braun

DATE OF REPORT:      03/04/2022

**COMPLAINT(S):**

Joseph Rossi reported errors in the Risk Limiting Audit numbers uploaded from Fulton County Elections to the Georgia Secretary of State website.

**COUNTY AND ELECTION INVOLVED:**   Fulton County November 03, 2020 General Election

**ELECTION STAFF:** Fulton County Board of Registration and Elections

**ELECTION CERTIFICATION:**  The Elections Director for Fulton County is Richard Barron, who was certified on December 27, 2015.

**JURISDICTION/VENUE:**  Jurisdiction will be with the State Election Board, Atlanta, Fulton County, Georgia.  Venue for any criminal prosecution will lie in Fulton County, Georgia.

**COMPLAINANT(S):**

Joseph Rossi



**RESPONDENT(S):**

Fulton County Board of Elections
130 Peachtree St. SW, Suite 2186 F
Atlanta, Ga. 30303
404-612-7020

Elections Director Richard Barron
130 Peachtree St. SW, Suite 2186 F
Atlanta, Ga. 30303
404-612-7020

**INVESTIGATIVE SUMMARY:**

On October 30, 2021 Joseph Rossi emailed Georgia Secretary of State Chief Operations Officer Gabriel Sterling the following. (Exhibit 1)

"Mr. Sterling, allow me to re-introduce myself.  Joseph Rossi, retired PepsiCo Executive, Professor CGTC.  Recall that I pointed out to you back in Jan that the batch tally sheets for Fulton County were posted in error, short over 200,000 votes.  You reviewed and responded that your team failed to scan all the ballot images for Fulton.  Subsequently your team deleted the original batch tally sheets and reposted.  I then reviewed the newly posted batch tally sheets and although closer to the actual certified number, the spreadsheet was still filled with gross accounting errors.  I pointed this out to you, and you responded that these errors would have to be addressed by Fulton. I believe our last correspondence was in March.

So, what is the objective of this email and the team's effort (team listed below).
1. review the 3 files attached - note these are pulled from the SOS website
2. after review and confirming that false information/errors exist - requesting that the SOS's office PUBLICLY RETRACT AND REMOVE ALL FALSE INFORMATION REGARDING THE NOV 3rd ELECTION for Fulton county.

Summary of 3 files.
1. jr7a = shows 36 accounting errors posted on SOS website regarding the hand audit
2. total2fulton = certified vote count for Fulton = 524,659, total for all ballot styles accepted = 516,499.  Numbers don't add up.

3. total3houston = same exercise for Houston.  Numbers closely match 74933 vs. 74823

Groups that have and are actively investigating this false data:
1. Governor Kemp's legal team

2. Congressman Hice's team
3. My attorney - Jack James from Warner Robins, GA
4. Tim Waters - Houston Home Journal
5. My representatives - Shaw Blackmon and Larry Walker have this information.

Please review and I'd appreciate a response by COB this coming TH.  Note the above team has a reconnect meeting at 1730 TH."

On November 01, 2021 Mr. Sterling emailed Mr. Rossi. (Exhibit 3)

"Our investigators have the information…I have received it."

On November 01, Mr. Rossi emailed Mr. Sterling. (Exhibit 4)

"Mr. Sterling, thanks for your timely response and I'm glad your "investigators," are on it.  As you may recall last Jan it took 21 days of follow-up calls and emails and a certified letter to finally get you and your team to admit that the batch tally sheets were posted in error for Fulton, per your email that you sent to me last Feb.  Note this does not need much investigating...about an hour at most to show that the data on SOS website is false and filled with errors relative to Fulton.  I'd be glad to walk you and your investigators through YOUR website and show you YOUR errors.  Please feel free to call me at ▮▮▮▮▮▮▮ my cell any time.  Our team respectfully asks for your response by COB this Th.  Our request, myself, attorney's and CPA's that have reviewed the data, is for the SOS to PUBLICLY RETRACT ALL FALSE DATA FROM THEIR WEBSITE REGARDING THE NOV 3RD ELECTION.

Think about this analogy...Pepscio (SOS's-office) submits an annual report (Election Data) filled with accounting errors/false data.  The shareholders (Voters of GA) would never tolerate this.  The CEO/CFO (SOS and Others) would not only be forced to resign, but also would be facing criminal charges.

Final note, much appreciation to the Governor's team for taking this seriously since our original meeting on Sept 10th here at our home in Perry, GA.  Talk to you all this week - Th 5:30pm.

PS - this ain't going away!!!!"

On November 02, 2021 Georgia Secretary of State Elections Division Director Blake Evans provided the following information concerning Mr. Rossi's complaint. (Exhibit 5)

"In regard to the JR7A file, his logic is flawed. He's assuming that the batch names from the RLA data always match batch names from EMS. They are two separate systems. The naming conventions are not necessarily the same always.

Also, the audit data displayed on our website is based on what counties entered for the audit, and we should not take it down. The whole point of posting it on the website is to be transparent with the audit counts from counties. <u>The purpose of the risk limiting audit is not to get a precise count, but to confirm the winner of the election, which it did.</u>

3

In regard to the file where he adds up totals from the absentee voter file to come up with 1,752 EBD ballots, 313,187 In-Person Advanced, and 142,417 Mailed, that file was last generated on 11/16/2020. Counties have 60 days after the election to enter credit into the voter registration system according to Georgia law (O.C.G.A. 21-2-215(i). Furthermore, when counties give credit after the election, they do not go through the absentee module in the VR system to issue a ballot and return it. They simply mark a person as voting either absentee, election day, advanced, or provisional so the person's record reflects voting history. Therefore, my understanding is that folks given credit after the election will not have ballot records in the absentee voter file.

Also, one other note, in the file where he comes up with the 516,499 number, he does not account for Provisionals."

On November 11, 2021 Mr. Rossi emailed Mr. Sterling. (Exhibit 6)

"Mr. Sterling, following up again - please provide update on your investigation which you emailed was under way 2 weeks ago.  Note many interested in what you and the SOS are planning to do regarding the FALSE DATA - that is posted on your website regarding the hand audit for a national election.  IE your "annual report" doesn't pass a simple accounting check.

See attached below - this is the statement and file that we are requesting be PUBLICLY retracted.

I'd be glad to answer any questions you have at any time.

Note, I've expanded those on this email - to gain momentum towards a response from the SOS's office!!!!

Thank you in advance for a response!!!!!!!!!!"

On November 12, 2021 Mr. Sterling emailed Mr. Rossi. (Exhibit 7)

"Please find attached answers to some of your specific concerns. Hopefully this will shed some light on them. Further, we would be happy to schedule a meeting to discuss these questions, or other questions, you may have. We can do that in our office or via Zoom if you would prefer."

"Summary of Investigations into Data Concerns by Mr. Joseph Rossi

The following will summarize findings regarding the following allegations:

1) There are discrepancies between the hand count (RLA) data and manual counts of batches of ballot images. Mr. Rossi provided file "JR7A" as an example.
2) Fulton's voter credit equals 516,499, and they show 524,659 ballots cast.
3) Fulton has over 75,000 accepted ballots in their absentee voter file with duplicate post numbers.

**Allegation 1**

Based on the file sent by Mr. Rossi, his allegations include 88 Fulton County batches from the Risk Limiting Audit (RLA). He is alleging that these 88 batches, as listed in the RLA Detailed Audit Report, have different counts compared to batches with similar names from files of ballot images. The assumption that batch names from RLA data always match batch names from the Election Management System that tabulates results is incorrect. They are two separate systems. The naming conventions are not necessarily the same.

The intent is not to replicate the way in which ballots were counted, but to achieve a final number that shows that the machines counted the ballots as they were marked.

Mr. Rossi also suggests that the audit data displayed on our website should be removed due to inaccuracies. The whole point of posting RLA data online is to be transparent with audit counts from counties. The purpose of the risk limiting audit is not to get a precise count, but to confirm the winner of the election, which it did. A precise count of over 5 million ballots by human beings in 159 jurisdictions is impossible. Humans counting will always produce errors. In Georgia, the difference was only 0.1053% in the number of votes cast and 0.0099% in the margin. These differences are well within the expected variances in a computer count vs. a hand count and further support the overall conclusion of the hand audit—that the initial reported result in the presidential contest in Georgia was correct.

**Allegation 2**

Mr. Rossi used an absentee voter file dated 11/16/2020 to determine that Fulton had 1,752 EBD ballots, 313,187 In-Person Advanced ballots, and 142,417 Mailed ballots.

Counties have 60 days after the election to enter credit into the voter registration system according to Georgia law (O.C.G.A. 21-2-215(i)). Furthermore, when counties give credit for voting after an election, they do not go through the absentee module in the Voter Registration system to issue a ballot and return it. They simply mark a person as voting either absentee, election day, advanced, or provisional so the person's record reflects voting history. Therefore, voters given credit after the election will not have ballot records in the absentee voter file.

In order to determine who has voter credit, the better file to use is located on our website at this location: https://elections.sos.ga.gov/Elections/voterhistory.do.

The voter history file at that location, indicates that Fulton County has 527,433 voters with credit. According to Fulton's recount, they had 527,925 ballots cast. That represents a discrepancy of 0.0932%, 17 times smaller than the 1.6% difference from the allegation. Even this small variance is not acceptable to our office, but it is not surprising or unique to the 2020 election given Fulton County's known issues with running their elections.

**Allegation 3**

The post number for a ballot is assigned at the time that a ballot is recorded as issued or mailed in the voter registration system. After consultation with our technical team, we have determined that duplicate post numbers were likely generated due to human error. The errors likely occurred because post numbers are virtually obsolete now.

Post numbers were used primarily several years ago when counties used the Balotar Ballot on Demand system to print ballots. Because counties no longer use Balotar, our understanding is that post numbers are no longer needed.

Regardless, post numbers are issued at the time a ballot is recorded as issued or mailed. They have nothing to do with how voters mark their ballots, how ballots are tabulated, or how ballots are tracked.

These allegations, like so many, are well intentioned. That said, in nearly all of our investigations we are seeing the expected and normal degree of issues that occur due to human error in nearly every election. The individual people running the elections are the main point where issues occur, because people can and do make mistakes. Everything we are seeing in our investigations regarding the 2020 election are similar human-error issues that occur in every election, especially where 4 or 5 million people are voting. And, as is also typical in Georgia elections, most of the issues are occurring in counties that historically have difficulty running their elections, such as Fulton. These allegations highlight issues that Fulton County can and should improve when it comes to running their elections, but they do not speak to the accuracy and integrity of the election results."

Mr. Rossi also reported his complaint to State of Georgia Office of Governor.

On November 17, 2021 a letter signed by Governor Kemp was sent to the members of the Georgia State Election Board. Also, the Governor's Office (40) forty-page investigation. (Exhibit 8)

"I write to refer the following matter to the board for it's review and consideration. As you know, I called on Georgians with information about inconsistencies or complaints regarding the 2020 election to notify the proper state authorities. To date, the complaint outlined below is the only instance where a complainant has referred any issue to my office and provided all requested information for me and my staff to fully evaluate it's veracity.

On September 3, 2021, Mr. Joseph Rossi, a retired executive from Houston County, Georgia, contacted my office. Mr. Rossi presented an analysis of the 2020 Risk-Limiting Audit Report ("RLA Report") data, noting 36 inconsistencies reported by Fulton County. The analysis was created by him and attorney Jack James who volunteered their own time, without compensation, to review thousands of ballot images, audit tally sheets, and other data to double-check the work of the county. Their dedication to this immense task is commendable.

The 36 inconsistencies noted by Mr. Rossi are factual in nature, pose no underlying theories outside of the reported data, and could not be explained by my office after a thorough review

detailed below. The purpose of this letter is to convey these inconsistencies to the Board and request them to be explained or corrected.

To be clear, this letter does purport to dispute or contest the outcome of the 2020 election, but rather to highlight apparent inconsistencies discovered in the RLA Report data.

Mr. Rossi requested my office review his findings and take whatever action may be appropriate to address his concerns. Mr. Rossi never alleged the outcome of the election was in question or asked me to act beyond my constitutional or statutory powers as Governor-the authority to oversee elections in Georgia lies with the State Election Board and the Secretary of State.

To determine whether it was appropriate to refer Mr. Rossi's claims to you, my office tested the veracity of his work by independently repeating the research Mr. Rossi conducted on each of his 36 claims. My office analyzed each of Mr. Rossi's claims against the RLA Report data. This process was extensive, required a manual review of thousands of ballot images and audit data, and took weeks to complete.

Based on the analysis, as evidence in the attached report, I believe a referral to the Board is warranted.

The data that exists in public view on the Secretary of State's website of the RLA Report does not inspire confidence. It is sloppy, inconsistent, and presents questions about what processes were used by Fulton County to arrive at the result. Though reasons for, or explanations of, Mr. Rossi's concerns may exist, they are not apparent in the RLA Report data. In reviewing this matter, I believe the Board should consider the following actions:

1) Direct investigators to review Mr. Rossi's findings, just as my office has, and order corrective action as needed to address any verified errors.

2) Determine whether any changes should be made to the RLA Report, if so, the Board should determine whether such changes adversely impact the integrity of the RLA Report as originally reported.

3) Review the audit methodology used in counties across Georgia and create a create a prescriptive and uniform set of rules that ensure one process is followed by all counties that result in a clear presentation of data.

As you know, I chaired this Board for nine years. During that time, we tackled many tough issues to ensure the integrity of Georgia's elections and make it easy to vote and hard to cheat. It is the responsibility of this Board to safeguard the confidence I and all my fellow Georgians must have in our elections. This is one issue where I believe this Board must act swiftly, and I urge you to do so in this case."

The 36 (thirty-six inconsistencies broken down by scanner with batch sheets attached. (Exhibit 8,9,10,11,12,13)

On December 16, 2021 myself and Investigator Zagorin met with Joseph Rossi and individuals accompanying him. This is a portion of the interview. The recording in its entirety is with the case file. (Exhibit 14)

Attending the meeting are:

1) Georgia Secretary of State Investigator Paul Braun
2) Georgia Secretary of State Investigator Vincent Zagorin
3) Attorney Jack James/ was not attending in the role of an attorney
4) Tim Waters with the Houston Home Journal/HHJ Online
5) Joseph Rossi

Investigator Zagorin explained how the Georgia Secretary of State receives complaints.

Mr. Rossi advised he is the complainant, and he sent his complaint to the Governor's Office.

Mr. James confirmed he was not acting as an attorney as he assisted Mr. Rossi.

Mr. Waters advised he wrote several stories about Mr. Rossi's complaint.

Investigator Zagorin advised everyone that we would interview them separately. Mr. James was advised if he was acting as Mr. Rossi's attorney he could stay, but since he is not, he was asked to leave the room.

Rossi- Are you looking at the Fulton County errors or you looking at the Secretary of State's Office?

Zagorin- We look wherever the evidence takes us. If there is a mistake made in our office, we would look at that. We would also look if Fulton County make a mistake. We will look at your entire complaint.

Braun- What led you to start investigating Fulton County? How did the process start?

Rossi- I just looked at the data posted on the Secretary of States website regarding Houston County and Fulton County, different counties. I am from Houston County.

Braun- I saw you had some numbers from Houston County. Did you look at any other county besides Houston and Fulton? Could not hear response.

Braun- Who did you send your findings to first?

Rossi- I corresponded with Mr. Sterling.

Braun- I saw Mr. Sterling did an investigation. Did you get a copy of his findings?

Rossi- He sent me emails. I have a number of his emails.

Zagorin- What we have from the Governor's Office has approximately 40 pages. We did not get your complaint direct just what they sent us. (Investigator Zagorin confirmed the information from the Governor's Office is Mr. Rossi's entire complaint)

Zagorin- You went to our website and looked at where the counties are listed and looked at the numbers for Fulton County? Or the one that said RLA?

Rossi- I looked at the XL spreadsheet on the Secretary of State's website.

Zagorin- There was another part that listed actual batch sheets did you look at those as well?

Rossi- Yes.

Zagorin- When you looked at all that did you come to a conclusion that there was a violation of the state election code?

Rossi- I'm not familiar with the State Election Code. It had a lot of accounting errors in it. Initially the batch sheets posted by Mr. Sterling's email were not all posted. He sent me an email back and said yes, we were in error we failed to post all of the batch sheets. Then they went back and posted all of the batch sheets.

Zagorin- Is that your issue with the Secretary of State's Office is that they did not post all of the batch sheets?

Rossi- That was one item that came up initially.

Zagorin- What were the other ones involving SOS?

Rossi- The Secretary of State's website per Mr. Sterling was supposed to post the batch sheets. He referred me to his website. He said if you want to understand what batch sheets are, they have been on our website since November. So, I went in to look at them there were several hundred thousand votes short of the 525 total for Fulton County. They were all there for Houston County, so I knew something was not right. I emailed him. He said you are correct we did not scan all of the images and we will have it corrected by Friday.

Zagorin- Is that the only issue with the SOS, the batch sheets?

Rossi- Per the Governor's report. I'll refer you to it he calls out 40 pages of inconsistencies.

Zagorin- What did you send the Governor's Office.

Rossi- I sent him some of the errors from the Secretary of State's XL spreadsheet. He went and investigated those errors himself from the Secretary of State's website and generated this report.

Braun- Did they find more errors than what you sent them?

Rossi- No, they vetted all the ones I sent them.

Braun- You sent them all the inconsistencies that were in the 40 page report?

Rossi- You are correct. I found the accounting errors.

9

Zagorin- My understanding was that you sent all of that information to the Governor's Office and they verified it. Then they sent it to us. What did you send the Governor's Office as to what your issue was?

Rossi- I sent them highlighted errors from that XL spreadsheet.

Zagorin- From the one that has all of the counties listed?

Zagorin - Your talking about things like scanner 1 batch 18 has a number and scanner 1, 18 has the same number is duplicated. That's you error?

Rossi- Yes.

Zagorin- The issue with the SOS are those errors? You think those errors are on the Secretary of State? Those errors that were posted were a mistake by the Secretary of State?

Rossi- I don't know they are posted on the Secretary of State's website.

Zagorin- *29:26* All counties, all 159 send us the information. Most of them send it electronically. It comes right into the website. We cannot alter that information. it is not our information. It is not our findings. (*Zagorin continues to explain the SOS receiving the information.*)

Rossi- So you're saying the double counts were entered by the counties?

Zagorin- The counties not the SOS. The batch sheets were scanned by the SOS. Someone in our office scanned the batch sheets. It came to the attention of the Secretary of State's Office that the numbers don't look right. (*It was discovered the SOS had more boxes of batch sheets than were posted on the website. The decision was made to scan and upload all of the batch sheets and delete the incomplete data on the website.*)

Rossi- Did the Secretary of State's Office check the data that was entered from the county for accounting errors?

Zagorin- I will have to ask that question. It's the counties information.

Rossi- It is posted on your website and you want to have accurate information on your website.

Zagorin- We are a conduit.

Rossi- A conduit of false information? Was the information checked? I would like to know the answer to that.

*(The conversation continues concerning the uploaded data.)*

*(Mr. Rossi refers to the Governor's investigation)*

Rossi- If there are accounting errors go back to the county and tell them to fix them. If my division of PepsiCo submitted a report with errors in it the CEO would not sign off on it.

Rossi- I would like to know if the hand audit data posted on the Secretary of State's website was checked? If you didn't check it how could you make a statement that the hand audit verified the machine count?

*(Zagorin answers the question 41:13.)*

*(Zagorin and Rossi discuss finding the errors that were uploaded 42:09.)*

*(Zagorin and Rossi discuss errors on the batch sheets 43:49.)*

*(Braun and Rossi discuss batch sheets being uploaded to ARLO at the county level 45:18.)*

*(Zagorin and Rossi discuss batch sheets being uploaded to ARLO incorrectly 48:20.)*

Rossi- If you add up the errors in that spreadsheet.

Zagorin- How many did you get?

Rossi- I'm not going to tell you. I'm going to let you guys do the work. It's a lot of them.

*(Zagorin and Rossi discuss the final numbers/errors in the spreadsheet.)*

Rossi- If you do the net and add up the errors on the Secretary of State's website it's a significant number.

Braun- That is for the hand re-count?

Rossi- For the hand audit.

Rossi- If you guys do the math and you look through it. The net vote error on that hand audit will be a significant number. The number on your website uses the errored data. If you back out all the errors on your website that number is wrong.

Rossi- If you do the math. The Governor's team did it. It's a significant number of votes. They did not put it in their report. If you do the match and check it, you cannot make the statement that the audit verified the first machine count. You can't do that it's not factual. That's the premise of why I came. Don't take that lightly, that's why I'm here.

*Zagorin and Rossi discuss the Governor's report and Rossi's findings 55:15.*

Rossi- I'm generally understanding how you are saying the errors occurred.

*(Zagorin and Rossi discuss the total vote count in Fulton and State wide 56:10.)*

Rossi- If the Secretary of State said the hand audit verified that machine count. Somebody at the Secretary of State's Office should have verified that data from the counties did not have accounting errors. That's my position.

*(Zagorin and Rossi discuss the total vote count in Fulton and State wide 57:40.)*

Braun- Do you believe the Secretary of State should verify every piece of data sent by the counties through ARLO?

Rossi- I can't speak to the rules. I would think before I made the statement that says the hand audit verified the machine count, I would make sure the hand audit verified the machine count. The ARLO spreadsheet should have been checked for accounting errors. I know there are accounting rules that says if you check this amount then statistically the information is correct.

*(Group discussion continues about the accounting errors and checking the data 1:00:40)*

Rossi- If the SOS did not verify the data then it's a process question that needs to be vetted out by the Governor. I think there is a part in the code that says errors should be directed back to the county. In this case there were errors, and they were not directed back to Fulton County.

*(Group discussion continues about the accounting errors and checking the data 1:10:05)*

Rossi- Would the Secretary of State be willing to put on the spread sheet that after further review we recognize this has accounting errors and we are going back to the county to check them. At least make the public aware.

Zagorin- That would not be the Investigators decision.

Rossi- My solution would be for someone to go back and footnote what's on the Secretary of State's website. Somebody is going to have to go back and figure out what happened in Fulton County. How the errors were generated and the origin of the errors.

*(Group discussion continues about the accounting errors and checking the data.)*

Rossi- I'm not going to tell you the number I came up with. I came up with a net difference.

Zagorin- A complaint has been filed. You are the complainant, but you do not want to give us all of the information

Rossi- That's not a good accusation of me. Everything I have looked at you have available to you on the SOS website and with the Governors report. I'm not withholding information that you do not have access to. I don't have to give you stuff that is on your website. You just need to look at it.

Zagorin- If you give us something that is on there and we can look at it a lot faster. Then this case will be closed quicker.

Rossi- I did that with the Governor so if you want that information go to the Governor and ask him.

Zagorin- It's not in his report either.

Rossi- Go ask him.

*(Zagorin and Rossi discuss the Governor's report and batch numbers 1:34:40.)*

Braun- With regards to Fulton County do you believe the errors made were human errors or something more nefarious?

Rossi- I can't say. I just know there are errors.

Braun- Same question regarding the Secretary of State's Office?

Rossi- If they didn't check the data, it's negligence. If they did check it and did not find errors that's incompetence. If they checked it found the errors and did not say anything about it then that's a cover up.

*(Jack James and Tim Waters enter the room again.)*

Waters- To the average Joe Citizen this looks like pure incompetence or a lot worse.

Zagorin- Incompetence on whose part?

Waters- On the Secretary of State. He is charged by the State of Georgia to ensure these elections are accurate. I do not see that that happened.

*(Rossi again provided a remedy)*

James- The Secretary of State has the responsibility to correct the errors when the errors are pointed out. A Georgia code section says they have that responsibility. These errors were pointed out in March or April. "Georgia Code 21-2-499(a) specifically says they have to do that, and they didn't do it." I don't see how the SOS can pass it off on Fulton County.

Braun- Meeting ends at 10:42hrs. on 12-16-2022.

On January 18, 2021, I emailed Fulton County Election Managers Richard Barron and Nadine Williams requesting a response to Joseph Rossi's complaint. I included the complaint in the email.

On March 02, 2022 this investigator received the following response from the Fulton County Attorney's Office. (Exhibit 15)

Re: Inconsistencies Alleged by J. Rossi This response is being provided, at the request of the investigative staff in the Office of the Secretary of State ("SOS"), in response to the letter and

information provided by Governor Kemp. The Fulton County Department of Registration and Elections ("DRE") is providing this response in the spirit of cooperation, to share its insights of the Risk-Limiting Audit ("RLA") process and to improve future RLAs in Georgia. The RLA was the first of its kind in Georgia. The counties were not properly assisted in preparing for the RLA and were not given tools and resources to allow them to reconcile the data that was entered. Given the high stakes of the election, and the scrutiny that the counties were under, adequate time, and tools to input and verify the information is a top priority. The SOS should start planning now for the type of system it will use in any future RLA. Larger counties with more voters should be given additional licenses at the beginning of the process. Future RLAs should take into account the number of voters in each county and allocate licenses and other resources accordingly.

Our office is well acquainted with Mr. Rossi. He has raised several issues about the RLA. For example, Mr. Rossi initially alleged that Fulton County had not turned in all of its batch sheets for the RLA. This allegation was incorrect, DRE staff subsequently learned that the SOS had failed to make all of Fulton County's batch sheets available online. The memorandum prepared by Mr. Rossi raises additional issues. The following are responses to the seven (7) types of alleged inconsistencies identified by Mr. Rossi:

I.    Misidentified and Duplicated Batch Entry

March 2, 2022
Response to Governor Kemp's Letter
Concerning Alleged Inconsistencies

(This alleged inconsistency is identified in the Review of Inconsistencies for items 1, 11, 29, 32, and 34.)

Response:

When the ARLO system was implemented for uploading the batch sheets for the RLA, all counties were initially provided one license — one person could upload data at any one time -- and had a limited number of days within which to compete the RLA and upload the information. The provision of a single license initially hindered Fulton County, because Fulton County has more voters than any other county. DRE promptly requested additional licenses so the DRE staff could upload the data in the time frame that was provided. More licenses were provided, and additional staff was designated to upload the data. However, the ARLO system was slow in uploading entries. This raised concerns that the ARLO system had not accepted uploaded information. In some instances, entries were duplicated by double entries when staff was unsure that the system had "taken" the entry.

Additionally, the condensed time frame and multiple personnel resulted in questions as to whether some batch sheets had been entered. In an effort to verify that all batch sheets had been entered, the DRE staff searched the system to find batch sheets they believed had not been entered. If the DRE staff searched for a batch sheet already entered in ARLO, and the search did not return a result, the batch sheet was entered. It is believed that the duplicates identified here were duplicates that resulted from this effort. If the DRE staff did not input the exact same name

14

of the batch sheet as it was initially entered, inclusive of capital letters, the batch sheet would not be found. If the DRE had had more time to complete the upload and reconcile the information, or an ability to clear the entries and reenter them, we could have minimized the errors. However, we were not given that ability. A recommendation to avoid these issues in the future would be to provide specific instruction on search features and to provide a drop-down menu to assist in running searches. Also, suggestions for universal naming conventions would be helpful. Further, it is recommended that the SOS purchase software meant for this purpose rather than continue to use the ARLO system, which was built for another purpose. The software needs to be tested by the SOS first.

Il.     Duplicated Batch Entry

This alleged inconsistency is identified in the Review of Inconsistencies for items 2, 3, 7, 10, 13, 15, 16, 17, 18, 19, 23, and 28.

Response:

See response to I above.

Ill.    Batch Entries Reflecting 100% Vote Counts for one Candidate

This alleged inconsistency is identified in the Review of Inconsistencies for items 4, 5, 27, and 31.

March 2, 2022
Response to Governor Kemp's Letter
Concerning Alleged Inconsistencies

Response: This alleged inconsistency may be due to human error.

IV.     Misidentified Batch Entry

This alleged inconsistency is identified in the Review of Inconsistencies for items 6, 8, 9, 12, 14, 20, 22, 26, 33, and 35.

Response:

This alleged inconsistency appears to be due to human error and is reflective of the time crunch and stress that the DRE staff were placed under. Vv. Misidentified Batch Entry or Duplicated Batch Entry This alleged inconsistency is identified in the Review of Inconsistencies for items 21, 24, and 30.

Response: See response to IV above.

VI.     Misidentified Batch Entry and Misallocation of Votes

This alleged inconsistency is identified in the Review of Inconsistencies for item 25.

Response:

See response to IV above.

Additionally, it appears that the votes for Biden and Trump were transposed.

VII.    Apparent Misallocation of Votes

This alleged inconsistency is identified in the Review of Inconsistencies for item 36.

Response:

See response to IV above. Additionally, it appears that the vote counts for Trump and Jorgenson were transposed. We believe more licenses, a more robust system capable of handling the data and additional time would eliminate the issues and concerns or Mr. Rossi in future RLA audits.

On March 25, 2022, I met with Monica Childers with VotingWorks. She provided the following information in reference to this complaint. (Exhibit 16)

"Risk-limiting audits are used to give confidence that the outcome of an election is correct, not to generate or confirm an exact vote count. Nothing found in this investigation would invalidate the conclusion of the 2020 audit, which indicated that President Biden rightfully won the 2020 presidential contest in Georgia. Inadvertent human errors like these are typical of processes that rely heavily on manual data entry of handwritten data, and we have seen no indication that they represent malice or bad faith on the part of Fulton County. Indeed, similar errors were also discovered in other counties, but those counties had time to review and correct errors before the deadline. Due to its size and the sheer amount of ballots, Fulton County simply lacked the time to adequately review and correct their data entry before the deadline.

"We concur with Fulton County's assessment that some limitations in Arlo, the open-source software we provide Georgia for risk-limiting audits, exacerbated some of these human errors. Though this did not materially affect the outcome of the audit, we have taken this opportunity, as recommended by Gov. Kemp, to further improve the audit process, paying particular attention to the needs of Fulton County, Georgia's largest. Should Georgia ever need to perform a full hand-tally RLA in the future, Arlo now provides election officials with extra tools to prevent the entry of duplicate batches and flag missing batches. We welcome any additional feedback from the state and other Georgia counties."

On March 04, 2022 Georgia Secretary of State Elections Director Blake Evans provided the following information concerning the complaint. (Exhibit 17)

**FINDINGS:**

**POTENTIAL VIOLATIONS:**

**Fulton County Registration and Election Division**
**Fulton County Elections Director Richard Barron**

There is evidence to suggest the **Fulton County Registration and Election Division and Richard Barron** are in violation of **Board Rule 183-1-15-.04 2(2) Preparing for Audit (36 counts)** The election superintendent shall create audit teams comprised of at least two sworn designees to assist with the audit. The superintendent may designate non-employees to assist with the audit process. All persons who the superintendent designates to assist with the audit shall take and sign an oath that they will conduct the audit accurately and securely prior to assisting with the audit. **Fulton County Election employees/staff misidentified and duplicated audit batch sheet data when it was being entered into ARLO. Examples include inconstancy #2 Scanner 1 Batch 18 is entered twice. One as AbsenteeScanner1Batch18 the other as Scanner 1/18. Inconsistency #18 scanner 3 Batch 18 is entered twice. One as AbsenteeScanner3Batch18 the other as scanner 3/18. Inconsistency #31 audit batch sheet shows 95 batches equaling 950 votes. The batch sheet should indicate 95 votes.**

**State Election Board Rule 183-1-15-.04**

**(1)Preparing for the Audit1.** Following November general elections in even-numbered years, each county shall participate in a statewide risk-limiting audit with a risk limit of not greater than 10 percent as set forth in this rule prior to the certification by the Secretary of State.

**2.** Prior to county certification, the election superintendent of each county shall prepare a ballot manifest as instructed by the Secretary of State.

**3.** The contest to audit shall be selected by the Secretary of State. The Secretary of State shall set a date, time, and location after the November general election in even-numbered years to select which contest to audit. Such meeting shall be open to the public. After selecting the contest to audit, the Secretary of State shall publicly announce which contest will be audited and publish the selected contest on the Secretary of State webpage. In selecting the contest to audit, the Secretary of State shall consider the below criteria:
**a.** The closeness of the reported tabulation outcomes;
**b.** The geographical scope of the contests;
**c.** The number of ballots counted in the contests;
**d.** Any cause for concern regarding the accuracy of the reported tabulation outcome of the contests;
**e.** Any other benefits that may result from auditing certain contests; or
**f.** The ability of the county to complete the audit before the state certification deadline.
**4.** The audit shall be open to the public, and public notice of the date, time, and location of the audit must be posted on the county election office's website, or, if the county election's office does not have a website, in another prominent location.

**(2) Conducting the Audit1.** The audit shall be open to the view of the public and press, but no person except the person(s) designated by the election superintendent or the superintendent's

authorized deputy shall touch any ballot or ballot container. The election superintendent may designate a viewing area from which members of the public may observe the audit for the purpose of good order and maintaining the integrity of the audit.

**2.** The election superintendent shall create audit teams comprised of at least two sworn designees to assist with the audit. The superintendent may designate non-employees to assist with the audit process. All persons who the superintendent designates to assist with the audit shall take and sign an oath that they will conduct the audit accurately and securely prior to assisting with the audit.

**3.** Chain of custody for each ballot shall be maintained at all times during the audit, including but not limited to, a log of the seal numbers on the ballot containers before and after completing the manual audit.

**4.** For ballots marked by electronic ballot markers, the auditors shall rely on the printed text on the ballot to determine the voter's selection. For ballots marked by hand, the auditors shall rely on the choices indicated by the voter by filling in the oval adjacent to the candidate or question.

**5.** The audit shall end once all selected ballots have been counted and the risk limit for the audit has been met.

**6.** The election superintendent shall report the results of the audit to the Secretary of State.

**7.**The election superintendent shall follow instructions issued by the Secretary of State on how to specifically conduct the audit, including but not limited to setting deadlines and formats for creating ballot manifests.

**EXHIBITS:**

1) October 31, 2021 Joseph Rossi Email to Gabriel Sterling
2) Witness List
3) November 01, 2021 Gabriel Sterling email to Joseph Rossi
4) November 01, 2021 Joseph Rossi email to Gabriel Sterling
5) November 02, 2021 Blake Evans response to the complaint
6) November 11, 2021 Joseph Rossi email to Gabriel Sterling
7) November 12, 2021 Gabriel Sterling's investigation summary emailed to Joseph Rossi
8) Governor Kemp letter with their investigation covering the 36 (thirty-six) inconsistencies
9) 36 (thirty-six) inconsistencies broken down to scanners. Scanner 1
10) 36 (thirty-six) inconsistencies broken down to scanners. Scanner 2
11) 36 (thirty-six) inconsistencies broken down to scanners. Scanner 3
12) 36 (thirty-six) inconsistencies broken down to scanners. Scanner 4
13) 36 (thirty-six) inconsistencies broken down to scanners. Scanner 5
14) Joseph Rossi interview with investigators
15) Response from the Fulton County Attorney's Office.
16) Monica Childers Voting Rights Response
17) Georgia Secretary of State Elections Director Blake Evans response to the complaint.
18) November 03, 2020 General Election Audit Report (Posted on the Georgia Secretary of State website.
19) Official Election Bulletin Audit Instructions sent to the counties for the audit

# EXHIBIT 3



### INVESTIGATIONS DIVISION

### REPORT OF INVESTIGATION

CASE NAME:        Fulton County- Tabulation & Audit Issues

CASE NUMBER:      SEB2020-203

INVESTIGATOR:     Paul Braun, Gilbert Humes

DATE OF REPORT:   April 24, 2023

**COMPLAINT(S):**

The Georgia Secretary of State initiated this investigation after receiving the following complaints alleging anomalies observed during the tabulation of ballots at State Farm Arena and the risk-limiting audit of the presidential election conducted at the Georgia World Congress Center for the November 3, 2020, General Election in Fulton County.

**Complaint 1:** Credentialed poll watchers Michelle Branton, Mitchell Harrison, Mark Amick, and Jane Levings reported that they were not able to adequately view the tabulation process at Fulton County's tabulation center located at State Farm Arena or were told to leave by elections workers before tabulation ended on November 3, 2020. The Secretary of State's office also received complaints that "suitcases" of ballots were secretly stored under a table at the tabulation center and were scanned that evening after poll watchers and the media left.

**Complaint 2:** Complainant Bridget Thorne reported in an affidavit that was provided to the Secretary of State's office that she served as a certified technician to assist Dominion Voting Systems in Fulton County for the 2020 General Election from October 27 through November 1, 2020. Thorne reported that test ballots were mishandled during logic & accuracy testing for one precinct and could have been mixed in with voted ballots from advanced voting. Thorne also reported in her affidavit that tabulation scanners used

during advance voting at State Farm Arena were transported with the voted ballots in them to Georgia World Congress Center, which was used by Fulton County as their temporary warehouse. Thorne alleged that ballots were not transported or placed in ballot bins securely.

**Complaint 3:** Complainant Robin Hall reported in an affidavit[1] provided to the Secretary of State's office that she observed suspicious ballots during the risk-limiting audit of the presidential election conducted by Fulton County at the Georgia World Congress Center. The complainant reported that certain batches of ballots appeared to be in "pristine condition" as if they were marked by a machine rather than a person.

**Complaint 4:** Complainant Susan Voyles reported in an affidavit submitted to the Secretary of State's office that she observed suspicious ballots during the risk-limiting audit of the presidential election conducted by Fulton County at the Georgia World Congress Center. Voyles reported that certain batches of ballots appeared to be in "pristine condition" as if they were marked by a machine rather than a person. Voyles also alleged that she served as a poll manager for a Fulton County precinct for the General Election and that voting equipment was delivered late to her polling location, and she was not able to use some of the voting equipment on election day because the numbers on the seals did not match the inventory sheet upon delivery.

**Complaint 5:** This complaint was submitted to the Secretary of State's office in the form of an affidavit from Hale Soucie. Soucier reported that he served as an observer for the Georgia Republican Party on November 14, 2020, during the post-election risk-limiting audit conducted by Fulton County at the Georgia World Congress Center. Soucie reported that there was inadequate security during the risk-limiting audit. Soucie also reported that he witnessed auditors report suspicious ballots, and that the batches being counted were skewed towards one candidate.

All allegations made are potential violations of Official Code of Georgia Annotated (O.C.G.A.) §21-2-603-Conspiracy to commit election fraud; O.C.G.A. §21-2-587-Frauds by poll officers; and O.C.G.A. §21-2-575-Counterfeit ballots.

## COUNTY AND ELECTION INVOLVED:

Fulton County and the November 3, 2020, General Election.

---

[1] Many affidavits that were submitted to the Secretary of State's office for investigation, including the affidavits of Robin Hall and Susan Voyles, had previously been submitted as evidence in a federal lawsuit filed by Lin Wood against the Secretary of State in the U.S. District Court for the Northern District of Georgia, *Wood v. Raffensperger*, Civil Action No. 1:20-cv-04651-SDG. Judge Steven Grimberg considered this evidence at a hearing on Wood's motion for preliminary injunction and denied Wood's motion to enjoin state certification of the presidential election results for the November 2020 General Election. This ruling was affirmed by the Eleventh Circuit Court of Appeals, and the U.S. Supreme Court denied Wood's petition for certiorari.

ROI: Fulton County-Tabulation & Audit Issues
SEB2020-203
Page 3

**ELECTION STAFF:**

Richard Barron, former Director of Elections, Fulton County Board of Elections and Registration.


Nadine Williams, current Director of Elections, Fulton County Board of Elections and Registration.

**ELECTION CERTIFICATION:**

Richard Barron met the election certification training requirements on December 27, 2015.

Nadine Williams met the election certification training requirements on March 11, 2014.

**JURISDICTION/VENUE:**

Jurisdiction will be with the State Election Board, Atlanta, Fulton County, Georgia. Venue for any criminal prosecution will lie in Fulton County, Georgia.

**COMPLAINANT(S):**

Michelle Branton
P.O. Box 583
Rome, Ga. 30162
████████████


Mitchell Harrison
524 Rivercrest Dr.
Woodstock, Ga. 30188
████████████


Mark Amick
3103 Balley Forrest Dr.
Alpharetta, Ga. 30004
████████████


Jane Levings
3380 E Wood Valley Rd. NW
Atlanta, Ga. 30327
████████████


Robin Hall
598 Medina Dr.
Augusta, Ga. 30907

███████████

Bridget Thorne
1195 Seale Dr.
Alpharetta, Ga. 30022
███████████

Susan Voyles
6750 River Springs Ct.
Atlanta, Ga. 30328
███████████

Hale Soucie
2121 Windy Hill Rd. Apt. 1706
Marietta, Ga. 30060
███████████

**RESPONDENT(S):**

Fulton County Board of Elections and Registration
141 Pryor St. SW #4075
Atlanta, Ga. 30303

**INVESTIGATIVE SUMMARY:**

**Complaint 1:**

Credentialed poll watchers for the Republican Party reported that they were not able to view the tabulation center at State Farm Arena. The poll watchers also claimed they were told by Fulton County Elections to leave the tabulation center on the evening of November 3, 2020, even though the scanning of ballots continued later that evening. The Secretary of State's office received additional complaints that after poll watchers and the media left that evening, elections workers removed "suitcases" of ballots that had been hidden underneath tables in the room and began to scan the ballots.[2]

Teams of investigators from the Secretary of State's office, FBI, and GBI conducted interviews of Fulton County elections workers who were involved in the processing and

---

[2] Complaint 1 of SEB 2020-203 overlaps with the allegations in a related investigation, SEB 2020-059, involving Respondents Ruby Freeman and Wandrea "Shaye" Moss. The complaint in SEB 2020-059 was initiated by a social media post purportedly created by Respondent Freeman, in which she allegedly admits to conspiring with Respondent Moss to commit fraud in the presidential election while serving as elections workers for Fulton County for the 2020 General Election. The complaint in SEB 2020-059 was investigated and the social media post was found to be fraudulent, and the complaint was not substantiated. *See* the Report of Investigation for SEB 2020-059 for more information.

scanning of absentee ballots at State Farm Arena on November 3rd.  Investigators also reviewed the unedited security video footage of the events in question at State Farm Arena. Additionally, SOS investigators interviewed poll watchers who were present at State Farm Arena that evening. The witness statements and video footage are summarized below.

On November 8, 2020, Michelle Branton, who identified herself as a member of the Georgia Republican Party, filed an affidavit reporting she was assigned to the State Farm Arena on November 3, 2020, to watch the processing of absentee ballots.  In her affidavit, Branton reported that as the night progressed, most of the staff processing the removal of the inner envelopes and ballots from the outer envelope of the absentee ballots stopped working; however, there was one employee that continued working when the others had stopped. She stated that after that last employee completed her stack at approximately 10:30 p.m., a woman across the room where the scanners were located yelled to everyone to stop working and to return the next day at 8:30 a.m. Branton further reported that when she and the FOX News crew concluded they were not going to get answers to their question from Fulton County's Communications Manager on the numbers of ballots left to be processed, she and the FOX News crew left State Farm Arena shortly after 10:30 p.m. When she left, three people remained around the scanners.

On January 12, 2021, former SOS Investigator Frank "Paul" Braun contacted Michelle Branton to interview her regarding the allegations in her affidavit.  Branton advised she was a credentialed poll watcher. During the interview, Branton told the investigator that no one was told to leave on election night at State Farm Arena, and everyone left at what they thought was the end of the night, including the FOX News crew. She further stated the Fulton County employees "had a disposition" of closing down and that everyone needed to leave. Branton acknowledged that she was aware poll watchers can be present from when the lights are turned on and until the doors are locked at the end of the night. However, she left because the staff were cleaning up and a woman, whom she described as an African American woman with long blonde dreads, had screamed to everybody "we are calling it, let's everybody go." This led her to believe that they were done for the evening.

Mitchell Harrison, who also identified himself as a member of the Georgia Republican Party, submitted an unsigned affidavit documenting his observations of the tabulation process on November 3, 2020, as his assignment was to monitor ballot counting and processing in Fulton County. Harrison reiterated what was reported by Branton, and confirmed Branton's account that when the counting activity slowed, a younger woman with long braided hair yelled out to everyone to stop working and come back the following day.

According to Harrison's affidavit, after the announcement, all but 4 election employees left State Farm Arena. Harrison stated that after he asked the Public Affairs Manager for Fulton County to provide him with the number of ballots left to be processed and was told to check the website, that he left State Farm Arena shortly after 10:30 p.m., along with the FOX News crew. Harrison's affidavit further states that they later heard from

news crews that ballot counting was still going on at the tabulation center even though they were told it had ceased for the night and would not resume until Wednesday morning.

On January 12, 2021, Investigator Braun contacted and interviewed Harrison regarding the statements in his affidavit. Harrison advised he was a credentialed field organizer for the Republican Party. Investigator Braun asked Harrison if anyone asked him to leave State Farm Arena. Harrison stated a Fulton County employee, possibly a supervisor, described as having long braids, advised everyone in the room they were going to stop working for the night. He told the investigator they were led to believe the workers were done but admitted that no one told him to leave. After Investigator Braun confirmed Harrison's initial account that there were Fulton County employees still at the scanners when the announcement was made and further explained that poll watchers can stay until the lights are out, Harrison responded it was his first time working as a poll watcher and did not really know what to do. Harrison explained since he wrote the affidavit, people have been texting and calling him and he is "done with it."

On January 22, 2021, Investigator Braun reached out to Mark Amick via telephone to interview him about the allegations in his affidavit. Amick wanted to verify the investigator's credentials because he had received harassing telephone calls. Amick declined to participate in an interview with the investigator because there were attorneys involved. Amick told the investigator in an email, "I appreciate you and the SOS following up. I was not aware of others who were credentialed by another party who may have been present or had any different access. It is my opinion that all observers there had the same opportunity to view regardless of political affiliation."

On January 8, 2021, Investigator Braun conducted a telephone interview with Jane Levings. Levings told the investigator that some media and "consultants" had more access than she did to observe activity at the tabulation center. She advised that she could not see the process and believes that she should have been able to be 3 to 6 feet from the elections workers. She also stated that she called the GOP hotline and complained about where she had to stand, but the person she spoke to confirmed that she was required to be in that spot.

Investigator Braun attempted to interview the FOX News crew that was present at the tabulation center on November 3rd but was not granted permission to speak to them by the network's legal department.

In addition to interviewing the complaining party observers, SOS investigators also interviewed Fulton County elections workers regarding the complaint that the poll watchers were told to leave.

Investigators interviewed Wandrea "Shaye" Moss, Registration Supervisor, who was supervising the processing and scanning of absentee ballots at the tabulation center on November 3rd. Moss told investigators that the elections workers at the tabulation center had specific job duties. Some employees served as envelope cutters, whose sole

responsibility was to cut open the mail-in absentee ballot envelopes. Once all the ballot envelopes were opened, their job was complete. Because cutting envelopes is at the beginning of the process and these employees had been there since 5:30 a.m., Moss dismissed those workers early. She denies that she told any of the party observers or media to leave on Election Night.

Investigators interviewed Regina Waller, who was working as a media liaison for Fulton County on the evening of November 3rd. She told investigators that she asked Moss that evening how long she planned to have the elections staff stay, and Moss told her they would probably leave at 10:30 p.m. Around that time, Waller reported seeing many of the staff get up, grab their belongings, and leave. There were still four women in the room, including Moss, who continued to work. Waller was sitting with the media and confirmed that no one came over and told the media or the observers that they were closing for the night and that they had to leave. Rather, when those in the area designated for observers and media saw some of the elections workers packing up to leave, they also got up and left, too.

Investigators interviewed Richard Barron and Ralph Jones. Jones reported that when he arrived at State Farm Arena the evening of November 3, 2020, he was informed by the staff that they were packed up, prepped for the next day, and ready to leave. Jones then received a call from Barron telling him that staff needed to stay and keep counting until there were no more ballots to count or until the Secretary of State told them they could stop the tabulation for the night. After this call, Jones told the remaining staff to stay and keep scanning ballots.

Investigators also looked into complaints that security footage of the tabulation center showed elections workers bringing out "suitcases" of ballots that had been hidden underneath tables and begin scanning them after party observers and the media left for the evening. On December 8, 2020, agents from the Secretary of State's office, the GBI, and FBI conducted separate interviews of the Fulton County elections workers present at the time: Shaye Moss, Ruby Freeman, Yetunda Sims, Keisha Dixson, and Ralph Jones.

In her interview, Moss told investigators that the "suitcases" were ballot bins that were placed underneath the table for scanning the next day. When Ralph Jones advised that all the open ballots in their possession that night had to be scanned that night, the remaining elections workers retrieved the bins from underneath the table to resume scanning. Moss stated that when the elections workers initially began packing up to resume scanning the next day, they placed the ballots back in the bins and properly sealed each one. When they were instructed to continue working, they had to cut the seals to access the ballots to continue scanning.

In the interview with Freeman, she told investigators that at the end of the evening when a decision was made by management to continue counting the next day, all employees began to seal the ballot bags and place them underneath the table in a certain order, so everyone knew where to start the following day. However, following communication between Fulton County Elections management and whom she believes was someone

from the Secretary of State's office, a decision was made to keep counting that night. She and the few Fulton County elections staff members that remained began to retrieve some of the ballot boxes from underneath the tables to continue the scanning process.  That required cutting the seals that were initially placed on the ballot boxes to secure them overnight. Once the seals were cut, the ballots were taken straight to the scanner to be processed.

Sims and Dixson confirmed the statements of Moss and Freeman that the ballot bins had been sealed and placed under the table when they believed that they were done scanning for the evening so that they could resume the next day. When they were instructed to continue the tabulation, workers removed the bins from underneath the tables, cut the seals, and resumed scanning. Jones confirmed that after he received the call from Barron to continue tabulating, he asked the workers still present to resume their work.

SOS Investigators obtained security video footage of the tabulation center at State Farm Arena from November 3, to 5, 2020. Review of the security video confirmed the witness accounts.

SOS Investigator Braun conducted a review of the unedited State Farm Arena surveillance footage and created the following timeline of events on November 3rd:

- 5:11 a.m.: A water leak was discovered by the first employee entering the tabulation room.
- 5:33 a.m.: Tables are moved to begin cleaning up the water.
- 6:55 a.m.: Water clean-up begins.
- 8:15 a.m.: Water clean-up is completed.
- 8:28 a.m.: Elections workers begin work.
- 10:05 p.m.: An elections worker (Ruby Freeman) places a ballot bin under a table. Media is present. The ballot bin appears to be sealed.
- 10:06 p.m.: An elections worker (George Hewitt) places a ballot box under a table. Media is present. The ballot bin appears to be sealed.
- 10:29 p.m.: Freeman places a ballot bin underneath a table with the media present.
- 10:34 p.m.: Most Fulton County elections workers leave for the day.
- 10:46 p.m.: With some Fulton County elections workers still in the room, the media and observers leave the room.
- 10:49 p.m.: Ralph Jones arrives at the tabulation center.
- 10:52 p.m.: The remaining Fulton County elections workers begin to pack up to leave.
- 10:58 p.m.: Ralph Jones receives a phone call on his cell phone.
- 11:02 p.m.: The remaining Fulton County elections workers start unpacking, retrieving ballot bins from underneath tables, and transporting ballots to tabulators for scanning.

Investigators also examined claims that Freeman could be seen on the security video scanning batches of ballots multiple times after 11 p.m. Investigator Braun reviewed the security video and scanner logs for Scanner 1. The investigator noted that at 11:03 p.m., Freeman sits at Scanner 1 and begins working. Freeman can be seen scanning batches of ballots, and numerous times the scanner stopped before finishing the batch. Freeman can be seen pulling the batch and trying to determine the problem with the scanner. She would then attempt to re-scan the batch. During her interview, Freeman reported her problems with the scanner not reading a clear scan is what caused her to have to start over again with the batch.

Investigators determined that the scanner was jamming as Freeman was attempting to scan ballots, and for that reason she had to attempt multiple times to get a clear scan. When the scanner obtains a clear scan of the entire batch, the worker then is required to hit a button to accept the batch before the scanned ballots are actually tabulated. The report by the independent SEB Monitor who was present at State Farm Arena on November 3rd included the observation that the scanners were frequently jamming that day.

**Findings:** *Based on the evidence, investigators could not substantiate the complaint that poll watchers were told to leave the tabulation center at State Farm Arena on the evening of November 3rd. Rather, the poll watchers left on their own when they believed that the work was completed for the evening. Investigators also could not substantiate the complaint that "suitcases" of ballots were hidden under tables by elections workers to be brought out and scanned after poll watchers and the media left. The alleged "suitcases" in the video were ballot bins shown were lawful absentee ballots that had been packed up earlier in the day and placed out of the way by elections workers, with the intent that they be scanned the following day. When workers were instructed to continue, they brought the ballot bins out and began scanning them.*

## Complaint 2:

This complaint was submitted to the Secretary of State's office as an affidavit from Bridget Thorne.  Thorne stated in her affidavit that she was certified to be a voting technician by Fulton County and was "hired as a certified technician to temporarily assist Dominion Voting Systems with preparation for the Fulton County Georgia General Election from October 27 thru [sic] November 1, 2020 at the Georgia World Congress Center, Building B, where all of the Fulton County voting machinery was tested and calibrated."[3] Thorne stated in her affidavit that she believed that test ballots were printed on the same type of paper as "actual ballots, making them, in every way, indistinguishable from live Georgia ballots." She stated that test ballots were handled "in a haphazard and careless way," and that "some batches of test ballots were lost during the

---

[3] The Georgia World Congress Center was used by Fulton County as temporary warehouse space due to a widespread outbreak of COVID-19 at the permanent warehouse.

process and [she] was required to reprint entire polling districts test ballots a second time." Her affidavit also stated that on October 30, 2020, voting equipment used for advance voting at State Farm Arena was moved to GWCC, and that the tabulators were moved with voted ballots inside, and the ballots were removed at GWCC. She complained that Dominion personnel were involved with the removal of the ballots from the tabulators.

SOS investigators conducted interviews of Thorne regarding the allegations in her affidavit on January 14, 2021, and July 29, 2021. Investigators also took statements from Fulton County employees and a consultant for Fulton County who were working at GWCC at the same time as Thorne and who had knowledge of her allegations. Investigators also reviewed video from GWCC during the relevant time period.

The investigation revealed that Thorne assisted with logic and accuracy testing for voting equipment for one precinct. On Sunday evening prior to Election Day, a contract elections worker with Fulton County was preparing the equipment to be transported to voting precincts for Election Day. He discovered that the equipment to be delivered to one precinct was missing documentation confirming that logic and accuracy testing had been conducted on that equipment. Thorne and another elections worker assisted with preparing test decks to be used in L&A testing. Once the logic and accuracy testing was completed, the results were uploaded to the EMS and the ICP scanner was reset to zero, and a tape printed to show that the ICP scanner was being sent to the precinct with zero votes. The ICP scanner was sealed, and the paperwork was turned in for the equipment. Witnesses confirmed that the test decks were turned in along with the tape for L&A, and the number of test ballots matched the tape.

Investigators did not find evidence to substantiate Thorne's allegation that test ballots were "lost" or that they were mixed in with voted ballots and counted. Investigators also reviewed security video from GWCC for the relevant time period and did not observe the activity that Thorne reported.

Thorne also alleged that tabulation scanners used for advance voting at State Farm Arena were not securely transported to GWCC, and that when the tabulators were delivered to GWCC, techs from Dominion assisted with removing ballots from them. Her affidavit indicates that she was upset about the way the ballot bins were being stored within the facility space. Other witnesses familiar with the transport of the tabulators were interviewed by investigators and confirmed they were securely transported to GWCC in locked cabinets and transported by two personnel. Witnesses confirmed that the area for L&A was separated from the area in which voted ballots were stored.

Finally, Thorne complained that the ACLU was providing "clerks" for absentee ballots in every precinct. Investigators confirmed that Fulton County contracted with the ACLU to have deputy registrars available to assist with cancelling absentee ballots at polling locations so that voters could vote in person.

**Findings:** *The investigation into Thorne's complaint did not substantiate any violations.*

## Complaint 3:

This complaint was received by the Secretary of State's office in the form of a sworn affidavit signed by Robin Hall, which had been filed in the civil case *Wood v. Raffensperger*, Civil Action No. 1:20-cv-04651-SDG.  Hall stated in the affidavit that she was assigned to be an observer on November 14, 2020, for the risk-limiting audit of the presidential election conducted by Fulton County at the Georgia World Congress Center.

Hall stated that she "observed many boxes of absentee or mail in ballots being counted" and that "many of the boxes of ballots had voted for 100% for Biden and 0% for Trump." The affidavit states in part, "I noticed the ballots seemed to be perfectly filled out as if they were pre-printed with the presidential candidate selected" and that "[a]ll of them looked alike." Hall also claims in her affidavit to have "created a spreadsheet with the list of batch headers."

Investigator Braun attempted several times to contact Ms. Hall by telephone and email to interview her regarding the allegations in her affidavit and to obtain information regarding the batch numbers for the ballots she claimed to have observed. The investigator also had a uniformed police officer visit her house and hand deliver the investigator's business card and ask Hall to contact him. However, each attempt to contact Hall was unsuccessful and Hall never contacted the investigator to corroborate the allegations in her affidavit.

**Findings:** *The allegations in Hall's affidavit were unsubstantiated and Hall failed to cooperate with investigators.*

## Complaint 4:

This complaint was received by the Secretary of State's office in the form of a sworn affidavit signed by Susan Voyles, which was dated November 17, 2020, and filed in the civil case *Wood v. Raffensperger*, Civil Action No. 1:20-cv-04651-SDG.  Voyles' affidavit raised complaints regarding her observations as both a precinct manager for the 2020 General Election and an auditor for the risk-limiting audit of the presidential election conducted by Fulton County at the GWCC.

Investigator Braun reviewed the Voyles affidavit and conducted an in-person, recorded interview of Voyles on January 8, 2021.  Former SOS Investigative Supervisor Adrick Hall was present at the in-person interview, as well as Ginger Bradshaw who arrived with Voyles.

Ms. Voyles advised she previously was the poll manager at precinct SS02 (A)(B) (West Spalding Drive Elementary School) for over 20 years and served a small stint at precinct SS01.

In her affidavit, Voyles complains about the delivery of the voting equipment for her precinct. Voyles reported that they "typically receive" voting equipment on the "Friday before the election," but for 2020 the equipment did not arrive until around 2:00 a.m. on November 3rd. Poll pads were also not delivered on time, according to Voyles. The investigation revealed that the delivery company that Fulton County hired to deliver equipment quit and the county had to get a new company, which resulted in equipment being delivered in the middle of the night.

In her interview with investigators, Voyles stated that when the ballot-marking devices (BMDs) for her precinct arrived, the seals on the machines did not match the seal numbers on the logs. Because of this, she did not put them in service on Election Day. Voyles stated that because her equipment came so late, she signed for some of the equipment on the Sunday before without actually having received and verified the equipment. Fulton County Elections Director Nadine Williams provided the equipment certification sheet to investigators, and it shows Voyles certified all the elections equipment delivered to her precinct was received and was accurate, when in fact, she made the certification prior to receiving the equipment.

Former SOS Investigator Braun conducted a telephone interview with Fulton County Area Manager Andrew Kurish regarding the equipment delivery issues that occurred at Voyles' precinct. He confirmed that there were mismatches for the numbers on one or more of the seals that did not match the documentation. He recalled the numbers were off by one digit, and he believed that an employee wrote down the wrong digit making the seal number off by one digit. Kurish believed that these were clerical errors but noted that this particular precinct had more clerical errors than is typical in his experience. Kurish further advised that Ms. Williams and Mr. Brower from Fulton County Elections headquarters advised it was permissible to use the equipment.

Voyles also served as an auditor for the risk-limiting audit of the presidential election conducted by Fulton County at the Georgia World Congress Center. She was present there on Saturday, Nov. 14 and Sunday, Nov. 15.

Voyles's affidavit states, "On Saturday at 7:00 a.m., I showed up at the World Congress Center at 285 Andrew Young International Blvd. in downtown Atlanta. We had to watch a very short training video (probably less than 5 minutes) there was no audio, but there were captions. I watched it three times to ensure I had captured all of the information, but there were some things that were not covered, like what an auditor should do if he or she saw matters of concern. I did not see any helpful written materials on that issue." In her interview with investigators, Voyles was asked if she felt the training was adequate, and she responded that she believed it was adequate. She also stated that those working the audit were sworn in and given an oath of office that day.

Voyles further states in her affidavit, "Everything was in total disarray at the counting location. The organizers did not have sufficient tables for all the committed volunteers." In her interview with investigators, Voyles stated when she arrived there was a long line to enter and sign in. After she signed in, she was assigned table number 136, which was

not yet set up. It was almost 9:45 or 10:00 a.m. when she got to her table, and things were in such disarray because they already had some people working. She reported that the tables were numbered but not in numerical order, with table 136 on the other side of the room as tables 134 and 135. Because of this, the runners bringing boxes of ballots were having a hard time finding the tables. Her partner at table 136 was Barbara Hartman.

The investigators asked Voyles about paragraph 11 in her affidavit, which states, "Again, we were not given any information or standards on how to interpret ballots or other discrepancies." Investigators asked if she or anyone at another table raised their hand, would they be assisted. She responded that she cannot effectively answer because they were paying attention to what they were doing at their table and not others. If someone had a problem, she has no idea. Investigators asked if she had a problem at her table and did she raise her hand to have any problems worked out. She said with one of them, yes, but that her "major concern" was dismissed.

Her "major concern" was an issue with the ballots she reviewed. She describes this in paragraph 12 of her affidavit: "We noticed the supervisors seemed selective as to how to allocate the assignments. For our first assignment, we were given a cardboard box that contained only absentee ballots. It was taped shut with packing tape with the seal of the Secretary of State. But the seal was blank, signed by no one, and no information had been supplied. There were no markings indicating the provenance of the box. The box was marked Box No. 5 Absentee Batch Numbers 28-36." Voyles stated it was a corrugated box like a book box used for moving. It had no markings and clear packaging tape with the Secretary's seal on the top. The seal had room for two signatures that should have been signed by the last two people that closed the box in the chain of custody. She advised there were no signatures on the sticker.

Paragraph 13 of her affidavit states, "Inside the box were stacks of ballots of approximately 100 ballots each. Each stack contained an original tally sheet that said the location where the ballots were picked up. I am assuming these ballots came from the pervasive ballot boxes that had been placed throughout Fulton County." The affidavit continues, "Most of the ballots had already been handled; they had been written on by people, and the edges were worn. They showed obvious use. However, one batch stood out. It was pristine. There was a difference in the texture of the paper—it was if they were intended for absentee use but had not been used for that purpose. There was a difference in the feel."

In her interview, Voyles stated she has been doing this for a long time. She has done absentee ballot observations for Fulton County. She has also been a poll manager and worked with provisional ballots. When the ballots come to her on election day, she has a packet of those ballots. They are shrink wrapped and very clean and pristine. That's why these ballots stood out to her because they looked like they came out of a packet of ballots that would have been delivered to her for either emergency or provisional use. The next thing she found unusual was the count in this batch were 2 for Trump, 1 for Jorgenson, and 107 for Biden. Voyles also felt it was unusual that out of the 107 for Biden, there was a slight eclipse (tiny white space) in the first oval in all of them. She

advised the eclipsed oval was for Biden. Voyles advised through her experience she knows that candidates and referendums are not always voted on a down ballot. She stated every single vote was the same on the down ballot on both sides of the ballot. Voyles told investigators that one of the ballots was not square as if it were pulled out of a copy machine before it was through being printed. She believed they were machine-generated copied ballots.

Investigators asked Voyles if she or her table partner alerted someone that the ballots looked different. She responded that they held their card up and someone with Fulton County responded but she "honestly does not remember who it was." The unknown person advised "those look fine, they're in a batch, continue to count." Voyles described the employee as a black female. Investigators received a list of all Fulton County employees present at the GWCC that day who matched that description and interviewed all of them. None of the individuals interviewed by investigators recalled having this conversation with Voyles.

Before interviewing Voyles, Investigator Braun emailed former Fulton County Elections Director Richard Barron on December 31, 2020, and requested access to ballot box five (5), batches twenty-eight (28) through thirty-six (36) as identified in Voyles's affidavit. Director Barron responded the same day granting the SOS investigators permission to view the ballots. This inspection was conducted after SOS investigators received and reviewed Voyles's affidavit but before the in-person interview of Voyles on January 8, 2021.

Investigators Hall and Braun met Fulton County elections employee Nadine Williams at the Fulton County warehouse located at 1365 English St. NW, Atlanta on December 31, 2020. The investigators were provided a small table to view the ballots, which was in plain view of other elections workers who were present. The batch numbers Voyles identified in her affidavit (28-36) were not contained exclusively in Box 5 but were spread across Box 5 and also 2 other boxes. The boxes were taped shut and the Secretary of State seal on the box was marked with a signature. Investigators Hall and Braun reviewed the ballots. Investigator Braun picked up each ballot looking at the front and back searching for the ballots Voyles described. Every ballot that the investigators viewed had crease marks as if they had been folded. They did not observe any ballot that had perfectly marked ovals throughout the ballot. The investigators also did not observe any ballots that appeared to be in pristine condition, with many of the ballots having stains and other markings.

In the January 8th interview with Voyles, Investigator Braun asked her to confirm whether it was Box 5 that she reviewed and if batch numbers 28-36 were solely within Box 5. She responded she thought they were, but that may have been an error and it might be Box 135. Voyles stated she remembered that batches 28-36 were contained within one box, and she told investigators she would check her notes for the box number. Investigator Braun asked her to check her notes and to call or email him with the correct box number. Voyles never confirmed the correct box number with investigators.

ROI: Fulton County-Tabulation & Audit Issues
SEB2020-203
Page 15

Investigators followed up with Nadine Williams to see if they could inspect box 135. Williams responded that they have researched and the combination Box 135/batches 28-36 did not exist. Investigators also asked about the different paper reported by Voyles, and Williams provided information that emergency/provisional ballots the county orders and/or prints are through a different vendor than the absentee-by-mail ballots and may be a different paper weight. Fulton County had a total of four hundred thirty-five (435) emergency ballots issued, and the county only duplicated ballots electronically.

On July 01, 2021, Investigator Braun conducted a telephone interview with Barbara Hartman, who was Voyles' partner at table 136. The investigator asked her if she saw any suspicious or unusual ballots at her table. She responded yes—Voyles saw the box they came in and it had the precinct information. She asked Voyles whether they were mail-in absentee ballots and Voyles confirmed. Hartman said she held one up to the light and it looked like it had not been folded. The ballots felt as if they were on card stock. They were perfectly circled in, had no marks that went out of the line, and had blue ink rather than black ink. She reported that "everyone" went for Joe Biden and very few went for Donald Trump. When asked by investigators if she remembered the box or batch number, she responded that Voyles would have that information. When asked if she or Voyles reported these ballots to anyone, she responded that they did not because they were fearful that someone would go back and fold them.

On July 08, 2021, Investigator Braun conducted a telephone interview with Gordon and Sonya Rolle, whose names were provided by Hartman. The investigator spoke directly with Gordon Rolle and Sonya Rolle spoke in the background. The investigator confirmed that the Rolles served as auditors for the risk-limiting audit at GWCC on Saturday, November 14, 2020.

The investigator asked if Mr. Rolle knew Hartman, and he stated yes. When asked if Rolle was sitting near Hartman, he responded that he was not—he was close to the front on the left-hand side and Hartman was sitting to the rear of the auditorium. The investigator asked if Rolle recalled anyone mentioning a batch of suspicious ballots, and he advised that he thought he recalled Voyles talking about a batch of suspicious ballots. He was not quite sure what she said, but she said they looked suspicious about the way they were marked and did not look folded. The investigator asked when Voyles brought this up to him and he responded it was the same day she noticed it, in the afternoon right before he and his wife were leaving.

On August 4, 2021, Investigator Braun conducted a second telephone interview with Sonya Rolle. She told the investigator that she and Mr. Rolle complained to Ralph Jones about auditors not counting as they were trained. She stated that they did not make a complaint to the Secretary of State, but that they signed an affidavit describing what they saw and gave it to an attorney. The investigator asked her if she or Mr. Rolle saw suspicious ballots while they were auditors. She stated they did not get many ballots but the ones they did count were not folded or had crease marks. Ms. Rolle advised they did approximately 200 or 300 ballots for the two days they were there. She did not remember any box or batch number for the ballots, and they did not record anything.

SOS investigators also obtained statements from the independent SEB monitor and an independent observer from the Carter Center who were both present at the GWCC for the risk-limiting audit.  Neither recalled hearing about any reports of pristine or otherwise suspicious ballots having been observed by auditors.

**Findings:** *After interviewing all identified witnesses and reviewing identified batches of ballots, investigators could not substantiate the allegations of "pristine" ballots being counted during the risk-limiting audit.*

*There is also no evidence to suggest Fulton County elections officials committed a violation regarding the delivery of election equipment to Voyles's precinct. It is the responsibility of the poll manager to ensure all elections equipment is accounted for, received, and operational. The Elections Code requires that the county superintendent deliver the proper voting equipment to polling places at least one hour before the time set for opening the polls. O.C.G.A. § 21-2-379.7.*

<u>**Complaint 5**</u>:

The Secretary of State received this complaint in the form of an affidavit from Hale Soucie. Soucie reported that he served as an observer for the Georgia Republican Party during the risk-limiting audit of the presidential election conducted by Fulton County at GWCC. Soucie reported that there was a lack of security at GWCC. Soucie also reported in his affidavit that ballots reviewed during the risk-limiting audit did "not feel right" and he believed that batches seemed to be skewed towards Joe Biden.

Former SOS Investigator Braun interviewed Soucie on January 8, 2021, regarding the allegations in his affidavit.  The investigator questioned Soucie regarding his allegation that ballots reviewed during the risk-limiting audit did "not feel right" and that the numbers appeared to be skewed towards Joe Biden. In support of this claim, Soucie stated that while he was observing, one table of auditors (Susan Voyles and Barbara Hartman) said that the look and feel of some ballots did not seem correct and were only going mostly for Biden 96 to 98 percent. Soucie reported seeing a box or batch number SCH1(28).

The investigator asked Nadine Williams with Fulton County if SCH1(28) was a valid box or batch number, and she reported that "this would mean Scanner 1 Batch 28." The investigator located the serial number associated with ICC Scanner #1 and located batch 28 from this scanner from the final election project. The investigator found that ninety-nine (99) ballots were scanned in batch 28 on Scanner #1. The investigator printed and reviewed the ballot images for each ballot in this batch, in addition to reviewing the original ballots from the batch as described above. While reviewing both the ballots and ballot images, the investigator did not observe perfectly marked ovals or numerous ballots voted the exact same way as described by Soucie and other complainants. Numerous ballots had ovals that were completely filled in but other ovals on the same

ROI: Fulton County-Tabulation & Audit Issues
SEB2020-203
Page 17

ballots had imperfections. Out of 99 ballots, 95 had votes for Joe Biden, 3 for Donald Trump, 0 for Joe Jorgenson, and 1 for no presidential candidate.

**Findings:** *The allegation that there was inadequate security at GWCC during the risk-limiting audit was determined to be unfounded as SOS Investigators were present throughout the process, in addition to many party and independent observers and elections workers. The allegations of suspicious ballots are duplicative of those made by Voyles, which were unsubstantiated by the investigator's review of the ballots, as addressed above.*

## POTENTIAL VIOLATIONS:

The investigation did not uncover any violations as alleged by the Complainants.

## EXHIBITS:

1)    Complaints
2)    Witness List
3)    FBI/GBI/SOS interview of Ruby Freeman
4)    FBI/GBI/SOS interview of Wandrea Moss
5)    FBI/GBI/SOS interview of Yetunda Sims
6)    FBI/GBI/SOS interview of Keisha Dixson
7)    FBI/GBI/SOS interview of Ralph Jones
8)    Branton Affidavit
9)    Branton telephone interview
10)   Harrison Affidavit
11)   Harrison telephone interview
12)   Amick Affidavit
13)   Levings Affidavit
14)   Amick telephone interview
15)   Amick email
16)   Levings telephone interview
17)   Barron email to Investigator Braun
18)   FBI/GBI/SOS interview of Regina Waller
19)   Thorne Affidavit
20)   Thorne Memorandum of Interview, dated January 14, 2021
21)   Thorne Memorandum of Interview, dated July 29, 2021
22)   Tia Benton Statement to Thorne
23)   Tia Benton Memorandum of Interview, dated August 25, 2021
24)   Statement and Memorandum of Interview, dated March 16, 2021, of Dominic Olomo
25)   Pendergast Memorandum of Interview
26)   Bridget Thorne Emails
27)   Robin Hall Affidavit filed in the U.S.D.C. Northern District of Georgia under Civil Action File No.: 1:20-cv-04651-SDG

ROI: Fulton County-Tabulation & Audit Issues
SEB2020-203
Page 18

28)    Email between Inv. Braun and Columbia County Sheriff's Office Re: Attempt to
       contact Complainant Hall
29)     Susan Voyles Affidavit filed in the U.S.D.C. Northern District of Georgia under
       Civil Action File No.: 1:20-cv-04651-SDG
30)    Susan Voyles Interview, dated January 7, 2020 (should have been 1/7/2021)
31)    Nadine William Statement form dated January 21, 2021, Re: Voyles
32)    Andrew Kurish Memorandum of Interview, dated July 12, 2021
33)    Emails between Inv. Braun and Rick Barron
34)    Email dated March 17, 2021 between Inv. Braun and Nadine Williams Re: Ballots
       found in scanners with ballots in them
35)    Emails between Investigators and Nadine Williams Re: Delay in delivery of
       voting equipment
36)    Hartman Memorandum of Interview
37)    Rolle Memorandum of Interview
38)    Jones Statement
39)    Kavanagh Memorandum of Interview Re: Pristine ballot at table 136
40)    Hale Soucie Affidavit
41)    Hale Soucie Interview, dated January 8, 2021
42)    Email between Inv. Braun and Nadine Williams Re: Identification of batch in
       Complaint #5
43)    Investigation Questionnaires Re: Fulton County Employees

# EXHIBIT 4



## INVESTIGATIONS DIVISION

## REPORT OF INVESTIGATION

CASE NAME:          Fulton County Tabulator Results 2020

CASE NUMBER:        SEB2023-025

INVESTIGATOR:       Gilbert C. Humes

DATE OF REPORT:     April 9, 2024

## COMPLAINT(S):

The Georgia Secretary of State opened this investigation after the State Election Board referred this Complaint filed by Complainants Kevin Moncla and Joseph Rossi alleging Fulton County did not properly perform a recount of the presidential contest in the 2020 General Election (the "Recount").  In this Complaint dated July 8, 2022, the Complainants alleged **(1)** they identified "irregularities" in the Recount, namely "17,852 votes of unknown provenance"; **(2)** there were 3,125 duplicate ballot images contained in the ballot images from the Recount produced by Fulton County; **(3)** the original tabulation includes results for ten (10) advance voting tabulators for which Fulton County does not have the tabulator tapes; and **(4)** that an individual by the name of Ryan Macias had communication with former Fulton County Elections Director Richard Barron about the alleged discrepancy with the Election Night and Recount results but was not a Fulton County employee or contractor.  Complainants allege that, collectively, there appeared to be "no paper documentation of ballots for nearly 42,000 votes," a potential violation of recount procedures in O.C.G.A. § 21-2-495 and SEB Rule 183-1-15-.03(1).

## COUNTY AND ELECTION INVOLVED:

Fulton County, November 3, 2020, General Election.
Fulton County, December 2020 General Election Recount.

## ELECTION STAFF:

Richard Barron, former Director of Elections, Fulton County Board of Elections and Registration.

Fulton County Elections Supervisor is Nadine Williams who met the election certification training requirements in 2014.

**ELECTION CERTIFICATION:**

Richard Barron met the election certification training requirements in 2015.

Nadine Williams who met the election certification training requirements in 2014.

**JURISDICTION/VENUE:**

Jurisdiction will be with the State Election Board, Atlanta, Fulton County, Georgia.  Venue for any criminal prosecution will lie in Fulton County, Georgia.

**COMPLAINANT(S):**

Joseph Rossi
2007 Cedar Ridge Dr.
Perry, Ga. 31069


Kevin M. Moncla
824 Lake Grove Dr.
Little Elm, Tx. 75068


**RESPONDENT(S):**

Fulton County Board of Elections and Registration
Nadine Williams, Director
141 Pryor St. SW #4075
Atlanta, GA 30303

Counsel for Respondent:

Law Office of Ann S. Brumbaugh LLC
The High House
309 Sycamore Street
Decatur, GA  30030

Annbrumbaughlaw.com

## BACKGROUND:

In the 2020 General Election, the original certified results from Fulton County included **528,777 total ballots cast**. There was a reported total of **524,659 votes cast in the contest for President of the United States**, including 137,240 (26.16%) votes for then incumbent Donald J. Trump, 381,144 (72.65%) votes for Joseph Biden, and 6,275 (1.20%) votes for Jo Jorgensen.

Following a Recount of the presidential contest requested by President Donald J. Trump, Fulton County recertified their results on December 7. 2020. The recertified results reported **527,925 total ballots cast** (a difference of -00.16%) and **523,779 total votes cast in the presidential contest** (a difference of -00.16%), including 137,247 (26.20%) for Donald J. Trump (a net gain of 7 votes), 380,212 (72.59%) votes for Joseph Biden (a net loss of 932 votes), and 6,320 (1.21%) votes for Jo Jorgensen (a net gain of 45 votes).

In preparation for the 2020 General Election and pursuant to an October 2020 Consent Order, the State Election Board (SEB) contracted with Seven Hills Strategies (SHS) to serve as an independent monitor for the 2020 General Election. One of SHS's responsibilities was to observe tabulation on Election Day and any post-election audit or recount. On January 12, 2021, following the General Election and subsequent Runoff Elections, SHS prepared and submitted a Post-Election Executive Summary (**Exhibit #3**). The summary indicated the Monitor observed every aspect of the Respondent's election processes and at no time was dishonesty, fraud, or intentional malfeasance observed. Under the topical heading "The Recount," the executive summary noted several issues that included poor record-keeping, which led to other procedural problems for Fulton County throughout the recount process; namely, Fulton County failed to properly follow protocols for backing up and uploading data to servers resulting in errors; and Fulton County inadvertently named two (2) scanners with the same name, causing delays in the completion of the Recount.

In August 2021, pursuant to a request from members of the Georgia General Assembly, the SEB appointed a Performance Review Board (PRB) to examine issues with Fulton County's election processes. On January 13, 2022, the PRB issued a report of its findings (**Exhibit #4**). On page 9 of the report under the topical heading *Double-Scanning of Ballots*, the PRB noted one of the allegations leading to the General Assembly's August 2021 request for this review was that ballots were being double scanned. The PRB further referenced in its report, in part, that a contributing factor to the possible double scanning of ballots "likely include[d] poor batch management and storage practices (also a contributing factor in errors in the hand-count audit and the recount…)."

Both SHS and the PRB provided their findings to the SEB in 2021 and 2022, respectively for review. The SEB voted to not pursue further legal action against the Respondent.

In July 2022, complainants Joseph Rossi and Kevin Moncla filed a complaint with the State Election Board alleging several anomalies that occurred in Fulton County related to the Recount. Specifically, the complaints alleged (1) the initially-reported Recount results reported to the SOS on December, 2, 2020, were off by approximately 17,000 votes compared to the results reported for the November 2020 Election Night; (2) Fulton County scanned duplicate ballots which were included in the vote count totals; (3) the original tabulation includes results for ten (10) advance

voting tabulators for which Fulton County does not have the tabulator tapes; and (4) that an individual by the name of Ryan Macias had communication with former Fulton County Elections Director, Richard Barron about the Recount results but was not a Fulton County employee or contractor.

## INVESTIGATIVE SUMMARY

In the 2020 General Election, the tabulated results of the presidential race were confirmed by a Risk Limiting Audit (RLA) and a Recount requested by former President Donald Trump. While the RLA was conducted by a full hand count, the Recount was conducted by machine tabulation as required by SEB Rule 183-1-15-.03. Complaints 1 and 2 relate to the Recount, and Complaint 3 is related to Election Night tabulation.

## COMPLAINT 1

The Complainants alleged they observed 3,125 duplicates in the ballot images for the Recount produced by Fulton County. The SOS Investigations Division reviewed the documentation submitted with the Complaint and subsequently sent three (3) investigators to the Fulton County Elections Office to conduct an independent review of the batches of ballot images identified by Complainants. The SOS investigators confirmed, as a result of this review, that the batches of ballot images matched the description provided by Complainants, in that there were sequences of ballot images that appeared to repeat, but in a different sequential order in the second batch. While at Fulton County, SOS investigators observed a total of 3,182 ballot images meeting this description. Of the 3,182 ballot images, the votes in the presidential contest included 1,401 for Donald Trump, 1,713 for Joseph Biden, 52 for Jo Jorgenson, and 16 ballots on which the presidential contest was left blank.

The Respondent subsequently provided the SOS with approximately 518,960 ballot images in response to a subpoena. The SOS Investigations Division conducted an in-house review of the same identified batches of ballot images to further determine how many alleged repeated ballot images were hand-marked and how many were BMD-printed ballots. The results of that analysis came close to the results the Complainants reported in their initial complaint. However, in the complaint, Complainants listed 2 batches of ballot images in tabulator 5162 (batch 001 with 20 ballot images and batch 002 with 97 ballot images) that were reportedly repeated images. Both batches combined totaled 117 ballot images. Following a comparison of the images identified in tabulator 5162, only 20 of the 117 were identified as repeated images thereby resulting in the final total of 2,969 repeated ballot images of which 1,806 were images of BMD-printed ballots and 1,163 were images of hand-marked paper ballots. The hand-marked paper ballot images appeared to be repeated because of unique identifying marks. The BMD-printed ballots contained the same selections, but because there were no distinct markings on these ballot images, investigators could not definitively identify them as duplicate or repeated ballots.

SOS Supervisory Investigator Gilbert Humes and Investigator Lance Patterson subsequently met with and interviewed Richard Barron, who served as the Fulton County Elections Director during the Recount. Investigators questioned Barron about his recollection of the Recount process and his communication with the SOS regarding the delay in completing the Recount, but Barron claimed he could not recall. Barron stated even though Dwight Brower was number 2 in

command as the Acting Elections Director during the Recount, he placed Warehouse Manager Nadine Williams in charge of the Recount.

Investigator Humes subsequently spoke with Nadine Williams, current Elections Director, and inquired about the ballot images identified in the complaint. Williams confirmed she managed the Recount; however, Barron was regularly kept informed of everything. All the processes that were established for the Recount were established by the executive leadership, and Barron ultimately made all executive decisions on how things were to operate and proceed. Director Williams told investigators because the same groups of sequentially-ordered ballot images were found in two separate batches but in a different sequential order in the second batch, it was most likely the result of poor batch management during the Recount. This was an issue that was brought to light in 2021 and changes have since been made by Respondent to the ballot scanning process. During the Recount, Respondent had one person assigned per scanner, and that person was responsible for scanning the batches, and after scanning each batch, placing the scanned batch into a box marked completed batches. According to Williams, when she became Elections Director, she assigned 2 persons to a scanner to scan batches. This method allowed one person to focus on their pre-scanning responsibility, which was to make sure each batch was properly named and required scanning; and the second person was to focus on their post-scanning responsibility which was to ensure scanned batches were scanned properly, labeled correctly, and stored in its correct location to avoid double scanning, misplacing batches, or missing a batch that required scanning. Williams further reported the implementation of this process was successful, as the 2022 General Election process experienced far fewer problems than in 2020. Director Williams further reported employees' resignations and/or not reporting to work due to the COVID-19 pandemic resulted in a decrease in available staff in 2020.

The SEB-appointed Monitor's executive summary described the Recount process by Respondent as follows: "Generally, poor records keeping led to a multitude of procedural problems throughout the recount process." For example, the Monitor observed that Fulton County leaders were sending out individual ballot batches instead of full boxes, and with this process it would not be difficult for a batch to be forgotten or fall to the wayside as it changed hands. When this practice was discussed with Director Williams, she acknowledged such practices as those identified by the Monitor could have potentially led to ballot images being uploaded twice during the Recount but could not state for certain whether that was the cause of the potentially duplicative ballot images.

Respondent reported that, since 2020, they have implemented processes to make sure that after full boxes of batches are scanned, they are immediately secured in an area designated for already scanned batches.

## COMPLAINT 2

The Complainants alleged that in reporting results to the Secretary of State for the Recount, Respondent initially "submitted vote totals (511,543) lower than that of the original count from Election Night (528,777)." Complainants further alleged that, approximately 12 hours after reporting the Recount vote-count total of 511,543, Respondent reported a re-certified vote-count total for the Recount of 527,925, an alleged "increase in votes counted" of 16,382.

It is important to note throughout the Complaint, the Complainants erroneously conflate the number of **total ballots cast** and **total votes counted in the presidential contest**.  The distinction between the two is important because there were nearly 4,000 ballots cast in Fulton County that left the presidential contest blank, so the number of total **ballots** cast will be greater than the **votes** cast in the presidential contest.  According to the Complainants, they alleged Respondent submitted Election Night "vote" count totals of 528,777, which is inaccurate because that number is the total **ballots** cast—not the total **votes** counted in the presidential contest.  According to the originally certified results, the correct number of **total ballots cast** in Fulton County for the 2020 General Election presidential contest was 528,777 and the **total votes counted** was 524,659 (**Exhibit #5**).  Approximately 4,118 ballots did not record a vote in the presidential contest, either because the voter left it blank or the ballot contained an overvote.

In support of Complaint 2, Complainants rely on two (2) Batches Loaded Reports that they received from Fulton County in response to an Open Records Act request.  Complainants allege that the first Batches Loaded Report (BLR 1) indicated 511,543 "votes were tabulated and published," and the second Batches Loaded Report (BLR 2) indicated 527,741 "votes were tabulated and published."  Complainants questioned how the Respondent was able to "find" more than 16,000 votes between BLR 1 and BLR 2.  The Complainants pointed out that a Batches Loaded Report is a product of the Dominion Election Management Server (EMS) that shows all batches of ballots that have been counted, along with the status of each batch.  However, a county is not mandated or required to use the BLR feature in EMS **nor is the BLR used to report election results to the SOS**.  Rather, it is a mechanism that exists to aid counties with the tracking and reconciling of batches and number of ballots scanned.  The BLR is also a running document meaning it is one document in which the totals will constantly change when updated and each update overrides the previous total amount.  In column "H" of the BLR in the complaint, the column reads "published."  It should be noted for the record "published" means the data can be viewed and/or printed in report format.  Respondent provided the SOS Investigations Division with the final BLR and the final tally on the BLR for the Recount was 527,925 (**Exhibit #6**).  Though the Complainants incorrectly referred to "ballots cast" as "votes counted," and referenced that a BLR was used by Fulton County to report official vote count results when such a report is not used for that purpose, the question remained as to how Fulton County reconciled the discrepancy between BLR 1 and BLR 2.

Counties report all official election results through the Election Night Reporting (ENR) system.  Each county will gather all the election results, prepare a report and upload the final official results into Dominion's Election Management System's (EMS) Results Tally Reporting (RTR) System.  The RTR is the main application for post-voting activities.  It receives election results from the tabulators, allows for validation of the results, and reports the results.  The counties are then required to export and upload the RTR results data into the ENR at which time the election results are received by the SOS.  This is the process that all counties follow when reporting election results information to the SOS.  During the Recount, Fulton County performed 3 uploads reporting results with the first being on December 3, 2020, at 12:16 a.m. showing total ballots cast as 525,365 with total votes cast in the presidential contest as 521,452 (**Exhibit #7**); the second upload was on December 3, 2020, at 11:04 p.m. showing total ballots cast as 527,925 with total votes cast in the presidential contest as 523,779 (**Exhibit #8**); and the third upload was on Friday, December 4, 2020, at 12:27 p.m. showing total ballots cast as 527,925 with total votes

in the presidential contest as 523,779 (**Exhibit #9**). Respondent also provided the corresponding reports to support the numbers uploaded into the ENR (**Exhibits #7a, #8a, and #9a**).

SOS Investigators interviewed Director Williams regarding the BLRs and the uploads to the RTR for the Recount. She reported that certain batches of ballots were initially scanned with an Image Cast Central (ICC) Scanner programmed with the same tabulator and batch numbers, so the RTR interpreted them as one and rejected scanned ballots as a duplicate batch. Respondent looked into the cause of the discrepancy, and eventually isolated the discrepancy to the duplicative programming of the ICC scanner. This issue was corrected by separating all 97 batches scanned on the duplicate ICC and rescanning them for accurate reporting on the RTR. Prior to rescanning, Fulton County made sure representatives from each political party, the SEB's independent monitor, and others were aware of the discrepancy, what caused the discrepancy, and were present to witness the rescan. Respondent confirmed at that point, they had a total of 506,127 scanned ballots. After they rescanned the initially-rejected batches of ballots totaling 21,798 votes from tabulator 816 (**Exhibit #10**), the final total ballots scanned was 527,925. Respondents acknowledged BLR's were referenced during their status update discussions about the discrepancy but only used them as a reference in trying to determine what went wrong and how far off were they in the count. There is no record of the Respondent submitting official results to the SOS on December 2, 2020.

Complainants have further alleged that Respondent failed to provide all ballot images from the Recount in response to an Open Records Request. In response to an investigative subpoena, Respondent provided to SOS Investigators a thumb drive that contained 518,960 ballot images from the December 2020 Recount (**Exhibit #11**). Respondent reported during the Recount, Dominion Voting Systems loaned Fulton County four scanners for the recount. Respondent was unsure exactly which counties Dominion had borrowed the scanner from, and those scanners have since been returned. The SOS Investigations Division asked Respondent to provide documentation to corroborate this account. Respondent further noted that the memory cards that were used in the borrowed scanners have since been redistributed and used in subsequent elections. As noted in the SEB Monitor's January 2021 executive summary, Fulton County acknowledged that technical issues occurred during the Recount that included failure to properly follow protocols for backing up data to servers. As a result, while Respondent may not have all the ballot images, **they do have all the physical ballots**, which are still being preserved under seal due to a pending litigation hold.

Complainants allege that ballots images should have been available, claiming in a separate email to SOS investigators that all ballots of an entire batch must be scanned successfully for it to be accepted and processed. (**Exhibit # 12**). The system will only accept ballots in a batch, and not just single ballots. There is no way with which an election worker could choose to save or not save ballot images as the only prompt they are given is to either accept or reject the batch by selecting yes or no. If the worker selects <Yes> then the entire batch, including the ballot image for every ballot in the batch, is processed as one unit. If the worker selects <No> then the worker must start over and scan the entire batch.

However, Complainants are only partially correct, as this only applies to counties whose central scanners and servers are housed at the same location. As with Fulton County, their central scanners and EMS Results Tally and Reporting (RTR) workstation was housed at different

locations, and therefore, Respondent had to follow a different process to import election results. This process required county workers to first download the results onto a form of removable media. They then had to upload the results from the media into the RTR workstation at the second location. During the upload process, the RTR provides the user three (3) options from which to choose: the user can select the box for "Load Results File"; "Load Ballot Images"; "Load Log File" or choose all three. If the "Load Results File" is the only option selected, which was a required option, then no ballot images uploaded into the RTR. Therefore, it is important to note that ballots can be scanned and tabulated *without* capturing ballot images.

Fulton County further highlighted that their new location now houses both the central scanners and EMS Results Tally and Reporting (RTR) workstation server, therefore every ballot scanned will automatically create the results file, ballot image file, and log files at the time the ballot is scanned. They no longer have to go through the import process.

Furthermore, the preservation of ballot images was not required by law in 2020. It was not until the passage of Senate Bill 202 in 2021 that ballot images were deemed public records subject to public inspection under the Georgia Open Records Act.

## **COMPLAINT 3**

The Complainants alleged the original election night vote count includes results for ten (10) advance voting tabulators (also called precinct scanners) for which Fulton County has no records. In support of this claim, Complainants reported that they submitted an Open Records Act request for the tabulator tapes for ten (10) advance voting precinct scanners in response to an Open Records Act request, and a Fulton County employee responded to this request by stating, "The requested documents do not exist." Complainants thus concluded that no documentation for the ten (10) advance voting tabulators exists and that no documentation of the ballots tabulated on those scanners exist.

It is important to note the purpose of the tapes. The tapes are produced by the precinct scanners after the polls have closed. They serve as a paper back-up to the memory cards that store the ballot tabulation and are not part of the process by which official results are reported by counties to the Secretary of State. They are merely additional documentation of the ballots cast on the precinct scanner.

On January 8, 2024, the Respondent advised SOS Investigators that they have all documentation for the precinct scanners in question; however, storage issues have been complicated after Fulton County relocated all its records to its new warehouse. The Respondent escorted SOS Investigators to the location where the 2020 election records were being stored and said that they would search for supporting documentation and provide it to investigators.

Between March 5, 2024, and April 19th, 2024, the Respondent provided the SOS with documentation on the 10 AV tabulators (**Exhibit #13a-j**):

- A Zero tape and Opening the Polls Zero Count Form dated October 12, 2020, for ICP 3 (tabulator 303) at AV State Farm Arena (**Exhibit 13a**)

- A Zero tape and Opening the Polls Zero Count Form dated October 12, 2020, for ICP 10 (tabulator 311) at AV State Farm Arena (**Exhibit 13b**)

- A Zero tape and Opening the Polls Zero Count Form dated October 12, 2020, for ICP 11 (tabulator 312) at AV State Farm Arena (**Exhibit 13c**)

- A Zero tape and Opening the Polls Zero Count Form dated October 20, 2020, for ICP 3 (tabulator 712) at AV South Fulton Srv Center (**Exhibit 13d**)

- A Zero tape dated October 26, 2020, a Daily Recap Sheet dated October 30, 2020, for ICP 3 (Tabulator 754 at AV Ponce De Leon Library reflecting closing count of 1,830 ballots (**Exhibit 13e**)

- Daily Recap Sheet dated October 30, 2020, and results tape for ICP 3 at AV Park Place @ Newton reflecting closing count of 4,216 ballots (**Exhibit 13f**).

- Daily Recap Sheet dated October 30, 2020, and results tape for ICP 3 at AV Northeast Library reflecting closing count of 2,511 ballots (**Exhibit 13g**).

- Opening the Polls Zero Count Form dated October 12, 2020, and a Daily Recap Sheet dated October 30, 2020, for ICP 2 at AV Johns Creek Env. Center reflecting a closing count of 4,242 ballots (**Exhibit 13h**).

- A Zero tape dated October 28, 2020, for ICP 3 (Tabulator 763) at AV East Point Library (**Exhibit 13i**)

- A Zero tape dated October 21, 2020, for ICP 4 (Tabulator 714) at AV Wolf Creek Library (**Exhibit 13j**)

Fulton County provided documentation to evidence the existence of the 10 tabulators in question, which show 12,799 of the 20,713 questioned ballots. Respondent advised they were still in the process of searching through approximately 700 boxes of 2020 records for the recap sheets and/or results tapes for the AV locations. But again, the tapes are merely back up documentation for the paper ballots tabulated by the precinct scanner. Those results are captured on memory cards (and a back-up memory card) and uploaded to the Election Management Server for the official Election Night Reporting. The actual paper ballots are also preserved. The Complainants' assumption that because tabulator tapes have not been produced then the paper ballots themselves are unaccounted for is simply incorrect.

## **COMPLAINT 4**

The Complaint alleged that an individual by the name of Ryan Macias had communication with former Fulton County Elections Director, Richard Barron about the discrepancy with the Election Night and Recount vote results. Complainants stated Macias was not a Fulton County employee, Happy Faces Employee (temp employment agency), Fulton County Contractor nor a

Fulton County vendor.  Respondent provided a "Memorandum of Understanding" between The Elections Group LLC where Macias was employed and Fulton County Board of Elections and Registration which was signed off by the Fulton County Manager and Fulton County Attorney approving The Elections Group to serve as a consultant for the 2020 General Election (**Exhibit #14**).

## **INVESTIGATIVE FINDINGS**

### **Complaint #1**

The Complainants' allegation that Fulton County had multiple batches of ballot images that were repeated in another batch was **partially substantiated**.  The investigation identified a series of BMD-printed ballots and hand-marked ballots repeated in the same order in a separate scanned batch from the first batch.  A review of the 1,163 hand-marked ballot images appeared to be duplicate ballot images based on the unique markings on the ballot; however, regarding the BMD generated machine ballots, the selections were the same but there were no distinct markings on these ballot images to positively identify them as duplicate ballot images.  The investigation also **substantiated** that Respondent did not follow proper batch management procedures for the Recount in violation of SEB Rule 183-1-15-.03.  **These investigative findings do not affect the accuracy of the results of the 2020 General Election in Fulton County, which were confirmed as accurate by both the RLA and the Recount.**

### **Complaint #2**

The allegation that Respondent uploaded vote totals of 511,543, which was 17,234 votes fewer than votes counted on Election Night was **unsubstantiated**.   The investigation uncovered that the Complainants conflated ballots cast with total votes.  As a ballot can be cast without a vote for the presidential contest, the two terms cannot be considered interchangeable.  Furthermore, the investigation revealed Respondent reported its Recount results late due to a count discrepancy caused by a scanner programming error.  As a result, Respondent did not submit official results until December 3, 2020, which was after the December 2,2020 deadline.  Lastly, the document the Complainants relied upon to suggest the Respondent submitted official results on December 2, 2020, was a Batches Loaded Report; however, counties are not required to use those forms and the BLR is not used to report official results.  Respondents acknowledged BLR's were used in discussions about the discrepancy but only used as a reference in determining what the totals were and should have been, and in determining the cause of the discrepancy.  There is no record of the Respondent submitting official results to the SOS on December 2, 2020.

### **Complaint #3**

The allegation that Fulton County did not have records for 10 AV locations for the November 2020 General Election was **unsubstantiated**.  The Respondent provided documentation to establish the existence of all 10.

### **Complaint #4**

The allegation that Ryan Macias was not a contractor with the Fulton County Board of Elections and Registration was unsubstantiated.  The Respondent provided a Memorandum of Understanding signed off by the County Attorney's Office and the County Manager's Office approving Ryan Macias to serve as a consultant for Respondent during the 2020 Election cycle.

**POTENTIAL VIOLATIONS**:

**Fulton County Board of Elections and Registration**

There is sufficient evidence to suggest Respondent violated of SEB Rule 183-1-15-.03 (Recount Procedure) when Respondent failed to ensure the Recount was completed through a precise, controlled process that ensured, for each ballot scanner used in the recount, no more than one ballot container was unsealed at any given time, and failed to ensure a clear audit trail was maintained at all times during the Recount.

SEB Board Rule 183-1-15-.03(1)(e) states:

> The tabulation of ballots must be completed through a precise, controlled process that ensures, for each ballot scanner used in the recount, no more than one ballot container is unsealed at any given time.

SEB Board Rule 183-1-15-.03(1)(f) states, in part:

> A clear audit trail must be maintained at all times during the recount…

**EXHIBITS**:

1) Complaint
2) Witness List
3) Post Election Executive Summary, dated January 12, 2021, Seven Hills Strategies
4) Performance Review Board Report on Fulton County Elections, dated January 13, 2022
5) Printout of Official Election Night results for the November 2020 General Election
6) Fulton County final Batch Loaded Report, December 2020 Machine Recount
7) December 2020 Machine Recount upload printout, December 3, 2020, at 12:16 a.m. with corresponding results report.
8) December 2020 Machine Recount upload printout, December 3, 2020, at 11:04 p.m. with corresponding results report.

ROI: Fulton County Tabulator Results 2020
SEB2023-025
Page | 12

9) December 2020 Machine Recount upload printout, December 4, 2020, at 12: p.m. with corresponding results report.

10) Breakdown of Tabulator 816 containing the 21,798 rejected ballots in question

11) Fulton County 2020 Recount Ballot Images totaling 518,960 images.

12) Moncla email correspondence Re: Scanning Process

13) Copy of results tapes for
   a. AV State Farm ICP  3
   b. AV State Farm ICP 10
   c. AV State Farm ICP 11
   d. AV Ponce De Leon ICP 3
   e. AV Johns Creek ENV Campus ICP 2
   f. AV South Fulton Service Center ICP 3

14) Memorandum of Understanding between Fulton County Board of Elections and Registration and The Elections Group/Ryan Macias

# EXHIBIT 5

# PERFORMANCE REVIEW BOARD REPORT ON FULTON COUNTY ELECTIONS

### January 13, 2023

Performance Review Board Members:
Ryan Germany
Stephen Day
Rickey Kittle

# SUMMARY

- In prior years, disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections. However, Fulton County has shown improvement in administering elections from 2020 to 2022. This improvement is due to a multitude of factors. Prior staff that oversaw elections, voter registration, redistricting, and absentee ballots are no longer with the office, and new staff can bring new energy and renewed commitment. Training, processes and procedures, and overall organization have all been improved as well, but those things need further improvement to ensure readiness and success in the 2024 election cycle.

- The Fulton County Board of Elections and Registration is engaged and helping to drive those improvements. Replacing the board would not be helpful and would in fact hinder the ongoing improvements to Fulton County elections.

- The County Manager's Office in Fulton County has continued to be involved in planning, strategizing, and preparing for upcoming elections, which has positively contributed to improved execution of elections.

- Like election officials across the state, Fulton County elections staff show daily dedication and effort in carrying out and seeking to improve the administration of elections in Fulton County. Director level staff and the Fulton County Board of Elections need to ensure that staff has the necessary tools and guidance to ensure best practices and compliance.

- The Performance Review Board members individually donated hundreds of hours to this project and The Carter Center donated almost 4000 people hours. Both observations (which were conducted independently) noted significant improvement from the 2020 election, but both also noticed things that could use additional improvement, including further improvements to training and processes.

- The existence of the Performance Review helped incentivize Fulton County to make improvements to their elections, but it took an enormous amount of donated work, and it is difficult to see how it is a sustainable process that can continue to positively influence election administration in Georgia without some reforms. A positive, proactive, and periodic review process, appropriately funded, designed to support and assist all counties with election process improvements could be more effective than the performance review process in its current iteration.

- While the Performance Review Process has seen improvement in Fulton County elections since the 2020 election, further improvement is still needed to ensure readiness for the 2024 presidential election cycle. Presidential election cycles see more voters than midterms and take even more planning and preparation to ensure successful execution. Georgia will be a competitive state in next year's elections, so election preparation needs to recognize that

Fulton County's actions (and all counties in Georgia, for that matter) will be heavily scrutinized by political parties, campaigns, candidates, and activist groups. To ensure successful execution of the 2024 election, Fulton County should continue the improvements it has already embarked on and prioritize the areas for improvement noted in this report. Those areas are:

- More contextualized poll worker training
- Environment of order, organization, and control
- Compliance with State Election Board Regulation regarding ballot review
- Planning and Preparation based on capacity and execution
- Review polling place layout
- Compliance with Georgia law regarding sequestration during early tabulation

## BACKGROUND ON FULTON COUNTY ELECTIONS

Fulton County has a long and well-documented history of issues administering elections.[1] The 2012 Presidential Election in Fulton County resulted in the largest fine ever issued by the State Election Board and required remedial training.[2] In that election failures in timely processing voter registration applications snowballed into significant issues for voters on Election Day.[3] This "snowball" effect, where problems on Election Day are generally indicative of earlier failures in the election administration process, was also very present in the June 2020 primary in Fulton County.

The June 2020 Primary Election was marked by long lines and confusion in Fulton County. That election, which occurred during the brunt of the COVID-19 pandemic, was uniquely difficult from an election administration perspective. Massive increases in absentee ballots were difficult for all election officials to keep up with. Pandemic fears increased the already difficult task of recruiting and training poll workers and finding adequate polling locations. Georgia election officials faced the added difficulty of having to implement a new paper-ballot voting system during the 2020 Election Cycle. Implementing a new system always increases logistical and training issues, and issues due to the COVID-19 pandemic stretched election officials to their breaking point. But while every county in Georgia faced those issues, many Fulton County voters had a uniquely bad experience.

Some of the reasons for the issues in the June 2020 primary, in addition to the exigencies mentioned in the above paragraph, were outside Fulton County's control. In addition to certain polling locations electing not to make themselves available due to the COVID-19 pandemic, other locations were not available due to previously existing remodeling schedules. This led to combining many precincts into one voting location and to utilizing locations that were not typically polling locations, such as Park Tavern in Midtown Atlanta. Fulton's Chief Registrar at the time was hospitalized due to COVID-19 and another long-time employee passed away due to the virus. However, Fulton's response to these circumstances added to the Election Day difficulties, specifically the hiring of poll workers on the weekend before Election Day and not ensuring adequate training of those poll workers.

Following the June 2020 Primary Election, the State Election Board considered multiple complaints regarding the election in Fulton County, including accusations that absentee ballot applications were not processed, that polling places did not open on time and did not have all required forms (such as recap sheets), and that poll workers were not adequately trained. The State Election Board found probable cause to send the complaints to the Attorney General's office for

---

[1] "Fulton to Retool Absentee Vote System" *Atlanta Journal-Constitution* (1993); "Touch and No-Go in Fulton? Unreadiness for New Voting System Raises Florida Effect Fears" *Atlanta Journal-Constitution* (2002); "Fulton Needs 'Wake-Up Call'" *The Macon Telegraph* (2008); "Claim: The 'Error Rates' for Fulton County Elections Department are 'Well Below the Average, Rating: False" *Politifact* (2012); "Fulton County Tries to Recover from Election Problems" *Athens Banner-Herald* (2014).
[2] "State Approves Fulton Election Settlement." *Atlanta Journal-Constitution* (August 13, 2015).
[3] "Fulton Elections Investigation Sent to Attorney General." *Atlanta Journal-Constitution* (December 17, 2013).

further prosecution, but instructed the Attorney General's office, Secretary of State's office, and Fulton County to try to resolve these issues with an eye toward improving the issues prior to the November 2020 General Election.

In October 2020, Fulton County and the State Election Board agreed to a Consent Order to resolve the complaints stemming from the June 2020 Primary Election.[4] That order included certain remedial measures that Fulton County agreed to implement prior to the November 2020 General Election as well as the appointment of an independent, non-partisan monitor. The consulting firm Seven Hills Strategies was appointed by the State Election Board as the independent monitor. Carter Jones, of Seven Hills Strategies, spent more than 270 hours observing all aspects of Fulton County's election processes and was granted full access by Fulton County.[5] Seven Hills Strategies' report noted that it saw no instances of dishonesty, fraud, or intentional malfeasance, but that it did see areas of disorganization, sloppiness, and mismanagement.[6]

### REQUEST FROM GENERAL ASSEMBLY FOR PERFORMANCE REVIEW

On July 15, 2021, Senate President Pro Tempore Butch Miller and twenty-two of his Republican colleagues in the Georgia Senate sent a letter to Rick Barron, then-Director of the Fulton County Board of Elections and Registration, requesting answers to questions regarding the double-scanning of nearly 200 ballots and Fulton County's audit tally sheets. Senator Miller requested a response by July 22, 2021. On July 21, 2021, Mr. Barron responded that he wanted to provide answers to the inquiries but that he needed approval from the Fulton County Board of Elections prior to sending responses, that the next board meeting was scheduled for August 12, 2021, and that he would not be able to meet the requested deadline.

On July 27, 2021, Senators Matt Brass, Kay Kirkpatrick, and John Albers (Republican members of the Senate Fulton County delegation), along with twenty-two other members of the Senate Republican caucus, sent a letter to the State Election Board invoking O.C.G.A. § 21-2-106 and requesting a performance review of Fulton County based on their failure to respond to Senator Miller's questions.

On July 30, 2021, Speaker Pro Tempore Jan Jones of the Georgia House of Representatives, joined by four other Republican members of the Fulton County delegation in the House of Representatives, joined their Senate colleagues' request for a performance review of Fulton County elections, mentioning the same issues as their Senate colleagues in addition to "persistent sloppiness in election processes over multiple election cycles."

---

[4] "Consent Order." State Election Board Cases 2020-016 and 2020-027, attached hereto as Exhibit A.
[5] "State Election Board Report- Post Election Executive Summary" *Seven Hills Strategies* (February 16, 2021), attached hereto as Exhibit B.
[6] "Report Shows No Fraud But Many Problems with Fulton Voting Process." Georgia Public Broadcasting. (February 17, 2021).

## PERFORMANCE REVIEW PROCESS

On August 18, 2021, pursuant to the request from the requisite members of the General Assembly, the State Election Board appointed a Performance Review Board consisting of Stephen Day, member and former Chair of the Gwinnett County Board of Elections; Ryan Germany, General Counsel for the Office of the Secretary of State; and Rickey Kittle, Chair of the Catoosa County Board of Elections.

O.C.G.A. § 21-2-106 states that the duty of the performance review board is "to make a thorough and complete investigation of the local election official with respect to all actions of the local election official regarding the technical competency in the maintenance and operation of election equipment, proper administration and oversight of registration and elections, and compliance with state law and regulations." "Local election official" is defined in relevant part to this performance review by O.C.G.A. § 21-2-105 as "a county board of elections or a county board of elections and registration."

After completing that thorough and complete investigation, the performance review board is to "issue a written report of its findings to the Secretary of State, the State Election Board, and the local governing authority which shall include such evaluations, judgments, and recommendations as it deems appropriate." O.C.G.A. § 21-2-106(b).

The Performance Review Board utilized a multi-faceted approach to accomplish the required "thorough and complete investigation," which spanned across the municipal elections in 2021, the redistricting process, and the 2022 election cycle. We reviewed existing documentation regarding Fulton County elections, particularly the report of independent-monitor Seven Hills Strategies. We conducted an interview with Carter Jones, the author of that report, to get his insights into the performance review process and into Fulton County elections generally. The Performance Review Board itself observed pre-election, Election Day, and post-election processes at Fulton County in both the 2021 municipal elections and the 2022 general and runoff elections. This observation included at least four separate visits to the Fulton County Election Processing Center during the 2021 and 2022 elections to observe absentee by mail processes, equipment and paperwork return, vote tabulation and uploading, and other operations. It also included visits to at least nine different election day polling places and seven separate advance voting locations.

In addition to the observation of the Performance Review Board, The Carter Center, which has observed more than 100 elections in 39 countries since 1989, was invited by the Performance Review Board and the Fulton County Board of Elections to observe the November 2022 General Election in Fulton County. The thorough investigation that the Performance Review Board conducted would not have been possible without the independent observation efforts of The Carter Center. The Carter Center greatly expanded the reach of the three-person Performance Review Board, who each had other election-related duties to attend to during the 2022 election cycle. The Carter Center contributed almost 4000 people hours to observation, as well as recruiting, managing, and training their observers and then analyzing and reporting the data they gathered. Their assistance was invaluable, and their work was of the highest quality. The Performance Review Board is exceedingly grateful to The Carter Center for their time and effort.[7]

---

[7] "2022 General Election Observation: Fulton County, Georgia." *The Carter Center*. Attached hereto as Exhibit C.

The Performance Review Board conducted formal interviews of key current and former staff members at Fulton County elections, reviewed Standard Operating Procedures, compared those Standard Operating Procedures to procedures in other counties, and interviewed members of the Fulton County Board of Elections.[8] We also were in close contact with the Secretary of State's Investigations Division and Elections Division as they looked into issues that were relevant to the ongoing review, including redistricting following the 2021 Census and processing of absentee ballot and absentee ballot applications.

**OBSERVATIONS**

**2020 Election Cycle**

Before moving to the observations of the Performance Review Board, this section will discuss the 2020 elections in Fulton County based on our review of Seven Hills Strategies' report, interview with Carter Jones, discussions with Secretary of State Elections Divisions, and review of Secretary of State investigations.  We will then move to the current status of Fulton County's elections process with the intent of showing the marked improvement in both preparation and performance from 2020 to 2022.

Regarding the 2020 elections that occurred prior to the outset of the performance review process, our interviews and review of materials confirmed much of what has already been written about those elections in Fulton County. In our interview with Carter Jones, the author of the Seven Hills Strategies report, we found him to be knowledgeable, fair, and well-informed regarding Fulton County operations. We concur in his finding that we did not see any indications of fraud, dishonesty, or intentional malfeasance in the 2020 election results in Fulton County, but we did see how a lack of careful planning and precision in ensuring that processes were strictly followed led to errors and to an overall environment that appeared unorganized. In an election with as much interest from voters, media, and others around the country and world, the organizational deficiencies identified in Seven Hills Strategies' report were apparent to voters, observers, and media.

For example, in a pattern that echoed the issues from the 2012 General Election (where a failure to timely process voter registration applications led to difficulties on Election Day), the June 2020 Primary Election saw a failure to timely process absentee ballot applications "snowball" into voter frustration, a high number of absentee ballot requests being cancelled, and long lines on Election Day. In June 2020, these issues were exacerbated due to policies that Fulton County put in place to respond to the COVID-19 pandemic and by issues outside the control of Fulton County (long-time polling places choosing not to make themselves available due to COVID-19, other polling places being closed for previously scheduled remodels, etc.).

---

[8] The two Republican Party-appointed members of the Fulton County Board of Elections did not respond to requests for interviews.

While the November 2020 General Election and January 2021 Runoff Election were smoother than the June 2020 Primary (in large part thanks to the remedial measures from the October 2020 Consent Order) Seven Hills Strategies still observed areas where a lack of precision and strict adherence to policies and rules made post-election activities more difficult. Again, many of these difficulties were exacerbated due to policies the Fulton County Board of Elections and Registration chose to put in place in response to the COVID-19 pandemic and by a post-2020 election environment filled with misinformation and false allegations that increased the difficulty of performing all election-related tasks.

Secretary of State Investigators who investigated complaints regarding the November 2020 General Election in Fulton County elections had similar findings to the Seven Hills Strategies' report—no evidence of fraud, dishonesty, or intentional misconduct, but persistent disorganization that made it difficult to get to the bottom of certain claims. Our review reaches a similar conclusion—we do not see any evidence of fraud, intentional misconduct, or large systematic issues that would have affected the result of the November 2020 election. The fact that three separate counts of the 2020 presidential race in Fulton County (initial count, hand-audit count, and machine recount) all showed very similar results supports this conclusion.

*Hand-Count Audit of 2020 Presidential Race*

One example of Fulton County's disorganization leading to errors and those errors being used to make claims of fraud are the allegations regarding the hand-count audit of the November 2020 Presidential contest that were investigated by Secretary of State Investigators in Case No. SEB 2021-181. In that case, citizen-activists brought to light errors made on tally sheets and in data entry. In a presentation to the State Election Board on March 18, 2022, Secretary of State Investigators confirmed data-entry errors in Fulton County but found that the citizen-activists conclusions (that such errors obviated the usefulness of the hand-count) were not substantiated.

Independent audit experts confirmed to Secretary of State Investigators that some amount of human error is expected in large hand-counts and that the types of errors seen in the Fulton County audit are the typical types of errors that are seen in hand tabulations. As part of that investigation, Fulton County stated that one reason for the errors was that the Arlo system used for the audit did not have required naming conventions for batches and allowed counties to utilize their own naming conventions. However, the fact that Fulton County did not use standardized naming conventions in their hand audit of the 2020 presidential race indicates a failure of planning and execution to avoid a predictable issue, not something that should be blamed on the Arlo system. The State Election Board referred Case No. SEB 2021-181 to the Attorney General's office, and it remains there for final resolution.

Additional contributing factors to the challenges that occurred in Fulton County's hand-audit that were outside of the county's control include that this was the first election with paper ballots in more than twenty years, so this was the first time the county had put in place and executed paper ballot batch management procedures for such a large number of ballots. Due to its status as the largest county with the greatest number of votes to count, Fulton also ran up against the deadline to complete the hand-count audit and was not able to do reconciliation checks of its data entry.

Other counties, including large counties, did have time to check their data entry and caught and corrected errors prior to submission. A full hand-count audit was not something that was planned for or expected in any county. It came about due to the state's new audit requirement and the fact that the margin of the race for president (the contest selected for the audit) was incredibly small, so counties were not allowed much time to plan and train prior to execution of the audit. The environment post-election in Fulton County in 2020 was also extremely difficult to operate in given an influx of poll-watchers and public from around the country that made even regular operations difficult. Of course, policies put in place to respond to the COVID-19 pandemic also contributed to these difficulties.

In conclusion, Secretary of State Investigators did confirm the existence of errors in the Fulton County audit, but independent audit experts confirmed that the existence of those errors was not surprising given the expected error rates in hand counts, the fact that Fulton did not have time to double check data entry, and the other circumstances surrounding the audit. Those same experts confirmed that some level of data entry errors are expected in a full hand-count, and they do not alter the overall conclusion of the audit, which confirmed that Joe Biden won the 2020 presidential race in Georgia.

*Double-Scanning of Ballots*

One of the allegations leading to the General Assembly's request for this review was that ballots were double scanned. As has already been reported, Secretary Investigators substantiated the allegations that two batches totaling almost 200 ballots were double scanned during the initial count of the November 2020 election.[9] As one election expert said, and the Performance Review Board concurs, double-scanning of ballots is "something that should never happen."[10] Contributing factors in this case likely include poor batch management and storage practices (also a contributing factor in errors in the hand-count audit and the recount), a time crunch created by the failure to utilize the early scanning period, and significantly heavier usage of central scanners due to the massive increase in absentee ballots resulting from the COVID-19 pandemic and a corresponding increase in paper jams.

*The January 2021 U.S. Senate Runoff*

The January 2021 U.S. Senate Runoff Election showed improvements from the November 2020 General Election, most notably in that Fulton County took advantage of the early scanning period for absentee ballots, which decreases the time crunch and rush to scan the ballots (increasing accuracy) and leads to faster posting of results on Election Day. Other reasons for these improvements include the fact that election officials and poll workers had more experience running elections with the new equipment, a decrease in the number of absentee ballots to issue and process, and greater familiarity with COVID-19 protocols.

---

[9] "Some Ballots Initially Double-Counted in Fulton Before Recount." *Atlanta Journal-Constitution*. (July 13, 2021).
[10] Id.

**2021 Municipal Elections**

After being appointed in August 2021, the first elections that the Performance Review Board observed in Fulton County were the 2021 municipal elections administered by Fulton County. These elections are orders of magnitude smaller than a presidential or midterm General Election, but they are still valuable to see how a county performs essential election functions. The 2021 municipal elections were significantly smoother than the 2020 elections in Fulton. On Election Night, one performance review board member was present at the Election Processing Center and spoke with Mr. Foris Webb, III, the Atlanta Municipal Clerk. Mr. Webb has observed elections in Fulton County (municipal elections, but also county, state, and federal elections) for 24 years, and he stated that the 2021 municipal election in Fulton was the smoothest one he had observed to date.

The Performance Review Board observation similarly showed smooth operations and significant improvement from the 2020 election. Some of this improvement is undoubtedly due to the fact that a municipal election is much smaller than a presidential election, but it also seemed that Fulton had improved some of their processes since 2020.

One area that contributed to the improvement in operations was staffing. Fulton County created and filled several key and new management positions. These new positions include a Deputy Director, an Absentee Ballot Manager, and a Manager for the Ballot Marking Equipment. The additional managers had staff focused on their areas, allowing for responsibilities to be more spread out and better executed.

*Absentee Ballot Process*

One example of improvement was identified during our observation of absentee ballot procedures. Following the 2020 election cycle, Fulton County split responsibility for managing the absentee ballot process and the registration process, which had been under one manager. Fulton County created and filled a new position of the Absentee Ballot Manager who supervised staff dedicated to absentee ballots. The Absentee Ballot Manager was new to her role in 2021 and had not been in charge of absentee ballots in 2020. This change seems to have resulted in significant process improvements. Our observation was that the processes put in place by the Absentee Ballot Manager were effective and compliant with Georgia law. The location where absentee ballot processing occurred was set up to ensure a good flow of the process while ensuring ballot security and allowing required transparency to poll watchers. The Absentee Ballot Manager stated that part of the training conducted for staff executing those processes is making sure they are aware of how important the task is to the success of the overall election and focuses on quality control.

*Equipment Handling*

Another issue Fulton County addressed following the 2020 election was to split responsibilities for managing ballot marking devices and other election site supplies. Fulton County hired a new manager responsible for ballot marking devices and assigned technicians to specific polling sites to address issues with the equipment. Fulton County also implemented a supply scanning system

that allowed more accurate and timely tracking of supplies and equipment. While this supply scanning system does not appear fully implemented, it is a positive step.

*Advance Voting*

We also observed several advance voting sites, including Sandy Springs Library and Metropolitan Library. At both locations, voting was proceeding smoothly with almost no wait time. Fulton had added a person to advance voting locations to ensure that voter credit was promptly and properly given in the ENET voter registration system and reconciled ENET voter credit with paper Advance Voting Ballot Applications filled out at the time of check-in. This reconciliation check is a noted improvement and shows increased attention to these important processes.

The Performance Review Board also observed advance voting at Buckhead Library and C.T. Martin Natatorium. The observation of those two locations occurred on the last day of early voting so traffic was heavier. Buckhead Library had some poll workers who did not show up that day and was experiencing long lines to vote. The check-in process was going smoothly, but we observed that some check-in stations were not being utilized due to the lack of staff. Buckhead Library is a popular voting location, but the setup is a bit cramped due to space that's available. On that same day, C.T. Martin Natatorium had a full complement of poll workers and kept a short line to vote. The facility at C.T. Martin Natatorium is bigger and allowed for more ease of movement.[11] We also noticed that the poll manager at C.T. Martin would jump-in to staff a check-in station when the line got long, which seemed to really set a good tone for all poll workers at that location.

*Election Day*

On Election Day for the municipal elections in November 2021, the Performance Review Board had a presence at Fulton County Election Headquarters, at the Election Processing Center, and at polling places around the county. At headquarters, Fulton County has an impressive system of logging issues that are reported at different polling places. But the overall atmosphere still seemed disorganized and reported issues did not seem to result in a sense of urgency to resolve. The Performance Review Board was able to visit locations that had specific issues reported such as North Springs High School in Sandy Springs and Independence High School in Roswell. Overall, voter experience on Election Day seemed to be smooth. Typical turnout during municipal elections is significantly lower than in a presidential or midterm election, so issues are able to be resolved without leading to major backups in voting. The two issues discussed below are indicative of the types of issues that can occur when administering an election.

---

[11] Finding good, centrally located polling locations that have sufficient space, parking, accessibility, security, etc. is a difficulty for election officials across the country, especially in urban environments and even more so since schools have understandably stepped back from being polling locations. We conclude that Fulton County does a good job managing this difficulty. Fulton County election seems to have a very good relationship with the Fulton County library system, and while the available space in libraries is not always large, libraries provide good accessibility, availability, and are under county control. We also understand that library staff has also been trained to assist in some election tasks, which could be a huge benefit. The Performance Review Board recognizes the vital assistance the Fulton County Library System plays in ensuring that Fulton County can continue improving administration of elections.

At North Springs High School, the poll manager noticed she was missing the key to the cabinets that store the ballot marking devices and scanners. Even though she reported this issue the Saturday before the election, the key to the cabinets was not delivered until 10:00 a.m. on Election Day. To the poll manager's credit, she utilized available backup procedures (i.e., emergency paper ballots) to ensure that voting was able to occur beginning at 7:00 a.m. on Election Day.

At Independence High School in Roswell, the equipment was delivered to the location much later in the day before the election than was scheduled (schedule for 2:00 p.m. but did not arrive until 8:30-9:30 p.m.). The equipment was incorrectly delivered to a cafeteria downstairs, but the poll manager was told by school officials that was not the proper place. The poll manager alerted Fulton County on Monday night that the equipment needed to be moved to a different location. She was told that a logistics team would be present at 5:00 a.m. on Election Day to move the equipment, but that team did not show up until 1:00 p.m. on Election Day. Fortunately, the poll officials (all female), took the initiative to manually move the necessary equipment themselves up a steep incline. They were up and running by the time the polls opened at 7:00 a.m. and had no delays to opening.

These examples both show poll managers utilizing their training and showing initiative to successfully resolve issues. The fact that backup procedures were utilized to ensure that voters were still able to vote without delay shows a massive improvement from the June 2020 Primary. However, the issues at both of those locations were ones that could have been avoided by better control and execution of the equipment delivery process.[12] These issues were also both noticed by poll managers well in advance of opening of the polls, and a quicker response from Fulton County would have mitigated the need for the extra steps that had to be taken by poll officials.

At the Election Processing Center on Election Night, we observed that the system for tracking memory cards that had already been uploaded was disorganized. Fulton County actually had to re-certify their election results after the Secretary of State's office pointed out to them that certain checks did not add up. Fulton County found memory cards that had not been uploaded. This is something that should never happen, would not happen with better organization, and would be caught with better checks and balances.

**Redistricting**

After the 2021 municipal elections and prior to the 2022 elections, all counties in Georgia had to redistrict voters following the new district maps passed by the General Assembly following the decennial census. Just like voter registration and the absentee ballot process, redistricting is an essential election process where errors can "snowball" into voters being in the wrong location, long lines, and confusion on Election Day. The Secretary of State's Elections Division, particularly Deputy State Elections Director Dr. Jesse Harris, communicated frequently with Fulton about their redistricting. Utilizing a mapping tool, the Secretary of State's office checked all counties state and federal redistricting work to identify voters that may have been placed in the wrong district

---

[12] One of the improvements observed in the 2022 election cycle by both the Performance Review Board and The Carter Center was improved organization in the warehouse. This improvement, if it is kept up, should help to minimize issues with equipment delivery moving forward.

and flagged those records for counties to review. In one of the initial checks, the mapping software identified approximately 30,000 records for counties to review. Approximately 20,000 of those records were in Fulton County.

Fulton County had new staff in charge of redistricting. Once the information regarding potential errors was brought to their attention, they worked diligently to resolve any issues. Fulton County also separately contracted with a mapping service to help them check their work for county level districts. Due to the delay in the census caused by COVID-19, which caused maps to be passed by the General Assembly later than in previous cycles, the corrections that Fulton County was making were occurring closer to the May primary than is ideal. It also became clear that Fulton had not prioritized monthly and annual "street maintenance" (the process that ensures that street names and numbers in the voter registration database are updated to account for new development).

In other large counties, street maintenance is a monthly process regardless of whether redistricting is occurring. As a result of neglecting the street maintenance process, the new staff in Fulton had to spend significant time "catching up" on tasks that ideally would have been completed prior to redistricting. However, at the end of the process, one expert at the Secretary of State's office said that he thought Fulton's voter database was in better shape than it had been in a long time. This was due to dedicated effort by Fulton County elections staff, support from others in Fulton County, (including the County Manager) to ensure that elections had the resources they needed, and assistance from the Secretary of State's office.

## 2022 Election Cycle

In an effort to expand the reach of the three-member Performance Review Board and to further inform the review, the Performance Review Board and the Fulton County Board of Elections and Registration entered into an agreement with The Carter Center to provide independent, non-partisan observation[13] of Fulton County's election. In addition to The Carter Center's observation, the Performance Review Board also conducted some limited observations of advance voting and processes at Fulton's Election Preparation Center when advance voting equipment and ballots were being returned.[14]

During advance voting in the November General Election, The Carter Center deployed 64 observers to all 36 early voting locations and the four "outreach" advance voting locations, collecting over 330 observation reports on advance voting. On Election Day, the Center deployed 104 observers to 217 of the 249 polling places in Fulton County. The Carter Center also observed absentee ballot processing, election night drop-off, and tabulation. Their analysis is based on direct

---

[13] "Nonpartisan election observation is an impartial process where observers systematically gather data determine whether an election was fair, peaceful, and credible… [N]onpartisan observers have no stake in the election outcome. They do not interfere in the election day process, even if they see something take place that should not happen. They are trained to understand the election process as specified by law and report on whether election day procedures are being correctly followed." The Carter Center Report on Observation of Fulton County Election, pg. 5.

[14] Due to the fact that the Performance Review Board members have election-related duties that they must also attend to, the members were limited in what observations they could perform in the November 2022 election. The Carter Center observation was vital to the ability to complete the review in a timely fashion.

observation, desk analysis of documents provided by Fulton County, and conversations with Fulton County staff.

The Carter Center's observation and the Performance Review Board's observations were conducted independently from each other, but both reached similar conclusions. The Performance Review Board observed dedicated poll workers working efficiently to process voters. Voter check-in was proceeding smoothly at the locations we observed (Buckhead Library and Chastain Park), averaging between 55 seconds and 2 minutes and 55 seconds per voter. The overall process was more organized than 2021, which was more organized than 2020. This conclusion was echoed by the poll manager at Chastain Park and by Fulton County elections staff. We also observed that the Elections Preparation Center looked cleaner and more organized than it had in 2021. Fulton County had also implemented a new inventory tracking system that aimed to help with equipment delivery and return. The inventory tracking system is not perfectly implemented yet, but the fact that they have added it shows a recognition of the importance of organization and preparation to the overall election process.

The Carter Center observed that both advance voting and Election Day were calm and peaceful. During advance voting, lines were generally short, ranging from no line to a maximum of 25 minutes. The last day of advance voting saw longer lines (also noted by the Performance Review Board observation). On Election Day, lines generally stayed under 15 minutes throughout the day. Most voters waited far less than 15 minutes, with 57% of observed polling places having no line at all and 38% had lines of 5 minutes or less. Lines at opening were manageable at all observed locations. The longest line at opening at an observed location was 43 people and observers reported that it was cleared quickly. The Carter Center also noted that the presence of compliance officer during advance voting, tasked with ensuring reconciliation of voter credit and voter check-in throughout the day, and a technical specialist, tasked with troubleshooting equipment issues, helped streamline processes.

The Carter Center also noted that election workers were generally friendly, enthusiastic, and helpful to voters, and that there was a strong emphasis on customer service. This is no small task given that workdays could be up to 14 hours.

The Carter Center observed good processes for tracking and processing absentee ballot applications and absentee ballots, similar to what the Performance Review Board observed in 2021. They noted that absentee ballot applications were received by the mailroom, timestamped, opened, and batched in groups of 50 for processing, with batch cover sheets used to track each group of 50 through the process, recording the total accepted or rejected. Applications were processed and reconciled to the voter registration database each night.

In another big improvement from the November 2020 election, Fulton County fully utilized the early scanning period to scan verified and accepted absentee ballots prior to Election Day. Utilizing this time period (codified in Georgia law by S.B. 202 following the 2020 election) allows absentee ballot scanning to be less of a rush, provides more time for quality control checks, and still allows the county to get results posted quickly after the polls close. Observers witnessed absentee ballot processing from initial receipt through verification and tabulation. Best practices were observed at

each step of the process, including using small batches, tracking each batch via a cover sheet that logged any ballots that were removed (e.g., ballots rejected during verification), and reconciling counts of ballots at various stages throughout the process. Following processes like this in an organized fashion is what ensures that the double-scanning of ballots that occurred in 2020 is not something that happens again. One other improvement noted by the Performance Review Board from 2021 to 2022 was a more organized system for storing memory cards when they are returned to the Election Processing Center for tabulation.

<h2 style="text-align:center">AREAS FOR IMPROVEMENT</h2>

Both The Carter Center and Performance Review Board observed significant improvements since 2020, but observers also noted things that could use further improvement.

While poll workers generally seemed better-trained in 2022 than 2020 given that essential functions were successfully performed with relative uniformity, poll worker training can still be improved. The Carter Center observers noted that more contextualized training that helped poll officials understand the big picture "why" of certain administrative steps would be beneficial. For example, the processes of checking seals and properly filling out recap sheets were completed by poll officials, but there did not seem to always be an understanding of why and how these processes were undertaken. Both of those processes are important for overall system security and for public confidence in elections, and both are also ways to potentially find any issues at the point where they can still be easily resolved.

General organization can continue to improve as well. While the reality is that there is no such thing as a mistake-free election, a tightly organized environment lessens the opportunity for mistakes and increases the probability of catching mistakes. For example, in the May 2022 Primary Election, just like in the November 2021 Municipal Election, the Secretary of State's office noticed that Fulton County did not upload all memory cards that contained votes. The issue was resolved prior to certification, but it's something that should not have happened and, at the very least, should have been caught with basic reconciliation checks.

Another observation that can be resolved through better training is compliance with the State Election Board regulation that requires the poll official stationed at the ballot scanner to "offer each voter specific verbal instruction to review their printed ballot prior to scanning it."[15]

The Carter Center also noted that the "outreach" locations opened on college campuses for advance voting had the most significant staffing challenges, with poll managers having to give inexperienced staff on-the-job training. These locations were not initially planned to be advance voting locations, but they were added at the request of activist groups.[16] Preparation and planning is vital to successful election administration. In determining plans for polling locations, we assume the Fulton County Board of Elections and Registration is already taking into account what can

---

[15] Georgia Rules and Regulations 183-1-12-.11(8).
[16] "Following ACLU Complaint, Fulton to Host Voting on College Campuses." *Atlanta Journal-Constitution*. (August 11, 2022).

feasibly be accomplished by available resources and staff. Altering plans at the request of activist groups, who may be driven by motivations other than Fulton County executing a smooth election, can lead to the significant staffing challenges that The Carter Center observed.

We have already mentioned that finding suitable polling places is a difficulty for all, and especially urban, election officials. But one thing Fulton can pay more attention to is the layout of equipment at polling places. Voter privacy, voter flow, and appropriate transparency for certified partisan monitors should all be considered when determining setup and layout. Of course, given that available space will not always be perfect, it is not always possible to maximize each of those considerations, but polling place setup should be intentional and thought through.

One area noted by The Carter Center where significant improvement is needed is in following the sequestration requirements of O.C.G.A. § 21-2-386(a)(6) during early tabulation.[17] Fulton County should be applauded for taking advantage of both the early processing and early tabulating opportunities offered by Georgia law. Early processing and early tabulation ensure that sufficient time and care can be offered to those vital processes, which increases accuracy, while still allowing timely reporting of results. But the rules in place that allow for those processes to be done securely must be followed to ensure fairness and confidence.

Fulton County also has relatively new staff managing certain process since the 2020 election. The Performance Review Board's observation is that staff is dedicated and open to improvements when the necessary tools and guidance are provided. As The Carter Center stated well:

> Election processes are complex logistical exercises. As such, there are always opportunities for continuous improvement of processes to bolster efficiency and maximize appropriate and contextualized transparency. This process of continuous improvement relies on the observation of systems and processes and the creation of monitored feedback loops so that lessons from one election can be integrated into systems to improve future elections.

We hope that Fulton County will continue to build on the significant improvements that our review has noted since the 2020 election cycle.

**Fulton County's Future Plans**

In addition to the improvements that the Performance Review Board and The Carter Center were able to observe, Fulton County has also taken other steps that we believe can lead to even further improvements in future elections.

---

[17] Georgia law, clarified by S.B. 202, allows for both an early processing period where absentee ballots can be scanned but not tabulated (i.e. election officials can essentially do everything to prepare absentee ballots for tabulation but not yet tabulate) and a period beginning at 7:00 a.m. on Election Day where absentee ballots can be tabulated as long as all participants are sequestered so that results cannot be know by anyone outside that room until the polls close.

*Elections Central Location*

Many of the issues in 2020 were caused by or at least exacerbated by the fact that tasks and personnel were spread across many different locations. This was even more so the case in 2020 due to processes put in place to respond to the COVID-19 pandemic, but even outside of pandemic circumstances, Fulton County election operations are spread across multiple locations.

In Spring 2023, Fulton County plans to move to one central location ("Elections Central") where they will be able to conduct all election operations. Elections Central should reduce miscommunication and allow more visibility to managerial staff. Elections Central also shows the commitment of the Fulton County Commission to ensuring that Fulton County Elections has the resources they need to be successful.

*Budget Priority*

Along the same lines as the move to Elections Central, it became clear through our interviews that the Fulton County Commission now takes the budget needs of Fulton County Elections more seriously. One benefit of all the challenges from the 2020 election is that it showed people other than just election officials that election administration is a difficult and complicated logistical operation. Executing elections with the precision, integrity, and voter convenience that Georgia voters deserve and election officials want takes adequate resources.

We did not review the Fulton County Elections budget as part of this review, so we cannot speak to specifically to that issue. We have heard some rumblings that Fulton County Elections is over-funded. We are not able to speak specifically to that allegation, but it is the opinion of the Performance Review Board that elections in Georgia have generally been underfunded, not overfunded.

*Improvements to Poll Worker Training*

Even before The Carter Center's observation noted that some improvements to training would be beneficial, members of the Fulton County Board of Elections had already identified improvements to poll worker training. This came across in our interviews with Cathy Woolard, Chair of the Board, and Teri Crawford, one of the members. Apparently, certain poll managers noticed some weaknesses in training and approached the board about reworking the training manual. We understand that project is in progress. It is also encouraging that the poll managers themselves sought out to improve the training.

## CONCLUSIONS AND RECOMMENDATIONS

- In prior years, disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections. However, Fulton County has shown improvement in administering elections from 2020 to 2022. This improvement is due to a multitude of factors. Prior staff that oversaw elections, voter registration, redistricting, and absentee ballots are no longer with the office, and new staff can bring new energy and renewed commitment. Training, processes and procedures, and overall organization have all been improved as well, but those things need further improvement to ensure readiness and success in the 2024 election cycle.

- The Fulton County Board of Elections and Registration is engaged and helping to drive those improvements. Replacing the board would not be helpful and would in fact hinder the ongoing improvements to Fulton County elections.

- The County Manager's Office in Fulton County has continued to be involved in planning, strategizing, and preparing for upcoming elections, which has positively contributed to improved execution of elections.

- Like election officials across the state, Fulton County elections staff show daily dedication and effort in carrying out and seeking to improve the administration of elections in Fulton County. Director level staff and the Fulton County Board of Elections need to ensure that staff has the necessary tools and guidance to ensure best practices and compliance.

- The Performance Review Board members individually donated hundreds of hours to this project and The Carter Center donated almost 4000 people hours. Both observations (which were conducted independently) noted significant improvement from the 2020 election, but both also noticed things that could use additional improvement, including further improvements to training and processes.

- The existence of the Performance Review helped incentivize Fulton County to make improvements to their elections, but it took an enormous amount of donated work, and it is difficult to see how it is a sustainable process that can continue to positively influence election administration in Georgia without some reforms. A positive, proactive, and periodic review process, appropriately funded, designed to support and assist all counties with election process improvements could be more effective than the performance review process in its current iteration.

- While the Performance Review Board has seen improvement in Fulton County elections since the 2020 election, further improvement is still needed to ensure readiness for the 2024 presidential election cycle. Presidential election cycles see more voters than midterms and take even more planning and preparation to ensure successful execution. Georgia will be a competitive state in next year's elections, so election preparation needs to recognize that

Fulton County's actions (and all counties in Georgia, for that matter) will be heavily scrutinized by political parties, campaigns, candidates, and activist groups. To ensure successful execution of the 2024 election, Fulton County should continue the improvements it has already embarked on and prioritize the areas for improvement noted in this report. Those areas are:

- o  More contextualized poll worker training
- o  Environment of order, organization, and control
- o  Compliance with State Election Board Regulation regarding ballot review
- o  Planning and Preparation based on capacity and execution
- o  Review polling place layout
- o  Compliance with Georgia law regarding sequestration during early tabulation

# EXHIBIT 6



# State Election Board Report – Post-Election Executive Summary January 12, 2021

## Introduction

Seven Hills Strategies, LLC (SHS) has been contracted by the State Election Board (SEB) to serve as an independent, non-partisan monitor for the pre-electoral processes in Fulton County leading up to the November 3, 2020 general election and for any subsequent runoffs. SHS will observe absentee ballot request processing procedures, absentee ballot processing/scanning, early voting procedures, and actual ballot counting on Election Day and beyond. The goal of SHS is to ensure that Fulton County is adequately prepared for the scrutiny that they will be subjected to due to the national implications of the election results.

## Fulton County's Compliance with the Terms of Sec. 12 of the Consent Order

In addition to this report on compliance with the terms of Consent Order, SHS believes that is necessary to share this observation: From October to January, I spent nearly 270 hours at various locations observing every aspect of Fulton County's election processes. At no time did I ever observe any conduct by Fulton County election officials that involved dishonesty, fraud, or intentional malfeasance. During my weeks of monitoring, I witnessed neither "ballot stuffing" nor "double-counting" nor any other fraudulent conduct that would undermine the validity, fairness, and accuracy of the results published and certified by Fulton County.

   A) **Absentee Ballot Procedures:**

   1) Leading up to the Nov. 3 general election, SHS had the opportunity to observe the signature matching processes for absentee ballot applications being processed both at Darnell Senior Center and at Fulton County headquarters. During the runoff, I was stationed at Georgia World Congress Center (GWCC) and was able to monitor the vast majority of signature matching for the weeks leading into the runoff.

   SHS determined the signature matching processes to be in-line with the terms outlined in the Consent Order, and generally erred on the side of "give it further research" when there was any doubt about a signature's authenticity.

   However, although most applications were being processed within 48 hours of being received, SHS found one ballot application at Darnell Senior Center that had been in Fulton's custody for more than two weeks. Given the massive influx of applications and ballots, it is not surprising that a few ballots might be left behind, but Fulton must re-double their efforts in future elections to speed up processing times.



Additionally, SHS received multiple reports of absentee ballots being sent to the wrong addresses, which seems to be the fault of sloppy data entry by staff. Future staff trainings should underscore the importance of correctly entering the temporary/preferred addresses of all ballot applicants.

2) Although Fulton County allocated ample resources for absentee ballot processing leading into the general elections, the processes themselves were extremely sloppy and replete with chain of custody issues as the massive tide of ballots bounced around the Fulton Gov't HQ building.

The system, created by Ralph Jones, Registration Chief for Fulton County, seemed to function, but there were many processes that seemed to be *ad hoc* solutions to problems caused by a lack of organization or permanent staff with the expertise to manage the system in place. For example, the room which housed the team doing additional voter verification was also a temporary housing location for ballots between the mail room (which receives, opens, and records the numbers of ballots) and the ENET processing room. Staff in this room seemed to not understand the process, and Jones had to intervene to stop a temporary staffer from moving a pile of recently-accepted but unverified absentee ballots into the stack to go straight to State Farm Arena for scanning/counting. Had Jones not been there with me to catch this mistake, it is safe to assume that those ballots would've been counted as if they had been verified.

I observed an additional security issue here, as one staff member told me that people had not been signing out batches of ballots as they moved around the building in trays between processing rooms, which is a clear failure in the chain of custody mandated by the O.C.G.A.

Given the inefficiencies of this system and the volume of absentee ballots received, there was no way that Fulton could possibly comply with the mandate to "process all absentee ballots by the close of business on the next business day after the ballot is received."

Despite the aforementioned deficiencies during the general, Ralph and his team were able to both streamline and improve processes for the Jan. 5 runoff. The Fulton team migrated the entire signature verification process to the facility established at GWCC and for several days even attempted to do the voter credit step on-site before resolving to handle that at Pryor St. before bringing credited ballots to GWCC. Performing the entire process[1] linearly and in full view of the public was a tremendous improvement on the labyrinthine system concocted for the general. In my opinion, Fulton clearly made available sufficient resources to handle the influx of ballots for the Runoff.

---

[1] Voter credit → 1st pass signature verification with ENET → 2nd pass signature verification with RocketFile → Return RocketFile rejects to Pryor St for curing



3) SHS has not yet been able to conduct an audit to graphically represent the rate at which absentee ballots were scanned for the general election; however, my research indicates that the staff was able to scan fewer than 80,000 ballots in the period leading up to Nov. 3. Judging by final absentee/UOCAVA numbers (approx. 147k), in the 72 hours from 11/3 to 11/5, the staff were able to scan nearly 80 percent (approx. 67k) of that which they had scanned in the previous two weeks. Regardless of whether the bottleneck was in receiving the ballots, verifying the signatures, opening the ballots or scanning them, this rapid acceleration in scanning rate indicates that Fulton failed to adequately utilize the pre-scanning period allowed by SEB Emergency Rule 183-1-14-0.9-.15.

The runoff, however, was a stark dichotomy and a comparative great success. With the eyes of the world watching, Fulton was able to report 106,117 absentee votes (the vast majority) on Election Day itself due to the diligent pre-scanning work by Fulton staff. By the time that the operation was closed at 2 a.m., Fulton had fewer than 5,000 absentee ballots left to process. This small remainder – all received from ballot drop boxes on the evening of Jan. 5 – is a testament to how hard the Fulton team worked to comply with this item in the Consent Order.

4) Based upon a conversation with Captain M. McHugh, Fulton County Police Department, regarding the security protocols installed to ensure the protection of ballot drop boxes, I am confident that Fulton's robust security architecture made it impossible to tamper with votes at ballot drop boxes.

Given the daily influx of new ballots to the GWCC facility, I believe that ballots were, in fact, collected each day as required by SEB Emergency Rule 183-1-14-0.8-.14. On Election Day, multiple shipments of drop box ballots were received at GWCC (one at 4:38 p.m. and another at 11:30 p.m.) after first being checked-in at the Pryor St. mail room. As far as I witnessed, Fulton fully complied with this item of the Consent Order.

## B) Poll Workers and Poll Worker Training:

1) Fulton greatly exceeded the target number (2,200) of poll workers required for both the November and January elections. Fulton enlisted so many poll workers to account for any potential emergencies, attrition, or no-shows on Election Day.[2]

| Indicator | Target | Poll Workers Assigned (Nov.) | Poll Workers Assigned (Jan.) |
|---|---|---|---|
| Dual Manager | | 81 | 81 |
| Manager | | 174 | 174 |
| Assistant Manager | | 510 | 510 |
| Line Manager | | 558 | 525 |
| Clerk | | 2,420 | 1,495 |

---

[2] N.B. This point also covers Section 12.B.4 of the Consent Order



| | | | |
|---|---|---|---|
| Deputy Registrar Clerk | | 255 | 155 |
| Provisional | | 30 | 17 |
| **Total** | **2,200 + 560 alts.** | **4,028** | **2,957** |

2) On October 28, 2020, SHS attended the four-hour Fulton County poll worker training at the North Annex Service Center. This training accurately and concisely reviewed all voting implementation procedures, how to use Poll Pads and other hardware, and the test at the end ensured that workers had actually learned the content.

A particular importance was placed on securing election materials and ensuring that all zip ties and numbered seal stickers are appropriately installed and recorded at the beginning and end of each day. In accordance with O.C.G.A Code, verifying the zero-count in the morning and recording the final count at the end of the day were also underscored, though there was no emphasis placed on the need to dually-sign these count receipts. Additionally, the trainer underscored processes for keeping voting open despite technological issues, stating that, "you can open the polls with one poll pad, one BMD, and one scanner; if you are not able to open at 7a.m., immediately contact Fulton County and see if you need to fall back to provisional ballots." The trainer also frequently repeated that "we do not turn voters away" to encourage poll workers to find a workable solution to any problems that may arise.

The sole training deficit that I recognized was regarding the Senate District 39 Special Election. While it was somewhat odd that a primary election would be taking place during a general election, this lack of knowledge was a failure to adequately train the trainers regarding this special election. This lack of knowledge was passed on to poll workers, which resulted in numerous complaints to SHS about a failure to offer voters the opportunity to participate in this special election.

3) Fulton was to provide the SEB with weekly updates on total poll officers and alternates, training, and allocation plan of poll officers to polling places, including contingency plan for alternate poll officers for the November election, as well as any runoff election in this election cycle. As these reports did not come to SHS, I cannot comment on this item.

**C) Advance Voting Locations:**

1) Fulton was required to have 24 early voting locations, but greatly exceeded this requirement in both the general and runoff elections.

| Indicator | Target | General | Runoff |
|---|---|---|---|
| Early Voting Locations | 24 | 30 + 2 mobile + 7 outreach sites | 30 + 2 mobile + 2 outreach sites |



Both Fulton staff and poll workers could have done a better job ensuring that ENET records were kept up to date. Failure to keep accurate records of whether a voter had voted yet led to a great deal of confusion at the polls during both the general and the runoff as well as concerns of widespread voter fraud. Some human error is to be expected, but Fulton must strive to reduce the number of these instances.

**D) Election Day Logistics and Polling Locations:**

1&2)  Fulton was required to have 255 voting locations for Election Day, and met this requirement in both the general and runoff elections. It is also worth noting that Fulton established 91 new polling locations for this election cycle to meet this goal.

| Indicator | Target | General | Runoff |
|---|---|---|---|
| Election Day Voting Locations | 255 | 255 | 254 |

3)  Fulton was to provide the SOS with their plan for Election Day distribution of election equipment and poll officers no later than October 2, 2020. As these plans did not come to SHS, I cannot comment on this item.

4)  On October 29, Rick Barron shared early voting turnout data with the Gabriel Sterling, Chris Harvey, and Blake Evans from the SOS' office. Sterling ran the modeling through MIT's Election Data Lab allocation tool, and shared the results with Barron. Complying with this term of the Consent Order, Barron then re-programmed Poll Pads and redirected election materials to buttress any weaknesses revealed by the data model.

5)  At no point during either the general or runoff did any polling unit run out of emergency/provisional paper ballots, paper backup pollbooks, or required forms. In January, three polling units (all served as both early voting and Election Day locations) received re-supply from headquarters but never ran out of materials.

6)  During the general election, Barron negotiated with the ACLU to provide 255 deputy registrars to use ENET to cancel absentee ballots. During the runoff, this task was performed mainly by a smaller number of non-ACLU deputy registrars. SHS received no complaints during the runoff about unnecessary wait times related to not having additional dedicated deputy registrars.

7)  Fulton established three call centers with a combined staff of more than 100 people to answer questions from poll managers during Nov. 3 and Jan. 5. My poll worker training encouraged me to call the hotline if any problems arose while voters were casting their ballots.

8)  After 9:30 a.m. on Nov. 3, no polling precincts in Fulton County had a wait time greater than 30 minutes. The same was true for the entirety of voting on Jan. 5. Both of these should be seen as tremendous victories for the Fulton team, as they had allocated sufficient staff,



resources, and procedures to ensure that all voters were able to cast their ballots quickly regardless of where they lived in the county.

**E) Technical Support:**

1) Fulton trained 255 technicians for the general election, and additionally ensured that each early voting site also had a dedicated tech aside from State Farm Arena, which had five techs on-hand to manage their large number of BMDs. For January, Fulton trained 254 technical support experts, but 22 did not report for work on Election Day for one reason or another.

**F) Audit Preparation:**

1) Fulton's document retention processes at State Farm were adequate for protecting ballots from tampering and the system of marking boxes with scanner number, batch number, and date made it much easier to process during the forthcoming audit and recount.

2) Risk-Limiting Audit (RLA)

   ▪ The scale to which Fulton prepared for the RLA was staggering. With a maximum of 174 teams of two processing ballots by-hand, Fulton completed the RLA more quickly and accurately than anyone had anticipated. It is a testament to the team's leadership that they were able to keep feeding the processors while keeping accurate records.

3) Recount

   ▪ As with the RLA, Fulton aggressively tackled the Recount and initially seemed as if they would complete their recount more quickly than estimated. However, failure to comply with approved technological procedures led to a server crash and significant, costly delays that required the Fulton team to completely rescan all ballots once again. Additionally, during the fourth count (the second lap of the recount), sloppy document storage procedures led to confusion as box labels no longer had precinct names and batch numbers on them but instead all said "ELECTION DAY." This mistake therefore made it difficult to ascertain which ballots had been missed while trying to solve the second technical issue that resulted from accidentally naming two scanners "ICC 16" during the fourth count. Until this point, proper ballot handling, storage, and manifest procedures had been observed.

# Appendices

- Appendix A – Challenges and Recommendations from the Entire 2020 Election Cycle



SEVEN HILLS
STRATEGIES

# State Election Board Report

# Appendix A - Challenges and Recommendations from the Entire 2020 Election Cycle

## I.    The Pre-Election Period

- COVID-19 preparedness was obviously on the forefront of Barron's mind. He and his team had taken a multitude of steps to ensure that everyone was safely fulfilling all required duties in the lead-up to Election Day, but the virus had taken a heavy toll on the permanent staff leading the warehouse team. This caused several pivots and logistical changes to protect the staff, but there was still concern that a team of new players would be able to handle the tremendous workload as seamlessly as the high stakes of this election required. SHS learned that the SOS office offered vendor support to mitigate the breadth of the COVID outbreak, but this was offer was declined by Fulton.

- SHS received multiple reports that Fulton was slow to update MVP and give voters credit for having voted by absentee ballot (both mailed in and deposited in a drop box). It was imperative that - as the Consent Order mandates - the BRE keep accurate and up-to-date records about who has voted in the publicly-visible portals lest they face double voting problems.  Reports have shown that this problem has affected both absentee and early voters, so the problem was bordering on systemic.

- Additional training should be done regarding O.C.G.A. § 21-2-381(a)(1)(A-G) pertaining to relatives or helpers filling out the absentee ballot for their temporarily out of state, disabled, or elderly voters. SHS witnessed multiple staff having difficulty deciding how best to handle family members and helpers requesting absentee ballots for others.

- SHS has received a multitude of reports of absentee ballots being sent to wrong addresses even though alternate/secondary addresses were provided or already on file. One notable case being from a servicemember currently serving out-of-state who felt disenfranchised by Fulton's inability to properly process his absentee ballot request. As witnessed at the Darnell Senior Center, the data entry for processing absentee ballot requests can be burdensome, but each entry much be triple-checked for accuracy to avoid careless mistakes like this.

- On 10/23, SHS saw one absentee ballot request dated 10/07. While this was a lone outlier and the vast majority of the ballot requests seen were dated 10/21, Fulton must ensure that all absentee ballot requests are processed in a timely manner.

- In his press conference on 10/22, Barron stated that there was no wait time difference between the early voting locations in the north and south parts of the county; however, anecdotal accounts have said that there have been long wait times in the Alpharetta/Johns Creek parts of the county.

- The Senate District 39 special election was a persistent problem.  As witnessed during SHS' poll worker training, there was a failure in the protocol for the training of trainers



that should be corrected in the event that this occurs in the future. This failure to adequately prepare trainers regarding this special election led to a countless number of voters not being able to participate in this election.  SHS suggests that to fix this, Fulton consider pivoting to an "opt out" instead of an "opt in" policy for these types of elections so that all voters may participate regardless of whether or not they are aware of the race.

- There were myriad problems with the absentee processing system at Fulton Government Headquarters, including:
    - Failure of staff to understand the process of moving ballots around the office
    - No chain of custody forms being used as ballots move from room to room
    - Mask-optional policy putting essential staff at unnecessary risk for COVID
    - Failure to sufficiently protect spoiled and rejected ballots in the mail room

- While touring the mail room at Fulton County Government Headquarters, SHS saw many ballots set to be cancelled because they were returned to drop boxes without the yellow exterior oath envelope.  It should be stressed more clearly to voters that they must precisely follow all the instructions on the absentee ballots and return both envelopes if they want their vote to be counted.  Since it is impossible to update the MVP of "naked" ballots when they are processed, it is likely that some of the complaints that the SOS office received about a failure to record ballots deposited at drop boxes were due to the fact that voters failed to correctly follow the necessary protocol.

- While there was a large focus on the "Know Before You Go" Campaign and encouraging voters to use the FultonVotes App to notify voters that their precincts may have changed, it is concerning that SHS has received a report that Fulton waited until 5:51pm on October 26 to mail 169,714 postcards notifying voters of changed precincts.  SHS received complaints that Fulton was "suddenly changing polling locations without notice."  It would have been prudent to send these notifications earlier so that the news did not surprise people already making plans for in-person voting on Election Day.

- On October 29-30, widespread power outages resulting from Tropical Storm Zeta forced seven polling precincts to close on 10/29 and two to stay closed on 10/30.  This unanticipated closure surely had a negative impact on turnout numbers as early voting came to an end on 10/30, but there was very little that the BRE could have done to avoid this.  In fact, it seems that they handled the crisis well by deploying the two mobile voting centers to the downed precincts to help manage the flow of voters.

- On October 26, the ACLU raised concern that the Fulton office was sitting on 1,500 voter registrations that for all intents and purposes seemed to voters to have gone missing.  It took two days before SHS was able to get an update from Ralph Jones, who said that there were indeed 1,500 remaining voter registrations awaiting processing and that they would be finished by the end of 10/28. This is cutting it far too close to actual Election Day for new voters who are likely unsure of the process.  These voter registrations should have been processed weeks ago.



- It was brought to the attention of SHS that Fulton has been using an outdated version of Easy Vote to check in voters and keep ENET records up to date. All software used must be updated to benefit from the latest bug and security patches.

- Fulton has leaned very heavily upon an army of temporary workers to fulfill the litany of tasks that must be completed from logistics to processing ballots to scanning final results. It would perhaps be best to offset this number of workers with stakeholders from the local community who would like to get involved in the electoral process. By conducting multiple interviews with temporary staff, it was made clear that some have no keen interest in participating in this immensely-important process, which is perhaps to blame for some of the sloppy clerical errors and logistical shortcomings that have plagued the complicated electoral process. However, others (particularly those scanning at State Farm) are the glue that holds the entire process together. It is the opinion of SHS that several of these leaders should be hired full-time if the budget allows.

## II.    The General Election

- The 4-BMD unit transporters are not ADA-compliant if used for duplicating ballots. People must stand for hours to duplicate and the screens are too tall to sit and operate. One of the Fulton staff has a bad knee and uses a cane. She was saying that her knee was hurting but she needed to keep working.

- The truth about what happened on the night of November 3rd between 10:30PM and 11:52PM continues to be elusive. GOP party poll watchers say that Fulton staff told them and the media to go home (implying that they did so in order to count without supervision). Fulton staff tell me that the poll watchers and the media just left when Moss sent home everyone but the scanner team. A SOS investigator is involved, so the truth will come out, but if the party poll watchers are correct, then there is a serious problem.

- There were persistent chain of custody issues throughout the entire absentee ballot processing system. Aside from the problems with the system at Pryor St (see executive summary report), the fact that ballots were being delivered to State Farm Arena in unsecured mail carts is very concerning. Protocol for securing ballots exists not only to protect the ballots themselves but also to ensure that no ballot box stuffing occurred. This problem was exacerbated by poor managerial processes by Ralph Jones, who failed to do intake counts for the provisional ballots. Similar problems seem to exist at the warehouse as well (e.g. poll pads for SC11). Fulton must bolster these processes to retain faith in their process.

- The entirety of events on Saturday, Nov. 7 was plagued by the mismanagement issues. If there had been a clear process on Friday, then perhaps that mess may have been avoided, but the fact that no one verified the number of provisional ballots either at intake at State Farm or at adjudication is concerning. Therefore, there was a possibility that 1) not all provisional ballots made it to State Farm or that 2) some were missing because they never did an intake count. It turned out that both were true. If Santé had not gone back into the



office to look up her file on provisional ballots, what would have happened to the 17 ballots that remained at Pryor St?

- The process for equipment delivery at the warehouse is in desperate need of an overhaul. SHS concurs with Barron that a digital check-in/out system would make the logistical job much smoother. Monday evening was far too chaotic for an operation of that size, and in the disorder, many mistakes were made that just caused more trouble for a team that was already underwater. As a result, SHS has received multiple complaints about a lack of sufficient numbers of ballot bags making it to precincts, which led to a chain of custody issue before tabulation. Additionally, SHS caught wind of missing CFs (e.g. Palmetto) after Election Day that had likely been misplaced due to inadequate check-in processes.

   - Furthermore, if Fulton implements a new digital system, it must be used by both the poll managers and the Fulton staff. The fact that a poll tech was able to show me that 157 polls were still "open" in Fulton's backend demonstrates that they were simply not utilizing a tool that they either developed or purchased. Working partially from two systems is a fantastic way to forget mission critical materials.

- Staff not using correct terminology caused confusion on multiple instances, including for this monitor attempting to audit Fulton's data. In pre-election reports, Fulton reported that they had "processed and scanned" 127k ballots. The term "processed" was used multiple times and by different teams, which indicates organizational silos and led to confusion because SHS thought that "scanned" meant literally scanned instead of having the barcode read and processed through MVP. In actuality, few ballots had actually been scanned in the pre-election period.

   - This same problem was evident when a staffer told SHS that ballots had been "found" instead of "cured." It is a distinction with dire consequences.

- The entire Fulton team must be more aware of the optics of their actions in such a high-scrutiny environment. It was a judgment call, but I still think that bringing ballots in through the back door on 11/5 was the wrong call for transparency purposes. It would have ignited a media firestorm if the Fulton team had not immediately held a press conference afterward. By far the worst maneuver for optics occurred on Saturday in using the OPEX cutters to count ballots. Aside from being slower than counting by hand, this gave the impression to everyone (myself included) that they had found more ballots after the deadline. I personally had to talk to the media and the party poll watchers, who were all understandably concerned by what was appearing to happen, to tell them that those were empty ballots being counted.

- In the "Provisional Ballot Recap Notice," Fulton stated that 1,205 people were "Not found in Express Poll, researched and found to be registered in Fulton County, U.S. Citizens, and ballot not challenged." Why were that many people not in the Fulton system and required to vote provisional?

- The OPEX scanners require constant re-calibration. The machines being out of calibration and failing to operate properly generated more work for workers that were



already exhausted and stretched thin. Fulton should either insist that OPEX techs remain available for service calls during election crunch time or dispatch a large number of letter openers to vote processing centers as a backup plan for the inevitable failure of the technology.

## III.   The Risk-Limiting Audit

- There were persistent chain of custody issues throughout the entire RLA process. From ballots being left unattended in front of party audit monitors to unsealed bags being transported for storage to zip tie seals being left unattended to not recording the seal numbers placed on the ballot bags, Fulton's system is plagued with these procedural issues. They must strengthen their chain of custody systems to follow the strict guidance in the O.C.G.A. code given the (inter)national significance of the processes happening here.

- Additionally, regarding proper seals, Fulton staff complained that the stickers provided by the Secretary of State's office for sealing cardboard boxes do not stick to tape and cardboard. I even noticed a few that had just fallen off boxes of absentee ballots. Would it be possible to change vendors for these stickers and provide counties with something more robust?

- Transparency is of utmost importance, and the party audit monitors are completely necessary, but the parties must strengthen their vetting procedures for their monitors, train them on the process they are observing, and brief them on their roles. Furthermore, it is my suggestion that repeat offenders who show a frequent disregard for the rules should be barred from serving as monitors again.

- Fulton was initially slow to report their numbers into Arlo because they only had one login. Then, to catch up they overcompensated and assigned too many staff to work on data entry. Is it possible to split the difference and provide Fulton (and the other large population counties) with more Arlo logins from the beginning? Fulton leaders were complaining that they should have more than the one they were initially assigned so that they could better manage the workload.

- There was a clear training deficit for auditors working through the new audit process. For future RLAs, additional guidance should be provided about how/when to use the manila envelopes, what constitutes clear voter intent (checkmarks, bubbles, or x's), and large number batch counting best practices to remove as much confusion as possible from the audit process.

- Following the procedure detailed in the training video, audit teams quickly ran out of envelopes for write-ins, under-votes, undecideds, etc. It is imperative that the Fulton team have a back-up supply of these envelopes for the next RLA so that their team does not have to scramble to help those working according to official procedure.



- Some of the precinct batches (particularly for early voting) were massive (3,500+), which increase human error due to fatigue as well as call into question the policies regarding leaving the audit table for necessary bathroom and food breaks. Is it possible to split batches larger than 1,500 to mitigate these issues if proper ballot manifests are kept?

## III.   The Recount

- Cardboard seems to be an insufficient storage method for document retention. Glancing at the boxes, it is clear to see that many of them have been crushed by the weight of the other boxes on the pallets upon which they were loaded. Additionally, the leak at State Farm Arena – though certainly anomalous – revealed the necessity for a more robust and potentially waterproof system for document retention.  SHS recommends using plastic storage bins instead of cardboard for future election cycles.

- Generally poor records keeping led to a multitude of procedural problems for Fulton throughout the recount process.  The poor managerial decision at the Fulton warehouse to reclaim ballot bags for then-upcoming December runoff and mix ballots of different types (e.g. early voting and Election Day) together for "deep storage" required additional rounds of scanning during the recount because the wrong ballots were scanned on two separate occasions.
    - In contravention to what they had done on Count 3 (during which they labelled all Election Day boxes with the precinct numbers on outer labels), all of Count 4's Election Day ballots were simply being placed in boxes marked "ELECTION DAY" but with no precinct information visible on the outside. This became a problem later when they had to retrieve particular batches because they had been overlooked during scanning.  This may have produced a chain of custody issue at the end as two Fulton leaders were sending out individual ballot batches instead of full boxes to make sure that each batch contained only Election Day ballots as expected. They were careful to correctly complete the coversheets for each batch, but it would not be difficult for a batch to be forgotten or fall to the wayside as it changed hands.

- Transparency is of utmost importance, and the party monitors are completely necessary, but the parties must strengthen their vetting procedures for their monitors, train them on the process they are observing, and brief them on their roles. Furthermore, it is my suggestion that repeat offenders who show a frequent disregard for the rules should be barred from serving as monitors again.  Throughout the time at GWCC, the party monitors flagrantly disobeyed guidance from Fulton staff and GWCC police regarding the mask policy and taking photos/videos of the procedure. One monitor even yelled, "THIS IS TREASON UNDER PENALTY OF DEATH!" in the face of a Fulton manager who was simply trying to check his party monitor credential – which he turned out to not have – for sign-in.

- SHS had received reports of several unsealed ballot bags, and hunted down the bag numbers to investigate. SHS found four unsealed ballot bags that were clearly marked



with zero counts on the exterior labels. For future best practices, it is encouraged that staff seal every ballot bag regardless if it's empty to mitigate accusations of "magic ballots" appearing from thin air. Additionally, if ballot bins are empty, it is a good idea to place the tops in them so that it is clear to monitors that the box is empty and is not an unsealed ballot bin.

- Technological issues abounded during the recount. The server crash on November 29 was a costly error caused by a failure to properly follow protocols for backing up and uploading data to the servers. This mistake cost Fulton taxpayers several days' worth of staff time as the entirety of the ballots had to be rescanned for a fourth time. Additionally, the small typographical mistake of accidentally naming two scanners "ICC16" on the fourth count led to a great deal of confusion and another full day of staff time for solving the problem. Fulton technological team must work more slowly, carefully, and in accordance with all protocol to ensure that these mistakes do not happen in the future.

## V.    The Runoff Election

- When it comes to communicating with monitors, it is encouraged to keep comments short and to the point without much editorialization. Early in runoff proceedings, Ralph Jones had a good faith conversation with several GOP monitors, one of which had declined to sign the sheet that said he would not record in the processing center. It turned out that that gentleman refused to sign because he was, in fact, wearing a recording device, and recorded Jones' answers to his question without Jones' knowledge. These monitors then submitted an eight page complaint to the SOS quoting long passages from their nearly 45 minute conversation.

- Monitors were very concerned about compact flash memory cards being left in scanners in the L&A side of the warehouse. Additional training regarding election security protocol is required to mitigate alarmist fears that these memory cards are arriving at precincts pre-loaded with votes.

- Parties must fully brief monitors on their role and the appropriate limit of their duties. Multiple monitors told me that they had been recording the license plates of the staff that parked in the deck as well as on the L&A side of the warehouse as "evidence." This seems like a massive invasion of the privacy of the election workers. It is recommended that Fulton County put pressure on the county wings of political parties to have greater accountability for the actions of the people to whom they provide monitoring credentials.

- Fulton was having an accuracy problem due to the data entry required to verify the signatures on received ballot envelopes. In order to improve both speed and accuracy it is recommended that Fulton provide barcode scanners to all signature verifiers in the future. These scanners allow workers to go directly to the correct voter page in ENET without worrying about typographical errors. This system was deployed with great success during the second half of the runoff.



- Fulton staff must be careful to accurately enter data into ENET. SHS received several reports of voters receiving multiple absentee ballots (N.B. not ballot applications) during the runoff. Additionally, there were widespread stories of voters showing up at the polls and being told that they had already voted. Taking voters' claims of not having voted at face-value and as the entire system is built to catch double voting, the only logical explanation for this problem is that an election worker incorrectly pulled voter information in ENET at some point. Extra training on ENET accuracy must be conducted in future elections.

- While I vehemently disagree with the assertion that proximity is tantamount to transparency, it would have alleviated a great deal of stress on Election Day if Fulton had initially provided more access to the party monitors. The floor was set up to allow more access, but the potential of the "cattle calls" was not utilized until it became a necessity. Additionally, SHS suggested that the blue barriers be removed from the UOCAVA duplication station on 12/30, but my suggestion was not followed for the worthy cause of ballot security. Unfortunately, the perceived lack of transparency led to a court order that immensely disrupted Election Day processes. If Fulton had more actively allowed monitors to approach election processes, then it would have been easier for them to see that Fulton had absolutely nothing to hide. The resultant overcompensating backlash left many staff fearing for their personal safety due to monitors violating the photography rules, staff receiving threats on social media, and astoundingly poor mask hygiene by monitors. Furthermore, the increased access to the ballot cage generated a considerable ballot security concern due to the proximity of partisan monitors to ballots being processed.

- A persistent impediment to continued processing was the rate at which ballots were transported from Pryor St to GWCC. While most days that can be attributed to sending all ballots that they had received, on Election Day there must be a faster turnaround. Though three ballot bins had been delivered at 7:04PM, it was not until 11:30PM on Jan. 5 that five bins arrived at GWCC from the 7pm collection of ballot drop boxes. At that point most of the election staff had already gone home due to a lack work, but the massive tide of ballots to be processed made it impossible to finish processing in its entirety on election night. If the Fulton team had dispatched the ballots sooner – even in smaller batches – then perhaps everything could have been finalized on Election Day.

  This same problem was repeated on Friday, Jan. 8. The tremendous GWCC team had waited all day for provisional ballots to arrive from Pryor St, but it was not until 3:47PM that four ballot bins were delivered. A large portion of the staff clocked out at 4:30PM, but the remaining team was left working until 8:15PM to handle the workload while shorthanded. This could have been mitigated by sending smaller batches of ballots as they became available.

# EXHIBIT 7

1     discussion, all those in favor signify by saying

2     aye.

3           **THE BOARD MEMBERS:**  Aye.

4           **MR. FERVIER:**  Any opposition?  Hearing no

5     opposition, so moved.

6           The chair at this point would entertain a

7     motion to recess for 45 minutes for a lunch

8     break.

9           **MS. GHAZAL:**  So moved.

10          **DR. JOHNSTON:**  Mr. Chairman, I move that we

11    recess 45 minutes for a lunch break.

12         **MR. FERVIER:**  We have a motion and a second.

13    All those in favor?

14         **THE BOARD MEMBERS:**  Aye.

15         **MR. LINDSEY:**  Could the young lady who

16    raised the complaint about a Gwinnett County

17    board member come -- come up?  Yeah.  Could you

18    come up?

19         (Recess)

20         **MR. FERVIER:**  We'll call back to order the

21    meeting of the State Election Board.  And as

22    promised, we're going to start with a -- out of

23    order with SEB2023-025, Fulton County tabulator

24    results 2020 general election.

25         Do we have a respondent here for that case?

1          **MS. BRUMBAUGH:**  Yes.

2          **MR. FERVIER:**  Thank you.

3          Would the investigator please -- we'll

4     recognize Charlene McGowan with the Secretary of

5     State's Office.

6          **MS. MCGOWAN:**  Thank you, Mr. Chairman.  I'm

7     going to assist Investigator Brunson in the

8     presentation of this case.  It's -- as you know,

9     this case has presented -- or generated a great

10    deal of speculation online, and there's been a

11    lot of chatter about it.  So I just want to start

12    out the presentation of this case by giving the

13    board some big picture context of what happened

14    here.

15         So the complainants in this case claim that

16    there is missing documentation for about 42,000

17    votes for the recount of the presidential contest

18    in the 2020 general election.  This is simply not

19    true and it's not corroborated by the findings of

20    this investigation.

21         We know there are not missing votes because

22    we have the paper ballots that document those

23    votes for this election.  The paper is the record

24    of the vote.  It is the most important document

25    and it is what is used to tabulate the vote and

1    to tabulate the results.  So as long as we have

2    that paper ballot, we have the paper trail that

3    accurately records the voter's choices.

4        Now, we have all of the paper ballots for

5    Fulton County for the 2020 election.  And we know

6    that because we have counted those paper ballots

7    three times.  They were counted in the original

8    tabulation, they were counted by hand in the

9    risk-limiting audit, and then they were counted

10   again during the machine recount which is what is

11   at issue in this case.

12       And all three counts confirmed the results

13   of the presidential contest in 2020.  So you will

14   hear a great deal during this presentation about

15   documents such as ballot images, batches loaded

16   reports, and tabulator tapes.  And all of those

17   documentation, they're all very important.  And

18   we expect that the counties will keep those,

19   maintain those, and make sure that they are

20   complete.

21       But it's important to note that they play no

22   role in the actual tabulation of results in an

23   election.  Again, those results are determined by

24   the paper ballots which we have for 2020.

25       And the conclusion of this investigation

1    which we will get into the details of in a minute

2    is that Fulton County used improper procedures

3    during the recount of the presidential contest in

4    2020.

5         The investigation also shows that there are

6    some duplicate ballot images in the ballot images

7    that Fulton County provided.  And this suggests

8    that some ballots may have been scanned more than

9    once.  But what cannot be decided conclusively or

10   confirmed conclusively is whether or not those

11   duplicative ballot images were included in the

12   count.  So we don't know for certain whether or

13   not those were in the tabulator results.  And we

14   will get into why that is during the case

15   presentation.

16        I also think it's important to note that

17   what happened during the recount was documented

18   in real time.  So we know what happened back in

19   2020.  And the results of this investigation

20   don't change any of the things that we already

21   knew back then.  It simply confirmed what

22   everyone already knew.  And the reason we already

23   knew that is because there's contemporaneous

24   documentation of what happened back in 2020.

25        This very board appointed an independent

135

1    monitor to monitor Fulton County throughout the
2    2020 election including during the recount.  And
3    the monitor's report notes what happened during
4    the recount and we have that as part of this
5    investigative file.

6         The Secretary of State's Office was aware of
7    what happened at the time.  And the secretary's
8    office worked with Fulton County to make sure
9    that they got to the -- the final and correct
10   results of the recount.  And what happened is
11   also recorded in the board meetings -- or the
12   board minutes of Fulton County's board of
13   elections meetings that they had to certify the
14   results of the recount.

15        So we know what happened at the time.  The
16   investigation has confirmed what we already knew,
17   and there's nothing new that we have learned as a
18   result of this investigation.  And most
19   importantly nothing about this case changes the
20   results of the 2020 election.  Those results are
21   accurate.  They were accurate at the time, in
22   2020, they are still accurate now, and nothing
23   about this investigation changes that.

24        And I will turn it over to the investigator
25   now to present the details.

1          **MR. BRUNSON:**  Okay.  The Georgia Secretary
2     of State opened this investigation after the
3     State Election Board referred this complaint
4     filed by complainants Kevin Moncla and Joseph
5     Rossi alleging Fulton County did not properly
6     perform a recount of the presidential contest in
7     the 2020 general election, quote/unquote, called
8     the recount.
9          In this complaint dated July 8, 2022, the
10    complainants allege, number 1, they identified
11    irregularities in the recount, namely 17,852
12    votes of unknown providence.  Number 2, there
13    were 3,125 duplicate ballot images contained in
14    the ballot images from the recount produced by
15    Fulton County.  Number 3, the original tabulation
16    includes results for ten advance voting
17    tabulators for which Fulton County does not have
18    the tabulator tapes.  And, number 4, that an
19    individual by the name of Ryan Macias had
20    communication with former Fulton County elections
21    director Richard Barron about the alleged
22    discrepancy with the election night and recount
23    results but was not a Fulton County employee or
24    contractor.
25         Complainants allege that collectively there

137

1    appeared to be no paper documentation of ballots

2    for nearly 42,000 votes, a potential violation of

3    recount procedures in O.C.G.A. 21-2-495 and SEB

4    rule 183-1-15-.03(1).

5        So as a result of background information in

6    the 2020 general election, the original certified

7    results from Fulton County included 528,777 total

8    ballots cast.  There was a reported total of

9    524,659 votes cast in the contest for president

10   of the United States, including 137,240 or

11   26.16 percent votes for then-incumbent president

12   Donald Trump and 381,144 or 72.65 percent votes

13   for Joseph Biden and 6,275 or 1.2 percent of the

14   votes for Jo Jorgensen.

15       Following a recount of the presidential

16   contest requested by then-president Donald Trump,

17   Fulton County recertified the results on

18   December 7, 2020.  The recertified results

19   reported 527,925 total ballots cast, a difference

20   of 00.16 percent, and 523,779 total votes cast in

21   the presidential contest, a difference of

22   .16 percent including a 137,247 votes for

23   then-incumbent president Donald Trump, a net gain

24   of seven votes; 380,212 or 72.59 percent votes

25   for Joseph Biden, a net loss of 932 votes and

1    6,320 votes for Jo Jorgensen for a net gain of 45

2    votes.

3         In preparation for the 2020 general election

4    and pursuant to an October 2020 consent order,

5    the State Election Board contracted with Seven

6    Hills Strategies to serve as an independent

7    monitor for the 2020 general election.  One --

8    one of Seven Hills Strategies' responsibilities

9    was to observe tabulation on election day and any

10    postelection audit or recount.

11         On January 12, 2021, following the general

12    election and subsequent runoff elections, Seven

13    Hills Strategies prepared and submitted a

14    postelection executive summary which is Exhibit

15    Number 3 in the investigation.  The summary

16    indicated the monitor observed every aspect of

17    the respondent's election processes and at no

18    time was dishonesty, fraud, intentional

19    malfeasance observed.

20         Under the topical heading, quote, The

21    Recount, the executive summary noted several

22    issues that included poor recordkeeping which led

23    to other procedural problems for Fulton County

24    throughout the recount process, namely Fulton

25    County failed to properly follow protocols for

1      backing up and uploading data to servers

2      resulting in errors.  And Fulton County

3      inadvertently named two scanners with the same

4      name causing delays in the completion of the

5      recount.

6           In August 2021, pursuant to a request from

7      the members of the Georgia General Assembly, the

8      SEB appointed a performance review board to

9      examine issues with Fulton County's election

10     process.

11          On January 13, 2022, the PRB issued a report

12     of its findings which is Exhibit Number 4 in the

13     complaint.  On page 9 of the report, under the

14     topical heading, Double Scanning of Ballots, the

15     PRB noted one of the allegations leading to the

16     General Assembly's August 2021 request for this

17     review was that ballots were being

18     double-scanned.

19          The PRB further referenced this report in

20     part and a contributing factor to the possible

21     double-scanning of ballots likely included poor

22     batch management and storage practices, quote,

23     also a contributing factor in errors in the

24     hand-count audit and the recount.

25          The Seven Hills Strategies and the PRB

1    provided their findings to the SEB in 2021 and
2    2022 respectively for review.  The SEB voted not
3    to pursue further legal actions against the
4    respondent.
5        In July 2022, complainants Joseph Rossi and
6    Kevin Moncla filed a complaint with the State
7    Election Board alleging several anomalies that I
8    discussed in the introduction.
9        So now we'll get into the investigative
10   summary.  So our attorney already talked about
11   some of the background.  So we'll get into
12   complaint number 1.  The complainants allege they
13   observed 3,125 duplicates in the ballot images
14   for the recount produced by Fulton County.  The
15   SOS investigations division reviewed the
16   documentation submitted with the complainant and
17   subsequently sent three investigators to the
18   Fulton County elections office to conduct an
19   independent review of the batches of ballot
20   images identified by the complainants.
21       The SOS investigators confirmed, as a result
22   of this review, that the batches of ballot images
23   matched the description provided by complainants
24   and that there were sequence of ballot images
25   that appeared to repeat but in a different

1    sequential order in the second batch.

2        While at Fulton County, SOS investigators

3    observed a total of 3,182 ballot images meeting

4    this description.  Of the 3,182 ballot images,

5    the votes in the presidential contest included

6    1401 votes for Donald Trump, 1713 votes for

7    Joseph Biden, 52 for Jo Jorgensen, and 16 ballots

8    on which the presidential contest was left blank.

9    The respondent subsequently provided the SOS with

10   approximately five thousand -- 518,960 ballot

11   images in response to a subpoena.

12       The SOS investigations division conducted an

13   in-house review of the same identified batches of

14   ballot images to further determine how many

15   alleged repeated ballot images were hand marked

16   and how many were BMD-printed ballots or machine

17   ballots.  The results of that analysis came close

18   to the results the complainant reported in the

19   initial complaint.  However, in the complaint the

20   complainants listed two batches of ballot

21   images -- images in tabulator 5162, batch 001,

22   with 20 ballot images and batch 002 with 97

23   ballot images that were reportedly repeated

24   images.  Both batches combined totaled 117 ballot

25   images.

1          Following a comparison of the images

2     identified in tabulator 5162, only 20 of the a

3     hundred and seventeen were identified as repeated

4     images, thereby resulting in the final total of

5     3,075 repeated ballot images of which 1806 were

6     images of BMD ballots and 1269 were images of

7     hand-marked paper ballots.

8          The hand-marked paper ballot images appeared

9     to be repeated because of unique identifying

10    marks.  The BMD printed ballots contained the

11    same selections, but because there were no

12    distinct markings on these ballots -- ballot

13    images, investigators could not definitively

14    identify them as duplicate or repeated ballots.

15         SOS supervisor, Investigator Gilbert Humes

16    and Investigator Lance Patterson subsequently met

17    with and interviewed Richard Barron who's the

18    former director of elections for Fulton County.

19    They asked him about his recollection of the

20    recount process and his communication with the

21    Secretary of State's Office regarding the delay

22    in completing the recount.  Barron indicated

23    during that interview that he could not recall

24    specifics of what occurred.

25         He stated that Dwight Brower was number 2,

143

second-in-command, and that -- and as the acting
elections director during the recount, he placed
warehouse manager Nadine Williams in charge of
the recount.

Investigator supervisor Hume subsequently
spoke with Nadine Williams who's the current
elections director and inquired about the ballot
images identified in the complaint.  Williams
confirmed she managed the recount.  However,
Barron was regularly kept informed of everything
and all the processes that were established for
the recount were established by the executive
leadership team, and ultimately he made the
executive decisions on how things were to operate
and proceed.

Director Williams told investigators because
the same groups of sequentially ordered ballot
images were found in two separate batches but in
a different sequential order in the second batch,
it was most likely the result of poor batch
management during the recount.  This was an issue
that was brought to light in 2021 and changes
have since been made by Respondent to the ballot
scanning process.

During the recount Respondent had one person

144

1    assigned per scanner and that person was

2    responsible for scanning the batches and after

3    scanning each batch, placing the scanned batches

4    in a box marked "completed batches."

5         According to Williams, when she became

6    elections director, she assigned two persons to a

7    scanner to scan batches.  This method allowed one

8    person to focus on their prescanning

9    responsibilities which was to make sure each

10   batch was properly named and required scanning.

11   And the second person was to focus on their

12   postscanning responsibilities which was to assure

13   scanned batches were scanned properly, labeled

14   correctly, and stored in its correct location to

15   avoid double-scanning, misplacing batches, or

16   missing a batch that required scanning.

17        Williams further reported the implementation

18   of this process was successful as the 2022

19   general election process experienced far fewer

20   problems than in 2020.

21        Director Williams further reported

22   employees' resignations and/or not reporting to

23   work due to the COVID-19 pandemic resulted in a

24   decrease in available staff in 2020.

25        The SEB-appointed monitor's executive

1    summary described the recount process by the
2    respondent as follows:  Quote, generally poor
3    recordkeeping led to a multitude of procedural
4    problems throughout the recount process.  For
5    example, the monitor observed that Fulton County
6    leaders were sending out individual ballot
7    batches instead of full boxes.  And with this
8    process, it would not be difficult for a batch to
9    be forgotten or fall to the wayside as it changed
10   hands.
11        When this practice was discussed with
12   director Williams, she acknowledged such
13   practices as those identified by the monitor
14   could have potentially led to ballot images being
15   uploaded twice during the recount but could not
16   state for certain whether that was the cause of
17   the potential duplicative ballot images.
18        Respondent reported that since 2020, they
19   have implemented processes to make sure that
20   after full batches of ballots are scanned, they
21   are immediately secured in an area designated for
22   already scanned batches.
23        So that's complaint number 1 as far as
24   the -- the investigation.
25        Complaint number 2.  The complainants allege

1    that in reporting results to the Secretary of

2    State for the recount, respondent initially

3    submitted vote totals of 511,543 which is lower

4    than that of the original count from election

5    night which was 528,777.

6        Complainants further allege that

7    approximately 12 hours after reporting the

8    recount vote of 511,543, the respondent's

9    reported a recertified vote count total for the

10   recount of 527,925, an alleged increase in votes

11   counted of 16,382.

12       It is important to note throughout the

13   complaint, the complainants erroneously conflate

14   the number of total ballots cast and the total

15   votes counted in the presidential election.  The

16   distinction between the two is important because

17   there were nearly 4,000 ballots cast in Fulton

18   County that left the presidential contest blank.

19   So the number of total ballots cast would be

20   greater than the votes cast in the presidential

21   contest.

22       According to the complainants, they allege

23   the respondents submitted election night vote

24   count totals of 528,777, which is inaccurate

25   because that number is the total ballots cast,

147

not the total votes counted in the presidential

contest.

According to the original certified results,

the correct number of total ballots cast in

Fulton County for the 2020 general election

presidential contest with 528,777 and the total

votes counted was 524,659. And that's part of

Exhibit Number 5. Approximately 4,118 ballots

did not record a vote in the presidential contest

either because the voter left it blank or the

ballot contained an overvote.

In support of complaint 2, the complainants

relied on two batches loaded reports they

received from Fulton County in response to an

open records request. Complainants alleged that

the first batches loaded report, BLR-1, indicated

511,543 votes were tabulated and published. And

the second batches loaded report indicated

527,741 votes were tabulated and published.

Complainants questioned how the respondent was

able to, quote/unquote, find more than 16,000

votes between BLR-1 and BLR-2.

The complainants pointed out that a batch

loaded report is a product of the Dominion

Election System's server, EMS, that shows all

1    batches of ballots that have been counted along
2    with the status of each batch.  However, a county
3    is not mandated or required to use the BLR
4    feature in EMS, nor is the BLR used to report
5    election results to the Secretary of State's
6    Office.  Rather it's a mechanism that exists to
7    any counties for the tracking and reconciling of
8    batches and number of ballots scanned.
9        The BLR is also a running document, meaning
10   it is one document in which the totals will
11   constantly change when updated and each update
12   overrides the previous total amount.  In column H
13   of the BLR in the complaint, the column reads
14   "published."  It should be noted for the record,
15   published means the data can be viewed and/or
16   printed in report format.
17       Respondents provided the SOS investigation
18   division with a final BLR and the final tally on
19   the BLR for the recount was 527,925, which is
20   Exhibit Number 6 in the report.  Through the
21   com -- throughout the complaint, the complainants
22   incorrectly referred to ballots cast as votes
23   counted and referenced that a BLR was used by
24   Fulton County to report official vote count
25   results when such report is not used for that

1    purpose.

2         The question remained as to how Fulton

3    County reconciled the discrepancy between BLR-1

4    and BLR-2.  Counties report all official election

5    results through the Election Night Reporting or

6    ENR system.  Each county will gather all the

7    election results, prepare a report, and upload

8    the final official results into Dominion's

9    Election Management System or EMS Results Tally

10   Reporting, RTR, System.

11        The RTR is the main application for

12   postvoting activities.  It receives election

13   results from the tabulators, allows for

14   validation of the results, and reports the

15   results.  The counties are then required to

16   export and upload the RTR results into the ENR at

17   which time the election results are received by

18   the Secretary of State's Office.

19        This is the process that all counties follow

20   when reporting election results information to

21   the Secretary of State.  During the recount,

22   Fulton County performed three uploads reporting

23   results with the first being on December 3, 2020,

24   at 12:16 a.m., showing total ballots cast as

25   525,365 with total votes cast in the presidential

150

contest as 521,452, which is Exhibit Number 7.

The second upload was on December 3, 2020, at 11:04 p.m., showing total ballots cast as 527,925, the total votes cast in the presidential contest as 523,779.  That's Exhibit Number 8.

And the third upload was on Friday, December 4, 2020, at 12:27 p.m., showing total ballots cast as 527,925 with total votes in the presidential contest 523,779, same as the second upload, Exhibit Number 9.  Respondents also provided the corresponding reports to support the numbers uploaded into the ENR.

SOS investigators interviewed director Williams regarding the BLR and the uploads to the RTR for the recount.  She reported that certain batches of the ballots were initially scanned with an ICC or ImageCast Central scanner programmed with the same tabulator and batch number.  So the RTR interpreted them as one and rejected scanned ballots as a duplicate batch.

Respondents looked into the cause of the discrepancy and eventually isolated the discrepancy to the duplicative programming of the ICC scanner.  This issue was corrected by separating all 97 batches scanned on the

1    duplicate ICC and rescanning them for accurate
2    reporting on the RTR.
3        Prior to rescanning, Fulton County made sure
4    representatives -- representatives from each
5    political party, the SEB's independent monitor,
6    and others were aware of the discrepancy, what
7    caused the discrepancy, and were present to
8    witness the rescan.  Respondent's confirmed at
9    that point they had a total of 506,127 scanned
10   ballots.  After they rescanned the initial
11   rejected batches of ballots totaling 21,798 votes
12   from the tabulator 816, Exhibit 10, the final
13   total of ballots scanned was 527,925.
14       Respondents acknowledged BLRs were
15   referenced during the status update discussion
16   about the discrepancy but only used them as a
17   reference in trying to determine what went wrong
18   and how far off they were in the count.  There is
19   no record of the respondents submitting official
20   results to the Secretary of State's Office on
21   December 2, 2020.
22       Complainants have further alleged that
23   Respondent failed to provide all ballot images
24   from the recount in response to an open records
25   request.  In response to an investigator's

1    subpoena, Respondents provided to the SOS

2    investigations division a thumb drive that

3    contained 518,906 ballot images from the

4    December 2020 recount, which is Exhibit Number

5    11.

6         Respondent reported during the recount

7    Dominion Voting Systems loaned Fulton County four

8    scanners for the recount.  Respondent was unsure

9    exactly which counties Dominion had borrowed the

10   scanners from and those scanners have since been

11   returned.  The SOS investigations division asked

12   Respondent to provide documentation to

13   corroborate this account.

14        Respondent further noted that the memory

15   cards that were used in the borrowed scanners

16   have since been redistributed and used in

17   subsequent elections.

18        As noted in the SEB monitor's January 2021

19   executive summary, Fulton County acknowledged

20   that technical issues during the recount that

21   include failure to properly follow -- follow

22   protocols for backing up data to servers, as a

23   result, while Respondent may not have all the

24   ballot images, they do have all of the physical

25   ballots which are still being preserved under

1    seal due to a pending litigation hold.

2         Complainants allege that ballot images

3    should have been available, claiming in a

4    separate e-mail to SOS investigators that all

5    ballots of an entire batch must be scanned

6    successfully for it to be accepted and processed,

7    Exhibit Number 12.

8         The system would only accept ballots in a

9    batch -- and this is -- this is from the

10   complainants.  The system would only accept

11   ballots in a batch and not just single ballots.

12   There is no way in which an election worker could

13   choose to save or not save ballot images as the

14   only prompt they're given is to either accept or

15   reject the batch by selecting yes or no.  If the

16   worker selects yes, then the entire batch,

17   including the ballot images for every ballot in

18   the batch, is process as one unit.  If the worker

19   selects no, then the worker must start over and

20   scan the entire batch.

21        This assertion is partially correct as this

22   only applies to counties whose central scanners

23   and servers are housed at the same location.

24   With Fulton County, their central scanners and

25   EMS results tally and reporting workstation

154

1    during that time was housed at different

2    locations.  And therefore the respondents had to

3    follow a different process to import election

4    results.

5        This process required county workers to

6    first download the results onto a form of

7    removable media.  They then had to upload the

8    results from the media into the RTR workstation

9    at the second location.  During the upload

10    process, the RTR provides the users three options

11    which to choose.  The user can select the box for

12    load results file, load ballot images, load log

13    file, or choose all three.

14        If the load result file is the only option

15    selected, which was a required option, then no

16    ballot images would be uploaded into the RTR.

17    Therefore, it is important to note that ballots

18    can be scanned and tabulated without capturing

19    ballot images.

20        Fulton County further highlighted that their

21    new location now houses both the central scanners

22    and the EMS results tally reporting workstation

23    server, therefore every ballot scanned will

24    automatically create the results file, ballot

25    image file, and log files at the time is scanned.

1    They no longer have to go through the import

2    process.

3        Furthermore, the preservation of ballot

4    images was not required in 2020.  It was not

5    until the passage of Senate Bill 202 in 2021 that

6    ballots images were deemed public records subject

7    to public inspection under the Georgia open

8    records act.

9        Finally the complaint -- or not finally but

10   complaint number 3, the complainants allege the

11   original election night vote count included

12   results for ten advance voting tabulators --

13   tabulators, also called precinct scanners, for

14   which Fulton County has no records.  In support

15   of this claim, the complainants reported that

16   they submitted an open records act request for

17   the tabulated tapes for ten advance voting

18   precinct scanners in response -- in response to

19   an open records act request.  And a Fulton County

20   employee responded to the request by stating the

21   requested documents do not exist.

22       Complainants thus concluded that no

23   documentation for the ten advance voting

24   tabulator exists and that no documentation of the

25   ballots tabulated on those scanners exist.

1          It is important to note the purpose of the
2     tapes.  The tapes are produced by the precinct
3     scanner after the polls have closed.  They serve
4     as a paper back-up to the memory card that stores
5     ballot tabulation and are not part of the process
6     by which official results are reported by
7     counties to the Secretary of State.
8          On January 8, 2024, the respondent advised
9     SOS investigators that they have all
10    documentation for their precinct scanners in
11    question.  However, storage issues have been
12    complicated after Fulton County relocated all of
13    its records to its new warehouse.  The respondent
14    escorted SOS investigators to the location where
15    the 2020 election records were being stored and
16    said that they would search for supporting
17    documentation and provide it to investigators.
18         Between March 5, 2024, and May 3, 2024, the
19    respondent provided the Secretary of State's
20    investigators with documentation on the ten AB
21    tabulators, and that is in Exhibit Number 13(a)
22    through (j) in the file.
23         This evidence consists of zero tapes opening
24    the polls, zero count forms, daily recap sheets,
25    and result tapes.  The respondents also provided

1   photographs of nine of the ten scanners,
2   including their serial numbers.
3        She also provided sworn affidavits from
4   eight poll managers who attested that the ICP
5   scanners in question associated with the advance
6   voting locations that they managed existed and
7   were utilized by voters to scan their ballots
8   during advance voting for the November 3, 2020,
9   election.  Accompanying each affidavit was a copy
10  of a tape, either zero or results or a recap
11  sheet to -- to show signatures on the affidavits
12  matched those on the election record.
13       Fulton County provided documentation to
14  evidence the existence of the ten tabulators in
15  question which show 12,799 of the 20,713
16  in-question ballots.  Respondent advised they
17  were still in the process of searching through
18  approximately 700 boxes of 2020 records for the
19  recap sheets and results tapes for the AB
20  locations.  The actual paper ballots are also
21  still preserved.
22       The complainants assumption that because
23  tabulator tapes have not been produced and the
24  paper ballots themselves are unaccounted for is
25  simply incorrect.

1          Complaint number 4:  The complainant alleged
2     that an individual by the name of Ryan Macias had
3     communications with former Fulton County
4     elections director Richard Barron about the
5     discrepancy with the election night -- the
6     recount vote results.
7          Complainant stated Macias was not a Fulton
8     County employee, Happy Faces employee, Fulton
9     County contractor, nor a Fulton County vendor.
10    Respondent provided a memorandum of understanding
11    between The Elections Group, LLC where Macias was
12    employed and Fulton County Board of Elections and
13    Registration which was signed off by the Fulton
14    County manager and Fulton County attorney
15    approving The Elections Group to serve as a
16    consultant for the 2020 general election.
17         So we can get into the investigative
18    findings.  For complaint number 1, the
19    complainant's allegation that Fulton County had
20    multiple batches of ballot images that were
21    repeated in another batch was partially
22    substantiated.  The investigation identified a
23    series of BMD printed ballots and hand-marked
24    ballots repeated in the same order in a separate
25    scanned batch from the first batch.  A review of

1    the hand-marked ballot images appeared to be

2    duplicate ballot images based on the unique -- on

3    the unique markings on the ballot.  However,

4    regarding the BMD-generated machine ballots, the

5    selections were the same but there was no

6    distinct markings on these ballot images to

7    positively identify them as duplicate ballot

8    images.

9        The investigation also submit --

10   substantiated that resident -- respondents did

11   not follow proper batch management procedures for

12   the recount in violation of SEB rule

13   183-1-15-.03.

14       Following the submission of the initial ROI,

15   or report of investigation, the investigation

16   division conducted further inquiry with technical

17   experts and learned if an error occurs while

18   images are moved over to the results tally

19   reporting system for processing, it will require

20   that the particular batch with the error to be

21   rescanned.  When those images are rescanned, the

22   second scan creates a new batch with the same

23   previously scanned images.

24       At this point there are repeated images as a

25   batch was required to be rescanned.  However,

only the batch that is published and validated is
included in the results.  As a result of this,
there are instances where a county may have
repeated images without the repeated images being
included in the tabulated results.

Complaint number 2:  The allegation that
Respondent uploaded vote totals of 511,543 which
was 17,234 votes fewer than the votes counted on
election night was unsubstantiated.  The
investigation uncovered that the complainant
conflated ballots cast with total votes.  As a
ballot can be cast without a vote for the
presidential contest, the two terms cannot be
considered interchangeable.

Furthermore the investigation revealed
Respondent reported its recount results late due
to a count discrepancy caused by a scanner
programming error.  As a result, the respondent
did not submit official results until December 3,
2020, which was after the December 2, 2020,
deadline.

Lastly, the document that complainants
relied upon to suggest the respondent submitted
official results on December 2, 2020, was a
batches loaded report.  However, counties are not

1    required to use those forms and the BLR is not

2    used to report official results.

3        Respondent acknowledged BLRs were used in

4    discussions about the discrepancy but only as a

5    reference in determining what the totals were and

6    should have been and determined the cause of the

7    discrepancy.  There is no record of the

8    respondents submitting official results to the

9    SOS on December 2, 2020.

10        Complaint number 3:  The allegation that

11   Fulton County did not have records for ten

12   advance voting locations for the November 2020

13   general election was unsubstantiated.  The

14   respondent provided documentation to establish

15   the existence of the ten tabulators.

16        Number 4:  The allegation that Ryan Macias

17   was not a contractor with the Fulton County Board

18   of Elections and Registration or employee center

19   was unsubstantiated.  The respondents provided a

20   memorandum of understanding signed by the county

21   attorney's office and the county manager's office

22   approving Ryan Macias to serve as a consultant

23   for the respondent during the 2020 election

24   cycle.

25        So for potential violations, there is

1    sufficient evidence to suggest Respondent

2    violated SEB rule 183-1-15-.03, regarding recount

3    procedure, when respondent failed to ensure the

4    recount was completed through a precise

5    controlled process that is sure for each ballot

6    scanner used in the recount, no more than one

7    ballot container was unsealed at any given time,

8    and failed to ensure a clear audit trail was

9    maintained at all times during the recount.

10        And that's the case.

11        **MR. FERVIER:**  Thank you very much.  I think

12    that what we'll do is hear from the respondents

13    first and then if the board has questions, they

14    can ask questions.

15        Would respondents like to -- if you'd press

16    your button, then I will turn on the mic.  Okay.

17        **MS. BRUMBAUGH:**  Hello?  Well, thank you for

18    that very thorough analysis of the allegations.

19    I'd just like to say on behalf of my client that

20    they have cooperated fully with the

21    investigation.  They've spent countless man-hours

22    on it of their own, searching through old boxes,

23    looking for all this documentation from 2020.

24        We don't really disagree with the findings

25    of the Secretary of State's Office.  We would

1   of duplicate counting during that hand recount?

2   **MS. MCGOWAN:**  Not the same thing that we're

3   seeing here.  We -- we did have a prior case that

4   the board took up that involved some -- some

5   issues with the RLA.  But the board already

6   addressed that in a prior case.

7   **MR. FERVIER:**  But the hand recount had

8   substantially similar results to the original

9   election and the machine count.

10   **MS. MCGOWAN:**  Correct.

11   **MR. FERVIER:**  Thank you.

12   **DR. JOHNSTON:**  Question for the

13   investigator.  How would you identify a

14   double-scanned ballot?

15   **MR. HUMES:**  Oh, so basically what we did, as

16   indicated in the report, we identified all of the

17   hand-marked ballots.  We sent a team of

18   investigators to review and analyze each ballot,

19   and they had distinct markings to show that they

20   were repeated ballots on the hand-marked ballots.

21   We looked in -- we determined if there was a

22   write-in, the bubbling of the circles.  If there

23   were distinct characteristics of the circling or

24   the filling in of the bubbles on the ballot, then

25   that's how we determined repeated ballots.

191

1    **DR. JOHNSTON:**  Thank you.  So those -- those

2    would have been counted; correct?

3    **MR. HUMES:**  Not necessarily.  Only because

4    if those ballots were scanned and were part of a

5    batch that was rejected, the images were captured

6    in the system but once rescanned and then it was

7    tabulated and published, then those ballot images

8    would have been captured.  So you can have

9    multiple ballot images without being included in

10   the results.

11   **DR. JOHNSTON:**  So Dominion machines are so

12   smart that they can detect a duplicate ballot?

13   **MR. HUMES:**  A duplicate batch.

14   **DR. JOHNSTON:**  A duplicate --

15   **MS. MCGOWAN:**  Yeah.  It detects the -- the

16   scanner number and the batch number and it can

17   reject things that have the same combination of

18   those numbers.

19   **DR. JOHNSTON:**  Did that occur during this

20   recount?

21   **MS. MCGOWAN:**  Yes.  That's exactly what is

22   detailed in our report.

23   **DR. JOHNSTON:**  That all of the duplicate

24   batches were detected and deleted?

25   **MS. MCGOWAN:**  No, that there was an incident

192

1    where because two scanners were programmed with

2    the same number, that certain batches of -- of

3    ballots were rejected because of that programming

4    error.

5        **DR. JOHNSTON:**  Oh, I understand.  But the

6    report -- the allegation is, from Mr. Rossi, that

7    3,125 duplicate ballots were counted.  I'm -- I'm

8    not talking about the ICC-14 scanner that -- that

9    ballots were misnamed and reloaded on it, I'm

10   talking about 3,125 duplicate ballots that were

11   counted.

12       **MS. MCGOWAN:**  And again, as we concluded and

13   it's in the report, we did partially substantiate

14   that we believe that there are duplicate ballot

15   images.  Whether or not those were actually

16   included in the tabulated results is

17   inconclusive.

18       **DR. JOHNSTON:**  Well --

19       **MR. FERVIER:**  Well, next question --

20       **DR. JOHNSTON:**  Well, what do you believe?

21   What do you believe?

22       **MR. FERVIER:**  Let me ask a question.  You

23   made a comment you didn't know whether they were

24   included, but you just told me that you had three

25   different counts that came up substantially --

193

1    one of them was a hand recount.  So if there were

2    duplicate ballots, it would've shown in the hand

3    recount along with the other two; correct?

4        **MS. MCGOWAN:**  I think that's a reasonable

5    assumption.  Also because the results of the

6    recount were actually lower, somewhat lower,

7    marginally lower than the originally certified

8    results.  So if you had 3,000 ballots that were

9    counted twice, you would expect the results to be

10   larger by that amount.

11       **DR. JOHNSTON:**  Right.  So in the hand re --

12   in the hand count, Governor Kemp's team found

13   6,653 errors or duplicates.  So -- and that was

14   in the count and the totals were given.  And to

15   my knowledge those count totals have never been

16   amended or -- or reversed.  And likewise the

17   3,125 that Mr. Rossi found are -- are duplicate

18   counted ballots.

19       Could I ask Mr. Rossi, is -- am I stating --

20   am I interpreting this correct?

21       **MR. ROSSI:**  I can really help with this and

22   all due respect if I can have just a couple

23   minutes, I think I can clear everything up.

24       **MR. COAN:**  Hit your microphone.

25       **MR. FERVIER:**  Can -- can you --

# EXHIBIT 8

1    reviewed those prior to the hearing.

2        **MR. MASHBURN:**  There's a motion and a

3    second.  Discussion?  No discussion.

4        Is the board ready to vote?  Okay.  All

5    those in favor say aye.

6        **THE BOARD MEMBERS:**  Aye.

7        **MR. MASHBURN:**  All those opposed say nay.

8    Motion passes unanimously to adopt the consent

9    cases as a block.

10       The next thing on the agenda is new cases.

11   With regard to new cases, SEB case number

12   2021-129, DeKalb County, has been continued based

13   on a notice issue.  So that's been continued.

14       So we move to SEB case number 2021-181.

15       **MR. CALLAWAY:**  Yes, sir.  Thank you,

16   Mr. Chairman, members of the board.

17       SEB 2021-181, Fulton County, data review.

18   The complaint was that there was a report of

19   errors in risk-limiting audit numbers uploaded

20   from Fulton County elections to the Georgia

21   Secretary of State.

22       We conducted an investigation using two of

23   our investigators with our office.  We reviewed

24   the findings of the complaints and there was

25   thirty-six issues and there was numerous examples

                                                    47

1    of human error while inputting data into the Arlo

2    open source software system.  But there was no

3    evidence discovered to suggest criminal behavior.

4    I believe the errors were due to batch sheet

5    being entered twice under different headings.

6         And at this time, we're going to do

7    something a little different.  Instead of me

8    sitting here, reading finding, finding, finding,

9    we're going to have the actual investigators that

10   worked the case tell you here today what their

11   findings were and go through the case that they

12   worked.

13        So Investigator Braun and Investigator

14   Zagorin.

15        **MR. MASHBURN:**  Any objections?  Without

16   objection, that's how we'll do it.

17        Please proceed.

18        **MR. ZAGORIN:**  I'm Investigator Vincent

19   Zagorin, Georgia Secretary of State's Office.  So

20   we -- when this complaint came in, we had to look

21   at all the batch sheets that were listed online

22   in the system.  There was four or five different

23   dropdowns we had to go into.  None of these were

24   in order.  Nothing was in order by scanner or by

25   batch sheet.  There might be a scanner 1, let's

1       say, that had, like, five or six in row 20

2       through 26, but then it would jump to 200 or then

3       it would jump to a completely different scanner.

4       We had to go through and kind of figure all this

5       out.

6               So when I went through from the complaint

7       that was submitted -- so, for instance -- there's

8       a way you can follow.  I don't know if you guys

9       have a copy of this.  They're in this white book.

10      There is a copy of these sheets.

11              The first one on there was absentee scanner

12      3 and scanner 1 both had batch 111s.  What

13      happened was it showed that scanner 3, batch 111

14      was entered twice.  We can go to that page.  It's

15      in the section that's marked 3-B and 3-C on the

16      little tab.  In the next, like, three pages over,

17      you'll find out where I'm at.

18          **MR. MASHBURN:**  Okay.  Everybody -- everybody

19      caught up?

20              Okay.  Please proceed.

21          **MR. ZAGORIN:**  If you look at this, it says

22      absentee scanner 3, batch 111 is in there twice.

23      So when I looked at this and we found this, I was

24      able to determine that the first one, the scanner

25      3, batch 111, was actually scanner 1.  So once I

1    started going through this and figured it out, I

2    looked at it as if you had each scanner lined up

3    in a row and every batch, from one to whatever

4    the bottom number is, they all had different

5    amounts, 320 or (indiscernible).

6        So in scanner 3, you would've had two batch

7    111s but you wouldn't've had a 111 in scanner 1.

8    So you would've been able to conclude that one of

9    those should be moved over to scanner 1 as you go

10   down the list.  So there were some that were like

11   that.

12       There was another one in here -- put it in

13   the right order -- if you go next to the last two

14   pages in this section, it's be scanner 1 dash 97,

15   second to the last page.  That was one that I

16   located pretty quickly.  When you look at that,

17   there's two scanner 1s, number 97.  However we

18   pulled the batch sheet, one of them was actually

19   number 47.  And the four was written kind of

20   oddly, so the person thought it was 97.

21       So once again, just going down the list,

22   there'd be two in the 97 spot.  You have to take

23   one of those out and move it to the 47 spot.  So

24   now it's starting to -- to fall into place.  So

25   there was that issue with some of these where

1    they were just put in the wrong section.

2         If you go back to the beginning and flip the

3    page, it'll have scanner 1, batch 18 is entered

4    twice.  And it was entered twice because if you

5    look at the top part in the section, it says --

6         **UNIDENTIFIED SPEAKER:**  Let's back up.

7         **MR. ZAGORIN:**  Back to the beginning?

8         **UNIDENTIFIED SPEAKER:**  Yes.  Eighty-three --

9         **UNIDENTIFIED SPEAKER:**  No, three of four,

10   okay.

11        **MR. ZAGORIN:**  So the first was entered as

12   absentee scanner 1, batch 18.  That's all written

13   out.  The next one was entered scanner 1, batch

14   18.  So the system did not catch that.  So they

15   were entered.  It was a -- an enter error, but if

16   you look at it, where someone had typed it all

17   the way out, and the next person probably

18   thought, "I'm not going to type all that," so

19   they abbreviated it.  The system didn't catch it.

20        Arlo is aware of that and there's ways to

21   fix that, but at the time it wasn't found.  So

22   that's how that one -- those were handled.

23        We had a few -- the next one, page 4, she

24   has the same issue:  One printed out, one is

25   abbreviated.  So there was a few of those that

1    are like that in there.  Just like the other

2    ones, they were just put in the wrong spot.

3        Then the other issue that came up was -- if

4    you go to page -- I guess it would be page 5

5    is -- so it shows a hundred for Candidate A and

6    zero for Candidate B, which the way the specifics

7    work, regardless of what part of the state you're

8    in, you're not going to have completely a hundred

9    or two hundred for one candidate.

10        So the county said what could've happened is

11    they took the batch and they divided it by

12    candidate and then they just scanned it by

13    candidate.  So somewhere in here we would have

14    the other candidate with numbers that would be a

15    hundred to zero the other way, which we do in one

16    of these sections.

17        But those do not match -- those batch sheets

18    do not match what this complainant went in and

19    looked at and actually said that they looked at.

20    They don't match.  So there really isn't a

21    determination on was someone just rushed for time

22    or did they just put a hundred and moved on.  And

23    that looks like what could've happened here.

24    But, like I said, that did happen both ways.  You

25    know, maybe if you go over to page 7 -- or no --

1    yeah.  So page 7's the same, where it did that.

2         Now, there was one that wasn't in here that

3    I found myself where Candidate B had in the

4    neighborhood of 230 to nothing, going the other

5    way.  And the complainant told us:  We found that

6    but we didn't add it in here.  So to me, if I'm

7    looking at this objectively and I have to look at

8    everything, it has to go both ways.  You can't

9    just play this where it helps one side and you

10   see something else on the other side and leave it

11   out.  So that was -- kind of got our attention.

12        Then if you continue through this, there is

13   page 8.  The same one is entered twice, but I had

14   found where the first one was actually scanner 1,

15   batch 210.  So that was going to the scanner 1,

16   it wouldn't have been part of scanner 2.  So this

17   scanner 2, 237 was actually correct.

18        Some of the other ones, the number were off

19   just a little bit.  With 238, those numbers were

20   off.  You know, on here it has candidate -- and

21   one of the candidates, 2259 and zero.  It was

22   actually four and forty-nine is what the numbers

23   would've been.  But even on -- for the batch she

24   showed, but even on there -- well, the

25   complainant found those numbers were a little bit

1      off.

2          The next one, page 10, the top one's going

3      to be a different batch or scanner.  At the

4      bottom one, we were able to find the match of two

5      two forty.

6          So I don't know if there's anything in here

7      that's different from those three different

8      scenarios where they just had the different --

9      oh, this was interesting too.

10         So number 12, so number 12 is a -- there's

11     two of these in here that showed several

12     different batches and then one total here.

13         **MR. MASHBURN:**  Are you on -- I'm sorry to

14     interrupt you.  Are you on page 12 or

15     inconsistency 12?

16         **MR. ZAGORIN:**  So twelve of forty.

17         **MR. MASHBURN:**  Okay.  Page 12.  Okay.  Thank

18     you.  I'm sorry to interrupt.

19         **MR. ZAGORIN:**  No worry.  So the totals at

20     the bottom are correct.  But the problem is when

21     they show their work on how they got there.  So

22     if you look -- like, it says number 243.  At the

23     top, it shows seven ninety and one.  At the

24     bottom, it shows twenty-one seventy-three and

25     two.  Like I said, the bottom numbers all match.

1      They all get to the right total at the bottom.

2      It's just the numbers in between for some reason

3      don't match.  So I don't know how they got the

4      correct number at the bottom but the numbers were

5      wrong in individual batches.

6          And there's a couple different ones -- those

7      are in here -- that did the same thing, where the

8      totals always matched, just the numbers in

9      between didn't match.  Like, some of them where

10     they would do -- like, it shows two -- 244 to 249

11     and it has the numbers which match the numbers at

12     the bottom.  They just didn't add the 243 in

13     there.  Once you added 243, it would've corrected

14     it and it's lined up properly.

15         So, like I said, the total number was

16     correct, just when they showed their work it was

17     off.  We couldn't figure out how they put the

18     number wrong at the top and got it right at the

19     bottom.

20         So that was all the different -- like I

21     said, each one of these basically has one of

22     those three different scenarios of what went

23     wrong.  Either it was entered wrong because they

24     didn't fill it out and do it the same way -- they

25     didn't put absentee scanner instead of AB scanner

1    or they went to a different batch than what they

2    showed -- and you could -- you can show that and

3    find those.

4         Like I said, on the totals, the ones that

5    had the big totals, they were all -- they matched

6    even though the other numbers didn't.

7         And then there was -- I believe there was

8    one where they inverted the numbers.  They

9    inverted Candidate C.  In Candidate B, they --

10   they just inverted those numbers.  You can see

11   where the numbers were inverted.  So if you

12   switched them over, it wasn't really a major

13   thing.

14        But most of it was the data entry and when

15   they -- they put it in.  So you can see where the

16   issues were on all of these.

17        Any questions on anything?

18        **MR. MASHBURN:**  Questions from the board?

19        **MRS. GHAZAL:**  I don't have any questions,

20   but I have grateful thanks that you were able to

21   spend the amount of time it must've taken to sort

22   through this and understand it.  And I appreciate

23   you spelling it out so clearly.  I understand

24   exactly what you're saying and what happened

25   here.  I don't think I could have come to these

1    conclusions.  So I appreciate everything that

2    you've put into this.

3         **MR. ZAGORIN:**  (indiscernible)

4         **DR. JOHNSTON:**  So I have a question.  How

5    much off were these numbers when you looked at

6    all of this again?

7         **MR. ZAGORIN:**  I just looked at these that

8    were sent in in the complaint.  Like I said, a

9    few time I would find others that I would stumble

10   across it.  But I didn't pull those into this.

11        But I didn't go back through to take out the

12   ones that were in there twice and try to figure

13   out exactly what the number was.  But I could

14   tell what the issue was.  I could that, like I

15   said, 97 wasn't in there twice; it was actually

16   97 and 47.  Then the ones that were in there

17   twice, I didn't sit there and write out the --

18   the specific number.  I didn't go that far with

19   this.

20        **MR. LINDSEY:**  Well, my comment actually is

21   going to echo some of the public comments that

22   we've heard.  Some of the public comments in

23   which they expressed concern on the resources,

24   being how people voted rather than helping out at

25   the next election.  And it would be helpful if

1       our local county folks had a consistent entry

2       system so that we would not -- so when citizens

3       have a reasonable complaint when they see these

4       inconsistencies that we do not have to devote as

5       many man-hours -- and I don't even want to think

6       about how many man-hours you had to devote to

7       these.

8            And so it sort of goes to the importance of

9       getting our local counties -- employees trained

10      properly so that there is a consistency out there

11      so that, you know, when citizens understandably

12      go in and do a review, that we don't come up with

13      these kind of issues that then come to the board

14      for a complaint and they'll be used for an

15      investigation.

16           And so we need to figure out a way to

17      rectify that.  This is the sort of thing -- you

18      know, I'm sitting there, writing down various

19      things as you go along:  Inconsistent entry and

20      garbage in, garbage out.  I'm not a computer

21      expert but I do remember that from my computer

22      classes.  And we need to figure out a way to get

23      our local county folks to be able to enter things

24      consistently so that others can have confidence

25      in the outcome and we don't have to devote

1    resources that you're having to devote to kind of

2    untangle when you have a simply entry problem.

3        **MR. ZAGORIN:**  There was one other issue that

4    came up with the system.  I think Ryan Germany

5    was going to address that.

6        **MR. GERMANY:**  Well, yes.  Thanks, Ed.

7    Additionally as part of the investigation, we

8    looked at not just what -- what Zagorin just --

9    Investigator Zagorin just went through but trying

10   to look at the context of where these occurred.

11       As part of that, we, of course, talked to --

12   to Fulton County, and they're here.  And also, a

13   Mr. Rossi, the complainant, is here and I know

14   would like to address the board after the

15   investigator's presentation.

16       But we also reached out to Voting Works, who

17   they assisted Georgia in implementing our audit

18   procedures.  And software that was used is a

19   software called Arlo that Voting Works utilizes.

20       You guys remember that a full hand count was

21   not, I think, completely contemplated in our

22   audit.  It was a risk-limiting audit.  It's

23   supposed to be a review of -- of basically

24   particular ballots and you compare them to see

25   what the machine count is.  And then there's a

1    formula that comes up with how many you have to

2    review to reach a statistical confidence level.

3         And I'm already getting outside of my area.

4    But the problem is if the result is so close,

5    the -- the number of ballots you have to pull

6    individually becomes so large, that it's --

7    frankly, you just have to look at every ballot.

8    It's actually more manageable.

9         And so we had to -- with the result being so

10   close and the secretary determining that he

11   wanted to audit the presidential election, which,

12   of course, would be the closest results, then we

13   had to move to a full hand count.  And we also

14   put in a time in.  So you've got to be done

15   counting by this time.  We actually had to extend

16   that time by twenty-four hours so that Fulton

17   County could finish -- finish their audit because

18   as has been pointed out by multiple people today,

19   they have the -- the largest number of ballots in

20   the state.

21        And so I think what we -- we found a few

22   things kind of is what I'm getting at.  One, that

23   time crunch, of course, contributed to that

24   Fulton County did not have -- and Voting Works

25   was working with every county.  In other counties

1    they had time to go back and do a -- you know,

2    essentially proofread their data entry and catch

3    mistakes.

4         Data entry mistakes happen.  Whenever we've

5    got humans entering data, we're going to have

6    data entry mistakes.  In a hand count, there's

7    going to be human error, not just in the count

8    but also in the data entry.

9         So Voting Works put out a couple things that

10   I think are relevant for you guys.  One, that

11   these are the type of data entry issues that they

12   see in an audit.  At Fulton County, the level was

13   higher because of that time crunch.  They didn't

14   have time to do that kind of quality assurance

15   check that a lot of counties do.

16        But then, three, that the -- nothing that

17   they are seeing here changes the overall

18   conclusion in their minds of the audit, which is

19   to confirm the result.  The audit is not meant to

20   get the exact same count.  In fact, that would

21   not be expected.  It's going to be -- the whole

22   point is to confirm, though, the -- the winner

23   won and that they've -- and Voting Works saw

24   nothing here that would change that conclusion,

25   the -- of the audit in their minds.

1       They also did mention that there were some,

2   I think -- they're making some improvements to

3   Arlo to kind of make these kind of data entry

4   errors lessen in the future.  And so I believe, I

5   think, we will have that benefit in the future,

6   these improvements to Arlo.  It had to do with

7   basically naming conventions and kind of not

8   allowing people to -- to double-enter these.

9       And what happened in Fulton is they

10  initially -- you want to have one person entering

11  all the data.  That's ideal.  In Fulton, we

12  have -- they can't do that.  They don't --

13  they're not going to have the time.  So they had

14  to bring another person in to enter data, at

15  least one more person.  And when you have that,

16  that's when you start having maybe some confusion

17  about, hey, has this already been entered or has

18  this not been.

19      So I just wanted to provide that context

20  from Voting Works.  And I do know that both

21  Mr. Rossi and Fulton County are here as well.

22      **MR. MASHBURN:**  Questions from the board?

23      **MRS. GHAZAL:**  Well, just while I definitely

24  appreciate that a hand count audit was not

25  anticipated, I think we need to look down the

1    road and make sure that we do have proper

2    procedures in place for naming protocols so that

3    it's standardized.

4        And if -- if the Arlo platform can have

5    drop-down menus as opposed to having to hard key

6    things in, that could help prevent some of these

7    errors and just clean it up on the -- on the

8    front end.

9        And training beforehand, before literally on

10   the fly.  I was there and saw how it was being

11   done and I admire how hard everybody worked to

12   make it work, but if we can prepare and

13   anticipate that we may come down to this again --

14   I hope to God we never do, but, you know, an

15   ounce of prevention and all of that.

16       So I think this board needs to be working on

17   that, looking down the road.

18       **MR. GERMANY:**  And that's a good point.  And

19   I should have something about that in the

20   rulemaking --

21       **MRS. GHAZAL:**  Yeah.

22       **MR. GERMANY:**  -- update.  I think that's

23   something we need to look at in rules because the

24   main thing from Voting Works is in order to do

25   that, to have a drop-down menu, which they --

1    they've actually -- they mentioned they've put in

2    extra tools in Arlo to have -- to prevent entry

3    of duplicate batches and flag missing batches.  I

4    think --

5        **MRS. GHAZAL:**  Yeah.

6        **MR. GERMANY:**  -- both of which occurred

7    here.  But in order to do that, you've got to

8    have a really good what they call ballot

9    manifest, which is where you're -- where you're

10   tracking that -- that stuff on the front end.

11   And so I think we can do things as a board, y'all

12   can do things as a board, to, you know -- the law

13   only requires the audit after the November

14   general election.

15       But I think the board can probably require

16   audits more often than that to help counties be

17   prepared for that audit, and especially the

18   ballot manifest.  I think that should be done

19   every time.  You know, the more -- the more time

20   someone does something, the better at it they'll

21   get.  So I think that's another thing we should

22   look at from a rulemaking perspective.

23       **MR. MASHBURN:**  I think you mentioned that

24   you were splitting your presentation between two

25   investigators.  Is the other investigator