## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| Robert L. Pitts, Chairman, Fulton County Board of Commissioners, Fulton County Board of Registration and Elections, and Fulton County, Georgia, <br><br> *Petitioners*, <br><br> v. <br><br> United States of America, <br><br> *Respondent*. | Case No. 1:26-CV-00809 |

## UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO PETITIONERS' AMENDED RULE 41(G) MOTION

# TABLE OF CONTENTS

Table of Contents ................................................................................................ ii

Preliminary Statement ........................................................................................ 1

Statement of Facts .............................................................................................. 5

Argument ........................................................................................................... 10

  I.   RULE 41(G) RELIEF IS UNAVAILABLE IN ALL BUT THE MOST EXTRAORDINARY CASES ........................................................................... 10

  II.  PETITIONERS ARE NOT PROPER PARTIES TO SEEK THE "RETURN" OF THE RECORDS ................................................................................... 12

  III.   PETITIONERS CANNOT SHOW THAT THE UNITED STATES CALLOUSLY DISREGARDED THEIR RIGHTS ............................................ 13

    A.  Petitioners Lack Fourth Amendment Rights In These Circumstances, And They Cannot Show Callous Disregard Of Any Such Rights Regardless 14

      1.   Petitioners do not have cognizable Fourth Amendment rights with respect to this property. ............................................................ 14

      2.   The United States did not callously disregard any Fourth Amendment rights that Petitioners may have .................................... 15

    B.  Petitioners' Secondary "Callous Disregard" Arguments Fail ................... 31

      1.   Statute of limitations issues are irrelevant. ................................. 31

      2.   Other state proceedings are irrelevant. ....................................... 32

      3.   Even if Petitioners could assert constitutional interests in local election authority, the United States did not callously disregard those interests. ... 33

  IV.  THE EQUITABLE FACTORS PRECLUDE RULE 41(G) RELIEF ................ 34

    A.  Petitioners Do Not Have An Interest In And Need For The Property .... 35

    B.  Petitioners Cannot Show Irreparable Injury ............................................... 36

    C.  Petitioners Cannot Show That They Lack Adequate Legal Remedies Because There Is No Harm To Remedy ............................................... 37

    D.  The United States Needs The Records ........................................................ 38

Conclusion .......................................................................................................... 39

## PRELIMINARY STATEMENT

Judge Salinas found that an FBI agent's sworn affidavit established probable cause that Fulton County election records contained evidence of violations of federal criminal law. Judge Salinas thus authorized the FBI to execute a search warrant and seize those records. Petitioners now ask this Court to order the United States to return the records under Rule 41(g) of the Federal Rules of Criminal Procedure. Their goal to disrupt an ongoing federal criminal investigation is clear. But the law is even clearer that they cannot do so: they fall far short of making the extraordinary showing necessary to invoke this Court's equitable jurisdiction and obtain relief under Rule 41(g).

To start, Petitioners are not proper Rule 41(g) parties. They lack possessory (or even custodial) interests in the records. The United States seized the records from the Clerk of the Fulton County Superior Court. Yet the Clerk is conspicuously absent from this case. The Court should deny the Rule 41(g) motion and dismiss this case for lack of jurisdiction on that basis alone.

Even if Petitioners were proper parties, they would plainly not be able to establish jurisdiction or entitlement to the records. "Only the narrowest circumstances permit a district court to invoke equitable jurisdiction" and grant relief under Rule 41(g). *Trump v. United States*, 54 F.4th 689, 697 (11th Cir. 2022). Among other requirements, Petitioners must show "'callous disregard' for [their]

1

constitutional rights." *Id.* at 698. Petitioners claim a violation of their Fourth Amendment rights. But they have no Fourth Amendment rights to assert. The Fourth Amendment protects "the people," not political subdivisions. That is another threshold basis for denial and dismissal for lack of jurisdiction.

Regardless, the United States was scrupulously careful to comply with any Fourth Amendment constraints: it seized the records only after obtaining a warrant based on a magistrate judge's probable-cause determination. The agents who executed the warrant (after seeking an amended warrant out of an abundance of caution) had no reason to doubt its validity or the magistrate's determination. That is the antithesis of "callous disregard" for constitutional rights.

Petitioners' contrary arguments are meritless. They disagree with the magistrate's probable cause finding. Pets.' Br. 8-19. But that is no basis to invoke Rule 41(g): Judge Salinas "decided that issue when approving the warrant," so there is no callous disregard. *Trump*, 54 F.4th at 701. This Court should not open the floodgates to parties who wish to use Rule 41(g) as a way to get a sneak peek at ongoing criminal investigations.

To the extent a Rule 41(g) movant could ever overcome a magistrate's probable cause determination, this Court's review would be extremely deferential considering both the ordinary deference that applies to such a determination and the extraordinarily high bar set by Rule 41(g)'s callous disregard standard. Under

any standard, Petitioners fail to undermine Judge Salinas's finding. They argue the affidavit does not contain sufficient evidence of *willful* violations. Pets.' Br. 8-10. But probable cause requires only a fair probability that evidence of a crime will be found; it does not require evidence of the "*mens rea* elements of perceived crimes." *United States v. Johnson*, No. 22-12504, 2024 WL 371954, at *4 (11th Cir. Feb. 1, 2024) (citing *Jordan v. Mosley*, 487 F.3d 1350, 1355-56 (11th Cir. 2007)). It is also irrelevant whether the affidavit proves an impact on "the outcome of the election." Pets.' Br. 10. The affidavit focuses on potential violations of 52 U.S.C. §§ 20701 and 20511 — outcome determinative or not. Petitioners are left to minimize (and mischaracterize) various statements in the affidavit. In doing so, they make the classic mistakes of viewing statements "in isolation" and relying on "innocent explanations" while ignoring non-innocent ones. *District of Columbia v. Wesby*, 583 U.S. 48, 61, 62 (2018).

Petitioners' demand for a *Franks* inquiry into whether the affiant intentionally or recklessly materially misled the magistrate is equally groundless. Pets.' Br. 19 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). Again, the "callous disregard" standard would require an especially egregious *Franks* violation before Rule 41(g) could be used to collaterally attack a warrant affidavit. Petitioners do not come close to making a *Franks* showing (egregious or otherwise), and the Court can easily so hold without an evidentiary hearing. Petitioners have not "point[ed]

out specifically" any "portion of the warrant affidavit" that is a "deliberate falsehood or . . . reckless disregard for the truth" as demonstrated by an "offer of proof," let alone one that would negate all "support [for] a finding of probable cause." 438 U.S. at 171-72. To the contrary, the supposed misrepresentations and omissions flagged by Petitioners are illusory and/or immaterial. So, even ignoring all the other independent legal grounds for denial and dismissal for lack of jurisdiction, "no hearing is required." *Id.* at 172.

The Court can just as easily reject Petitioners' back-up arguments. *See* Pets.' Br. 26-35. Statute-of-limitations defenses do not negate probable cause, may be raised only by the defendant in an eventual prosecution, and are not applicable here in any event. Nor is there any conflict between this seizure of records and separate state proceedings or Petitioners' "sovereign interests in safeguarding election integrity." Pets.' Br. 33. There is no substance behind Petitioners' heightened rhetoric, and their failure to show callous disregard is dispositive. *See Trump*, 54 F.4th at 698 ("Absent that, courts will not intervene in an ongoing investigation.").

Petitioners also fail to satisfy the remaining Rule 41(g) factors. In fact, they barely try. *See* Pets.' Br. 34-35. Petitioners can hardly claim a meaningful interest in the records, or irreparable harm, given that Petitioners have admitted here and elsewhere that the Clerk (with whom they conflate themselves) wishes to divest

4

or destroy the same records. Petitioners lack a remedy at law only because there is nothing to remedy in the first place. And "a Rule 41(g) motion is properly denied" where, as here, "the government's need for the property as evidence continues." *E.g.*, *United States v. Garcon*, 406 F. App'x 366, 369 (11th Cir. 2010).

Ultimately, Petitioners seek an unlawful "judicial intrusion into the course of criminal investigations—a sphere of power committed to the executive branch." *Trump*, 54 F.4th at 698. The United States is not aware of any successful attack on an ongoing criminal investigation on the sort of grounds raised by Petitioners. The Court should deny their motion, vacate the evidentiary hearing (and instead hold oral argument if it would be helpful), dismiss this case for lack of equitable jurisdiction, and reject Petitioners' attempt at "unnecessary interference with the executive branch's criminal enforcement authority." *Id.* at 697.

## STATEMENT OF FACTS

The FBI is investigating irregularities that occurred during the 2020 presidential election in the County. Unlike previous lawsuits and investigations into whether any errors altered the outcome, this investigation is concerned with potential violations of 52 U.S.C. § 20701, which requires election records to be maintained for 22 months, and 52 U.S.C. § 20511(2)(B), which prohibits the procurement, casting, or tabulation of false, fictious, or fraudulent ballots.

FBI agents conducted numerous interviews of individuals with information relating to the 2020 election. That included individuals who stated that they witnessed misconduct firsthand (witnesses 8, 9, and 11), individuals who stated that they had analyzed public election information and uncovered errors (witnesses 1, 5, and 7), and Georgia Secretary of State officials who investigated the election and defended the outcome (witnesses 4 and 6). The investigation is currently focused on at least four categories of deficiencies set out in the affidavit.

*First*, the FBI is investigating whether County officials did not properly retain ballot images as election records. Doc. # 22-2 ("Aff.") ¶¶ 12–28. Based on Witness 1's analysis that there were 17,852 ballot images missing during the election recount, the State election board issued a letter of reprimand to the County. *Id.* ¶¶ 14, 16.[1] The affidavit also indicates that retention defects may have resulted from additional criminal conduct. For example, when Witness 2 was allowed to review the stored images, she noticed that the Secure Hash Algorithm files that guarantee a ballot image has not been modified were missing. *Id.* ¶ 20. She also noticed post-election modification dates associated with the files (as late as January 11, 2024). *Id.* ¶ 22.

---

[1] As the affidavit explains, the Fulton County ballots were counted three times. There was an original count on election night and into the following day; a "Risk Limiting Audit" consisting of a hand recount completed in mid-November 2020; and a machine recount in early December 2020. Aff. ¶ 9.a n.1.

*Second*, the FBI is investigating whether some ballots were scanned and tallied multiple times. *Id.* ¶¶ 29–38. Witness 5 conducted an image analysis of ballots and found duplicates in both the original count and the recount. *Id.* ¶ 33. Although his analysis indicated that the duplicates could not have changed the election outcome, the duplicates indicated a desire to "make the recount numbers match," which would constitute a violation of 52 U.S.C. § 20511(2)(B). *Id.* ¶ 35; *see also id.* ¶ 37. The Secretary of State investigator assigned to review this allegation did not dispute that ballots were scanned multiple times, and the County has admitted that duplication of ballots "may have occurred." *Id.* ¶¶ 36, 38. State investigators ended their inquiry based on their finding that duplicates did not change the outcome. *Id.* ¶ 36.

*Third*, the FBI is investigating information that unfolded, unmailed ballots were tabulated as absentee mail-in ballots. *Id.* ¶¶ 52–75. As Witness 3 explained, absentee ballots should generally have folds because they must fit in envelopes. *Id.* ¶ 53; *see also id.* ¶ 52. Yet at least two witnesses saw batches of purported absentee ballots that were pristine (*i.e.*, not folded or creased). *Id.* ¶¶ 58, 59. To be sure, Witness 4 explained that there would be pristine absentee ballots in any election because, *e.g.*, damaged ballots would be adjudicated by a Vote Review Panel and a new pristine ballot would be used as a replacement. *Id.* ¶ 67. But under Georgia law, duplicated ballots of damaged or unscannable ballots would have

7

been marked as such. *Id.* ¶ 63 (citing Georgia Code 21-2-483 (effective July 1, 2011)). Additionally, during the Risk Limiting Audit, Witness 8 received a batch of 110 purported absentee ballots. *Id.* ¶ 58. And 107 were not only pristine, but also had the exact same votes for each of the many candidates on the ballot. *Id.* Witness 9 was at the same table and recalled the same thing. *Id.* ¶ 61. Witness 8 also received a stack of roughly 60 pristine ballots that purportedly came from a senior living center. *Id.* ¶ 59.

*Fourth*, the FBI is investigating irregularities concerning tabulator tapes, which indicate how many votes were received for each candidate and how many ballots were counted on a particular machine. *Id.* ¶¶ 39–51. Witness 3 described them as the "holy grail" for vote counting. *Id.* ¶ 41. And Witness Parikh found that tabulator tapes were missing for some machines. *Id.* ¶ 45. Of 138 closing tapes provided by Fulton County, only 16 tabulators accounted for approximately 315,000 ballots. *Id.* One tabulator was used to close out 15 tabulator machines from 12 different locations. *Id.* Witness Parikh found that the interval between poll closing times and report printed times on several tabulator tapes were suspiciously short, such that memory cards may have been removed from an original tabulator and put in another. *Id.* Witness Parikh also found that protective counters (the "odometer" of a tabulator tape) were identical on at least five tabulator tapes, and that in some instances the reported number of ballots scanned

8

exceeded the protective counter number. *Id.* ¶ 46. This suggested to Witness Parikh that memory cards may have been used to tamper with the tabulation. *Id.* The County admitted that tabulator tapes accounting for 315,000 ballots were not properly signed as required by Georgia law. *Id.* ¶ 51; *see also id.* ¶ 42 (citing Ga. Compl. R. & Regs. 183-1-12-.12). Witness 6 stated that the tabulators would not have been used in the recount and the ballots are what mattered. *Id.* ¶ 48.

During the investigation, the FBI confirmed that County election records were maintained in a warehouse. *Id.* ¶ 83. On January 28, 2026, FBI Special Agent Evans applied for a search warrant before Magistrate Judge Catherine M. Salinas. *See* Case No. 1:26-mc-0158. The affidavit summarized his investigation, included statements indicating election misconduct, and acknowledged contrary potential explanations and prior investigations that—given the information presented at those times—found the election improprieties not to be the result of intentional conduct. Judge Salinas issued the search warrant. *See* Case No. 1:26-mc-0158.

After FBI agents arrived at the warehouse to execute the warrant, they learned that the warehouse is a storage facility for multiple entities and that the items to be seized were located in an access-limited section devoted to the Fulton County Superior Court and controlled by the Clerk of Court. Aff. ¶ 84. Because the original warrant authorized a search of the warehouse as a whole, out of an abundance of caution the agents sought a second warrant narrowed to the Clerk

of Court's section. *Id.* Judge Salinas issued the second search warrant. *See* Doc. # 22-2. The FBI executed the warrant and seized 653 boxes of materials.

Petitioners—the County, Robb Pitts (the chairman of the County Board of Commissioners), and the County Board of Registration and Elections ("BRE") — now seek return of the seized materials under Rule 41(g).

## ARGUMENT

## I.    RULE 41(G) RELIEF IS UNAVAILABLE IN ALL BUT THE MOST EXTRAORDINARY CASES

"Because federal courts lack general jurisdiction, it 'is to be presumed that a cause lies outside' of [their] 'limited jurisdiction.'" *Trump*, 54 F.4th at 697 (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). In the absence of a criminal proceeding, a Rule 41(g) motion is treated "as a civil action in equity." *United States v. Howell*, 425 F.3d 971, 974 (11th Cir. 2005); *accord United States v. Chapman*, 559 F.2d 402, 406 (5th Cir. 1977). "Exercises of equitable jurisdiction . . . should be exceptional and anomalous." *Trump*, 54 F.4th at 694 (internal quotation marks omitted). "Only the narrowest of circumstances permit a district court to invoke equitable jurisdiction," and "[i]t is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions." *Id.* at 697 (quoting *Douglas v. City of Jeannette*, 319 U.S. 157, 163 (1943)).

At the threshold, any party trying to satisfy Rule 41(g)'s extraordinarily demanding standard must show a "possessory interest in the property seized by

the government." *Howell*, 425 F.3d at 974. After all, Rule 41(g) contemplates the "return" of property to someone who had it in the first place. Fed. R. Crim. P. 41(g).

Beyond that threshold, an extraordinarily demanding standard applies. "To avoid unnecessary interference with the executive branch's criminal enforcement authority—while also offering relief in rare instances where a gross constitutional violation would otherwise leave the subject of a search without recourse—th[e] [Eleventh] Circuit has developed an exacting test for exercising equitable jurisdiction over suits flowing from the seizure of property." *Trump*, 54 F.4th at 697. Under the *Richey* factors, courts consider:

> (1) whether the government displayed a 'callous disregard' for the plaintiff's constitutional rights; (2) 'whether the plaintiff has an individual interest and need for the material whose return he seeks'; (3) 'whether the plaintiff would be irreparably harmed by denial of the return of the property'; and (4) 'whether the plaintiff has an adequate remedy at law for the redress of his grievance.

*Id.* at 697 (citing *Richey v. Smith*, 512 F.2d 1239, 1243-44 (5th Cir. 1975)).

Additionally, courts may deny a Rule 41(g) motion where "the government's need for the property as evidence continues." *Garcon*, 406 F. App'x at 370. That includes when the evidence could be used in a potential future trial. *See United States v. Alford*, 805 F. App'x 924, 926 (11th Cir. 2020).

The Eleventh Circuit "ha[s] emphasized again and again that equitable jurisdiction exists only in response to the most callous disregard of constitutional rights, and even then only if other factors make it clear that judicial oversight is

absolutely necessary." *Trump*, 54 F.4th at 698. Courts must "apply [the] usual test"—and may not "carve out an unprecedented expansion" or "drastically expand the availability of equitable jurisdiction for every subject of a search warrant"—"no matter who the government is investigating." *Id.* at 694, 701.

## II.   PETITIONERS ARE NOT PROPER PARTIES TO SEEK THE "RETURN" OF THE RECORDS

Petitioners have no "possessory interest" in the records. *Howell*, 425 F.3d at 974. In their original motion, they emphasized that the records "were held . . . by the Clerk of the Superior Court in accordance with Georgia law as the lawful custodian." Doc. # 1-1 at 5. Yet the Clerk is nowhere to be found in this case—despite participating in other litigation concerning the records. *See id.* at 7, 8. Nor is the Clerk merely an agent of the County or BRE; rather, the Clerk is an independently elected constitutional officer with powers and duties provided by State law. *See* Ga. Const. art. IX, § 1, ¶ 3; O.C.G.A. § 15-6-50 *et seq.* As Petitioners have explained, Georgia law required the delivery of records to the Clerk and the Clerk's exclusive control of those records under seal. *See id.* at 5-6 (citing O.C.G.A. §§ 21-2-73, 21-2-390, 21-2-500(a)). Although the statutory retention period has passed, the Clerk has retained exclusive control under court order. *Id.* at 7. Yet the Clerk is not a party to this case.

There is accordingly no basis for *Petitioners* to seek "return" of the *Clerk's* records. Fed. R. Crim. P. 41(g). Petitioners do not dispute the Clerk had possession

and control of the records. Instead, they assert that Petitioners are "constitutionally authorized to possess and own property." Pets.' Br. 7. That says nothing about *this* property. As to it, all Petitioners offer is a vague reference to "Georgia law" and "ongoing pending litigation." *Id.* at 7-8 (citing O.C.G.A. §§ 21-2-73, 21-2-390, 21-2-500; *Allen v. State of Georgia*, 24-CV-014632 (Fulton Cnty. Super. Ct. Dec. 22, 2025)). But the laws they cite merely require "deliver[y] to the clerk of the superior court." O.C.G.A. § 21-2-390(a); *see also* §§ 21-2-500(a), § 21-2-73. And their discussion of litigation only confirms the Clerk's exclusive control of the records. *See* Doc. # 1-1 at 7-8 (in *Allen* and another case, Petitioner BRE has "explain[ed] the requested records were held under seal by the County Clerk under O.C.G.A. § 21-2-500").[2]

Petitioners' glaring failure to show any possessory interest in the records requires denial of their motion and dismissal for lack equitable jurisdiction.

## III.    PETITIONERS CANNOT SHOW THAT THE UNITED STATES CALLOUSLY DISREGARDED THEIR RIGHTS

Even if Petitioners had a possessory interest in the records, they could not satisfy Rule 41(g). Litigants cannot use Rule 41(g) as a general vehicle to challenge search warrants. If that became the rule, "a flood of disruptive civil litigation would surely follow." *Trump*, 54 F.4th at 698. For that reason, a "callous disregard" of constitutional rights is the "foremost" *Richey* factor—"[a]bsent that, courts will

---

[2] Petitioners have never explained why Petitioner Pitts, one of seven members of the Board of Commissioners, has ever had any cognizable interest in the records.

not intervene." *Id.* (internal quotation marks omitted). "Because the vast majority of subjects of a search warrant have not experienced a 'callous disregard' of their constitutional rights, this factor ensures that equitable jurisdiction remains extraordinary" and "guards against needless judicial intrusion into the course of criminal investigations—a sphere of power committed to the executive branch." *Id.* This Court lacks jurisdiction for the additional reason that there has been no callous disregard of Petitioners' rights.

### A.    Petitioners Lack Fourth Amendment Rights In These Circumstances, And They Cannot Show Callous Disregard Of Any Such Rights Regardless

1.    *Petitioners do not have cognizable Fourth Amendment rights with respect to this property.*

Petitioners' motion fails (again) at the threshold because Petitioners lack Fourth Amendment rights. The Fourth Amendment protects "[t]he right of *the people* … against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). Thus, "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969); *accord United States v. White*, 322 U.S. 694, 698 (1944) (the Fourth Amendment is "directed primarily to the protection of individual and personal rights"). Just as "'person' in the . . . Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union," *South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966), States and their subdivisions are

14

not among "the people" protected by the Fourth Amendment, *cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) ("'[T]he people' protected by the Fourth Amendment . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community[.]"). Rule 41(g) safeguards an individual's possessory interest under the Fourth Amendment, *see Howell*, 425 F.3d at 974, not local governmental units' political interests.[3]

> 2.   *The United States did not callously disregard any Fourth Amendment rights that Petitioners may have.*

Even if they were proper parties and had Fourth Amendment rights, Petitioners could not show a "callous disregard" of those rights "after seizure under a presumptively lawful search warrant." *Trump*, 54 F.4th at 699 n.3.

> a.   The "callous disregard" standard poses a near-insurmountable burden where officers obtain a warrant from a magistrate judge.

There can be no "callous disregard . . . in view of the agents' efforts to comply with the warrant requirement, and the [magistrate] judge's approval of the search." *Matter of Search of 4801 Fyler Ave.*, 879 F.2d 385, 388 (8th Cir. 1989); *cf. Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("[T]he fact that a neutral

---

[3] Petitioner Pitts has never had any apparent interest in the seized property. *See* n.2, *supra*. He also purports to sue in his official capacity, so the same logic applies to him. *Cf. Brandon v. Holt*, 469 U.S. 464, 470 n.13 (1985) ("[O]fficial capacity suits generally represent . . . an action against an entity of which an officer is an agent.").

magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner[.]"). To the contrary, "[a] warrant . . . provide[s] assurances from a neutral officer that the inspection is reasonable under the Constitution." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323 (1978). Law enforcement officers cannot be expected to second guess a magistrate's probable-cause determination because of events in other cases and investigations. Indeed, "[i]t is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination." *Messerschmidt*, 565 U.S. at 547–48.

For these reasons, if a party seeks to exclude fruits of a search, or to impose damages on officers for conducting a search, they can obtain relief only in the extreme circumstance where "no reasonably competent officer would have concluded that a warrant should issue." *Id.* at 547; *see also id.* at 546 n.1. The "callous disregard" standard provides at least as much protection to the government (if not more) in the context of a Rule 41(g) property-return action. That is why the Eleventh Circuit has refused to "requir[e] federal courts to oversee routine criminal investigations beyond their constitutionally ascribed role of approving a search warrant based on a showing of probable cause." *Trump*, 54 F.4th at 701.

Petitioners' diatribe against Judge Salinas's probable cause finding (Pets.' Br. 8-19) is thus a red herring. Judge Salinas "decided that issue when approving the warrant." *Trump*, 54 F.4th at 701. Judicial second-guessing in this posture

would "allow any subject of a search warrant to invoke a federal court's equitable jurisdiction." *Id.* at 698. That "would make equitable jurisdiction not extraordinary, but instead quite ordinary." *Id.* (internal quotation marks omitted).

As detailed below, Petitioners' arguments are, at best, mine-run (and misguided) probable-cause objections that come nowhere near establishing that no reasonable officer could have relied on the warrant, let alone that doing so reflected "callous disregard" of the Fourth Amendment. Indeed, the fact that the officers proactively sought an amended warrant to narrow the location to be searched should, by itself, make clear that they conscientiously sought to comply with the Fourth Amendment rather than callously disregard it. The Court should reject Petitioners' attempt to fling open the courthouse doors to premature probable cause challenges brought by "every subject of a search warrant" during ongoing investigations. *Trump*, 54 F.4th at 694. The United States nevertheless addresses Petitioners' misplaced probable cause arguments below.

b.  The affidavit on its face established probable cause, and certainly did not constitute callous disregard.

Even in the typical posture of a motion to suppress, the magistrate's probable cause finding would be reviewed with "great deference." *United States v. Foster*, No. 1:20-CR-00296, 2024 WL 249324, at *3) (N.D. Ga. Jan. 22, 2024) (Boulee, J.) (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)). The court would "only . . . determine whether there is substantial evidence in the record supporting

17

the magistrate judge's decision to issue the warrant, rather than conduct a *de novo* determination." *Id.* (internal quotation marks omitted). There thus was no callous disregard if there was even *arguably* a substantial basis for the magistrate's probable cause finding. *Cf. Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009) (applying "arguable probable cause" standard in the qualified immunity context). Under any standard, the affidavit easily established a substantial basis to conclude that the records would contain evidence of violations of sections 20701 and 20511(2). *See* pp. 6-9, *supra*.

Petitioners' primary argument to the contrary is that the affidavit does not sufficiently prove any "willfull[]" *mens rea*. Pets.' Br. 8. But as Petitioners acknowledge, the question is whether the affidavit establishes a "fair probability that . . . evidence of a crime will be found in a particular place." *Id.* at 9 (internal quotation marks omitted). "Probable cause does not require . . . specific evidence of each element of the offense," *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003), let alone the "*mens rea* elements of perceived crimes," *Johnson*, 2024 WL 371954, at *4 (citing *Jordan*, 487 F.3d at 1355-56); *see also Jones v. Town of Seaford, Del.*, 661 F. Supp. 864, 871 (D. Del. 1987) (rejecting argument that an affidavit supporting a warrant was required to set forth "indicia of . . . criminal intent"). Because "no police officer can truly know another person's subjective intent," *Jordan*, 487 F.3d at 1355, it would not make sense to require an affiant to provide evidence of such

intent at the early search warrant stage of an investigation when evidence "otherwise gives rise to probable cause," *Gates v. Khokhar*, 884 F.3d 1290, 1300 (11th Cir. 2018) (discussing probable cause to arrest). Search warrants are often the means by which evidence supporting *mens rea* is obtained in the first place. *See, e.g.*, *United States v. Shemtov*, No. 1:21-CR-00123-JPB, 2023 WL 7276484, at *3 (N.D. Ga. Nov. 3, 2023) (Boulee, J.) (warrant covered evidence "relating to . . . state of mind").

Regardless, read as a whole, the affidavit *does* support an inference of willful misconduct. Affidavits should not be re-examined "in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). A fair reading of the affidavit makes clear that if, for example, ballot images were manipulated following the election, or boxes of identical pristine ballots were counted, or tabulator memory cards were manipulated, willfulness could be inferred. Any "innocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect." *Wesby*, 583 U.S. at 68.

Petitioners' additional probable cause arguments get them nowhere. For example, Petitioners argue that the "irregularities . . . are immaterial" because, in

Petitioners' view, they were "of no consequence to the outcome of the election." Pets.' Br. 10. *That* is of no consequence to Judge Salinas's probable cause finding. Violations of sections 20701 and 20511(2) need not be outcome determinative.

Petitioners also complain about scattered pieces of the affidavit. But courts do not evaluate evidence supporting probable cause "in isolation"—they look at "the whole picture." *Wesby*, 583 U.S. at 60; *see also id.* at 62 (rejecting similar "divide-and-conquer approach"). Regardless, Petitioners' isolated objections also do not withstand scrutiny.

***Ballot images.*** Petitioners argue that Witness 1's data analysis of missing images was not reliable because Witness 1 had "no formal role in the 2020 election." Pets.' Br. 11. But as Judge Salinas likely recognized, no role is necessary to analyze images (otherwise only insiders could investigate elections). And Petitioners do not dispute that the Georgia State Election Board reprimanded the County after investigating Witness 1's complaint. Aff. ¶ 16. Petitioners similarly attack Witness 2 for having "not worked an election" before 2021. Pets.' Br. 12. But as a member of the State Election Board by the time she reviewed the ballot images in May 2024, she had ample experience with election matters. *See* Aff. ¶ 22; *contra* Pets.' Br. 12. As another member of the State Election Board, Witness 3's confirmation that there were missing ballot images is also (at least) fairly credible. *Contra* Pets.' Br. 13. The fact that Witness 4 was unaware of missing images and

offered a possible innocent explanation does not undermine that (and other) evidence from multiple sources. *See Wesby*, 583 U.S. at 60-62; *contra* Pets.' Br. 13. And Petitioners' half-hearted assertion that images do not "seem to be covered" by section 20701, is clearly incorrect. *Contra* Pets.' Br. 13. Such images are quintessential "records and papers . . . relating to any . . . act requisite to voting," 52 U.S.C. § 20701, because they directly "relate" to the casting of ballots (which is why the images are created in the first place).[4] Regardless, the missing images also pertain to potential violations of section 20511(2).

**Duplicated Ballots**. Petitioners doubt Witness 5's analysis of duplicate ballots because Witness 5 admitted he "was not positive" that the data he used was from an Open Records Request from the County. Pets.' Br. 14. But probable cause does not require certainty—and Petitioners ignore that a County Director of Registration & Elections admitted that duplication "may have occurred," as seemingly confirmed by Witness 6's understanding of the candidate breakdown of duplicated ballots cast. Aff. ¶ 38; *see also id.* ¶ 36. Although Witness 5 thought duplication "could be intentional" (to make "recount numbers match") "but was not partisan," Judge Salinas was aware that section 20511 does not require partisan

---

[4] Petitioners argue that BRE did not preserve the images because such preservation "was not required by Georgia law" as of 2020. *Pets.' Br.* 13. But it *was* required by federal law. 52 U.S.C. § 20701.

gain. Aff. ¶ 35; *contra* Pets.' Br. 15. Petitioners cite statements by other investigators in the affidavit that any duplication "was not intentional" and "due to human error." Pets.' Br. 15 (internal quotation marks omitted). But unlike Witness 5, these investigators illogically equated whether a violation changed the election outcome with whether the violation was intentional. *See* Aff. ¶ 36. Their conclusions, based on different evidence at prior times, are not binding regardless.

***Pristine Purported Absentee Ballots***. Petitioners barely try to refute probable cause as to pristine purported absentee ballots. Aside from framing the evidence from multiple witnesses as "confusing" (without rebutting that evidence, some of which was corroborated, *see* Aff. ¶¶ 52-63, 70-73), Petitioners suggest all those witness statements are outweighed by statements from Witnesses 6 and 4. Pets.' Br. 16. Witness 6 doubted that a person could "inject fraudulent absentee ballots into the absentee ballot process," and thought any such effort would result in a discrepancy between "the number of ballots versus the [number of] people who voted." Aff. ¶ 69. But other evidence shows how fraudulent absentee ballots could have been used. *See, e.g., id.* ¶¶ 57 (boxes had broken security seals), 62 (witness saw people re-voting ballots), 71-72 (test ballots were unsecured and people could print ballots). Indeed, Witness 4 explained that comparing ballots to voters would not catch fake absentee ballots "if someone within the process of counting votes substituted fictitious ballots for real ballots." *Id.* ¶ 65. He doubted

that would have been feasible "on a large scale," but could not rule it out entirely. *Id.* ¶ 64. This investigation is about any violations, not just large scale ones.

>*Tabulator Tapes.* Petitioners' arguments about tabulator tapes have similar flaws. They discount Witness 3's statement about their importance because she did not work on the 2020 election—even though, as noted, she is on the State Election Board. Pets.' Br. 18. They emphasize "ballots are what matter" to the final count, but ignore that a violation need not be outcome determinative (and other categories of potential ballot irregularities). *Id.* They dismiss suspicious time reports as speculation without providing any explanation for why poll closing and report printed times were unrealistically close. *Id.* at 18-19. And they wholly fail to address that Judge Salinas considered witness statements that tabulators were missing from some machines, one tabulator was used to close out 15 machines from 12 locations, protective counters were identical on at least five tabulator tapes, and in some instances the reported number of ballots exceeded the protective counter number. *Id.* ¶¶ 45, 46.

>In sum, Petitioners' isolated arguments are neither persuasive nor capable of undermining the magistrate's probable cause determination as to the affidavit as a whole—especially given the exceedingly deferential standard.

c.  Petitioners' *Franks* objections to the affidavit are meritless, and certainly not strong enough to show callous disregard.

i. As discussed more below, *see* pp. 35-37, *infra*, Petitioners have all but admitted they have no genuine desire or use for the records at issue. What is their real motivation?  They want a freewheeling evidentiary hearing that disrupts an ongoing criminal investigation and reveals privileged information. Indeed, Petitioners' outlandish *Touhy* request admits their goal is to conduct a hearing to "understand the investigation" and "assess" the affiant's statement "that he had not included in the affidavit every detail of the investigation." Ex. A. This is a classic case of a party improperly using Rule 41(g) "for strategic gain." *In re Sealed Case*, 716 F.3d 603, 607-08 (D.C. Cir. 2013).

That is inappropriate in the context of Rule 41(g), which looks only to whether the United States callously disregarded Petitioners' constitutional rights and whether the United States lacks a need for the evidence. Under *Franks*, Petitioners would need to provide an "offer of proof" demonstrating "deliberate falsehood or reckless disregard for the truth" in statements that were necessary to the magistrate's probable cause finding. 438 U.S. at 171. In reviewing for "callous disregard," any *Franks* violation would need to be indisputable. And as explained in more detail below, Petitioners do not come close to showing any *Franks* violation—and certainly not an egregious one. To the contrary, they are on a fishing expedition with a desperate and futile hope to find such a violation.

24

Holding an evidentiary hearing would thus turn the *Franks* and "callous disregard" standards on their heads, and it is entirely unnecessary. Given all the defects described, Petitioners' motion can and should be swiftly resolved on the law and undisputed facts. That is even more true where the government would likely assert various privileges to any questioning regarding the details of an ongoing investigation. *See, e.g.*, *Congressional Requests for Information from Inspectors General Concerning Open Criminal Investigations*, 13 Op. O.L.C. 77, 81 (1989) ("[A]ll investigative reports are confidential documents of the executive department of the Government . . . . Counsel for a defendant or prospective defendant . . . could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon.").

If it were otherwise, every search warrant would be prematurely attacked under Rule 41(g), with demands for evidentiary hearings to get a sneak peek at the federal government's ongoing criminal investigation. Once again, the Court should tread carefully before inviting such abuse of Rule 41(g).

ii. The particulars of Petitioners' objections confirm that they do not come close to satisfying the *Franks* standard, let alone Rule 41(g)'s "callous disregard" standard. "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. For an evidentiary hearing to be proper, "the challenger's attack must be more than conclusory and

25

must be supported by more than a mere desire to cross-examine." *Id.* Rather, as noted, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth." *Id.* "Allegations of negligence or innocent mistake are insufficient." *Id.* "They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons." *Id.* Those specific arguments and allegations, moreover, "must be accompanied by an offer of proof." *Id.* "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* And even "if these requirements are met, . . . if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171-172.

Far from establishing an egregious violation of *Franks*, Petitioners' attack on the affidavit flunks the *Franks* standard at every step. Once again, they target statements and purported omissions in isolation. And once again, *Petitioners* are the misleading ones.[5]

---

[5] Given the *Franks* requirements of specifically identifying purportedly misleading portions of the affidavit and providing an accompanying offer of proof, the United States limits its arguments to those points raised in Petitioners' brief.

*County Admissions*. Petitioners' lead argument is that the affidavit wrongly stated that the County admitted to "impropriety." Pets.' Br. 21. But Petitioners concede that the County "has acknowledged . . . errors or inefficiencies" (albeit while framing them as "innocent"). *Id.* Petitioners assume that it is recklessly or intentionally misleading to characterize errors and inefficiencies as improprieties. But the dictionary shows otherwise. *See impropriety*, Oxford Online Dictionary ("The quality of being improper," including "incorrectness, erroneousness, [and] inaccuracy."), https://www.oed.com/dictionary/impropriety_n1 (last visited Feb. 20, 2026). Regardless, read in context, the affidavit clearly does not suggest that the County admitted to intentional misconduct or violations of federal criminal law. Petitioners' attempt to turn a semantic dispute into a deliberate falsehood (with no citation to any offer of proof on this issue) is beyond the pale. And given the other evidence, probable cause would easily exist without the County's admissions.

*Pristine Ballots.* Petitioners assert that pristine absentee ballots "are a[] typical and benign byproduct of overseas and military voting." Pets.' Br. 21 (citing Macias Decl. ¶ 23). But a *Franks* argument cannot merely suggest that the affiant overlooked a possible explanation by "negligence or innocent mistake," and Petitioners' purported offer of proof (a declaration they cite only as to this and one other issue) makes no effort to show that the affiant himself was deliberately or

recklessly misleading on this point. *Franks*, 438 U.S. at 171. Regardless, one "innocent explanation" for some of the pristine ballots could not defeat probable cause. *Wesby*, 583 U.S. at 61. Nor does this explanation meaningfully explain suspicious evidence like the box with 107 identical pristine ballots (as described by two witnesses) or the stack of pristine ballots from a nursing home. Aff. ¶¶ 58, 61, 63. Petitioners' assertion that the affidavit omits information about the Secretary of State's investigation into pristine ballots, Pets.' Br. 21, 22, ignores that the affidavit both (i) expressly acknowledges that Secretary of State investigators found "no evidence of fraud, dishonesty, or intentional misconduct," Aff. ¶ 82, and (ii) includes more detailed perspectives from *two* Secretary of State officials who were skeptical that fraudulent pristine ballots were used (or used systematically), Aff. ¶¶ 64-69, 74-75—as Petitioners themselves emphasized in their probable cause argument, *see* p. 22, *supra*. That is hardly an effort to hide the Secretary of State's views (recklessly, intentionally, or otherwise)—and certainly not material to Judge Salinas's probable cause finding.

***Missing Ballots During Recount***. Petitioners do not dispute that the County's recount total changed by nearly 17,000 votes the day after it was first announced. Pets.' Br. 23. They nevertheless call the affidavit's statement to that effect "flagrantly misleading." *Id.* But elsewhere, Petitioners acknowledge that although the introductory portion of the affidavit "describes this supposed issue

as a 'deficiency or defect,' there is no further discussion of it anywhere else in the Affidavit." Pets.' Br. 17. On their own account, the recount total discrepancy could not have been material to Judge Salinas's probable cause finding.

*Tabulator Tapes.* Petitioners say the affidavit "misleadingly omits the SoS's conclusion that tabulator tapes have no relevance to official vote counts." Pets.' Br. 24. But Petitioners' own quote makes clear that tabulator tapes are "additional documentation of the ballots cast." *Id.* To the extent the Secretary of State report states that missing tabulator tapes do not imply that "ballots themselves are unaccounted for," *id.*, nothing in the affidavit (which primarily relies on suspicious data from tabulator tapes rather than missing tabulator tapes) states or implies otherwise. In any event, the affidavit includes a Georgia Secretary of State official's statements minimizing the importance of tabulator tapes because "the ballots are what mattered." Aff. ¶ 48. There was no omission on this point at all—let alone a material omission that would undermine all the other evidence.

*Witness Bias.* Petitioners believe a few of the witnesses have "bias[] and credibility issues." Pets.' Br. 25. Those arguments are misplaced, because *Franks* permits "impeachment . . . of the affiant, not of any nongovernmental informant." 438 U.S. at 171. Regardless, Petitioners' claims of bias (pointing only to case citations and internet links rather than any reliable offer of proof) are exceedingly weak. For example, they attack Kurt Olsen. But the affidavit merely mentions that

this investigation originated from a referral sent by Olsen. Aff. ¶ 6. It does not rely on him as a witness or for any evidence. Similarly, Petitioners attack Witness 7, but the affidavit does not rely on Witness 7 for evidence, either. *See id.* ¶ 44 (merely stating that Witness 7 asked someone to perform an analysis). To the extent the report appears to take aim at another witness for believing in "election conspiracies," Pets.' Br. 26, Petitioners cannot negate probable cause for an investigation concerning federal election law by circularly assuming that all such investigations are unfounded and anyone who disagrees is not a proper witness.

*

In the end, the Court can simply compare Petitioners' arguments with the affidavit to conclude that the latter was not deliberately or intentionally misleading—let alone materially so. Across the affidavit, the agent acknowledged (over twenty times) innocent alternatives and contrary perspectives. Petitioners' attempt to make a substantial evidentiary showing that the affiant's evenhanded recitation was deliberately or recklessly misleading is woefully inadequate. They attach a lengthy declaration (which they barely cite) about alternative explanations, and they point to report findings that the affidavit already reflects in substance. None of that can show intentional or reckless misrepresentation. The Court should reject Petitioners' attempt to leverage a meritless Rule 41(g) motion into an evidentiary sideshow under the guise of *Franks*.

## B.    Petitioners' Secondary "Callous Disregard" Arguments Fail

### 1.    *Statute of limitations issues are irrelevant.*

Petitioners' timing arguments cannot impact the Rule 41(g) analysis. With respect to section 20701, they argue that the retention window is only 22 months. *See* Pets.' Br. 29. So what? That does not mean a violation of the retention requirement is prosecutable only within the same 22-month period.

More to the point—with respect to both the 22-month retention window and Petitioners' argument that a 5-year limitations period applies to section 20511, Pets.' Br. 28—"statute of limitations is a defense and must be asserted on the trial by the defendant in criminal cases." *Biddinger v. Comm'r of Police of City of New York*, 245 U.S. 128, 135 (1917). Even if a criminal defendant could make a limitations argument, that would have no bearing on the reasonableness of a warrant-based seizure, because "a statute-of-limitations defense becomes part of a case only if the defendant puts the defense in issue." *Musacchio v. United States*, 577 U.S. 237, 248 (2016). "The existence of a statute of limitations bar is a legal question that is appropriately evaluated by the district attorney or by a court after a prosecution [has] begun, not by police officers executing an arrest warrant." *Pickens v. Hollowell*, 59 F.3d 1203, 1207–08 (11th Cir. 1995). The possibility of such a defense, then, cannot establish a Fourth Amendment violation (let alone a "callous" one).

Relatedly, Petitioners gloss over how any limitations period would be calculated given conduct that may have occurred during various inquiries and

investigations following the November 2020 election (as detailed in the affidavit).

Any subsequent criminal acts, or acts in furtherance of a criminal conspiracy,

would restart the limitations period. In the end, questions about calculating that

period would always be case-specific—which underscores why courts examine

limitations defenses raised in concrete prosecutions, not abstract Rule 41 motions.

2.     *Other state proceedings are irrelevant.*

Petitioners' argument that "this seizure effectively enjoined an ongoing

state judicial proceeding" in purported violation of *Younger v. Harris*, 401 U.S. 37

(1971), Pets.' Br. 29, has no merit.

To start, *Younger* concerns a federal court's power "to enjoin pending

proceedings in state courts." 401 U.S. at 45. Even then, "[c]ircumstances fitting

within the *Younger* doctrine . . . are exceptional." *Sprint Commc'ns, Inc. v. Jacobs*, 571

U.S. 69, 73 (2013) (internal quotation marks omitted). But "this seizure" was an

exercise of the Executive Branch's power to execute a lawful search warrant

pursuant to a federal investigation. The Executive Branch cannot "enjoin"

anything in the *Younger* sense. To the extent Petitioners' real gripe is with "the

issuance of the federal warrant," Pets.' Br. 30, that is also not a judicial injunction

of any state court proceeding. *Younger* does not bar the Executive from proceeding

with a federal investigation.

The details of the underlying proceeding underscore the weakness of Petitioners' argument. Beyond not pointing to any injunction, Petitioners are invoking a State court order that was entered *against* one of them. Pets.' Br. 30 (citing *Allen*). In *Allen*, BRE officials petitioned to quash two subpoenas issued by the Georgia State Elections Board; the court denied their motion such that the Clerk would provide the materials once the parties and the court had sorted out costs and scheduling. *See* Doc. # 1-1 at 7-8. Those proceedings are now stayed, so there is no order requiring compliance. *See* Pets.' Br. 30. Consider the gamesmanship that would follow if a tentative State-court loss could shield property from a search warrant. If anyone could invoke *Younger* to challenge issuance of a search warrant, it would not be Petitioners.

### 3. *Even if Petitioners could assert constitutional interests in local election authority, the United States did not callously disregard those interests.*

Petitioners also assert a free-floating interest in local control over elections. Pets.' Br. 31-34. But such structural concerns are unmoored from an individual's "possessory interest in the property," *Howell*, 425 F.3d at 974, and are thus not relevant to the Rule 41(g) analysis, *accord United States v. Calandra*, 414 U.S. 338, 349 n.6 (1974) ("Rule 41([g]) does not constitute a statutory expansion of the exclusionary rule.").[6]

---

[6] *Calandra* refers to Rule 41(e), but Rule 41(e) was later redesignated to Rule 41(g).

Regardless, Petitioners do not dispute that Congress can define offenses related to federal elections. *See, e.g.*, *United States v. Saylor*, 322 U.S. 385, 387 (1944). Nor do they dispute that sections 20701 and 20511 are lawful exercises of that power. The fact that section 20703 *also* authorizes the Attorney General to inspect election records during the section 20701 retention period does not somehow undermine the United States's broader investigative authority. *Contra* Pets.' Br. 32.

This investigation also has no impact on Petitioners' election authority. It does not interfere with any County practice or process. As discussed below, the Clerk intends to destroy or divest the documents (and would have but for a court order). The United States's retention of records that would otherwise remain with the Clerk, who does not want them, hardly violates Petitioners' sovereignty—let alone callously so.

## IV. THE EQUITABLE FACTORS PRECLUDE RULE 41(G) RELIEF

Because Petitioners cannot establish callous disregard—an "indispensable" factor—their motion can be denied without considering the balance of the equities. *Trump*, 54 F.4th at 698. Nonetheless, the equitable factors—Petitioners' individual interest and need for the material, irreparable harm, and whether there is an adequate remedy at law—independently compel denial and dismissal for lack of jurisdiction. The United States's continued need for the records requires the same.

**A. Petitioners Do Not Have An Interest In And Need For The Property**

Petitioners "ha[ve] no noteworthy need" for the records. *Richey v. Smith*, 515 F.2d 1239, 1243 n.9 (5th Cir. 1975). As discussed, they have no possessory interest at all. In any event, "personal interest in or ownership of a seized document is not synonymous with the need for its return. In most search warrants, the government seizes property that unambiguously belongs to the subject of a search. That cannot be enough to support equitable jurisdiction." *Trump*, 54 F.4th at 699.

Petitioners never adequately "explain . . . why" they have a unique need for the records. *Id*. Petitioners cite no "Georgia statutes" with which they are "now unable to comply." Pets.' Br. 34. As explained, they cannot seriously rely on "court orders" entered *against* them. *Id*.

In reality, Petitioners' original motion and other public materials confirm they do *not* need (or even want) the records—they just don't want the United States to have them, which is insufficient for Petitioners to prevail. *See Trump*, 54 F.4th at 699 ("Plaintiff's task was to show why *he* needed the documents, not why the government did not."). Petitioners have always conflated their position with the Clerk's. And in their original motion, Petitioners admitted that a court "order to maintain the documents at issue . . . is the reason the 2020 election materials were still being stored in the Clerk's office despite the statutory retention period having long past." Doc. # 1-1 at 7. In fact, in the lead up to the 2024 election, counsel for

the Clerk asked a court to allow the Clerk to divest or destroy the same records. Judge Robert McBurney, *MOTIONS HEARING: Favorito et al. v. Wan et al. (20cv343938)*, at 13:30–19:03 (YouTube, June 24, 2024), https://youtube.com/watch?v=yXpVAUJzSUM.[7] Petitioners merely wish to interfere with the United States's ability to conduct an investigation.

### B.    Petitioners Cannot Show Irreparable Injury

For similar reasons, Petitioners cannot show they "would be irreparably injured by denial of the return of the property." *Trump*, 54 F.4th at 699 (internal quotation marks omitted). This factor focuses "on the injury to [the plaintiff] from loss of the property" itself. *See, e.g.*, *United States v. Search of Law Office, Residence, and Storage Unit of Alan Brown*, 341 F.3d 404, 415 (5th Cir. 2003).

For all the reasons already discussed, Petitioners are suffering no such injury. Anyone could raise unfounded "chain of custody" concerns as to seized items. Pets.' Br. 35. And Petitioners' claimed interest in "verify[ing] the chain of custody of the election returns," *id.*, cannot demonstrate irreparable harm given

---

[7] The United States requests that the Court take judicial notice of this video under Rule 201 (b)(2). Judge McBurney asked counsel for the Clerk: "Are you here to say, we're done, we don't want to preserve the evidence anymore, find your own warehouse?" Counsel responded: "That's correct. We don't want to. The clerk does not want to continue preserving the evidence. . . . The clerk would really like to be able to move out old stuff so that she can fulfill her obligation to store" future election records. Counsel then stated that the records "can be destroyed" and "if they get destroyed, they get destroyed."

that the records were not in their custody (and the Clerk wants to divest or destroy the records). If anything, given the information and statements in the affidavit, Petitioners' desire to control the chain of custody shows how much returning the records would jeopardize an ongoing investigation.

Courts have treated failure to show irreparable harm as independently dispositive in this context. *See, e.g.*, *Alan Brown*, 341 F.3d at 415 (rejecting claimed "irreparable harm which [the plaintiff] must have proven to prevail in the Rule 41([g]) proceeding"); *United States v. Bacon*, 900 F.3d 1234, 1237 (10th Cir. 2018) ("[T]he district court should dismiss a Rule 41(g) motion if the movant has failed to make this showing[.]"). This Court should do the same.

### C.    Petitioners Cannot Show That They Lack Adequate Legal Remedies Because There Is No Harm To Remedy

Courts also consider "whether the plaintiff has an adequate remedy at law for the redress of his grievance." *Trump*, 54 F.4th at 700. "The real question that guides [the] analysis is this—adequate remedy *for what?*" *Id.* at 701. "If there has been no constitutional violation—much less a serious one—then there is no harm to be remediated in the first place." *Id.* That is the case here. Petitioners have not established any possessory interest, let alone any constitutional violation, let alone a callous one. They are without a remedy because there is no lawful basis for them to seek a return of the records at issue.

### D.    The United States Needs The Records

If any party faces a risk of irreparable harm, it is the United States. An additional basis for denying a Rule 41(g) motion is where "the government's need for the property as evidence continues." *United States v. Garcon*, 406 F. App'x 366, 370 (11th Cir. 2010). There is a need to retain evidence when there is a possible future trial. *See United States v. Alford*, 805 F. App'x 924, 926 (11th Cir. 2020) (a Rule 41(g) motion is "properly denied" where the government has a "legitimate need to retain the evidence" because the evidence may be needed in a future trial). These limits ensure that Rule 41(g) cannot be used to disrupt ongoing criminal investigations.

The undisputed evidence shows the United States has a continuing "need for the property" as part of its ongoing criminal investigation into the potential mishandling of the criminal records at issue, which could result in a future trial. And the affidavit submitted in support of the search warrant—"which, it bears repeating, was authorized by a magistrate judge's finding of probable cause," *Trump*, 54 F.4th at 700—explains that the original materials include information that may not be perceptible in mere electronic copies, like whether a ballot was creased or folded. Aff. ¶¶ 9(d), 52-53, 58-59. Regardless, Petitioners ask the Court to order the United States to "return any copies"—confirming their bare desire to interfere with an investigation. Pets.' Br. 35.

Ultimately, it makes no sense to order original evidence returned to Petitioners when there is probable cause to believe such records were not properly retained and preserved in the first place, which was one of the bases for obtaining the warrant. If the United States loses the records now, it might never regain them. As a result, the United States has at least "state[d] a legitimate reason" for retaining the seized materials, and that independently compels denial of the motion and dismissal for lack of jurisdiction. *Garcon*, 406 F. App'x at 369.

## CONCLUSION

For these reasons, the Court should deny Petitioners' Rule 41(g) motion, vacate the evidentiary hearing, and dismiss this case for lack of equitable jurisdiction.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

/s/ THOMAS C. ALBUS
THOMAS C. ALBUS
*Special Attorney to the Attorney General*
*and United States Attorney for the*
*Eastern District of Missouri*
Missouri Bar No. 46224
Thomas Eagleton U.S. Courthouse
111 S. 10th Street, 20th Floor
St. Louis, MO 63102
(314) 539-2200

A. TYSEN DUVA
*Assistant Attorney General – Criminal*
*Division*

R. TRENT MCCOTTER
*Associate Deputy Attorney General*

MICHAEL WEISBUCH
*Senior Counsel to the Associate Attorney*
*General*

PETER L. COOCH
*Trial Attorney/Senior Counsel, Criminal*
*Division*

**Certificate of Compliance**

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing

brief has been prepared using Book Antiqua, 13 point font.

/s/ THOMAS C. ALBUS
THOMAS C. ALBUS
*Special Attorney to the Attorney General*
*and United States Attorney for the*
*Eastern District of Missouri*
