### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| ROBERT L. "ROBB" PITTS, CHAIRMAN, FULTON COUNTY BOARD OF COMMISSIONERS; FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS; and FULTON COUNTY, GEORGIA,<br><br>　　　　　　　Petitioners,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>　　　　　　　Respondent. | Civil Action No.<br>1:26-CV-00809-JPB |

### REPLY IN SUPPORT OF AMENDED MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(G)

Each of Respondent's arguments is designed with one primary goal: to evade this Court's review of an unconstitutional seizure of hundreds of thousands of original election records and thus set a precedent that would grant the federal government unchecked power to interfere with the local administration of elections. Contrary to Respondent's assertion, each Petitioner has standing, and Respondent's grossly reckless seizure of original election records callously disregarded Petitioners' Fourth Amendment interests and the sovereignty protected by the Constitution.

Respondent cannot hide behind the Magistrate Judges *ex parte* approval of the warrant. The mere issuance of a warrant does not preclude a finding of callous disregard, especially given that the Affiant inexplicably failed to inform the

1

Magistrate Judge that (a) the investigation's core allegations were contradicted by the specific findings of Georgia Secretary of State investigations and independent reviews that were omitted from the Affidavit, (b) Kurt Olsen, upon whose referral this criminal investigation was predicated, has been twice sanctioned for false statements to courts about elections, and (c) the Affidavit was rife with statements from witnesses lacking credibility, with extraordinary and undisclosed biases.

Furthermore, endorsing the Affiant's theory of probable cause—which relies on a series of "if-then" hypotheticals—would radically lower the standard for the issuance of search warrants. Under Respondent's novel theory of probable cause, the DOJ could seize any record, no matter how unfounded the claim of a violation, so long as the records would be evidence of a crime **if** someone had the intent to use them in a criminal scheme. That logic would eviscerate the probable cause standard and give the federal government blanket authority to seize anything it desired.

In addition to the defects in probable cause, this was not a run-of-the-mill seizure. Respondent seized 656 boxes of original election records—the only copies in existence—and now claims an unqualified right to hold them indefinitely. In doing so, Respondent callously disregarded Petitioners' constitutionally delegated function of administering elections and their obligation to assure Georgia voters of the integrity of elections, as well as the superior court's ability to effectuate relief in ongoing litigation. Unless legal guardrails are imposed, the type of warrant that

Respondent utilized in this matter would allow the federal government to seize original election records even in the middle of recounts in contested battleground states. There is no historical precedent for Respondent's seizure.

Protecting the public's confidence in the right to vote is of the highest importance. That confidence is undermined by allowing Respondent to retain possession of the only set of Fulton County's election records, with no provision for ensuring the integrity of the records themselves, no return of the originals, no provision of a verified digital copy, and no mechanism for Petitioners to (a) comply with a wide range of statutory and litigation obligations relating to the records themselves or (b) rely on its original election records to defend against continuing false public accusations of election fraud, including those now prompted by **this very seizure.** The President's recent statements about Petitioners are the paradigmatic example. ("[A]ll those crooked ballots were taken . . . . They cheated like dogs.").[1] Without the ballots, Petitioners cannot rebut false narratives and are at risk of the state or federal government stripping them of the ability to administer Fulton County's elections. This Court should reject Respondent's invitation to condone the federal government's callous disregard of Petitioners' constitutional

---

[1] Sarah Kallis, *Trump visits Georgia, a target of his election falsehoods, as Republicans look for midterm boost*, Associated Press (Feb. 20, 2026), https://www.gpb.org/news/2026/02/20/trump-visits-georgia-target-of-his-election-falsehoods-republicans-look-for-midterm.

rights and infliction of irreparable harm on both Petitioners' reputations and the public's confidence in elections.

## I.    Petitioners Have Standing to Obtain a Return of the Original Election Records.

Attempting to avoid an adjudication on the merits, Respondent insists that no one has standing to challenge its seizure, but each standing objection fails.

### A.    Petitioners Are Proper Parties to Seek a Return of the Records.

To start, Respondent misapprehends the standard for Rule 41 relief in asserting that Petitioners have no "possessory interests" in the seized ballots.[2] Federal Rule of Criminal Procedure 41(g), by its terms, does not require "possessory," "custodial," or any specific property interest; it merely requires that the  party be "aggrieved" by an "unlawful search or seizure" "or by the deprivation of property." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (en banc) (per curiam), *overruled in part on other grounds by Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 21 (2017) ("[Rule

---

[2] *See United States v. Fed. Ins. Co.*, No. 23-438, 2024 WL 1714273, at *1 (9th Cir. Apr. 22, 2024) ("Because property-owning entities like Federal can be injured by government seizure—just like property-owning individuals . . . Federal was entitled to bring a Rule 41(g) motion for return of its property."); *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1375 (10th Cir. 1990) ("Rule 41(e) requires us to consider not only the lawfulness of the search and seizure, but also whether Kitty's is aggrieved by a deprivation of its property, despite the legality of the search.").

41(g)] nowhere speaks of an ownership interest; rather, by its plain terms, it authorizes anyone aggrieved by a deprivation of property to seek its return.").

Respondent asserts that because the FBI seized the ballots from the Fulton County Clerk of Courts ("the Clerk"), only the Clerk can seek their return. That argument is incorrect and moot. The Clerk has moved to join as a petitioner. Doc. 36. But even if the Clerk had not done so, Petitioners would have standing. Notably, Respondent admits that the Clerk has standing to seek a return of the seized records. That same logic confirms that the Fulton County Board of Registration and Elections ("FBRE") and Fulton County have standing as well. "The Georgia Constitution recognizes the 'clerk of the superior court' as an **officer of the county**." *Seibert v. Alexander*, 351 Ga. App. 446, 448 (2019). It likewise refers to the clerk as a "**county officer**," Art. 9, § 1, ¶ III, while other statutes confirm that the Clerk is a "**county constitutional officer**," O.C.G.A. § 15-6-60.1(a)

The Clerk merely holds election records for the FBRE (which is the "election superintendent") and the County. For example, under O.C.G.A. § 21-2-500(a):

> [i]mmediately upon completing the returns required by this article…the superintendent shall deliver [election records] in sealed containers to the clerk of the superior court or, if designated by the clerk of the superior court, to the county records manager or other office or officer under the jurisdiction of a county governing authority which maintains or is responsible for records …
>
> The clerk, county records manager, or the office or officer designated by the clerk shall hold such ballots and other documents under seal, unless otherwise directed by the superior court, for at least 24 months[.]

In other words, the Clerk acts as a registrar with whom Petitioners deposit their records; the ownership, right to access, and interest in the records never diminishes.

By statute, the FBRE has the "powers and duties of the election superintendent," is empowered to conduct elections, register voters, and can exercise powers and duties over voter registration, and absentee ballot procedures. O.C.G.A. § 21-2-40; Georgia Law, 1989, Act 250. The FBRE is obligated to make its election records "open to public inspection" and has an ongoing role that requires access to the records, even when the records are in the Clerk's custody. *See* O.C.G.A. §§ 21-2-72; 21-2-493(j.2)(1); 50-18-71(k). Given the FBRE's statutory need for ongoing access to the records, its role in election administration, and its ability to obtain records from the Clerk as required by law, it has an obvious "interest" in a return of the seized records.

Moreover, pending litigation involving the State Election Board, the FBRE, and Fulton County, as well as Fulton Superior Court Judge McBurney's order staying a related case, confirm that the County and the FBRE have standing. In his order staying *Allen v. State of Georgia*, in which the FBRE sought to quash two State Election Board subpoenas for the 2020 election records, Judge McBurney expressly noted that **Fulton County** is "**the rightful custodian**" of the people of Fulton County's 2020 ballots. *See Allen v. State of Georgia*, No. 24CV014632, (Ga. Super. Ct. Fulton Cnty. Feb. 9, 2026), 2 n.2 ("The parties were consulted and agreed that

6

the matter should be stayed, rather than dismissed as moot, in the off chance the people of Fulton County's ballots and other papers are returned to **their rightful custodian (the County)** and, upon return, remain in a condition that would allow for duplication.") (emphasis added).

Further, the State Election Board has repeatedly issued subpoenas for Fulton County's 2020 election records to the FBRE. *See Allen*, No. 24CV014632, (Dec. 22, 2025 Order) (describing State Election Board's subpoenas issued to FBRE and noting that FBRE "will be obligated to comply upon payment of costs"). There is no question that each Petitioner,[3] including the Clerk, has standing to seek a return of the seized records.[4] And, as detailed below, Petitioners' need for the records more than satisfies the *Richey* factors. *See Richey v. Smith*, 515 F.2d 1239 (5th Cir. 1975).

### B.    Petitioners Are Not Categorically Exempt from the Fourth Amendment.

Respondent's radical position that counties are a Fourth-Amendment-free zone is unsupported by any authority and patently false. Resp. at 1–2, 14. The record confirms that Respondent does not even believe its own argument. If counties are

---

[3] The Court should disregard Respondent's suggestion that Chairman Pitts lacks standing, Resp. at 13 n.2. He is Chairman of the county governing authority that has "original and exclusive jurisdiction" over county property. O.C.G.A. § 36-5-22.1(a)(1). Because the County is a party, and because Petitioners seek a return of the property to the County, the Court need not resolve Pitts's standing.

[4] Even Respondent's opposition describes the records as "County election records." Resp. at 9. Likewise, the Affiant admits that the election records are "retained by the [FBRE]," Doc. 22-2 ¶ 11, though the Clerk had technical custody.

unprotected by the Fourth Amendment, then the FBI never needed a warrant to seize Fulton County's records in the first place. Under Respondent's novel view of the Fourth Amendment, the U.S. Government has *carte blanche* to kick down the doors of local government buildings, seize ballots without a warrant, and take state records without any legal process whatsoever. No court has adopted such an extreme position, and this Court should not be the first.

None of Respondent's cases supports its argument. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 261 (1990) ("The question presented by this case is whether the Fourth Amendment applies to the search and seizure by United States agents of property that is owned by a **nonresident alien** and located in a **foreign country**.") (emphasis added). Respondent's cases involve third-party standing, extraterritorial searches, and Fifth Amendment due process—not the physical seizure of property in the United States. Resp. at 14. And Respondent's brief is silent about whether the Fourth Amendment is suspended when counties are parties.

To the extent Respondent suggests that the Fourth Amendment only protects natural persons, Respondent is simply wrong. Courts have consistently held that corporate entities have Fourth Amendment standing. *See, e.g.*, *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977) ("The respondents do not contend that business premises are not protected by the Fourth Amendment. Such a proposition could not be defended in light of this Court's clear holdings to the contrary."); *United*

*States v. Leary*, 846 F.2d 592, 596 (10th Cir. 1988) ("[I]t seems clear that a corporate defendant has standing with respect to searches of corporate premises and seizure of corporate records") (citation and quotation omitted).

Notably, every county in Georgia is a "body corporate," and like other corporations recognized under state law, counties have the "power to sue or be sued." O.C.G.A. § 36-1-3 ("Every county is a body corporate, with power to sue or be sued in any court."). And Respondent does not dispute that Fulton County can own, possess, govern, and have property interests. C*ompare* Am. Mot. at 7 n.2 *with* Resp. at 12–13. Accordingly, there is no basis to conclude that any of the Petitioners are excluded from Fourth Amendment protections given their interest in the seized property.

Respondent does not dispute that the Fourth Amendment's prohibition on unreasonable seizures flows from a party's property interests, even where no other liberty or privacy interest is at stake. *See* Am. Mot. at 7 (citing *Soldal v. Cook Cnty., Ill*, 506 U.S. 56, 65 (1992)); *cf. United States v. Jones*, 565 U.S. 400, 407 (2012). The Court should reject Respondent's radical interpretation of the Fourth Amendment that places local government functions at the mercy and discretion of

unrestricted federal agents. But regardless, Petitioners would still be entitled to Rule 41 relief under other constitutional grounds.[5]

## II. The Seizure of Originals, With No Provision Made for Access or a Copy, Callously Disregarded Petitioners' Fourth Amendment Rights and Other Interests—Despite the Issuance of a Warrant.

### A. The Mere Existence of a Warrant Does Not Preclude a Finding of "Callous Disregard."

Respondent suggests that the mere existence of a warrant precludes a finding of "callous disregard" of constitutional rights. Resp. at 15. But it primarily relies on *Trump v. United States*, 54 F.4th 689, 696 (11th Cir. 2022), which did not address that issue at all. In *Trump*, following the execution of a search warrant at Mar-a-Lago for certain classified records, Petitioner Trump filed a "Motion for Judicial Oversight and Judicial Relief" demanding an injunction to stop DOJ from reviewing seized materials and the appointment of a special master—with no explanation as to how the "district court had jurisdiction to act on all of its requests" and without filing a motion for return of property under Rule 41(g). *Id.* Notably, in *Trump*, (a) the Petitioner did not challenge whether the warrant was supported by probable cause,

---

[5] As argued in the Amended Motion, the execution of a search warrant on a governmental entity exercising a delegated constitutional function implicates state sovereignty principles and the Tenth Amendment. Am. Mot. at 31-32.; *cf. Printz v. United States*, 521 U.S. 898, 919–20 (1997) ("[T]he Framers rejected the concept of a central government that would **act upon . . . the States**, and instead designed a system in which the State and Federal Governments would exercise concurrent authority over the people.") (emphasis added).

(b) the district court found no "callous disregard," and (c) neither Trump nor DOJ argued otherwise. *Trump*, 54 F.4th at 698 ("The callous disregard standard has not been met here, and no one argues otherwise.").

Nor could they. Unlike Petitioners, who are exercising a delegated constitutional function and seek a return of hundreds of thousands of election ballots, Petitioner Trump was no longer in office and sought a return of, among other things, his "passport," which had already been returned to him before he filed the motion, as well as personal items such as "golf shirts" and "pictures of Celine Dion." *Id*., at 699 n.3.

Here, by contrast, the FBI seized hundreds of thousands of ballots of Fulton County residents. It did so despite the fact that (a) Respondent's Affidavit in support of the seizure recklessly omitted material facts that would have precluded judicial authorization of the seizure (b) Respondent had recently initiated civil litigation for the same records, (c) those records were the subject of state court proceedings and state subpoenas, (d) the records belonged to an entity exercising a constitutional function delegated to it by a sovereign, here, the State of Georgia, and (e) the warrant made no provision for a return of originals, a copy, or any consideration of Georgia's statutory scheme which contemplates ongoing County and FBRE access to the

records so long as they exist.[6] These factors collectively demonstrate that Respondent seized the election records in callous disregard of Petitioners' rights.

Moreover, numerous courts have recognized that relief under Rule 41 may be appropriate even where the property at issue was seized pursuant to a warrant. *See Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985) (affirming district court's holding that return of property was appropriate where the search warrant authorizing the seizure was overbroad); *Ctr. Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 748 (9th Cir. 1989) (same); *cf. Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593, 599 (5th Cir. 2021) ("The district court incorrectly concluded that the government did not show a 'callous disregard' for Harbor's rights simply because it obtained search warrants prior to seizing Harbor's privileged materials.").

To the extent that *Trump* noted that the "callous disregard" standard should remain high to prevent a flood of litigation by aggrieved search warrant targets, that concern is not implicated here: Petitioners exercise crucial governmental functions and, as a result, have a sovereign duty that the usual private search warrant targets do not. In other words, not "[a]nyone could make these arguments." *Trump*, 54 F.4th at 701. Respondent's seizure of the originals without any protocol for maintaining record integrity—and with complete indifference to Petitioners' need for access to even a copy—easily demonstrates "callous disregard," with or without a warrant.

---

[6] *See* O.C.G.A. §§ 21-2-72; 21-2-493(j.2)(1); 50-18-71(k).

Respondent's other cases do not help its position and do not create a *per se* rule that precludes a finding of callous disregard simply because a warrant issued. Unlike the barebones and facially deficient Affidavit here, *Matter of Search of 4801 Fyler Ave.*, 879 F.2d 385, 388 (8th Cir. 1989) involved a "lengthy and detailed affidavit describing a broad range of illegal activity." Here, the Affidavit identifies a range of activity that is **non-criminal**; as previously noted, there is no allegation of "willful" conduct, which is the dividing line between criminal conduct and human error. And, unlike here, there was no allegation that the affidavit was misleading, based on material omissions, and predicated on hypotheticals.

The Respondent's remaining citations have nothing to do with Rule 41(g) or the callous disregard standard. They are a mish-mash of inapposite cases that do not purport to define what constitutes "callous disregard," especially in the context of this case, which involves the seizure of hundreds of thousands of election records from a governmental entity. *See, e.g.*, *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("The validity of the warrant is not before us.") (qualified immunity); *Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009) (qualified immunity); *Marshall v. Barlow's, Inc*., 436 U.S. 307, 311 (1978) (rejecting OSHA's Secretary's position that "warrantless inspections to enforce OSHA are reasonable" under the Fourth Amendment). As explained below in Section II.C. below, Respondent's warrant was wholly lacking in probable cause.

**B.    The "Good Faith" Exception Does Not Apply to a Rule 41(g) Motion Seeking a Return of the Original Records Where the Respondent Can Obtain Access to Copies.**

Respondent suggests that the FBI's good faith reliance on a warrant forecloses Rule 41(g) relief and means the probable cause determination should be given "great deference." Resp. at 17 (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)). But that is not a correct statement of the law. *See, e.g.*, *J.B. Manning Corp. v. United States*, 86 F.3d 926, 928 (9th Cir. 1996); *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1375 (10th Cir. 1990). "If a district court determines that property has been illegally seized, the proper question in deciding the merits of a 41(e)[7] motion is **not** whether the officers acted in good faith, but whether returning the illegally seized documents would be reasonable under all of the circumstances. If the government's investigatory and prosecutorial interests can be served by retaining copies of the documents, **it is unreasonable for the government to refuse to return original documents** to the owner." *J.B. Manning*, 86 F.3d at 928.

Notably, this is not a criminal prosecution. So, the exclusionary rule does not apply, and the Court's finding of a Fourth Amendment violation does not result in the exclusion of evidence. Given this posture, if the Court grants a Rule 41 motion, "society does not incur the costs of exclusion." *J.B. Manning*, 86 F.3d at 928 ("Thus, granting a 41(e) motion does not increase the chance that a guilty defendant may go

---

[7] That rule is now housed in 41(g).

14

free, which was the concern behind the good faith exception.") (quotation marks and brackets omitted). Put differently, the Court can assess whether probable cause supported the warrant, without factoring in any purported good faith reliance.

Here, Respondent does not explain why it should be entitled to indefinitely retain the originals of hundreds of thousands of election ballots, voter roll data, and the contents of all 656 seized boxes. Instead, Respondent vaguely asserts that it needs the originals for a "future trial," which is facially implausible given that the statute of limitations for the offenses cited in the warrant has lapsed. Although Respondent also asserts that it needs to inspect "pristine absentee ballots," it does not explain why (a) it would need to retain any of the other original records, (b) why a digital copy is not sufficient, or (c) why that theoretical need justifies indefinite retention of the originals.

Given that a return of the originals does not foreclose Respondent from accessing a copy, the Court should grant Petitioners' Rule 41 relief for a return of the original records. Here, Respondent had numerous other channels to obtain copies of the records. But, without justification, it chose the most extreme option. It did not wait for the results of the civil litigation **it** initiated in *United States v. Alexander*; nor wait to use the discovery process by intervening in the pending litigation involving the State Election Board. It did not even use the normal procedure of a

grand jury subpoena. Given Respondent's alternative means of accessing copies of the records at issue, the Court should at a minimum order a return of the originals.

**C.    The Affidavit's Probable Cause Defects Are Extraordinary and Unprecedented.**

Respondent concedes that this Court must determine whether there is "substantial evidence" supporting the issuance of the warrant. Resp. at 17.

**i.    Respondent cites no authority establishing that the failure to retain a "ballot image" can ever violate 52 § U.S.C. 20701.**

Respondent agrees that the Affidavit must establish that there is a "fair probability" that a crime was committed. But there are no allegations establishing a violation of 52 U.S.C. § 20701. After 43 pages of briefing, Respondent cannot cite a case establishing that a "ballot image" is a covered record under 52 § U.S.C. 20701. That statute, which was passed in 1960, only applies to "records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting." A ballot image is none of these things; it is a digital scan created by a tabulating machine **after** a vote has already been cast. It is not an "application," not a "registration," not a "poll tax," and it is not an "act requisite to voting." The notion that an Eisenhower-era statute, passed decades before the existence of ballot imaging technology, requires the retention of digital ballot images defies common sense. Notably, Respondent concedes that, under Georgia law, election officials were not required to retain ballot images until after 2020. Though Respondent asserts that it

"was required under federal law," it cites nothing but the statute itself, which does not say that. Resp. at 21 (citing § 20701). No one appears to have been prosecuted for such a crime in the 66 years since the statute was enacted. Because there is "no probability" that the failure to retain a "ballot image" violated § 20701, and because the "ballot image" retention allegations are the only ones arguably implicating § 20701, the Court should not consider that statute in the probable cause analysis.

> **ii.    Respondent cites no authority defending the Affidavit's hypotheticals and failure to make any willfulness allegations whatsoever.**

Although Respondent argues that search warrant affidavits are not to be read in a "hypertechnical manner," Resp. at 19, alleging "willfulness" is not a technicality. It is the dividing line between routine election administration errors and federal crimes—and it is a core element that Congress established when it passed both statutes. Without it, the warrant seeks information about non-criminal conduct. Given the Affidavit's complete failure to even allege intent or willfulness, and its reliance on two hypotheticals instead of intent allegations, the Court should rule that the warrant lacked probable cause to issue. Respondent cites no authority for the proposition that affidavits can simply omit allegations about a key statutory element. *Cf. United States v. Brouillette*, 478 F.2d 1171, 1176–77 (5th Cir. 1973) ("Yet that is what must be established in order to justify a warrant under these circumstances. Otherwise, federal agents would be able, by merely mentioning a statute involving

interstate commerce, to search what would otherwise be establishments violating only local state law, possibly in the hopes of finding evidence which would support a federal violation.").

Here, Respondent does not dispute that both crimes identified in the warrant require willfulness. Nor does it dispute that the Affidavit is devoid of express allegations that anyone did anything willfully or intentionally. But to create the illusion that probable cause affidavits can simply ignore elements of a crime altogether, Respondent mischaracterizes the law by cobbling together a series of selective quotations wrenched from their context. But search warrant affidavits must allege facts supporting the elements of the offense. *Brouillette*, 478 F.2d at 1176–77.

Respondent quotes *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003) and says that "[p]robable cause does not require . . . specific evidence of each element of the offense." Resp. at 18 (ellipses in Response). But that selective quotation (and use of ellipses) obscures what the passage actually says: "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support **a conviction**." *Holmes*, 321 F.3d at 1079 (emphasis added). That full statement is undoubtedly true and undoubtedly irrelevant. And it certainly does not say that a search warrant affiant can ignore elements of a crime altogether and rely on hypotheticals instead. Again, this is

especially the case where the only thing separating normal election process mistakes from a federal crime is **one** element—intent.

Respondent then quotes *United States v. Johnson*, No. 22-12504, 2024 WL 371954, at \*4 (11th Cir. Feb. 1, 2024), a case about whether there was "reasonable suspicion" for a traffic stop—not the sufficiency of a *mens rea* allegation in a search warrant affidavit. Resp. at 18. The remaining cases are equally unhelpful. The out-of-district and non-binding *Jones v. Town of Seaford, Del.*, 661 F. Supp. 864, 871 (D. Del. 1987) confirms that there must be sufficient allegations of a "probability" of a criminal offense. *See also Gates v. Khokhar*, 884 F.3d 1290, 1300 (2018) (section 1983 case about a "warrantless arrest"). Shockingly, Respondent cites *United States v. Shemtov*, 2023 WL 7276484, at \*3 (N.D. Ga. Nov. 3, 2023) to argue that warrants are "the means" by which "*mens rea* evidence is obtained in the first place." Resp. at 19. But the case does not say that at all. And that proposition conflicts with the discredited notion that a "search can be justified by what it turns up[.]" *Bumper v. North Carolina*, 391 U.S. 543, 548 n.10 (1968); *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("[A search] is good or bad when it starts and does not change character from its success."). Moreover, nothing the Affiant submitted suggests that the seized records will show anyone's intent.

Undoubtedly, that is why even Respondent's attempt to defend the Affidavit as sufficient relies on hypotheticals. Resp. at 19 ("**if** ballot images were manipulated

. . . willfulness **could be inferred**') (emphasis added). But the Affiant himself did not make any such inference. And the Court should not draw inferences that the Affiant, who conducted the investigation and was free to include such information, expressly declined to include and instead framed as a pure hypothetical. Nor did he offer a reviewing court any basis to find a "probability" that any witness statement was credible, reliable, or corroborated in any way. *See* Am. Mot., at 11. In short, the Court should rule that the warrant lacked probable cause.

### D.  The Affidavit's Material Omissions and Misstatements Satisfy the *Franks* Standard for a Hearing

Without citing case law, Respondent asserts that "[i]n reviewing for 'callous disregard,' any *Franks* violation would need to be indisputable." Resp. 24. But no court has ever articulated such a standard. And though Respondent claims that "holding an evidentiary hearing would [ ] turn the *Franks* and 'callous disregard' standard on their heads," a party seeking a *Franks* hearing "face[s] a burden of production only: proof by a preponderance of the evidence is not required until the Franks hearing itself." *United States v. Maxwell*, 143 F.4th 844, 854–55 (7th Cir. 2025) (citation omitted).

To secure a *Franks* hearing, a party "need not overcome the court's speculation regarding an innocent explanation for the falsity or omission. While reasonable explanations for the omission of the information might well exist, the defendant need not disprove them before the *Franks* hearing itself." *United States v.*

*Glover*, 755 F.3d 811, 820 (7th Cir. 2014). Instead, Petitioners' only obligation is to make a "substantial preliminary showing" that, accounting for the Affidavit's reckless omissions, there was no showing of probable cause. *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

Petitioners have clearly made the preliminary showing necessary for a *Franks* hearing by pointing to the Affidavit's numerous omissions of material fact. Though "neither negligent mistakes nor immaterial omissions implicate *Franks*," *United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021), "[a] party need not show by direct evidence that the affiant makes an omission recklessly." *Id.* at 1326. Rather, "when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980); *see United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984) ("Because states of mind must be proved circumstantially, a fact finder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations.").

Here, the Affiant's recklessness may be inferred from his material omissions about the well-documented, innocuous explanations for the occurrences he portrays as potentially nefarious, as well as the biases of the witnesses upon whom he relies. Respondent attempts to downplay the significance of these omissions rather than refuting them, but this is a situation where "given the bare bones nature of the

21

probable cause finding from the four corners of the affidavit, the veracity of the affidavit [was] crucial to whether the judge would have found probable cause if presented with accurate and complete facts . . ." *United States v. Hueston*, No. 1:21-CR-37-HAB, 2021 WL 5231734, at *4 (N.D. Ind. Nov. 10, 2021).

Respondent does not dispute that the Affidavit omitted: the fact that pristine absentee ballots are a typical and benign byproduct of overseas and military voting; the fact that the Secretary of State specifically investigated pristine ballot allegations and found them to be entirely meritless; the fact that a scanner error during the recount (and not some unexplained discovery of late-arriving ballots) prevented Fulton County from reporting vote tallies to the Secretary of State on December 2, 2020; the fact that Kurt Olsen was sanctioned by multiple courts for lies about elections; and the fact that Witness 7, whom the *Atlanta Journal Constitution* has identified as Kevin Moncla, was reportedly referred to the FBI in 2023 for sending threatening emails to members of the SEB and an aide to Secretary of State Brad Raffensperger. Respondent's only answer is that these omissions were each, in isolation, immaterial. But Respondent seemingly fails to grasp that probable cause is a totality-of-the-circumstances inquiry, and that the cumulative impact of these omissions fatally undercuts a probable cause determination that was already hanging by a thread.

Moreover, Respondent does not dispute that "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report" for assessing probable cause. Am. Mot., at 11 (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).To that end, it is implausible that the magistrate judge would have issued this warrant had she known that the person the Affiant described as a "Presidentially appointed Director of Election Security and Integrity" was, in reality, a person whom federal courts have twice sanctioned for lying about elections. In any event, a visual comparison of (a) each allegation purportedly supporting probable cause, (b) each concession contained with the Affidavit that defeated probable cause, and (c) each material ommission from the Affidavit, confirms that the warrant is unsupported by probable cause. *See* Exhibit A, Demonstrative Chart ("The Affidavit's Illusory Allegations of Probable Cause").

## III.    The Seizure Was Unreasonable

### A.    Respondent Does Not Articulate a Legitimate Governmental Interest in Seizing Original Election Records to Investigate Time-Barred Conduct

Respondent advances no serious argument challenging the proposition that the statute of limitations bars **any** prosecution for conduct involving the 2020 election (*i.e.*, as of the date that the warrant issued, the only prosecutable conduct had to have taken place **after January 28, 2021**). But, as noted above, the Affidavit cites no conduct that could have violated 52 U.S.C. § 20701. As to 52 U.S.C. §

23

20511, no one "proceure[d]," "cast[]," or "tabulate[d]" any ballot after January 5, 2021. And Respondent makes no specific argument to the contrary. Without citing authority, Respondent speculates that "subsequent criminal acts" or "acts in furtherance of a criminal conspiracy, would restart the limitations period." Resp. at 31–32. What acts? Which conspiracy statute? This is speculation at its most extreme. Here, the issue is not that a statute of limitations defect *per se* defeats probable cause; it is that Respondent does not have a legitimate, let alone significant, interest in a criminal investigation that cannot yield a criminal prosecution, especially when balanced against Petitioners' competing governmental interest in retention of their own records. *Cf. Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 534 (1967) ("it is obviously necessary [when assessing reasonableness] first to focus upon the governmental interest which allegedly justifies official intrusion[.]"). As a logical matter, the more limited the governmental interest, the more callous the disregard of Petitioners' interests.

Respondent claims that the statute of limitations is irrelevant to the reasonableness of a warrant-based seizure. Resp. at 31–32. But none of

Respondent's authorities support that position.[8] Moreover, Respondent ignores Rule 41(g)'s balancing of "law enforcement interests" with property rights. *See* Fed. R. Crim. P. 41, Advisory Committee Notes, 1989 Amendments. Given the absence of any legitimate law enforcement interest in records that cannot be used in a criminal prosecution, the Court should order Respondent to return the original records.

### B. Respondent's Callous Disregard for Petitioners' Exercise of a Constitutionally Delegated State Function Was Unreasonable.

Respondent does not dispute that Petitioners retained original election records as an integral part of their delegated constitutional authority to administer elections. *See* U.S. Const. art. II, § 1, cl. 2. Nor does it dispute that Respondent deployed the warrant authority against a governmental entity discharging a function delegated to it by a state sovereign. Contrary to Respondent's assertion, the issue is not whether the federal government can criminalize certain election misconduct; it whether the federal government can profoundly disrupt the balance of power vis-a-vis the states by (a) indefinitely seizing original governmental election records based on nothing more than a bare assertion of probable cause and (b) laying waste to pending state

---

[8] *Biddinger v. Comm'r of Police of City of New York*, 245 U.S. 128, 134 (1917) and *Musacchio v. United States*, 577 U.S. 237, 247 (2016) stand only for the proposition that a criminal defendant must affirmatively raise the statute of limitations defense as a bar to an existing prosecution. *Pickens v. Hollowell*, 59 F.3d 1203, 1206–08 (11th Cir. 1995) is also inapposite because (1) the statute of limitations in that case only passed after the **arrest warrants** were validly issued, and (2) the court only held that there was no clearly established law sufficient to pierce qualified immunity.

court proceedings and investigations based on its official curiosity about what the records say. Because nothing in Rule 41(g) limits Petitioners' interests solely to Fourth Amendment claims, the Court can and should consider Respondent's callous disregard of these constitutional interests.[9]

## C.    Respondent Ignores the Seizure's End-Run Around State and Federal Litigation.

Respondent's seizure was even more unreasonable given that it effectively shut down state judicial proceedings relating to election administration. Respondent claims that "[o]ther state proceedings are irrelevant" because no judicial injunction issued. Resp. at 32. But as Respondent knew when it applied for the search warrant, those same election records were the subject of pending state and federal litigation involving petitioners—one of which Respondent itself initiated. *See, e.g.*, *Allen v. State of Georgia*, 24CV014632 (Fulton Cnty. Super. Ct. 2024); *United States v. Alexander*, No. 1:25-cv-07084 (N.D. Ga. Dec. 11, 2025). Yet without regard to the consequences on existing proceedings, Respondent submitted an affidavit that made no mention of those pending actions. In doing so, the warrant effectively ended numerous state proceedings relating to election administration; *see, e.g.*, *Allen*, 24CV014632 (Fulton Cnty. Super. Ct. 2024); and trampled on state and local

---

[9] *Cf. Comprehensive Drug Testing, Inc.*, 621 F.3d at 1173–74 ("[Rule 41(g)] nowhere speaks of an ownership interest; rather, by its plain terms, it authorizes anyone aggrieved by a deprivation of property to seek its return.").

interests including the "[s]tate's interest in enforcing the orders . . . of its courts." *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013).

## IV.   The Remaining Equitable Factors

Respondent incorrectly contends that Petitioners cannot satisfy the remaining equitable factors, namely (1) an interest in and need for the property seized, (2) irreparable harm from the continued deprivation of property, and (3) the absence of an adequate remedy at law. *See Richey*, 515 F.2d at 1243–44. Although courts apply a balancing test for 41(g) relief that does not require Petitioners to satisfy each factor, Petitioners do satisfy each one.

First, as discussed above, Petitioners have an interest and need for the seized records. Since the 2020 election, there has been a relentless campaign of misinformation, fraud, and falsehoods designed to undercut the legitimacy of that election. Importantly, the judicial branch, has stood as a critical bulwark against such improper uses of the legal system, rejecting complaints based on untruths and sanctioning litigants like Kurt Olsen, from whom Respondent took direction to initiate this gross abuse of authority.

But that campaign of misinformation continues. It did not take long for the then-candidate and now-President to cite **this seizure** as proof that Fulton County's 2020 election results cannot be trusted. He has said: Petitioners "cheated like dogs," and has fueled an effort to strip Fulton County of its authority to administer

elections.[10] Petitioners have a responsibility to separate fact from fiction. But they cannot do so without access to their own records. While Petitioners need the records to respond to subpoenas, ongoing litigation, and public records requests, they also have a need and overriding interest in rebutting unfounded attacks on the 2020 election with evidence.

Consequently, Petitioners' lack of access to their own election records continues to cause irreparable harm. Without any transparency or oversight, federal agents have taken the original and only copy of election records—previously secured under seal—to a location unknown to Petitioners for no obvious purpose, given the statutory bar on any prosecutions in this matter. Simply put, for each retread allegation of fraud—whether this time for "Pristine Ballots" or "Tabular Tapes"—Petitioners need the original, unadulterated records to provide Georgia citizens with undeniable proof that they can trust the election process. Every day that the records remain in Respondent's sole custody impairs Petitioners' ability to fight back against baseless claims of election fraud, and meanwhile, the President continues to spur on conspiracy theorists. The seizure has also been used to justify other attacks on Petitioners, including calls for the State Election Board to strip Petitioners of election

---

[10] Sarah Kallis, *Trump visits Georgia, a target of his election falsehoods*, Associated Press (Feb. 20, 2026), https://www.gpb.org/news/2026/02/20/trump-visits-georgia-target-of-his-election-falsehoods-republicans-look-for-midterm.

administration authority.[11] Such threats to divest Petitioners of that authority are real and serious, and they gain more momentum the longer that Respondent maintains possession of the records pursuant to a defective search warrant.

Contrary to Respondent's suggestion that Petitioners' intent is to "disrupt" what is now a stale and baseless "criminal investigation," Petitioners' goal is to secure access to an unadulterated set of their original records. It is Respondent—not Petitioners—that has insisted on being the sole custodian. Respondent, following proper procedures, may of course use lawful means to obtain a copy of election records.[12] But there is no basis for indefinitely depriving Petitioners of their original records based on the improper means Respondent used here.

Given the existing litigation, Petitioners are the ones who have to establish a complete chain of custody and maintain an interest in the original, unadulterated election records as long as they remain subject to the superior court's order. *See,*

---

[11] *See, e.g.*, Deidra Dukes, *Georgia lawmaker urges state takeover of Fulton County elections after FBI ballot seizure*, Fox5 Atlanta (Feb. 11, 2026), https://www.fox5atlanta.com/news/fulton-county-elections-state-board-takeover-proposal ("Sen. Greg Dolezal . . . is calling for the Fulton County Elections to be handled by the state"); *State Election Board won't take over Fulton County elections for now*, WSB-TV (Feb. 18, 2026), https://www.wsbtv.com/news/local/fulton-county/state-election-board-wont-take-over-fulton-county-elections-now/JNG634MSW5HXHFHT4QM5MJXODE/ (whether State Elections Board will intervene in County elections depends on results of the seizure).

[12] *See, e.g.*, *Allen v. State of Georgia*, Civil Action No. 24CV014632, at 1 (describing State Election Boards subpoenas issued to FBRE for production of 2020 election records and noting that FBRE "will be obligated to comply upon payment of costs").

*e.g.*, O.C.G.A. § 21-2-500(a) (requiring ballots to be preserved "for at least 24 months" or as "otherwise provided by order of the superior court."). And, because normal, proper processes (*e.g.*, civil discovery or even a grand jury subpoena) would provide Respondent with copies, Respondent should not be able to obtain more through an improper use of a search warrant.

Third, Petitioner lacks any adequate remedy at law. Tellingly, Respondent does not argue to the contrary—it just reiterates its previously addressed arguments regarding irreparable harm. Where, as here, Petitioners cannot file suit for damages and are not currently subject to a prosecution such that suppression is available, the only proper remedy is a return of property under 41(g). *See Harbor Healthcare Sys.*, 5 F.4th at 600 (where suppression is not applicable, "[movant's] injury can only be made whole by the government returning and destroying its copies of the privileged material.").

## V.    Conclusion

For the reasons stated herein, Petitioners request that the Court (1) order Respondent to return all original seized materials; (2) order Respondent to return any copies of the seized materials without prejudice to its ability to use lawful channels to obtain copies; (3) order Respondent to verify precisely what was taken and copied via detailed chain-of-custody documentation; and (4) order any other relief the Court deems appropriate.

Respectfully submitted, this 24th day of February, 2026.

/s/ Y. Soo Jo

Y. Soo Jo
Georgia Bar No. 385817
OFFICE OF THE FULTON
COUNTY ATTORNEY
141 Pryor St. SW, Suite 4038
Atlanta, Georgia 30309
Tel.: (404) 612-0246
soo.jo@fultoncountyga.gov

/s/ Kamal Ghali

Kamal Ghali
Georgia Bar No. 805055
Michael C. Duffey
Georgia Bar No. 710738
CHAIKEN GHALI LLP
One Atlantic Center
1201 W. Peachtree St. NW, Suite 2300
Atlanta, Georgia 30309
Tel.: (404) 795-5005
kghali@chaikenghali.com
mduffey@chaikenghali.com

/s/ Abbe David Lowell

Abbe David Lowell*
John Bolen*
LOWELL & ASSOCIATES, PLLC
1250 H Street NW
Washington, D.C. 20005
Tel.: (202)-964-6110
alowellpublicoutreach@
lowellandassociates.com
jbolen@lowellandassociates.com

/s/ Stephen Jonas

Stephen Jonas*
Norman Eisen*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE
Suite 1580, Washington, D.C. 20003
Tel.: (202) 594-9958
steve@democracydefenders.org
norman@democracydefenders.org

*Counsel for Petitioners Robert L. Pitts, Chairman, Fulton County Board of Commissioners, Fulton County Board of Registration and Elections, and Fulton County, Georgia*

*Admitted pro hac vice*

31

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record.

This 24th day of February, 2026.

*/s/ Michael C. Duffey*
Michael C. Duffey