## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| ROBERT L. "ROBB" PITTS, CHAIRMAN, FULTON COUNTY BOARD OF COMMISSIONERS; FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS; and FULTON COUNTY, GEORGIA,<br><br>　　　　　　　　　　　Petitioners,<br><br>　　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　　Respondent. | Civ. No. 1:26-cv-809-JPB |

## BRIEF OF BIPARTISAN FORMER JUSTICE DEPARTMENT OFFICIALS AS AMICI CURIAE IN SUPPORT OF PETITIONERS

Kurt G. Kastorf
GA Bar No. 315315
KASTORF LAW LLC
1387 Iverson Street NE, Ste. 100
Atlanta, GA 30307
Tel: (202) 999-6303
kurt@kastorflaw.com

Carey R. Dunne*
FREE AND FAIR
LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018
Tel: (646) 434-8604
carey@freeandfair.org

*pro hac vice application pending

*Counsel for Amici Curiae*

**INTERESTS OF AMICI**

Amici are former high-level Department of Justice ("DOJ") officials who served during Republican and Democratic administrations. (*See* Appendix A.) Amici have substantial experience creating and implementing criminal law enforcement policy within DOJ, and they are acutely aware of DOJ's immense authority. They are also aware that administrations from both parties have long sought to carefully limit the unbridled and unprincipled exercise of that authority, particularly where, as here, substantial and competing constitutional rights and responsibilities are at stake. Amici respectfully submit that the public record in this case strongly suggests that DOJ has failed to live up to the high standard set by previous administrations and that the search warrant executed at 5600 Campbellton Fairburn Road, in Fulton County, Georgia (the "Search Warrant") represents the abdication of DOJ's role as a protector of constitutional rights and liberties.

**INTRODUCTION**

DOJ's role in our legal system is unique. DOJ is not simply counsel to the executive branch, much less a tool through which executive branch officials may pursue personal vendettas or grievances. As previous administrations have understood, DOJ's role in our system is to seek justice on behalf of the American people. In amici's experience, justice may be achieved only when it is tempered by restraint and candor.

In amici's experience, DOJ has historically strived to fulfill this role. In matters implicating constitutional rights and responsibilities, DOJ has sought to carefully weigh the full use of its authority against those competing interests. DOJ has codified this perspective in regulations and guidelines that prohibit the exercise of DOJ's authority where the risk to individual constitutional liberties is too great.

Based on the public record concerning the Search Warrant, amici respectfully submit that DOJ appears to have failed to fulfill its essential role in our justice system when it submitted the Search Warrant for judicial review. The warrant seeks extraordinarily sensitive information that implicates constitutional federalism, the First Amendment rights of Fulton County voters, and the Fourth Amendment right of the county itself—and it is information that was already available to DOJ in a separate proceeding through the civil discovery process. Moreover, the affiant who swore out the search warrant omitted crucial information that undermines or contradicts the warrant's key factual assertions, and therefore its claim to establish probable cause. And the warrant's loose allegations of hypothetically criminal activity are, in any event, beyond the statute of limitations for the subject offenses.

Based on the publicly available record, amici submit that DOJ should not have authorized the submission of the Search Warrant to a magistrate judge. Indeed, based on amici's experience at DOJ, they submit that it is exceedingly

unlikely the Search Warrant would have been approved for submission to a magistrate judge in the Departments in which they served.

## ARGUMENT

### I. Prosecutors play a crucial role in protecting individual constitutional rights.

The three coordinate branches of our federal government share responsibility for protecting individual constitutional rights.  *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 798 (2008) (noting that "[t]he political branches" have an "independent obligation[] to interpret and uphold the Constitution").  Federal courts have the final word on the scope of individual constitutional rights, *see Marbury v. Madison*, 5 U.S. 137 (1803), and, in cases before them, they are responsible for the imposition (or not) of remedies to address violations of those rights, *see, e.g.*, *United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.").[1]  But judicial remedies are a final bulwark against unconstitutional actions, not the first line of defense.

Every day—far from courtrooms and outside the presence of judges and juries—executive officials make decisions and take actions that implicate

_____

[1] Internal citations, quotation marks, and alterations are omitted from all case quotations.  Emphasis is in the original except where otherwise noted.

individual constitutional rights. Many of these actions are never subject to judicial review or are, at most, only partially amenable to judicial remedies. *See, e.g.*, *U.S. Dep't of Com. v. Montana*, 503 U.S. 442, 458 (1992) ("In invoking the political question doctrine, a court acknowledges the possibility that a constitutional provision may not be judicially enforceable. Such a decision is of course very different from determining that specific . . . action does not violate the Constitution.").[2] Executive branch officials have nevertheless recognized that they must act in accordance with the Constitution, irrespective of whether their actions may be subject to judicial review. *See, e.g.*, The Constitutional Separation of Powers Between the President and Congress, 20 Op. Off. Legal Counsel 124, 180 (1996) (explaining that in cases where "the President has special constitutional responsibility" to make decisions that are not justiciable, "the executive branch's regular obligation to ensure, to the full extent of its ability, that constitutional requirements are respected is heightened by the absence or reduced presence of the courts' ordinary guardianship of the Constitution's requirements").

---

[2] *See also, e.g.*, Trevor W. Morrison, *Constitutional Avoidance in the Executive Branch*, 106 Colum. L. Rev. 1189, 1259 n. 21 (2006) (citing Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1304 (2000) ("In the vast majority of cases . . . executive branch interpretation is not subjected to judicial review") and Henry P. Monaghan, *Marbury and the Administrative State*, 83 Colum. L. Rev. 1, 6 n.33 (1983) ("[C]onstitutional questions may arise outside the adjudicatory context—for example, where no plaintiff has standing.").

In modern American history, prosecutors have played a unique role in ensuring that law enforcement officers comply with constitutional law and norms. At the founding, "[t]here were no professional police" and "criminal investigations were generally conducted by private parties who presented cases to the government for charging."  Richard M. Re, *The Due Process Exclusionary Rule*, 127 Harv. L. Rev. 1885, 1919 (2014).  That changed dramatically by the twentieth century, with the advent of professional police forces, the attendant changes in investigation and prosecutions at the state and federal levels, and therefore the "exten[sion of] the machinery of criminal justice beyond the courtroom." *Id*. at 1920 n.172.  In this new environment, prosecutors—"steeped in legal training and attentive to judicial interpretations of constitutional rights"—were charged with overseeing law enforcement activities and protecting individual rights. *Id*. at 1920–21.  Some commentators have described prosecutors as an "intra-executive branch check" on law enforcement activities.  Russell M. Gold, *Beyond the Judicial Fourth Amendment: The Prosecutor's Role*, 47 U.C. Davis L. Rev. 1591, 1596 (2014).[3]

---

[3] This is of course "not a reflection of investigative officers as individuals." *United States v. Guerrerio*, 675 F. Supp. 1430, 1435 (S.D.N.Y. 1987).  It is, rather, a result of the division of labor between police officers and agents on one hand, and prosecutors on the other.  Police officers and agents are engaged in the "competitive enterprise of ferreting out crime" and therefore their role is, by design, "less conducive to the protection of individual rights." *Id*. (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

In our modern system, federal prosecutors are "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). Federal prosecutors are not merely advocates serving institutional—much less personal—interests; they are "in a peculiar and very definite sense the servant of the law," whose interest is not in winning, "but that justice shall be done." *Id*.; *Guerrerio*, 675 F. Supp. at 1435 ("a prosecutor is better suited [than investigating agents] to the task of guaranteeing that the subject of a criminal investigation in not denied his rights"). They may of course employ "every legitimate means" to pursue that interest, but they must "refrain from improper methods" even when—perhaps *especially* when—there is no obvious remedy for behavior that may be perceived as politically advantageous, but constitutionally unsound. *Berger*, 295 U.S. at 88. As then-Attorney General Robert Jackson explained, "[o]nly by extreme care can we protect the spirit as well as the letter of our civil liberties, and to do so is a responsibility of the federal prosecutor." Robert Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3, 6 (1940).

Prosecutors' special role in our system is reflected in law and regulations. Modern prosecutors have constitutional and statutory obligations that are not shared by members of the defense bar, *see, e.g.*, *Brady v. Maryland*, 373 U.S. 83

(1963); 18 U.S.C. § 3500, and ethical obligations intended to ensure that their

lodestar is justice, rather than personal grievance or political advantage, *see, e.g.*,

ABA Model Rule 3.8 ("Special Responsibilities of a Prosecutor").  DOJ's Justice

Manual instructs that federal prosecutors must "mak[e] certain that the general

purposes of the criminal law . . . are adequately met, while making certain also that

the rights of individuals are scrupulously protected."  Justice Manual 9-27.110

Comment.  And since the late nineteenth century, courts have recognized the

"quasi-judicial" nature of prosecutorial decision-making and protected it with the

same immunities applicable to judges and grand jurors.  *See Imbler v. Pachtman*,

424 U.S. 409, 422–23 & nn.19, 20 (1976) ("The common-law immunity of a

prosecutor is based upon the same considerations that underlie the common-law

immunities of judges and grand jurors acting within the scope of their duties.");

*Kadivar v. Stone*, 804 F.2d 635, 637 (11th Cir. 1986) ("a prosecutor enjoys absolute

immunity when engaging in quasi-judicial functions").

In amici's experience, DOJ has for decades sought to meet these high

standards and to balance its immense authority to pursue law enforcement interests

against its unique role in the protection of individual rights and liberties.  DOJ has

not always succeeded in achieving this goal, but nor has it shirked from

responsibility when it has fallen short.

II.    **DOJ has historically taken great care to assess and protect competing constitutional interests.**

Through its governing regulations, internal policies, and oversight practices, the Department of Justice has historically demonstrated a commitment to exercising its authority to obtain evidence in criminal investigations with restraint—particularly when the object of compulsory process is, like Fulton County, a sovereign, non-suspect third party performing core governmental functions.

For starters, regulations governing DOJ's collection of evidence recognize that government searches and seizures "necessarily involve[] intrusions into personal privacy," and that federal officers therefore have a responsibility to use search warrants only when less intrusive means are not appropriate. 28 C.F.R. § 59.1(a)–(b). A search warrant "*should not be used*" unless less intrusive means "would substantially jeopardize the availability or usefulness of the materials sought." 28 C.F.R. § 59.4(a)(1) (emphasis added). And DOJ regulations explicitly reject use of a warrant merely because the custodian might resist civil process: "The fact that the disinterested third party possessing the materials may have grounds to challenge a subpoena or other legal process is not in itself a legitimate basis for the use of a search warrant." 28 C.F.R. § 59.4.

In sensitive contexts involving core constitutional concerns, DOJ has required even greater caution. For example, given the First Amendment

implications, compulsory process directed at news media is an "extraordinary measure[], not standard investigatory practice[]." 28 C.F.R. § 50.10(a)(3). Such process "should not be used to obtain peripheral, nonessential, or speculative information." *Id.* § 50.10(c)(4)(i). Similarly, given the Sixth Amendment implications of demanding information from attorneys, DOJ requires that prosecutors "take the least intrusive approach" of "obtaining information from other sources or through the use of a subpoena" where feasible, obtain approvals from the U.S. Attorney or Assistant Attorney General, and generally exercise "close control" over subpoenas or search warrants. Justice Manual § 9-13.410-420. The principle is clear: Where, as here, constitutional sensitivities are heightened, DOJ has historically exercised restraint, narrow tailoring, and careful oversight to ensure that individual rights and liberties are protected.

Such concerns are particularly acute where federal process targets a sovereign entity administering elections. "The Department has long recognized that the States—not the federal government—are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and court." Justice Manual § 9-85.300. Accordingly, DOJ "should generally *avoid* interfering or appearing to interfere with election administration, tabulation, validation, or certification." *Id*. (emphasis added). When federal

authorities seize large volumes of voting records from a county election authority acting pursuant to state law, the sovereign interests DOJ has acknowledged are directly implicated.

Finally, DOJ's recent experience in the context of the Foreign Intelligence Surveillance Act ("FISA") makes clear the importance of caution, restraint, and candor when investigations implicate sensitive information.  In December 2019, the DOJ Inspector General ("DOJ OIG") conducted a review of four FISA applications and identified "significant inaccuracies and omissions," including failures to disclose information that was inconsistent with the government's theory, mischaracterizations of source reporting, and assertions that lacked adequate evidentiary support.  DOJ OIG, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* viii, 375, 413, App. 1 (Dec. 2019).  DOJ OIG concluded that the errors violated DOJ policy requirements, and "made it appear as though the evidence supporting probable cause was stronger than was actually the case." *Id.* at 413.  DOJ OIG further explained that "the Department's decision makers and the court should have been given complete and accurate information so that they could meaningfully evaluate probable cause." *Id.* Although the Search Warrant was drafted and submitted to the Magistrate Judge in a different context, the concern is the same: because courts rely on the government's sworn representations to adjudicate probable cause, inaccuracies and

omissions distort the judicial determination and deprive the court of the ability to make an informed assessment of probable cause.

### III.    The government's warrant application deprived the Magistrate Judge of a neutral probable cause determination.

Based on the public record in this case, amici respectfully submit that the submission of the Search Warrant to a magistrate judge strongly suggests that DOJ failed in its role to serve as an intra-executive check to protect constitutional rights and liberties.  The affiant omitted material facts from the warrant application, thereby depriving the Magistrate Judge of information necessary for judicial review to function as the Fourth Amendment requires.

> #### a.    *The warrant affidavit omits contrary investigative findings and adverse credibility determinations.*

The government's application and supporting affidavit omits two categories of material information: (1) well-documented contrary findings by investigations rejecting similar allegations of election impropriety; and (2) the serious credibility issues and potential biases of the witnesses on which the affidavit relies.  These material omissions undermine the magistrate's ability to make a neutral probable cause determination and call into question the internal review processes utilized by DOJ officials in approving this application.

First, the search warrant application omits critical facts and findings of prior investigations regarding the 2020 presidential election in Fulton County.  For example, the application suggests that Fulton County's failure to retain all ballot

images indicates possible violations of election record retention statutes. (*See* Dkt. 22-1, ¶¶ 12–28.) But the application fails to note that Georgia law did not require preservation of ballot images in 2020, and ballot images play no role in tabulating official results—the controlling record is the paper ballot and the cast-vote record. (*See* Dkt. 30-1, ¶ 14.) The application also fails to acknowledge that a prior investigation by the Georgia Secretary of State confirmed that ballots in Fulton County can be scanned and counted without storing images, and Fulton County's results were confirmed through multiple counts of physical ballots. (*See* Dkt. 30-1, ¶ 14(c), (n).)

Similarly, the application asserts that some ballots were scanned multiple times during the recount, implying that votes were intentionally duplicated. (*See* Dkt. 22-1, ¶¶ 29–38.) But again, the application fails to acknowledge that a previous investigation already determined that duplicate ballot images did not result in duplicate vote totals and did not affect the accuracy of the election results. (*See* Dkt. 30-1, ¶ 16(d).) Likewise, the application asserts that the existence of unfolded, "pristine" absentee ballots evidences fraud, but fails to disclose that this allegation was also investigated and refuted by a Secretary of State investigation that found no malfeasance. (*See* Doc. 30-1, ¶¶ 19–27.)[4]

---

[4] Unfolded ballots commonly result from the lawful duplication of overseas military ballots which are often sent on regular, unscannable printer paper. (*See* Dkt. 30-1, ¶¶ 19–27.)

Second, the search warrant application fails to disclose material adverse witness credibility information that should have been included, particularly given the warrant's uniquely sensitive context.  The affidavit in support of the application notes that this "criminal investigation originated from a referral sent by Kurt Olsen, Presidentially appointed Director of Election Security and Integrity."  (*See* Dkt. 22-1, ¶ 6.)  But the application fails to explain that Mr. Olson has been sanctioned by a federal court and disciplined by a state bar for making frivolous, unsubstantiated claims of election fraud.[5]  Other witnesses include an individual who conducted a data analysis based on unverified data downloaded from something called "ZebraDuck," and a chemical engineer who also conducted an analysis of absentee voter ballot images notwithstanding his lack of experience, much less expertise, in election administration or voting systems.  (*See* Doc. 22-1, ¶¶ 13, 29.)

> b. *The deliberate or reckless omission of material information from the warrant application undermines probable cause.*

If the Court determines that DOJ omitted material facts from the warrant application, the Court has authority to remedy DOJ's omission.  *See Franks v.*

---

[5] *See Lake v. Hobbs*, 643 F. Supp. 3d 989, 1012 (D. Ariz. 2022) (Mr. Olson sanctioned as counsel for making "false, misleading, and unsupported factual assertions" in complaint alleging security failures of state's voting systems), *aff'd sub nom*. *Lake v. Gates*, 130 F.4th 1064 (9th Cir. 2025); *In the Matter of Kurt Olsen*, No. PDJ 2024-9004 (Ariz. Presiding Disciplinary Judge Oct. 17, 2024) (disciplining Mr. Olson for "making 'unequivocally false' representations" in case alleging election fraud).

*Delaware*, 438 U.S. 154, 155–56 (1978) (holding that a warrant should be voided when the affidavit in support of the warrant contains intentional false statements or statements made with "reckless disregard for the truth"); *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997) (intentional or reckless omissions invalidate a warrant if the omitted facts would have prevented a finding of probable cause). Where "facts omitted from the affidavit are clearly critical to a finding of probable cause[,] the fact of recklessness may be inferred from proof of the omission itself." *Madiwale*, 117 F.3d at 1327 (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)); *see also United States v. Reivich*, 793 F.2d 957, 962 (8th Cir. 1986) (warrants may be voided "where the omission is sufficiently material to cast doubt on the existence of probable cause"). Law enforcement may not "turn a blind eye to exculpatory information that is available to them, and instead support their actions on selected facts they chose to focus upon." *Kingsland v. City of Miami*, 382 F.3d 1220, 1228 (11th Cir. 2004), *abrogated on other grounds by Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020)

Here, although the affidavit acknowledges that "[s]ome of t[he] allegations have been disproven" while others were "substantiated" (*see* Dkt. 22-1, ¶ 6), it fails to identify which allegations have already been rejected, by what investigative body, and on what grounds. It fails to include material findings from previous Georgia Secretary of State investigations, and it fails to include critical adverse

information regarding the credibility of key witnesses, including Mr. Olson—the entire impetus for this criminal investigation.  The omission of contrary investigative findings and witness credibility limitations is not a minor drafting oversight—it is the type of one-sided presentation that the Fourth Amendment protects against and that the normal processes of DOJ guard against.

## CONCLUSION

For the reasons set forth above, and based on amici's experience and the public record in this matter, amici respectfully submit that the Search Warrant is inconsistent with DOJ's role in our justice system and, in particular, its history of protecting individual rights and liberties.

Respectfully submitted,

February 25, 2026

*/s/   Kurt G. Kastorf*
Kurt G. Kastorf
GA Bar. No. 315315
KASTORF LAW LLC
1387 Iverson Street NE, Ste. 100
Atlanta, GA 30307
kurt@kastorflaw.com
(202) 999-6303

Carey R. Dunne\*
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018
Telephone: (646) 434-8604
carey@freeandfair.org

\*pro hac vice application pending

*Counsel for Amici Curiae*

## Appendix A – List of Amici

**Robert J. Cleary**, United States Attorney for the District of New Jersey (1999–2002), Acting United States Attorney for the Southern District of Illinois (2002–2002), First Assistant United States Attorney for the District of New Jersey (1994–1999), and Assistant United States Attorney for the Southern District of New York (1987–1994);

**Deirdre M. Daly**, United States Attorney for the District of Connecticut (2013–2017), First Assistant United States Attorney for the District of Connecticut (2010–2013), Assistant United States Attorney for the Southern District of New York (1985–1997);

**Murray Dickman**, Primary Assistant to the United States Attorney General (1988–1991);

**Stuart M. Gerson**, Acting Attorney General of the United States (1993), Assistant Attorney General for the Civil Division (1989–1993), and Assistant United States Attorney for the District of Columbia (1972–1975);

**Peter Keisler**, Acting United States Attorney General (2007), United States Assistant Attorney General for the Civil Division (2003–2007), and United States Associate Attorney General (2002–2003);

**John S. Martin Jr.,** United States Attorney for the Southern District of New York (1980–1983) and Assistant United States Attorney for the Southern District of New York (1962–1966);

**Stanley Twardy**, United States Attorney for the District of Connecticut (1985–1991);

**Bill Weld**, United States Assistant Attorney General for the Criminal Division (1986–1988) and United States Attorney for the District of Massachusetts (1981–1986).