# EXHIBIT 2

Fulton County Superior Court
***EFILED***QW
Date: 12/19/2025 6:29 PM
Che Alexander, Clerk

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| SHERRI ALLEN, in her capacity as Chair of the Fulton County Board of Registration and Elections *et al.*,<br>　　　Petitioners<br><br>vs.<br><br>STATE OF GEORGIA,<br>　　　Respondent | CIVIL ACTION 24CV014632 |

## ORDER DENYING QUASHAL

Over half a decade ago, on 3 November 2020, official electoral counts showed that a majority of voters in Georgia did not select Donald Trump as their choice for President. Repeated recounts confirmed this result. Nonetheless, some continue to insist that the numerous state tallies were faulty and that the rot behind them is centered here in Fulton County. The State Election Board (or at least a majority of its members) has remained peculiarly fixated on this outcome. On 5 November 2024 -- the day when a majority of voters in Georgia *did* select Donald Trump as their choice for President -- the State Election Board (SEB) issued two subpoenas to the Fulton County Board of Registration and Elections (BRE)[1] demanding that the BRE -- even though it was in the midst of the busiest and most critical weeks of the year -- promptly produce reams of information concerning *not* the current election but instead the election from four years earlier.

---

[1] The two subpoenas were identical; one was for the BRE and the second was for the County's "Board of Elections", care of Nadine Williams, the County's Director of Elections.

As stale and ill-timed as these requests might seem to the casual observer, they were nonetheless inquiries that fell squarely within the SEB's authority.  O.C.G.A. § 21-2-31 defines the SEB's duties; they include "investigat[ing] when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections" and "tak[ing] such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections."[2]  Evaluating how a particular election jurisdiction performed its vote tabulation responsibilities and reviewing the results of those efforts (*i.e.*, the ballots and related papers) is part of what our Legislature tasked the SEB to do.  And, to obtain such election performance information, the SEB enjoys "full power to subpoena persons and papers."  O.C.G.A. § 21-2-33.

On 18 November 2024 -- the due date set forth in the subpoenas[3] -- Petitioners filed a petition to quash the subpoenas, claiming they were "unreasonable" and "oppressive" and they "concern[ed] matters already resolved." (Petition at 1).  After the State responded, the two sides asked the Court to stay any proceedings while they discussed cost-effective ways for the BRE to provide the SEB with the voluminous materials it was seeking.[4]  When it became clear that no negotiated resolution was forthcoming, the Court set a hearing for 8 September 2025.  However, on the eve of the

---

[2] O.C.G.A. § 21-2-31(5) and (10).

[3] This made the attempt to quash timely (although just barely): a party seeking to quash a subpoena must petition the court "promptly and in any event at or before the time specified in the subpoena for compliance therewith."  O.C.G.A. § 24-13-23(b).

[4] This included a joint request (which was granted) to continue the hearing the Court initially set for 27 February 2025.

**2**

hearing, Petitioners filed an amended petition that recast its claims from quashal to declaratory and injunctive relief.

This procedural swerve prompted the State to ask for time to file a motion to dismiss the amended petition.  The Court subsequently entered a briefing schedule and set the matter down for hearing on the motion to dismiss as well as the declaratory and injunctive relief claims set forth in the amended petition.  That hearing occurred on 24 November 2025.

At the hearing, after considerable sparring over Petitioners' ability to sue the State pursuant to Article I, Section II, Paragraph V(b)(1), of the state constitution and the applicability of *res judicata* to the SEB's agency actions, there was a breakthrough: the State agreed that O.C.G.A. § 24-13-23 applied to the SEB's subpoenas, reverting the discussion back to the simpler and more productive exploration of whether the subpoenas should be quashed.

They should not.  In the context of a motion to quash, the party that issued the subpoena bears the burden of proving that its subpoena seeks relevant information. *Gregg v. State*, 331 Ga. App. 833, 835 (2015).  The SEB has done that: its twin subpoenas seek information that is directly relevant to the SEB's roles and responsibilities.[5]  That

---

[5] Petitioners also argue that the subpoenas should be quashed because they relate to what they claim is a closed investigation for which the Board cannot subpoena information.  The Court rejects this argument for four reasons: First, on their face, there is nothing that links the subpoenas to any particular investigation, open or closed (other than a generic inquiry into the operations of the "Fulton County Board of Elections").  Second, plausible or not, the SEB articulated an interest in learning from the "mistakes" of the 2020 election to prepare for future elections.  Clearly that is within the Board's purview, regardless of one's perspective on whether the 2020 vote count was particularly error-riddled in Fulton County. Third, it is not plain from the limited record established that the SEB's investigation into Fulton County's 2020 election management was in fact closed.  While two Board members bandied about the Latin term *res judicata* ("a matter judged") to stanch the flow of demands for Petitioners' data from the other three members, it is not clear that the "matter" (*i.e.*, the SEB's original investigation) had ever been completed.

information may be a tad outdated (and the basis for the request somewhat politically motivated) but *all* the records the SEB seeks are *election* records -- and if any state agency is entitled to examine election records, it would be the SEB.

But relevance does not end the inquiry. Petitioners also allege that the subpoenas are unreasonable and oppressive. That is their burden to prove. *Bazemore v. State,* 244 Ga. App. 460, 463 (2000). And here they have, at least preliminarily. Petitioners estimate that total compliance with the subpoenas would cost the County nearly $400,000. Even if Petitioners are off by an order of magnitude, the County should not bear such cost. Pursuant to its broad discretion governing discovery matters (of which this dispute is a species), the Court intends to require Petitioners to comply with the subpoenas but also intends to require the SEB to pay for what it wants. *Georgia Emission Testing Co. v. Reheis*, 268 Ga. App. 560, 564 (2004).

Accordingly, Petitioners are directed to file with the Court no later than 7 January 2026 an itemized cost breakdown for complying with each of the SEB's eighteen[6] requests (assuming such individualized calculations are possible -- if certain requests must be grouped together because the cost to produce them is linked, then there may

---

There was a "judgment" in the form of a 13 June 2024 letter of reprimand from the SEB, but that letter required as part of the resolution of investigation that the SEB, the Secretary of State, and the BRE enter into a memorandum of understanding (MOU) that would place an outside monitor in Fulton to ensure compliance with SEB rules and state law during future elections. No such MOU was ever entered, leaving the matter unresolved (and thus arguably still open). Finally, on a most practical level, there is nothing preventing a majority of the Board from simply opening a *new* investigation or inquiry that would entitle the Board to obtain all the information requested in the contested subpoenas. So, rather than kick this already heavily dented 2020 election records can even farther down the road, it is more efficient -- and consistent with fundamental principles of transparency and public access -- to address the request here and now.

[6] The subpoenas reference twelve paragraphs of requests but a simple count (and recount) reveals that there are in fact eighteen requests. Perhaps everyone needs a counting monitor.

not be a full menu of eighteen different cost line items).  Respondent will then have one week (until 14 January 2026) to file a challenge to the cost estimates; such a challenge will trigger the convening of an evidentiary hearing on costs.  Following that, the SEB will be free to press its demand for some, all, or none of the eighteen items and Petitioners will be obligated to comply upon payment of costs.

SO ORDERED this 22nd day of December 2025.


_____
Judge Robert C.I. McBurney
Superior Court of Fulton County


*Filed and served electronically via eFileGA*