# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ROBERT L. "ROBB" PITTS, Chairman, Fulton County Board of Commissioners, FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS, and FULTON COUNTY, GEORGIA,

     *Petitioners*,

     v.

UNITED STATES OF AMERICA,

     *Respondent*.

No. 1:26-cv-00809-JPB

## BRIEF OF *AMICI CURIAE* ELECTION EXPERTS AND SCHOLARS

Eliyahu E. Wolfe
GA Bar No. 776278
WOLFE LAW, LLC
1201 W. Peachtree Street
Suite 2300
Atlanta, GA 30309
Tel: (404) 963-0013
Fax: (404) 963-0023
ewolfe@wolfe.law

Dax Goldstein*
STATES UNITED DEMOCRACY CENTER
95 Third Street, 2nd Floor
San Francisco, CA 94103
Tel: (202) 999-9305
dax@statesunited.org

Max J. Kober*
STATES UNITED DEMOCRACY CENTER
45 Main Street, Suite 320
Brooklyn, NY 11201
Tel: (202) 999-9305
max@statesunited.org

*Pro Hac Vice Application Forthcoming*

*Counsel for* Amici Curiae *Election Experts and Scholars*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTEREST OF *AMICI CURIAE* AND INTRODUCTION ...................................1

ARGUMENT ......................................................................................................4

I.    Georgia Deployed Robust Election Safeguards in 2020 to Detect Errors or Fraud ..........................................................................................................4

II.   The EOG Report and Amicus Brief Do Not Provide a Reliable Analysis of Fulton County's 2020 Election ..................................................................9

      A.    Preservation of Ballot Images Is Unnecessary to Determine or Verify Results and Was Not Required by State or Federal Law......................9

            1.    Georgia law on ballot images ...................................................10

            2.    Federal law on ballot images....................................................12

      B.    There Is No Evidence of Intentionally Double-Counted Ballots........14

      C.    There Was No Impropriety in Reporting the Recount Results...........16

      D.    The EOG Amicus Fundamentally Misunderstands the Role of Tabulator Tapes ...............................................................................18

      E.    Purportedly Fictitious Ballots "Intentionally" Added to the Hand Count Audit ......................................................................................20

      F.    "Pristine" Ballots Are Not Evidence of Fraud..................................23

CONCLUSION ...............................................................................................25

APPENDIX A .................................................................................................26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Republican Nat'l Comm. v. Eternal Vigilance Action, Inc.*,
   321 Ga. 771 (2025) ...................................................................................13

**Statutes**

*Federal*

52 U.S.C. § 20701 ...............................................................................9, 12, 13

*State*

O.C.G.A. § 21-2-220.1 .................................................................................7

O.C.G.A. § 21-2-381 ....................................................................................7

O.C.G.A. § 21-2-386 ....................................................................................7

O.C.G.A. § 21-2-417 ....................................................................................7

O.C.G.A. § 21-2-483 ..................................................................................18

O.C.G.A. § 21-2-493 ....................................................................................8

O.C.G.A. § 21-2-500 ..........................................................................5, 10, 11

O.C.G.A. § 50-18-71 .............................................................................10, 12

**Rules**

Ga. Comp. R. & Regs. R. 183-1-6-.06 .........................................................7

Ga. Comp. R. & Regs. R. 183-1-12-.01 ........................................................5

Ga. Comp. R. & Regs. R. 183-1-12-.02 (repealed Feb. 12, 2020)........................12

Ga. Comp. R. & Rules R. 183-1-12-.12 ......................................................19

Ga. Comp. R. & Rules R. 183-1-12-.13 ............................................10, 11, 12

Ga. Comp. R. & Regs. R. 183-1-14-.12 ........................................................8

Ga. Comp. R. & Rules R. 183-1-14-.14 ........................................................8

**Other Authorities**                                                                    **Page(s)**

Carter Ctr., *The Georgia Risk-Limiting Audit/Hand Tally: A Carter Center
    Observation Report* (Nov. 2020) ...............................................................16

Ga. Sec'y of State, *Historic First Statewide Audit of Paper Ballots Upholds
    Result of Presidential Race* (Nov. 19, 2020) ...............................................5, 6

Ga. Sec'y of State, *List of Voters Voted in Nov. 2020* .......................................9, 23

Ga. Sec'y of State, *Recount Ballots Cast by County Compared to
    ENet Credit* ..................................................................................................8, 24

Ga. Sec'y of State, *Report of Investigation SEB2020-203:
    Fulton County Tabulation & Audit Issues* (Apr. 24, 2023) .........................22

Ga. Sec'y of State, *Report of Investigation SEB2021-181:
    Fulton County Data Review* (Mar. 4, 2022)................................................22

Ga. Sec'y of State, *Report of Investigation SEB2023-025:
    Fulton County Tabulator Results 2020* 8 (Apr. 9, 2024)......................passim

Ga. Sec'y of State, *Secretary of State Certifies Election, Kraken Case
    Dismissed* (Dec. 7, 2020) ..............................................................................6

Ga. Sec'y of State, *The Poll Worker Manual* (updated Apr. 2020) .....................5, 7

Laura Hinkle et al., *Implications of Making Ballot Images and Cast Vote
    Records Public* (Bipartisan Policy Ctr. Aug. 2023)....................................14

Mark Lindeman & Philip B. Stark, *A Gentle Introduction to Risk-Limiting
    Audits*, 10 IEEE Sec. & Priv. 42 (Sept./Oct. 2012).....................................20

Ryan Germany, Justin Grimmer & Stephen Richer, *Report on the "Election
    Oversight Group" Allegations About the 2020 Election in Fulton
    County, Georgia* (States United Democracy Ctr. Apr. 8, 2026).................1, 2

Seven Hills Strategies, *State Election Board Report, Post-Election
    Executive Summary* (Jan. 12, 2021).............................................................15

States United Democracy Ctr. & The Elections Grp., *The Reality of Full
    Hand Counts: A Guide for Election Officials* (Feb. 6, 2024) .................21, 22

Tr., *In re State Elec. Bd. Meeting* (Ga. Sec'y of State May 7, 2024)......................14

**INTEREST OF *AMICI CURIAE* AND INTRODUCTION**

*Amici curiae* are scholars and election experts dedicated to ensuring accuracy in public discussions of elections, including the 2020 U.S. General Election. In April 2026, *amici* authored a report analyzing claims that the "Election Oversight Group" (EOG) made in its report entitled *Fulton County: Report of Investigation of the 2020 General Election*[1] (the "EOG Report"). *See generally* Ryan Germany, Justin Grimmer & Stephen Richer, *Report on the "Election Oversight Group" Allegations About the 2020 Election in Fulton County, Georgia* (States United Democracy Ctr. Apr. 8, 2026).[2] Individuals associated with EOG have also submitted an amicus brief to this Court—in their words, "both to vindicate their work" in connection with the EOG Report "and to ensure the Court is not misled by inaccurate statements of fact or law." Br. of Amici Curiae in Supp. of Probable Cause Aff. and in Opp. to Am. Pet. at 3 (Doc. 79) (the "EOG Amicus"). *Amici* submit this brief to inform this Court of the flaws in the EOG Report and the EOG Amicus (collectively, the "EOG Report and Amicus").

The EOG Report, published on January 6, 2026, sets out 26 "counts" that purport to establish fraud, or the likelihood of fraud, in Fulton County's 2020

---

[1] https://www.scribd.com/document/989542479/Report-of-Investigation-Fulton-2020.
[2] https://statesunited.org/wp-content/uploads/2026/04/SUDC-Fulton-County-Report.pdf.

general election. Some of the allegations in the EOG Report form the core of the affidavit supporting the search warrant for the FBI's raid on the Fulton County Elections Hub on January 28, 2026. *Compare, e.g.*, EOG Report at 10-13, *with* Affidavit of Special Agent Hugh Evans at 7 (Doc. 22-1). But, as we establish, the EOG Report is not a credible post-election analysis and is, itself, deeply inaccurate and misleading. Ryan Germany, Justin Grimmer & Stephen Richer, *Report on the "Election Oversight Group" Allegations* at 4. The EOG Report relies on faulty and inadequate evidence, unsupported claims, meaningless comparisons, omissions and misreadings of primary sources, misunderstandings of election laws, and disregard for the election safeguards in place in 2020.

The EOG Amicus, in turn, is no better. It regurgitates several of the EOG Report's flawed arguments, and adds new ones, in an attempt to craft a conspiracy from a collection of misunderstandings, misstatements, and inconsequential irregularities. *See, e.g.*, EOG Amicus at 15 (suggesting a "team" of Georgia officials suppressed investigation of the 2020 election). The attempt fails. None of EOG's positions withstand even superficial scrutiny.

Here, *amici* address the claims set out in the EOG Amicus to assist the Court in its analysis of those claims. We are:

2

**Justin Grimmer**, the Morris M. Doyle Centennial Professor of Public Policy in the Department of Political Science and a Senior Fellow in the Hoover Institution, Stanford University. Professor Grimmer's research develops and applies new statistical tools for the study of American elections. He has published extensively on election administration and has served as an expert witness in election litigation.

**Stephen Richer**, a legal scholar at the Cato Institute, a fellow at the Harvard Kennedy School's Ash Center, and the CEO of consulting firm Republic Affairs.[3] Previously, Mr. Richer was the elected Recorder of Maricopa County, Arizona, the fourth largest county in the United States, where he was responsible for voter registration, early voting administration, and public recordings.

**Ryan Germany**, a partner in the Atlanta office of Gilbert Harrell Sumerford & Martin, P.C., where he leads the Political and Election Law Practice Group. Before entering private practice, Mr. Germany was general counsel to three Georgia secretaries of state—Brian Kemp, Robyn Crittenden, and Brad Raffensperger—where he helped to guide the office through some of the most fiercely contested and heavily litigated elections in the state's history. He regularly advises state and local governments, candidates, political committees, and non-profit organizations on all aspects of election law.

---

[3] Stephen Richer is a Board Member of Democracy Defenders Fund, co-counsel for Petitioners in this matter. Mr. Richer authors this brief solely in his capacity as a friend-of-the-court election expert and does not serve as counsel for any party.

3

## ARGUMENT

### I.    Georgia Deployed Robust Election Safeguards in 2020 to Detect Errors or Fraud

The EOG Report and Amicus are shot through with misstatements and inaccuracies, but both also suffer from one pervasive error: The failure to acknowledge the safeguards in place during Fulton County's 2020 general election. Those safeguards protect against the very types of fraud the EOG Report and Amicus attempt to suggest. The EOG Report and Amicus's failures to address these safeguards results in a set of inaccurate and unreliable conclusions about the consequences of election events.

In 2020, Georgia employed strong election-safeguard procedures, including registration verification, use of printed and paper ballots, and verification of voters and ballots. These procedures are designed to ensure that errors are caught and the rare attempts to commit fraud are detected. Georgia also employed automatic checks, including risk-limiting audits and reconciliations, designed to detect significant issues in the election—even if no safeguard was known to have failed. Together, these safeguards and checks are designed to ensure that there is no single point of failure in the conduct of the election, and problems in any one process or technology will not affect the election outcome.

Any theory of fraud based on EOG's claims becomes totally implausible against the backdrop of these procedures. Yet both the EOG Report and Amicus largely fail to grapple with them—and where they do, it is to falsely claim that they did not exist. *See, e.g.*, EOG Amicus at 15. We outline these safeguards in detail in our own report, but for purposes of understanding the EOG Amicus, the most salient safeguards are:

*Use of paper ballots*. In 2020, all in-person Georgia voters received a printed, paper ballot displaying the choices they entered into the voting machine. Ga. Sec'y of State, *The Poll Worker Manual* 111-12 (updated Apr. 2020).[4] Poll workers were required to instruct voters to review this paper ballot for accuracy before putting it into the tabulation equipment to be counted. *Id*. at 112-13. Those paper ballots, along with the paper ballots submitted by mail, were securely stored after the election. O.C.G.A. § 21-2-500(a). This ensured the ballots could be, as they were here, hand-counted to ensure the reliability of the machine results. *See* Ga. Sec'y of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race* (Nov. 19, 2020).[5]

---

[4] https://voting.naacpldf.org/media/awupuwrx/2020-poll-guide-ga.pdf.
[5] https://sos.ga.gov/news/historic-first-statewide-audit-paper-ballots-upholds-result-presidential-race.

As discussed in more detail below, the use and preservation of paper ballots fundamentally undercuts EOG's complaints regarding preservation of ballot images and tabulator tapes. Neither ballot images nor tabulator tapes were used to determine election results. Ga. Comp. R. & Regs. R. 183-1-12-.01. They were, at most, a copy or summary of the original records—the paper ballots. See *infra* Parts II.A-B. Those original records are preserved and stored. As a result, it is difficult to understand how tampering with ballot images or tabulator tapes could facilitate, much less be an attractive route for, election fraud. Neither the EOG Report nor the EOG Amicus sheds any further light on this question.

*Full hand count and machine recount.* In 2020, Fulton County conducted both a full hand count of ballots and a candidate-requested machine recount—all observed by observers from both political parties and the public—which confirmed the outcome of the presidential election. Ga. Sec'y of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*; Ga. Sec'y of State, *Secretary of State Certifies Election, Kraken Case Dismissed* (Dec. 7, 2020).[6] These additional counts undercut theories based on irregularities in any single set of election results. For example, EOG alleges that some ballots were double-scanned. But whether or not that is the case, the existence of a full hand

---

[6] https://sos.ga.gov/news/secretary-state-certifies-election-kraken-case-dismissed.

count, which did not rely on scanners at all, plus an additional machine count, shows that any double-scanning did not have an impact on the results. As a result, intentional double-scanning would not be a reliable route to election fraud—prompting the question why anyone would attempt it.

*Voter registration and verification procedures guarding against submission of fraudulent ballots.* In Georgia, most voters are registered through an automatic voter registration process that requires proof of citizenship. *See* Ga. Comp. R. & Regs. R. 183-1-6-.06 (eff. Jan. 4, 2010). And even voters who do not register through this process have to prove their identities; every voter has to be matched against an official database or submit proof of identity before they vote for the first time. O.C.G.A. § 21-2-220.1; Ga. Comp. R. & Regs. R. 183-1-6-.06. Registration information (other than sensitive voter information) is publicly available and heavily used by civic groups, Republican and Democratic political campaigns, and election officials to reach voters—and none have identified any reason to believe that there was a large number of fake registrations in Georgia or Fulton County in 2020.

Further, Georgia subjected every in-person voter to an identification check and an additional check to ensure no absentee ballot had already been submitted on the voter's behalf. O.C.G.A. § 21-2-386(a); O.C.G.A. § 21-2-417(a); Ga. Sec'y of State, *The Poll Worker Manual* at 107, 111. Mail absentee voters, in turn, were

7

required to apply for absentee ballots; the signatures on these applications were checked, and the addresses to which ballots could be sent were restricted. O.C.G.A. § 21-2-381(a)(1)(C)-(D); O.C.G.A. § 21-2-386(a)(1)(B) (eff. until July 1, 2021). Returned mail ballots also required the voter's signature, which was checked to ensure the ballot was submitted by the registered voter—and not someone else. Ga. Comp. R. & Regs. R. 183-1-14-.12(1).

In addition to these security measures, any registered voter appearing to vote would be told if there had already been a ballot submitted in their name, and the record of who votes in an election is public. That data is made available to, and regularly used by, political campaigns and researchers. Together, these processes guard against the injection of fraudulent ballots at the point of voting by making submission of ballots under fraudulent registrations extremely difficult, and very unlikely at scale.

*Reconciliation processes.* There are also important safeguards against fraudulent ballots after voting is complete: For example, the number of verified voters who submitted a ballot was reconciled against the number of ballots counted. O.C.G.A. § 21-2-493(b); Ga. Comp. R. & Rules R. 183-1-14-.14(3); Ga. Sec'y of State, *Recount Ballots Cast by County Compared to ENet Credit*[7]

---

[7] https://statesunited.org/wp-content/uploads/2026/04/Recount-Ballots-Cast-by-County-Compared-to-ENet-Credit-112021.xlsx.

8

(reconciling the number of ballots cast in 2020 with the number of voters credited for voting); *see also* Ga. Sec'y of State, *List of Voters Voted in Nov. 2020*.[8] This reconciliation process helps ensure that there are no significant differences between the number of ballots counted and the number of verified voters in the election. Reconciliation, along with other processes, guards against the injection of fraudulent ballots during the canvass. The EOG Report and Amicus assert that such reconciliation did not occur, which is simply false. *See* EOG Report at 141; EOG Amicus at 15.

## II.    The EOG Report and Amicus Brief Do Not Provide a Reliable Analysis of Fulton County's 2020 Election

### A.    Preservation of Ballot Images Is Unnecessary to Determine or Verify Results and Was Not Required by State or Federal Law

The EOG Report and Amicus claim that "missing" ballot images are violations of state and federal law that cast doubt on the results of the 2020 election in Fulton County, alleging that Georgia law required preservation of ballot images in 2020 and that so-called destruction of ballot images is a violation of federal law, 52 U.S.C. § 20701. *See* EOG Report at 10; EOG Amicus at 3-7.

The EOG Report and Amicus are wrong on all counts. Ballot images from Fulton County are not "missing"; they simply were not preserved, because neither

---

[8] https://statesunited.org/wp-content/uploads/2026/04/List-of-Voters-Voted-in-Nov-2020-Copy.csv.zip.

federal nor state law required preservation and preserving ballot images is difficult and time-consuming for under-resourced elections offices. Nor is the absence of ballot images consequential. Ballot images are simply copies of the original paper ballots, which the county did preserve. The ballot images have no impact on the results or the county's ability to verify results.

### 1.      Georgia law on ballot images

The EOG Report and Amicus misinterpret Georgia law. In 2020, Georgia election superintendents were not obligated to preserve ballot images. Ga. Sec'y of State, *Report of Investigation SEB2023-025: Fulton County Tabulator Results 2020* 8 (Apr. 9, 2024)[9] (finding that "the preservation of ballot images was not required by law in 2020"). At that time, Georgia statutes required preservation of some election materials, but ballot images were not among them. *See* O.C.G.A. § 21-2-500. While Georgia law now requires preservation of these materials for public records purposes, this law did not apply during the 2020 election. O.C.G.A. § 50-18-71(k) (eff. Mar. 25, 2021); Ga. Comp. R. & Rules R. 183-1-12-.13(a)(1) (eff. Oct. 12, 2021).

---

[9] https://www.documentcloud.org/documents/26949175-seb2023-025-roi-redacted. A true and correct copy of this report is attached to the Motion for Leave to File Brief of *Amici Curiae* Election Experts and Scholars as Exhibit 3.

Section 21-2-500 of the Georgia Code sets out the election materials superintendents must deliver to the county clerk for 24 months' preservation after the completion of returns. Section 21-2-500's exhaustive list, which includes, for example, used and void ballots and the stubs of all ballots used, does *not* include ballot images. O.C.G.A. § 21-2-500(a).[10]

Faced with this unambiguous exclusion, the EOG Amicus points to an SEB Rule, Rule 183-1-12-.13, and an SEB member's statements "apply[ing]" that rule in 2024. EOG Amicus at 4-5. But the 2020 version of Rule 183-1-12-.13 merely preserved an earlier requirement titled "Storage of Returns" requiring that, "[a]fter tabulating and consolidating the results," election superintendents must prepare a copy of the ballot images, vote totals, and consolidated returns for delivery to the

---

[10] O.C.G.A. § 21-2-500(a), which has not changed since 2020, requires that county clerks "shall hold" the following materials "under seal, unless otherwise directed by the superior court, for at least 24 months":

> . . . the used and void ballots and the stubs of all ballots used; one copy of the oaths of poll officers; and one copy of each numbered list of voters, tally paper, voting machine paper proof sheet, and return sheet involved in the primary or election . . . [and] copies of the voting machine ballot labels, computer chips containing ballot tabulation programs, copies of computer records of ballot design, and similar items or an electronic record of the program by which votes are to be recorded or tabulated, which is captured prior to the election, and which is stored on some alternative medium such as a CD-ROM or floppy disk simultaneously with the programming of the PROM or other memory storage device.

11

county clerk "in accordance with [Section] 21-2-500." Ga. Comp. R. & Regs. R. 183-1-12-.02(6) (repealed Feb. 12, 2020); Ga. Comp. R. & Regs. R. 183-1-12-.13 (eff. Feb. 12, 2020) (same). Notably, Rule 183-1-12-.13 and its predecessor did not require the materials at issue to be preserved or purport to alter the categories of records subject to *retention* in Section 21-2-500, which did not (and still does not) include ballot images. O.C.G.A. § 21-2-500(a). Instead, the rule governed *delivery* of materials. And no SEB member's after-the-fact "appl[ication]" of the Rule can vary its text.[11]

### 2.    Federal law on ballot images

The EOG Report and Amicus attempt to tie ballot images to potential violations of 52 U.S.C. § 20701, which governs retention and preservation of certain election records. EOG Amicus at 6-7. But Section 20701, like Georgia state law in 2020, imposes no preservation obligation relevant to ballot images. Instead, it requires preservation of "records . . . relating to any application, registration,

---

[11] Indeed, the SEB later promulgated rule changes requiring the preservation of ballot images under Georgia law so they can be made available as public records. Ga. Comp. R. & Regs. R. 183-1-12-.13(a)(1) (eff. Oct. 12, 2021). The SEB's October 2021 amendment creating Rule 183-1-12-.13(a)(1) requires that, going forward, "[t]he election superintendent shall retain copies of all ballot images . . . to ensure the election superintendent's ability to provide public access to ballot images." *Id.* This new requirement is tied to new Georgia law regarding public records requirements, rather than preservation requirements under O.C.G.A. § 21-2-500. *See* O.C.G.A. § 50-18-71(k) (eff. Mar. 25, 2021).

payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Ballot images plainly do not fit this bill; they are an additional electronic image of a ballot, not a record relating to voter registrations, poll taxes, or acts requisite to voting an election. Whether or not a ballot image is produced has nothing to do with whether a voter can register to vote or vote.

Against the statute's plain text, the EOG Amicus asserts a convoluted argument based on purported Dominion Voting Systems software algorithms. But Section 20701 was passed in 1960, long predating Dominion, its associated software, or modern voting systems. And in any case, the statute's plain text dooms this argument: The method by which software used by a voting system vendor operates cannot qualify as an "act requisite to voting in such election," because that software and its operation are not requisite for an individual to vote in Fulton County. Qualified, properly registered individuals are entitled to have their vote counted, regardless of the function or operation of any particular voting system software. *See Republican Nat'l Comm. v. Eternal Vigilance Action, Inc.*, 321 Ga. 771, 784 (2025) ("The right to vote is fundamental; it is necessary to preserve our republic and our liberty.").

Stepping back, it is not surprising that ballot image retention is not required by federal law and was not required under Georgia law until recently. As experts have noted, preserving ballot images is both time-consuming and requires "a

13

baseline level of operation" for local election offices, reflecting significant trade-offs in a "chronically under-resourced" area. Laura Hinkle et al., *Implications of Making Ballot Images and Cast Vote Records Public* 7-8 (Bipartisan Policy Ctr. Aug. 2023)[12] (noting that "[a]ctivating the image capture capability of tabulators can slow tabulation, affecting both the efficiency of in-person voting sites and the speed of unofficial results reporting"). Georgia law during the 2020 election aligned with the laws of many states. *Id.* at 5. Given that Fulton County, like most jurisdictions, retains better evidence of the votes—the paper ballots—retention of ballot images is not necessary to election verification or security.

**B.       There Is No Evidence of Intentionally Double-Counted Ballots**

The EOG Report and Amicus assert "intentional" tampering with the results of the election in Fulton County through double-scanning of ballots, based on their comparisons of ballot images. EOG Report at 193; EOG Amicus at 7-8 & n.8 (citing the EOG Report). There is no evidence that there was any intentional double-scanning of ballots, much less intentional double-counting, and there is no reason to doubt the conclusions of the Secretary of State's investigation into this claim. Ga. Sec'y of State, *Report of Investigation SEB2023-025* at 4-5; *see also* Tr.

---

[12] https://bipartisanpolicy.org/explainer/implications-of-making-ballot-images-and-cast-vote-records-public.

14

at 217, *In re State Elec. Bd. Meeting* (Ga. Sec'y of State May 7, 2024)[13] (declining to refer investigation SEB2023-025 to the Georgia Attorney General for prosecution).

The Secretary of State's investigation and conclusions regarding these allegations are set out in its report of investigation SEB2023-025. Ga. Sec'y of State, *Report of Investigation SEB2023-025* at 4-5. That report reflects that the Secretary "sent three (3) investigators to the Fulton County Elections Office to conduct an independent review of the batches of ballot images identified by Complainants." *Id.* at 4. The investigators found that Fulton County did double-scan some of the paper ballots, but that this resulted not from intentional misconduct, but from human error and poor process design. *Id.* at 5 ("[Fulton County] had one person assigned per scanner, and that person was responsible for scanning the batches, and after scanning each batch, placing the scanned batch into a box marked completed batches.").

The findings of the investigators are consistent with the conclusions of the State Election Board's court-appointed monitor who was present throughout Fulton County's administration of the election, as well as the findings of a team of independent observers. Seven Hills Strategies, *State Election Board Report, Post-*

---

[13] https://sos.ga.gov/sites/default/files/forms/24-05.07.2024%20SEB%20final%20312.pdf.

*Election Executive Summary* 1 (Jan. 12, 2021);[14] Carter Ctr., *The Georgia Risk-Limiting Audit/Hand Tally: A Carter Center Observation Report* 33 (Nov. 2020).[15] The EOG Report and Amicus ignore the conclusions in both of those reports. They also ignore the ultimate conclusion of investigation SEB2023-025: "These investigative findings do not affect the accuracy of the results of the 2020 General Election in Fulton County, which were confirmed as accurate by both the RLA and the Recount." Ga. Sec'y of State, *Report of Investigation SEB2023-025* at 10. There is nothing in the EOG Report or Amicus that undercuts the conclusion of these investigations or suggests "intentional" double scanning.

### C.  There Was No Impropriety in Reporting the Recount Results

The EOG Amicus squarely raises a claim that the Report only gestures at: that Fulton County's December 2, 2020 reporting of the recount results was "initially 17,243 ballots short" of the Election Day total, but on December 3 "the shortfall was found." EOG Amicus at 8. The implication appears to be that Fulton County manipulated the results. But the EOG Amicus's evidence does not support even the claim that Fulton County's official recount results were 17,243 ballots short, much less the implication of intentional wrongdoing.

---

[14] https://documentcloud.org/documents/20484973-fulton-county-state-election-board-report.

[15] https://cartercentee50c07c05.blob.core.windows.net/blobcartercentee50c07c05/wp-content/uploads/2021/04/georgia-audit-final-report-033121.pdf.

16

The EOG Amicus appears to treat a December 3, 2020 email attaching a "Batches Loaded Report" (BLR), paired with ancillary statements that the recount was completed on December 2, as evidence that the BLR reflected the recount's final results. EOG Amicus at 9. But the BLR and these statements provide no reason to doubt the Secretary of State's investigators on this claim. Ga. Sec'y of State, *Report of Investigation 2023-025* at 6-7. Those investigators concluded that the vote totals in the BLR cited by the EOG Amicus as "reported" by Fulton County were, in fact, running totals of still-ongoing tabulation that did not constitute official results. *Id.* at 6. Indeed, BLRs represent the running tally of votes and are not the format used by the voting system to generate results that are reported to the Secretary of State. *Id.* Official results are reported in a different form, called results tally reporting (RTR). *Id.* It was only on December 3 that Fulton County first uploaded RTR results for the recount, as reflected in exhibits filed with the Secretary of State. *Id.* at 6-7.

To shore up its claim, the EOG Amicus points to ancillary statements regarding when the recount was completed that do not directly bear upon, much less vary, these underlying facts. EOG Amicus at 9-10. The relevant question is whether the BLR at issue reflected official recount results. Statements about when the recount was completed do not affirm that the BLR at issue reflected the results of the recount, nor do they call into question the investigators' determination both

that "[t]here is no record of the Respondent submitting official results to the SOS

on December 2," and that Fulton County provided adequate documentation for its

accurate, official recount results. Ga. Sec'y of State, *Report of Investigation*

*SEB2023-025* at 10.

> **D.      The EOG Amicus Fundamentally Misunderstands the Role of Tabulator Tapes**

The EOG Report and Amicus assert that "tabulator tapes are statutorily

defined and required by law" and that alleged tabulator-tape improprieties in 2020

call the "official returns" into question. EOG Amicus at 11; EOG Report at 51. The

only evidence the EOG Report cites for this claim is a series of accounts of

tabulators from the first ballot count and purported discrepancies between the serial

numbers and tabulator ID numbers on tabulator tapes. *Id.* at 51-53.

This claim exemplifies the extent to which its authors fundamentally

misunderstand the purpose of the tabulator tapes. The EOG Amicus claims that

"Georgia law . . . defines tabulator closing tapes as '*the official returns*.'" EOG

Amicus at 12 (emphasis in original) (citing O.C.G.A. § 21-2-483(h)). This is a

misstatement of law. Section 21-2-483 does not define tabulator tapes as the

official returns; it provides that "the official returns of the votes cast on ballots at

each polling place shall be printed by the tabulating machine." O.C.G.A. § 21-2-

18

483(h). In other words, tabulator tapes are print-outs reflecting returns; they are not the returns themselves.

The EOG Amicus treats the term "official returns" as a talisman that disposes of the issue. But, even if it were correct that the statute somehow defines the tabulator tapes as "official returns," the language does not convert tabulator tapes into something that, under Georgia law, they are not. It does not change the fact that tabulator tapes are an additional record of votes tabulated, not an authoritative record of the ballots cast in the election. For the authoritative record, election officials have both the actual ballots and the cast vote records. *See* Ga. Comp. R. & Rules R. 183-1-12-.12(b)(7). Once the ballots and CVRs are consulted, the tabulator tapes are merely another backup. Thus, the discrepancies in serial numbers and tabulator ID numbers the EOG Report identifies, even if accurate, would not facilitate fraud—and certainly could not suggest the votes reflected in these tapes are "illegitimate." Instead, if true, they are likely due to an administrative error.

At base, neither the EOG Report nor the EOG Amicus proposes any theory of how manipulating tabulator tapes would be an effective method for committing election fraud, given that the physical ballots would be inspected in a risk-limiting audit and the physical ballots would be used again in a recount. There is no reason

19

to doubt that the discrepancies the EOG Amicus raises are, at most, a clerical error with no consequence for the election results.

**E.    Purportedly Fictitious Ballots "Intentionally" Added to the Hand Count Audit**

The EOG Report and Amicus claim that Fulton County added roughly 6,700 "fictitious absentee ballots and votes for the presidential contest," during the hand count risk-liming audit, and that the addition "was not the product of data entry error," but that batch tally sheets produced during the risk-limiting audit were "intentionally falsified." EOG Amicus at 12-13; EOG Report at 157.

But neither the EOG Report nor the EOG Amicus provides any evidence, or even any plausible theory, of fraud or intentional behavior. Further, they fail to explain, even on a basic level, what facet of a conspiracy to steal the election would be advanced by adding ballots to the hand count risk-limiting audit that does not reflect the official results of the election. Neither the Report nor the Amicus offers any rationale for ballots being added or misrepresented in a risk-limiting audit, given that the ballots were going to be recounted after the audit. Nor do they explain how adding ballots in a risk-limiting audit could change the outcome of the election, given that a risk-limiting audit is performed for comparison and validation purposes.

The EOG Report and Amicus also fail to recognize the limitations of humans, and the fact that mistakes are common during hand counts such as the one conducted during the risk-limiting audit. *See generally* States United Democracy Ctr. & The Elections Grp., *The Reality of Full Hand Counts: A Guide for Election Officials* (Feb. 6, 2024).[16] As a result, risk-limiting audits using hand counts are neither intended to confirm a winner, nor produce results that are mathematically identical to the original count. A risk-limiting audit is a method to ensure that at the end of the canvass, "the hardware, software, and procedures used to tally votes . . . found the real winners. Risk-limiting audits don't guarantee that the electoral outcome is right, but they have a large chance of correcting the outcome if it's wrong." Mark Lindeman & Philip B. Stark, *A Gentle Introduction to Risk-Limiting Audits*, 10 IEEE Sec. & Priv. 42, 42 (Sept./Oct. 2012).[17] That is what this risk-limiting audit did. But election experts are well aware that minor errors, like data-entry errors, can occur in a risk-limiting audit—that is why they are designed to confirm a winner and not for mathematical certainty in results. States United Democracy Ctr. & The Elections Grp., *The Reality of Full Hand Counts* at 27-29.

---

[16] https://statesunited.org/wp-content/uploads/2023/11/The-Reality-of-Full-Hand-Counts.pdf.

[17] https://www.nist.gov/system/files/documents/2025/03/31/A_Gentle_Introduction_to_Risk-Limiting_Audits.pdf.

As a result, the EOG Report's and Amicus's conclusions that errors must indicate fraud is especially weak.

The EOG Report and Amicus assert that the errors in the audit must have been intentional, because the wrong numbers were entered into the batch tally sheets. EOG Report at 167; EOG Amicus at 13. But neither actually explains this conclusion; the EOG Report asserts that because the errors were made at this point in the process, rather than when data was entered into a computer, they cannot have been anything but intentional misrepresentations. EOG Report at 162. But the EOG Report never explains why data-entry errors could not have been made on the batch tally sheets—and, indeed, it is easy to see how human error could occur in the process of recording the tally for a batch of ballots. States United Democracy Ctr. & The Elections Grp., *The Reality of Full Hand Counts* at 27-29.

In short, the EOG Report and Amicus provide no reason to doubt the Secretary of State investigators' conclusion that there were errors in the risk-limiting audit, but those errors were expected in a hand tally at that scale and did not affect the audit's result. Ga. Sec'y of State, *Report of Investigation SEB2021-181: Fulton County Data Review* 14-17 (Mar. 4, 2022).[18]

---

[18] https://www.documentcloud.org/documents/26949174-seb2021-181-roi-redacted.

### F.    "Pristine" Ballots Are Not Evidence of Fraud

The EOG Amicus repeats the claim that Fulton County counted absentee ballots that were "pristine"—*i.e.*, uncreased, and thus purportedly suspect—by pointing to witness statements and noting that "Fulton County did have [1,058,910] 'extra ballots sitting around.'" EOG Amicus at 14-15; *see also* EOG Report at 22-32. In response to a previous incarnation of this allegation, Georgia investigators interviewed the complainants, inspected the specific boxes and batches complainants identified, and examined roughly 1,000 absentee ballots and ballot images. Ga. Sec'y of State, *Report of Investigation SEB2020-203: Fulton County Tabulation & Audit Issues* 11-16 (Apr. 24, 2023).[19] They were unable to find ballots matching the witnesses' descriptions or otherwise substantiate the claim that counterfeit ballots were tabulated in Fulton County. *Id.* at 16. As discussed above, there are several safeguards against injection of ballots into the election, including a reconciliation of the number of voters and the number of ballots in the election. See *supra* Part I. But neither the claimants involved in previous "pristine ballot" claims nor the EOG have identified a meaningful discrepancy between the number of voters and the number of ballots. *Cf.* Ga. Sec'y of State, *List of Voters*

---

[19] https://s3.documentcloud.org/documents/26949173/seb2020-203-roi-redacted.pdf.

*Voted in Nov. 2020*[20] (enumerating a statewide numbered list of voters); Ga. Sec'y of State, *Recount Ballots Cast by County Compared to ENet Credit* (reconciling the number of ballots cast in 2020 with the number of voters credited for voting).[21]

The EOG Report's focus on Fulton County's order of extra ballots is also misguided, and it reflects a misunderstanding about how elections are administered. *See* EOG Report at 22; EOG Amicus at 15. The EOG Report concedes that procuring the ballots broke no laws, but nonetheless asserts that it "goes to means, method and opportunity as further detailed in subsequent counts, and is important to consider in overall scope," and "[p]otentially [is] an overt act." EOG Report at 22. Neither the EOG Report nor the EOG Amicus offers any plausible theory as what this "overt act" would have been in service of. The EOG Report fails to articulate anywhere how these ballots are tied to the outcome of the election—leaving these details to the reader to fill in. And to the extent the EOG Report intends to insinuate that there was a scheme to commit election fraud in Fulton County in 2020, it fails to offer any theory as to how these million ballots could have been fraudulently entered into the count without being detected, given the safeguards in place. See *supra* Part I.

---

[20] https://statesunited.org/wp-content/uploads/2026/04/List-of-Voters-Voted-in-Nov-2020-Copy.csv.zip.

[21] https://statesunited.org/wp-content/uploads/2026/04/Recount-Ballots-Cast-by-County-Compared-to-ENet-Credit-112021.xlsx.

## CONCLUSION

*Amici* respectfully submit that the foregoing will contribute to the Court's understanding of the EOG Amicus (Doc. 79) and related issues in this matter.

Respectfully submitted this 24th day of April, 2026.

/s/ Eliyahu E. Wolfe
Eliyahu E. Wolfe
GA Bar No. 776278
WOLFE LAW, LLC
1201 W. Peachtree Street
Suite 2300
Atlanta, GA 30309
Tel: (404) 963-0013
Fax: (404) 963-0023
ewolfe@wolfe.law

Dax Goldstein*
STATES UNITED DEMOCRACY CENTER
95 Third Street, 2nd Floor
San Francisco, CA 94103
Tel: (202) 999-9305
dax@statesunited.org

Max J. Kober*
STATES UNITED DEMOCRACY CENTER
45 Main Street, Suite 320
Brooklyn, NY 11201
Tel: (202) 999-9305
max@statesunited.org

*Pro Hac Vice Application Forthcoming*

*Counsel for* Amici Curiae *Election Experts and Scholars*

25

## APPENDIX A

### List of Amici

**Justin Grimmer** is the Morris M. Doyle Centennial Professor of Public Policy in the Department of Political Science and a Senior Fellow in the Hoover Institution, Stanford University. Professor Grimmer's research develops and applies new statistical tools for the study of American elections. He has published extensively on election administration and has served as an expert witness in election litigation.

**Stephen Richer** is a legal scholar at the Cato Institute, a fellow at the Harvard Kennedy School's Ash Center, and the CEO of consulting firm Republic Affairs.[22] Previously, Mr. Richer was the elected Recorder of Maricopa County, Arizona, the fourth largest county in the United States, where he was responsible for voter registration, early voting administration, and public recordings.

**Ryan Germany** is a partner in the Atlanta office of Gilbert Harrell Sumerford & Martin, P.C., where he leads the Political and Election Law Practice Group. Before entering private practice, Mr. Germany was general counsel to three Georgia secretaries of state—Brian Kemp, Robyn Crittenden, and Brad

---

[22] Stephen Richer is a Board Member of Democracy Defenders Fund, co-counsel for Petitioners in this matter. Mr. Richer authors this brief solely in his capacity as a friend-of-the-court election expert and does not serve as counsel for any party.

Raffensperger—where he helped to guide the office through some of the most fiercely contested and heavily litigated elections in the state's history. He regularly advises state and local governments, candidates, political committees, and non-profit organizations on all aspects of election law.

## LOCAL RULE 7.1(D) CERTIFICATE OF COMPLIANCE

I certify that this **BRIEF OF *AMICI CURIAE* ELECTION EXPERTS AND SCHOLARS** complies with the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this notice was prepared using 14-point Times New Roman font.

This 24th day of April, 2026.

/s/ Eliyahu E. Wolfe
Eliyahu E. Wolfe
Georgia Bar No. 776278

# CERTIFICATE OF SERVICE

I certify that on this date, I served a true and correct copy of this **BRIEF OF**

***AMICI CURIAE* ELECTION EXPERTS AND SCHOLARS** using the Court's

CM/ECF system, which will automatically notify all counsel of record.

This 24th day of April, 2026.

/s/ Eliyahu E. Wolfe
Eliyahu E. Wolfe
Georga Bar No. 776278