

April 21, 2026

Judge Jean-Paul Boulee
Richard B. Russell Federal Building & United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303-3309

**Re: Support for the Election Oversight Group Report on Fulton County's 2020 General Election**

Dear Judge Boulee:

I write in my capacity as Chairman and Co-Founder of Unite4Freedom, and from a professional background that has involved decades of work in mission-critical systems, cybersecurity architecture, cyber forensics, data-integrity controls, election operations and other high-consequence operational environments. I also write as someone who has worked with members of the Election Oversight Group for years and regards them as serious people acting in good faith. For those reasons, I want to state plainly that I support and endorse the Election Oversight Group's January 6, 2026 report concerning Fulton County's 2020 general election.

My endorsement should be understood correctly. I am not representing that I have personally re-performed every factual inquiry in every one of the report's twenty-six counts. I am saying something both narrower and, in my judgment, more important: the EOG report identifies categories of records, controls, reconciliation failures, preservation failures, and auditability defects that no responsible government should casually dismiss when it claims to have certified a lawful, accurate, and independently auditable election, as required by law. In any mission-critical system, whether governmental, financial, or operational, missing authoritative records, broken provenance, incomplete reconciliation, absent authentication artifacts, disputed audit trails, or conflicting explanations are not minor housekeeping issues. They are warning indicators that the system, likely, is unable to prove its own output.

That is also why the EOG report is consistent with Unite4Freedom's independent work analyzing official state election registrations and voter histories, an example of which is attached. U4F's position has been straightforward and public. The government must be able to know who voted and that they were eligible to vote, know that the ballots counted came from voters' hands, know that legitimate ballots were counted accurately, and prove the outcome through legitimate comprehensive audits. Put another way, valid elections require real voters, real votes, real counts, and real proof. Where those things cannot be shown from preserved records and reproducible methods, officials should not ask the public to rely on their assertion that everything is ok, alone.

The EOG report fits that framework. Its subject is not merely one dramatic allegation or one isolated event. It is a cumulative records-and-process report. It raises issues concerning software and testing, absentee controls, signature verification, ballot provenance, chain of custody, tabulator records, missing ballot images, missing SHA authentication files, reconciliation, hand-count irregularities, recount anomalies, and record retention. Whether every count is ultimately sustained in exactly the form EOG presents is not the threshold question. The threshold question is whether the State can



prove the certified result from preserved, auditable, authoritative records. The EOG report argues that Fulton County's records and processes do not satisfy that standard. That is a serious claim, and it requires review.

U4F's own Georgia work points in the same direction. U4F's Georgia scorecards for 2022 and 2024 independently reflect recurring anomalies in voter-roll integrity, votes counted from questionable or unlawful registration conditions, and failures of reconciliation between votes counted and voters credited with voting. Those scorecards are not presented as final adjudications of every cause of every anomaly. They do show, however, that the official records continue to produce conditions that should not exist in an accurate, transparent, and end-to-end auditable election system. When the same kinds of provability problems appear across cycles, they cannot be dismissed as trivial and it directly brings the legitimacy of certification into question.

The governing question, in my view, is simple: what is the authoritative record, and can the government prove the certified result from preserved, auditable records? If the authoritative records are missing, incomplete, contradictory, inconsistently described, or unavailable for meaningful independent review, neither an accusation alone nor an official rebuttal alone resolves the matter. The burden does not properly rest on citizens to reverse-engineer every exploit path before government must explain its own records. It is my unequivocal opinion that an independent and transparent end to end audit must be performed to decide if the Government created the system can even be used. Government controlled the certification process. Government bears the obligation to preserve the records necessary to prove what it certified was correct, instead of demonstrating compliance they continue to summarily dismiss citizen concerns rather than reconciling records.

That is also why I do not regard a risk-limiting audit performed by the same people that executed the election, standing alone, as a complete or appropriate answer to the issues raised here. A risk-limiting audit is an outcome-checking tabulation audit. It can be useful and important. But it does not by itself prove end-to-end legality, voter eligibility, ballot provenance, full chain of custody, complete record retention, or forensic sufficiency of the preserved record set. A recount is likewise not a substitute for a system that can be independently reconstructed and tested after the fact. If core records are missing or disputed, an audit that checks one layer of the system does not necessarily resolve defects in the layers beneath it.

For that reason, I do not find the States United Democracy Center report dispositive. It raises points that deserve consideration, and some of its criticisms of EOG are substantive. But it repeatedly answers a narrower question than the one that matters most. It faults EOG for not presenting a fully coherent, outcome-changing fraud theory. That criticism does not resolve the separate question whether the State can prove certification from preserved authoritative records. It is entirely possible for a citizen investigator to be unable to narrate every mechanism of failure while still correctly identifying that the government's recordkeeping and control structure is insufficient to prove the result it certified. This said, it is the government's obligation to prove their systems work when the data is significantly flawed, which it is.

The SUDC report also uses loaded framing that should not be mistaken for refutation. It describes the EOG allegations as "spurious" and refers to Kevin Moncla as a "known election skeptic" before its substantive analysis is complete. That sort of language may color the reader's view, but it does not answer the record questions EOG raises. I also believe the SUDC report is too dismissive when it



minimizes disputed or missing records on the ground that paper ballots and cast-vote records are the most important evidence of outcome. Even if one accepts that proposition as to final tabulation, it does not follow that missing tabulator records, missing ballot images, missing authentication files, incomplete logs, or broken chain-of-custody materials are irrelevant. In any serious critical-system review, those are exactly the kinds of evidentiary defects that matter.

Readers may also fairly take account of institutional vantage point. The SUDC report presents itself as an independent expert analysis, but one of its authors is a former general counsel to multiple Georgia secretaries of state, including Brad Raffensperger. I do not raise that as a personal criticism. I raise it because readers should understand that the report is not institutionally detached from the election-administration establishment whose work it substantially defends.

None of this means that anyone should accept unsupported accusations. It does mean that the same standard should apply to official defenses and official reassurances. They must be proved. If the State contends that the system worked lawfully and accurately, then it should be able to produce the authoritative record set, explain the record hierarchy, reconcile the ballots, voters, and results, account for disputed or missing records, and permit independent expert replication from the same preserved materials. If it can do that, then the public can evaluate the proof. If it cannot do that, the failure of proof is itself part of the determination.

For these reasons, I support the EOG report as a serious, good-faith, records-based basis for official preservation, production, technical review, and independent replication. I do not endorse the casual dismissal of its concerns. I do not believe Georgia's response to date has legitimately resolved the deeper provability problems raised by the report. In my judgment, any government position that there are not severe and unresolved election-system problems in Georgia is itself evidence of how normalized election misconduct, noncompliance, or evidentiary indifference has become. When a system cannot clearly prove its own certification through preserved, auditable records, that system is not entitled to public trust merely because officials insist that it should be.

I therefore respectfully urge that the EOG report be treated as a serious report of failures that must be explained and that the relevant authorities require production and reconciliation of the controlling records, including the authoritative voter-history and registration extracts, certified results, reconciliation files, chain-of-custody materials, tabulator and poll-tape records, ballot-image inventories and associated authentication artifacts, cast-vote records, adjudication logs, software-version records, and device and audit logs necessary to determine whether the certified result can actually be proved. U4F remains willing to assist responsible officials with technical review, analytical replication, and systems-level explanation of these issues.

Thank you for your consideration.

Respectfully,

**Harry Haury**
Chairman and Co-Founder
Unite4Freedom
HarryHaury@protonmail.com

Enclosures



*"Congress seeks. . . .to guard the election of members of Congress against any possible unfairness by compelling, under its pains and penalties, everyone concerned in holding the election to a strict and scrupulous observance of every duty devolved upon him while so engaged. . . . The evil intent consists in disobedience to the law."* —In re Coy, 127 U.S. 731 (1888)

# Georgia 2024 General Election Validity Scorecard

## ★ 1. Were the voter rolls accurate, as required by the National Voter Registration Act of 1993?

| Registrations with material errors and omissions as per the Civil Rights Acts of 1964 | Number of Instances* | |
|---|---|---|
| Illegal duplicate registrations | 77,326 | |
| Invalid addresses found | 2,132 | |
| Age discrepant registration—over 105 or under 17 | 1,505 | **6.1%** |
| Backdated registrations | 63,533 | REGISTRATION |
| Invalid registration date (99999999 or 5201011) | 58 | ERROR |
| Invalid names | 214 | RATE |
| Sunday registration | 226,269 | |
| January 1 registration | 76,516 | |
| Inactive and no contact for 8+ years | 81,409 | |
| **TOTAL REGISTRATION VIOLATIONS PROHIBITED BY LAW:** | **528,962** | |
| **UNIQUE REGISTRATIONS PROHIBITED BY LAW:** | **503,373** | |

## ★ 2. Were the votes counted from eligible voters, as required by the US Constitution?

| Registrations with material errors and omissions whose votes were counted | Number of Instances* | |
|---|---|---|
| Illegal duplicates | 45,794 | |
| Invalid address | 968 | |
| Age discrepant—over 105 or under 18 | 923 | **5.8%** |
| Backdated registration | 27,245 | VOTE |
| Invalid registration date (99999999 or 5201011) | 32 | ERROR |
| Invalid names | 84 | RATE |
| Sunday registration | 161,725 | |
| January 1 registration | 67,149 | |
| Inactive and no contact for 8+ years | 1,090 | |
| Registration after cutoff date and voted | 18,941 | |
| **TOTAL VOTING VIOLATIONS PROHIBITED BY LAW:** | **323,951** | |
| **UNIQUE VOTES PROHIBITED BY LAW:** | **308,258** | |

## ★ 3. Was the number of votes counted equal to the number of voters who voted?

| Official Source | Reported Total by Official Source |
|---|---|
| GA SOS Official Results of 2024 GE certification (January 30, 2025) | 5,297,264 |
| GA SWVRD raw data, official federal document (November 14, 2024) | 5,306,420 |
| **DIFFERENCE (LESS votes counted than voters who voted):** | **−9,156** |

## ★ 4. Was the number of ballots in error valid according to the Help America Vote Act of 2002?

| | |
|---|---|
| Total ballots counted in error in the 2024 GE | 308,258 |
| Allowable machine error rate is 1/10,000,000 ballot positions or 1/125,000 ballots | 43 |
| **Total excess ballots counted in error: Provable accuracy fails to meet any protective legal standard** | **308,215** |

## ★ TOTAL ELECTION ERRORS (Sections 2+3) . . . . . . . . . . . . . . . . . . . . . . 317,414    6.0% TOTAL ELECTION ERROR RATE

*Voter rolls as published on the Georgia SOS on January 30, 2025.
**Voter history file for 2024 as downloaded from the Georgia SOS website on November 14, 2024.

Unite4Freedom.com    ★    info@Unite4Freedom.com

© Unite4Freedom

12152025



# Georgia's 2022 General Election Validity Scorecard

## ⭐ 1. Were the voter rolls accurate, as required by the National Voter Registration Act of 1993?

| Ineligible or Uncertain Registration Type | Number of Instances* |
|---|---:|
| Illegal duplicate registrations | 77,190 |
| Invalid addresses found | 61,251 |
| Age discrepant registration—over 105 or under 17 | 849 |
| Backdated registrations | 28,335 |
| Invalid registration date (99999999 or 5201011) | 47 |
| Invalid names | 205 |
| Sunday registration | 201,195 |
| January 1 registration | 82,763 |
| Inactive and no contact for 8+ years | 92,024 |
| **TOTAL APPARENT REGISTRATION VIOLATIONS:** | **543,859** |

## ⭐ 2. Were the votes counted from eligible voters, as required by the US Constitution?

| Ineligible or Uncertain Registration Type that Voted in 2022 GE | Votes cast in 2022 GE** |
|---|---:|
| Illegal duplicates | 36,327 |
| Invalid address | 11,269 |
| Age discrepant – over 105 or under 18 | 540 |
| Backdated registration | 7,305 |
| Invalid registration date (99999999 or 5201011) | 20 |
| Invalid names | 58 |
| Sunday registration | 110,729 |
| January 1 registration | 71,057 |
| Inactive and no contact for 8+ years | 181 |
| Registration after cutoff date (10/10/2022) and voted | 14,399 |
| **TOTAL APPARENT VOTING VIOLATIONS:** | **251,885** |
| **UNIQUE VOTES IMPACTED BY APPARENT VOTING VIOLATIONS:** | **239,178** |

## ⭐ 3. Was the number of votes counted equal to the number of voters who voted?

| Official Source | Reported Total by Official Source |
|---|---:|
| GA SOS Official Results of 2022 GE certification  (January 8, 2023) | Votes counted: 3,924,926 |
| GA SWVRD raw data, official federal document (January 9, 2023) | Voters who voted: 3,959,230 |
| **DIFFERENCE (fewer votes counted than voters who voted):** | **34,304** |

## ⭐ 4. Was the number of ballots in error valid according to the Help America Vote Act of 2002?

| | |
|---|---:|
| Apparent voting violations in the 2022 GE according to NV SWVRD raw data | 239,178 |
| Allowable machine error rate is 1/10,000,000 ballot positions or 1/125,000 ballots | 32 |
| **Unresolved vote errors: Provable accuracy fails to meet any protective legal standard** | **239,146** |

*"Congress seeks. . . .to guard the election of members of Congress against any possible unfairness by compelling, under its pains and penalties, everyone concerned in holding the election to a strict and scrupulous observance of every duty devolved upon him while so engaged. . . . The evil intent consists in disobedience to the law." —In re Coy, 127 U.S. 731 (1888)*

*Voter rolls of 11/23/2022 as purchased from the Georgia SOS.*
*Voter history file for 2022 as downloaded from the Georgia SOS website.*

Unite4Freedom.com   ★   info@Unite4Freedom.com

© Unite4Freedom

11092025

Align top of FedEx® shipping label here.

ORIGIN ID:SUSA  (314) 359-5828
CONSTANCE KRAMER

572 STRATFORD AVE

SAINT LOUIS, MO 63130
UNITED STATES US

SHIP DATE: 21APR26
ACTWGT: 0.10 LB
CAD: 6571887/ROSA2710

TO  JUDGE JEAN—PAUL BOULEE
UNITED STATES COURTHOUSE
75 TED TURNER DRIVE SOUTHWEST
RICHARD B. RUSSELL FEDERAL BUILDING
ATLANTA GA 30303
(311) 111—1111          REF:
INU:
PO:                                    DEPT:



FedEx
Express

E

TRK# 8709 1957 6960
0201

THU — 23 APR 5:00P
** 2DAY **

SP QFEA

30303
GA—US   ATL



